## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Alpha Latam Management, LLC, *et al.*,[1] | Case No. 21-[_____] ( ) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF JOHN R. CASTELLANO IN SUPPORT OF
## DEBTORS' PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, John R. Castellano, declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I am a Managing Director with AlixPartners, LLP ("**AlixPartners**") and a restructuring advisor for debtor Alpha Latam Management, LLC, a Delaware limited liability company ("**ALM**") and its debtor affiliates (together with ALM, the "**Debtors**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").[2]

2.     I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called as a witness I would testify competently to the facts set forth in this First Day Declaration.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Alpha Latam Management, LLC (4610); Acsa Atentofexhib S.A.S. (766-6); Alpha Capital S.A.S. (717-5); AlphaCredit Latam S.A.S. (326-5); AlphaCredit Sudamérica, S. de R.L. (72 87); AlphaDebit, S.A. de C.V. (3FI4); and Vive Créditos Kusida S.A.S. (013-4). Alpha Latam Management, LLC's registered address is 1209 N Orange Street, Wilmington, DE 19801. The main address of the other Debtors is Carrera 14 No. 94 – 81, Bogotá, Colombia.

[2]     Certain affiliates of the Debtors have not sought chapter 11 protection and are not Debtors in these Chapter 11 Cases. They include, without limitation, Mexican affiliates Alpha Holding, S.A. de C.V. and AlphaCredit Capital, S.A. de C.V., SOFOM, E.N.R.

3.      This First Day Declaration is divided into five parts.  Part I provides background information about myself.  Part II is an introduction regarding these Chapter 11 Cases.  Part III provides background information about the Debtors, their business operations, and their corporate and capital structures.  Part IV describes the circumstances leading to the commencement of the Chapter 11 Cases.  Part V affirms the facts that support the "first-day" relief requested in the various motions filed contemporaneously herewith (the "**First Day Motions**").

## I.      Background of Declarant

4.      I am a Managing Director with AlixPartners, the Debtors' proposed restructuring advisor.  In my role as a restructuring advisor, I provide a variety of consulting and advisory services to the Debtors including working with management, the ALM Board, and the Debtors' other advisors to design and implement a restructuring strategy.

5.      AlixPartners specializes in designing and implementing business turnarounds, assisting companies with the administration of the bankruptcy process, and providing interim crisis management, among other things.  AlixPartners provides these services for companies throughout the financial services industries and has an intimate understanding of the economic, regulatory, operational, strategic, and financial factors that drive these businesses.  AlixPartners' prior experience includes a range of activities and services targeted at restructuring, stabilizing, and improving a company's financial position.  These services have historically included: (a) providing executive leadership to financially distressed companies; (b) developing or validating forecasts, business plans, and related assessments of a business's strategic position; (c) monitoring and managing cash, cash flow, and supplier relationships; (d) assessing and recommending cost reduction strategies; and (e) designing and negotiating financial restructuring packages.

2

6.      I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Strategy from the Kellogg School of Management at Northwestern University.  I have nearly 30 years of industry experience, with areas of expertise in business plan development, contingency planning, and creditor negotiations.  In addition, I have over 25 years of financial restructuring and bankruptcy experience and over 23 years of experience with AlixPartners.  I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007.  Prior to joining AlixPartners, I worked at Ernst & Young LLP in their Assurance practice as an auditor, and in their Consulting practice focusing on restructuring advisory services, and I was a plant controller and manager of financial, planning and analysis for Sweetheart Cup Company in Chicago.

7.      As a result of my role and experience with the Company, my review of relevant documents, and my discussions with members of the Debtors' management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein.  Except as otherwise stated, all facts set forth in this First Day Declaration are based on my personal knowledge, my discussions with members of the Debtors' senior management and advisors, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this First Day Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case, under my supervision, at my direction, and for my use in preparing this First Day Declaration.

## II.    Introduction

8.    The Debtors, together with their Mexican non-Debtor affiliates (the "**Mexican Affiliates**") and certain other affiliated non-Debtors (collectively, the "**Company**," and all such affiliates that are not Debtors are referred to herein as "**Non-Debtors**"), operate a specialty finance business that offers consumer and small business lending services to underserved communities in Mexico and Colombia.  In connection with an internal accounting review,[3] the Company identified certain accounting errors with respect to the Mexican segment of its business, and on March 13, 2021, formally presented a preliminary report of such accounting errors to the board of managers of ALM (the "**ALM Board**").  As a result, a special committee, comprised of non-management members of the ALM Board (the "**Special Committee**"), was formed and hired independent counsel to provide advice in connection with the investigation of the accounting errors.  The Special Committee's legal counsel retained a forensic accounting firm to assist legal counsel in providing advice to the Special Committee.  The Special Committee is chaired by the Board's independent manager.  The Company also hired restructuring advisors, including AlixPartners and Rothschild & Company, to analyze the Company's liquidity position and cash flow projections, assist with lender negotiations, and develop options for a potential restructuring.

9.    On April 20, 2021, the Company publicly announced errors in the Company's accounting for its derivative positions and the need to restate its financial statements for the years ending 2018 and 2019.  The Company also disclosed additional accounting errors relating to the Company's: (i) allowance for loan losses; (ii) reserves for certain accounts receivables; and (iii) amortization of certain capitalized expenses.  Shortly after the Company's announcement, certain

---

[3]    The internal accounting review is further discussed in Section III.E.i.

creditors sent notices of default to the Company for, among other things, failure to accurately report financial statements.  Though the Company and its advisors tried to negotiate forbearance and waivers with these creditors, these efforts proved unsuccessful. As a result, the Company was unable to continue raising capital to continue to originate new Alpha Loans (as defined below).

10.     The Company's advisors also began analyzing the Company's liquidity position. As part of that process, the Company determined that due to several factors, including the variability in loan collections, it needed to preserve cash.  As a consequence, the Company, based on advice from its advisors and with a view toward maximizing value in the best interests of the Company and all relevant stakeholders, determined that the Company would cease making any new loan originations and would elect to exercise the grace period under the Senior Notes (as defined below) by not making the June 19, 2021 interest payment.

11.     Starting in May 2021, with Rothschild's assistance, the Company began to market the Company's unencumbered Colombian loan portfolio (the "**Colombian Assets**") in an effort to bolster its cash position.  As the Company's liquidity position tightened, and negotiations with key stakeholders progressed, it became evident that the best path for a restructuring of the Company was a sale of substantially all of the Debtors' Colombian Assets pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").  To that end, the Company began preparing for the commencement of these Chapter 11 Cases in parallel with negotiating a stalking horse bid and soliciting a $45 million debtor-in-possession financing ("**DIP Financing**") to provide the bridge necessary for the Debtors to effectuate a sale of the Colombian Assets.

12.     On August 1, 2021 (the "**Petition Date**"), the Debtors each filed voluntarily petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**") under chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11

Cases.  To ease their transition as debtors in possession, the Debtors subsequently filed the First Day Motions.  I submit this declaration to: (i) offer the Court and parties in interest a background on the Company and the circumstances leading to the commencement of the Chapter 11 Cases; and (ii) provide evidence for the relief requested in the First Day Motions.

### III.    Discussion

#### A.  History and Business Overview

13.    The Company was founded in 2011 with the mission of improving the quality of life of individuals in the low-income segment of the population and promoting the growth of small and midsize enterprises ("**SMEs**") in Mexico by offering these populations greater access to credit. The Company began its consumer lending operations by providing loans with repayment via payroll deduction, or "**PDLs**," to federal and state government employees in Mexico and, over the next ten years, grew into a leading financial technology company.  In 2015, the Company expanded its operations into the Colombian marketplace with creation of the Vive brand, a platform providing PDLs, and acquired TotalCredit, a Mexico-based PDL lender that partners with various employers across Mexico.  In 2016, the Company launched Alcanza Capital, a leasing and factoring initiative and also acquired Crediamigo, a pioneer in the discount credit industry utilizing income advancement for government employees.  In 2018, the Company expanded its technological platforms by launching its first mobile application, AXS, to offer instant loans to its customers.  In 2019, the Company launched Bontu, a credit platform for SMEs based on new internet sales models, and completed the 100% digitization of the business for its consumers from origination to collection of each loan.

6

### B.  Corporate Structure

14.    The Company is made up of 28 entities.  Alpha Latam, L.P. ("**Alpha Latam**"), a private limited partnership formed under the laws of the province of Manitoba, Canada, and Clarum Capital, L.P. ("**Clarum Capital**"), a private limited partnership formed under the laws of the province of Quebec, Canada, each Non-Debtors, are the ultimate parent companies in the enterprise, and the beneficial owners of the Company hold equity shares in Alpha Latam and Clarum Capital.  Alpha Latam wholly owns Alpha Tech Partners, LLC ("**Alpha Tech**"), a Delaware limited liability company and Non-Debtor, and Alpha Tech and Clarum Capital in turn jointly own AlphaCredit Tech Partners, L.P. ("**AlphaCredit Tech**"), a private limited partnership formed under the laws of the province of Ontario, Canada.  Alpha Latam is the sole shareholder of Alpha Tech.  AlphaCredit Tech serves as the "aggregator" entity for investors who own equity in Clarum Capital and Alpha Latam.  ALM is the general partner of each of Alpha Latam, Clarum Capital, and AlphaCredit Tech.

15.    AlphaCredit Tech is the parent of Non-Debtor Alpha Holding, S.A. de C.V. ("**Alpha Holding**"), a Mexican entity.  Alpha Holding is the primary holding company that (i) directly or indirectly owns each of the Company's other operating entities and (ii) is the issuer or borrower of the majority of the Company's funded obligations.  A chart depicting the Company's organizational structure as of the Petition Date is attached as **Exhibit A**.  As reflected on Exhibit A, not every entity within the Company is a debtor in these Chapter 11 Cases.

16.    The Debtors' operations are generally performed by three of the Debtors:  Alpha Capital, S.A.S. ("**Alpha Capital**"); Acsa Atento S.A.S. ("**ACSA**"); and Vive Créditos Kusida S.A.S. ("**Vive Créditos**").  Debtors AlphaCredit Latam, S.A.S. ("**AC Latam**") and AlphaCredit

Sudamerica, S. de R.L. ("**AC Sud**"), a Panamanian entity, as well as Non-Debtor Acercándonos, S.A.P.I. de C.V., a Mexican entity, are holding companies that own the shares of the other Debtors.

### C. The Colombian Business

17.      In Colombia, the Debtors have historically focused on providing PDLs to current and former governmental, union, and private sector employees, pensioners, and retirees (the "**Alpha Loans**" and the borrowers thereunder, the "**Alpha Borrowers**") using the *Vive* brand.  The successful operations of the Debtors' PDL businesses depended on creating, maintaining, and renewing collaboration agreements with these governmental agencies, unions, or other major employers that, in turn, enable the Debtors to generate new Alpha Loans to the Alpha Borrowers and/or collect repayment of the Alpha Loans.

18.      The Debtors' target borrowers have a monthly gross income ranging from COP 700,000 to COP 10,000,000 ($181 to $2,591 USD) and ages ranging from 31 to 84.  On average, a PDL has an initial term of approximately 108.9 months and an initial principal amount of COP 18.03 million or $4,900 USD.  The average interest rates for PDLs is 24.40% per annum, which complies with Colombian interest rate regulations.  As of May 31, 2021, the Debtors had approximately 36,800 PDLs outstanding with an aggregate principal amount of COPs 647.8 billion or $174.4 million USD.

19.      Alpha Capital owns most of the PDLs and collects the majority of repayments on the Colombian Assets.  Vive Créditos historically originated PDLs in Colombia, but the majority of its portfolio now resides with Alpha Capital.  ACSA is mainly responsible for commercial payroll and owns the Colombian offices and PP&E.  As of the Petition Date, the Debtors had 262 employees (the "**Colombia Employees**") with approximately 140 corporate-level employees (employed by Alpha Capital) and 122 operational employees (employed by ACSA).

8

20.     Though the Debtors have their own loan portfolios and operations, the Debtors rely on the Non-Debtor Mexican Affiliates to support their operations and collections.  Without the support of the Non-Debtor Mexican Affiliates the Debtors would not be able to function and the inability of those affiliates to continue their own operations is an existential threat to the Debtors and their operations.  For example, 80 of the Mexican Affiliates' employees spend part of their time providing the Debtors with back office and personnel support.  Furthermore, several IT systems used by the Debtors, including certain IT equipment, software and licenses are owned and/or provided by the Non-Debtor Mexican Affiliates (approximately 75% of the IT licenses, software and platform used in the Debtors' business are held by two Non-Debtor Mexican Affiliates).

### D.  Prepetition Capital Structure

21.     As of the commencement of these Chapter 11 Cases, the Debtors were either borrowers/issuers or guarantors of approximately $768.4 million in third-party financial debt obligations (the "**Obligations**" and their governing agreements, together, the "**Debt Documents**"). The Obligations are described in further detail below.[4]

### i.      *Debt with Debtors as Borrowers and Guarantors*

### a.  MS Loan

22.     Debtor Alpha Capital is the borrower under a Credit Agreement dated December 18, 2020 (as from time to time amended, the "**MS Loan Agreement**" and loans thereunder the

---

[4]      The descriptions herein of the Company's debt, including any security in respect of such debt, are provided for the convenience of the Court and parties in interest.  In certain cases, amounts stated are approximate.  The descriptions are not intended to be comprehensive nor should they be construed as an admission with respect to the validity or enforceability of any debt, any lien or other security described as securing the debt, or any other right or obligation.  These descriptions are qualified in their entirety by the operative relevant debt and related documents. The Debtors are continuing to review their debt obligations and related matters and expressly reserves all rights relating thereto.

"**MS Loan**") with Morgan Stanley Senior Funding, Inc. ("**Morgan Stanley**") acting as arranger and Wilmington Savings Fund Society, FSB ("**WSFS**") acting as administrative agent for the lenders thereunder.  The following Debtors are guarantors of the MS Loan: (i) ACSA; (vii) AC Latam; (iii) Vive Créditos; and (iv) Alpha Holding.  The following Non-Debtor Mexican Affiliates are guarantors of the MS Loan: (i) Acercándonos, S.A.P.I. de C.V.; (ii) Adelanto Express, S.A. de C.V., SOFOM E.N.R.; (iii) Aeternam, S.A.P.I. de C.V.; (iv) Alf Recursos, S.A.P.I. de C.V.; (v) AlphaCredit Capital, S.A. de C.V., SOFOM E.N.R.; (vi) BetaCredit, S.A. de C.V., SOFOM E.N.R.; (vii) Beta Planeación, S.A. de C.V.; (viii) C Claro, S. de R.L. de C.V., (ix) Collect Broker, S.A.P.I. de C.V.; and (x) Prestaciones Finmart, S.A.P.I. de C.V., SOFOM E.N.R. (collectively, with the Debtors that are guarantors of the MS Loan, the "**MS Guarantors**").  Proceeds of the MS Loan were used to originate certain of the Company's PDLs, repay existing intercompany debt, fund reserve accounts, pay for fees and expenses, and other general corporate purposes.  The MS Loan is secured by specific PDL portfolios of certain of the Mexican Affiliates that are MS Guarantors (the "**MS PDL Collateral**"), but unsecured against the other MS Guarantors. Collections from the MS PDL Collateral arrive into a master trust (i.e., *fideicomiso*) in Mexico under which Non-Debtor AlphaCredit Capital, S.A. de C.V., is the settlor, and the trustee immediately directs the collections corresponding to the MS PDL Collateral to a trust that is established for the benefit of WSFS, in its capacity as administrative agent under the MS Loan. The MS Loan matures in June 2022 and has an interest rate of 12.0%.  As of the Petition Date, the MS Loan is outstanding in the principal amount of $18.5 million USD.  The MS Loan Agreement is governed by New York law.

### b.  IDB Loans

23.     Debtor Alpha Capital is the borrower under a Loan Agreement dated December 22, 2020 (as from time to time amended, the "**IDB Loan Agreement**" and the loan provided thereunder, the "**IDB Loan**") with Inter-American Investment Corporation ("**IDB Invest**") as lender acting on behalf of the Inter-American Development Bank ("**IDB**").  The following Debtors are guarantors under the IDB Loan: (i) ACSA; (ii) AC Latam; (iii) Vive Créditos; and (iv) Alpha Holding.  The following Mexican Affiliates are guarantors under the IDB Loan: (i) Acercándonos, S.A.P.I. de C.V.; (ii) Adelanto Express, S.A. de C.V., SOFOM E.N.R.; (iii) Aeternam, S.A.P.I. de C.V.; (iv) Alf Recursos, S.A.P.I. de C.V.; (v) AlphaCredit Capital, S.A. de C.V., SOFOM E.N.R.; (vi) BetaCredit, S.A. de C.V., SOFOM E.N.R.; (vii) Beta Planeación, S.A. de C.V.; (viii) Collect Broker, S.A.P.I. de C.V.; (ix) Prestaciones Finmart, S.A.P.I. de C.V., SOFOM E.N.R.  The IDB Loan is unsecured.  The IDB Loan matures in December 2024 and has an interest rate of the incremental borrowing rate plus 5.25%.  As of the Petition Date, the IDB Loan is outstanding in the principal amount of $24 million USD and is unsecured.  The IDB Loan Agreement is governed by New York law.

### ii.     *Debt with Debtors as Guarantors*

### a.  The Senior Notes

24.     Non-Debtor Alpha Holding is the issuer of two series of senior unsecured notes. Pursuant to the indenture dated December 19, 2017 (the "**2017 Indenture**") Alpha Holding issued the 10.000% Senior Notes due 2022 (the "**2022 Notes**") for the principal amount of $300,000,000 USD.  Pursuant to the indenture dated February 10, 2020 (the "**2020 Indenture**"), Alpha Holding issued the 9.000% Senior Notes due 2025 (the "**2025 Notes**" and together with the 2022 Notes, the "**Senior Notes**") for the principal amount of $400,000,000.  Bank of New York Mellon (the

"**Senior Notes Agent**") is the indenture trustee in respect of the Senior Notes.  The following Debtors are obligors in respect of the Senior Notes: (i) Alpha Capital; (ii) AC Sud; (iii) ACSA; (iv) AC Latam; and (v) Vive Créditos.  The following Mexican Affiliates are obligors in respect of the Senior Notes: (i) Acercándonos, S.A.P.I. de C.V.; (ii) Adelanto Express, S.A. de C.V., SOFOM E.N.R.;  (iii) Aeternam, S.A.P.I. de C.V.; (iv) Alf Recursos, S.A.P.I. de C.V.; (v) AlphaCredit Capital, S.A. de C.V., SOFOM E.N.R.;  (vi) BetaCredit, S.A. de C.V., SOFOM E.N.R.; (vii) Beta Planeación, S.A. de C.V.; (viii) C Claro, S. de R.L. de C.V., (ix) Collect Broker, S.A.P.I. de C.V.; and (x) Prestaciones Finmart, S.A.P.I. de C.V., SOFOM E.N.R. (collectively, with Debtors as obligors in respect of the Senior Notes, the "**Notes Obligors**").  Proceeds of the Senior Notes were used, in whole or substantial part, to originate new Alpha Loans and otherwise finance the Company's operations.  The 2017 Indenture and 2020 Indenture are governed by New York law.

### b.  Credit Suisse

25.     Non-Debtor Alpha Holding is the borrower under the Credit Agreement dated August 15, 2019 (as amended from time to time, the "**CS Loan Agreement**" and the loan provided thereunder, the "**CS Loan**") with OPCR, S.A. de C.V., SOFOM, E.N.R. (formerly known as MCRF P, S.A. de C.V., SOFOM, E.N.R.) ("**Credit Suisse**") acting as the lender.  Debtor AC Latam is a guarantor of the CS Loan.  The following Mexican Affiliates are guarantors of the CS Loan: (i) Acercándonos, S.A.P.I. de C.V.; (ii) Adelanto Express, S.A. de C.V., SOFOM E.N.R.; (iii) Alf Recursos, S.A.P.I. de  C.V.; (iv) AlphaCredit Capital, S.A. de  C.V., SOFOM E.N.R.; (v) AXS Servicios, S.A. de C.V.; (vi) BetaCredit, S.A. de C.V., SOFOM E.N.R.; (vii) C Claro, S. de R.L. de C.V.;  (viii)  Iyu Digital, S.A. de C.V.; (ix) Prestaciones Finmart, S.A.P.I. de C.V., SOFOM E.N.R.; and (x) RXN Broker's, S.A.P.I. de C.V. (collectively, with AC Latam, the "**CS**

**Guarantors**").  Alpha Holding and the CS Guarantors' obligations under the CS Loan Agreement are secured by (a) a non-possessory pledge over non-performing PDLs, (b) a non-possessory pledge over beneficiary rights in other trust agreements, (c) a share pledge over shares of Prestaciones Finmart, S.A.P.I. de C.V., SOFOM E.N.R., (d) a share pledge over shares of Adelanto Express, S.A. de C.V., SOFOM E.N.R, and (e) a security trust agreement to which certain eligible PDLs, shares and intercompany loans have been assigned.  As a result, collections on such eligible PDLs are transferred from the Company's master trust into the trust (*fideicomiso*) established in favor of CS (the "**CS Trust**").  In addition, the CS Trust owns the shares of Finmart and Adex. The CS Loan matures in September 2022 and has an interest rate of 15.0%.  As of the Petition Date, the CS Loan is outstanding in the principal amount of $9 million USD.  The CS Loan is unsecured against the Debtor guarantor AC Latam.  The CS Loan Agreement, the CS Trust, and the other collateral agreements are governed by Mexican law.

### c.  ResponsAbility Notes

26.    Non-Debtor Alpha Holding, issued two series of four (4) unsecured promissory notes for each series (for a total of eight (8) notes) (the "**ResponsAbility Notes**") dated December 20, 2019 (the "**2019 ResponsAbility Notes**") and August 28, 2020 (the "**2020 ResponsAbility Notes**"), respectively, with various noteholders all acting for the benefit of their sub-funds, (a) responsAbility SICAV (Lux) Micro and SME Finance Leaders, (b) responsAbility SICAV (Lux) Financial Inclusion Fund, (c) responsAbility Global Micro and SME Finance Fund, (d) responsAbility SICAV (Lux) Micro and SME Finance Debt Fund (together, "**ResponsAbility**").  The following Debtors guarantee the ResponsAbility Notes: (i) ACSA; (ii) Alpha Capital; and (iii) Vive Créditos.  The following Mexican Affiliates guarantee the ResponsAbility Notes: (i) Acercándonos, S.A.P.I. de C.V.; (ii) Adelanto Express, S.A. de C.V.,

SOFOM E.N.R.; (iii) Aeternam, S.A.P.I. de C.V.; (iv) Alf Recursos, S.A.P.I. de C.V.;
(v) AlphaCredit Capital, S.A. de C.V., SOFOM E.N.R.; (vi) BetaCredit, S.A. de C.V., SOFOM
E.N.R.; (vii) Beta Planeación, S.A. de C.V.; (viii) C Claro, S. de R.L. de C.V., (ix) Collect Broker,
S.A.P.I. de C.V.; and (x) Prestaciones Finmart, S.A.P.I. de C.V., SOFOM E.N.R. The 2019
ResponsAbility Notes mature on June 20, 2022 and have an interest rate of 9.0%, and the 2020
ResponsAbility Notes mature on August 29, 2022 and have an interest rate of 8.0%. As of the
Petition Date, the ResponsAbility Notes are outstanding in the principal amount of $16.9 million
USD. The ResponsAbility Notes are governed by Luxembourg law.

*    *    *

27.    The following chart provides a summary of the Debtors' Obligations as of the
Petition Date:

| Facility | Debtor Borrower(s) | Debtor Guarantors | Principal Amount Outstanding |
|---|---|---|---|
| MS Loan | – Alpha Capital | – ACSA<br>– Vive Créditos<br>– AC Latam | $18.5 million |
| IDB Loan | – Alpha Capital | – ACSA,<br>– Vive Créditos<br>– AC Latam | $24 million |
| 2022 Notes | – N/A | – Alpha Capital<br>– ACSA<br>– Vive Créditos<br>– AC Latam<br>– AC Sud | $300 million |
| 2025 Notes | – N/A | – Alpha Capital<br>– ACSA<br>– Vive Créditos<br>– AC Latam<br>– AC Sud | $400 million |
| CS Loan | – N/A | – AC Latam | $9 million |
| 2019 ResponsAbility Notes | – N/A | – Alpha Capital | $11.3 million |

14

| | | – ACSA<br>– Vive Créditos | |
|---|---|---|---|
| 2020 ResponsAbility Notes | – N/A | – Alpha Capital<br>– ACSA<br>– Vive Créditos | $5.6 million |
| **TOTAL** | | | **$768.4 million** |

### iii.       Intercompany Loans

28.       In addition to the third-party debt described above, amongst Debtors, and as set forth in greater detail in the Debtors' Cash Management Motion (defined below) filed concurrently herewith, the Colombian Debtors engage in intercompany transfers amongst themselves. Additionally, in the ordinary course of the Company's business, certain of the entities, including Debtors and their Non-Debtor Mexican Affiliates have historically engaged in intercompany loan transactions. After the Petition Date, however, intercompany transactions between the Debtors and Non-Debtor Mexican Affiliates will cease, other than as described below.

29.       As noted above, the Debtors' business still depends on support from the Mexican Affiliates, which provide the Debtors with essential back office services, personnel, and IT support functions. With the help of my team, we determined that without this support from the Mexican Affiliates, the operations in Colombia would shut down, resulting in a material negative impact on the value of the Debtors' assets. Thus, to avoid that fate and ensure that the Mexican Affiliates have sufficient liquidity, on August 1, 2021 and in conjunction with the DIP Financing, Debtors AlphaDebit and Alpha Capital entered into an intercompany working capital facility with the Mexican Affiliates secured by the Mexican Affiliates' unencumbered loan portfolios, government receivables, and other assets (the "**Intercompany Facility**"). The primary purpose of the Intercompany Facility is to: (i) provide the operating cash necessary for the Mexican Affiliates to continue this support; (ii) preserve the value of the Debtors' businesses while the sale of the

15

Colombian Assets is being effectuated; and (iii) maximize the value of the Debtors' assets, which are all in the best interests of the Debtors' creditors.  No amounts will be drawn under the Intercompany Facility until the DIP Financing is approved and funded.

### E.  Circumstances Leading to the Commencement of the Chapter 11 Cases

#### i.        *Accounting Errors and Restatement of Financials*

30.     In May 2020, the Company hired a new Controller to improve internal audit and accounting processes.  In connection with the Controller's implementation of a new accounting and finance team, the Company conducted a thorough review of each line item of the Company's financial statements.  Such internal accounting review identified certain material errors relating to the Company's Mexican Affiliates' (i) derivative positions, (ii) provisions for non-performing loans, (iii) provisions related to certain account receivables, and (iv) amortization of capitalized expenses (collectively, the "**Errors**").  Following discussions with its current and former auditors, the Company determined that a restatement of its financial statements for previous years, including fiscal years ending December 31, 2018 and December 31, 2019 would be necessary (the "**Restatement**").

31.     The Company and its advisors immediately and proactively began working toward resolving any issues arising out of the Restatement, including requesting waivers and forbearance agreements from its lenders and other funded-debt holders with respect to certain defaults and/or events of default that may have arisen under the Debt Documents.

32.     On April 20, 2021, the Company issued a press release (the "**April Press Release**") to disclose the Restatement and appointment of the Special Committee.  The Special Committee was tasked with conducting an investigation of the accounting practices at the Company and related matters (the "**Internal Investigation**") and hired law firms Skadden, Arps, Slate, Meagher

16

& Flom LLP ("**Skadden**") and Nader, Hayaux y Goebel, S.C. as its independent legal counsel. Skadden subsequently engaged a forensic accounting firm to assist in providing legal advice to the Special Committee.  On May 6, 2021 the Company announced the appointment of Alan M. Cohen as an independent manager to the board of ALM and as chair of the Special Committee.

33.     As a result of the Errors, the Company was unable to deliver audited 2020 financials and first quarter of 2021 financials nor deliver related certificates (the "**Financial Reporting Failure**"), as required under certain of its Debt Documents.

### ii.     Lenders Notice Events of Default and Exercise Remedies

34.     The Restatement and Financial Reporting Failure triggered various defaults under the Company's Debt Documents.  These defaults blocked the Company from access to the capital and liquidity needed to originate new Alpha Loans, and eventually caused the Company to cease all originations.  Although the Company and its advisors sought waivers and forbearance agreements from the Company's creditors, they were unsuccessful, and several lenders began to take actions to enforce rights, including accelerating their debt.[5]

35.     Given the foregoing threats to the Company's business and to preserve liquidity and extend the Company's runway, the Company took a number of steps to cut costs and expenses. In addition to ceasing all originations at the end of June, the Company began a reduction in workforce program, terminating over 70 of its employees in both Mexico and Colombia.

---

[5]     Indeed, IDB filed an action against certain of the Debtors in Colombia on July 26, 2021.  The Debtors have not been served or received official notice of the suit, and only learned of it when the Debtors' Colombian counsel spotted it on the Colombian court docket, and thus does not have any details about the relief sought or whether it included a request for protective measures.  Given this uncertainty, the Debtors reserve their rights to seek any relief with respect to such action.

F. **Path to Restructuring**

36.    As its liquidity situation worsened, the Company began to explore various restructuring strategies, including a sale of its Colombian Assets, which is entirely unencumbered. As early as May, the Company entered into various non-disclosure agreements with potential third-party buyers.  The Company facilitated due diligence for these potential buyers and received a number of non-binding proposals for the purchase of all or a portion of the Colombian Assets.  It quickly became evident, however, that potential buyers would be unwilling to pursue a purchase of the Colombian loan portfolio outside a sale under section 363 of the Bankruptcy Code.  The Debtors continue to engage in due diligence and negotiate with potential buyers, and are optimistic they will be in a position to select a stalking horse bid and file a motion seeking approval of bidding procedures (including entry into a potential stalking horse agreement) within the first few days of these Chapter 11 Cases.

37.    To address its acute liquidity situation, and provide the Debtors with sufficient runway to conduct a competitive auction process for the Colombian Assets, the Company determined early on that it would need DIP financing.  As described more fully in the declaration of Marcelo Messer filed in support of the DIP Motion (as defined below), as early as June 2021, Rothschild began formally soliciting proposals for new financing.

38.    On or about June 18, 2021, the Company entered into confidentiality agreements with certain members of an ad hoc group (the "**Ad Hoc Group**") of holders of the Senior Notes represented by Cleary Gottlieb Steen & Hamilton LLP and began discussions in earnest regarding DIP financing.  Around this time, the Company also entered into confidentiality agreements with seven other potential third-party lenders.

39.    Between July 7 and 9, 2021, five potential lenders submitted DIP financing proposals, and after further discussions with these potential lenders, four advanced to the second round of the process. The Debtors ultimately selected the proposal from certain members of the Ad Hoc Group (the "**DIP Note Purchasers**"), and on August 1, 2021, the Debtors obtained a DIP Financing commitment for a senior secured superpriority facility of $45 million to be provided pursuant to a certain Secured Super-priority Debtor-in-Possession Note Purchase Agreement (the "**DIP Note Purchase Agreement**").[6]    Under the DIP Note Purchase Agreement, the DIP Financing will be secured by first priority senior liens on substantially all of the Debtors' unencumbered assets (including the Debtors' rights under the Intercompany Facility) and junior liens on assets subject to prior liens.  The Debtors will use a portion of the proceeds of the DIP Financing to fund their Mexican Affiliates pursuant to the Intercompany Facility, which Intercompany Facility is secured by first liens on the Mexican Affiliates' unencumbered loan portfolios, government receivables, and other assets.

40.    Although the Debtors expect that access to the DIP Financing, together with their incoming cash from collections, will provide them with sufficient runway to consummate a value-maximizing sale transaction, time is of the essence.  Given the Debtors' current financial condition, the DIP Financing documentation provides certain milestones with respect to a sale of the Colombian Assets.  Specifically, the Debtors must: (i) file a motion seeking approval of bidding procedures within 20 calendar days from entry of the interim DIP order; (ii) obtain entry of a

---

[6]    Although the Debtors have not received a fully executed commitment from the DIP Note Purchasers as of the Petition Date, the Debtors received written confirmation from counsel to the Ad Hoc Group that they hold written email confirmations from all DIP Note Purchasers providing the DIP Financing on their commitments, totaling $45 million.

bidding procedures order within 45 calendar days after entry interim DIP Order; and (iii) conduct

an auction within 90 calendar days of the Petition Date.

## IV.    The First Day Motions

41.    Concurrently with the filing of these Chapter 11 Cases, the Debtors filed the First

Day Motions seeking relief related to: (i) the administration of the cases; (ii) the Debtors' vendors,

employees, and customers; (iii) their operations; and (iv) their cash management.  A list of the

First Day Motions is set forth below.

### A.  Administrative Motions

- *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Cases and (II) Granting Related Relief*

- *Application of the Debtors for an Order Appointing Prime Clerk, LLC as Claims and Noticing Agent* Nunc Pro Tunc *to the Petition Date*

- *Debtors' Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs*

- *Motion of the Debtors for Entry of an Order (I) Confirming, Restating, and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and* Ipso Facto *Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief*

- *Motion of the Debtors for Entry of an Order: (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix in Lieu of Submitting a Separate Creditor Matrix for Each Debtor, Waiving Certain Creditor Matrix Requirements; (B) File a Consolidated List of Top 30 Unsecured Creditors; (C) Redact Certain Personal Identification Information; (D) Establish Procedures for Notifying Parties of the Commencement of these Cases; and (II) Granting Related Relief (the "**Creditor Matrix Motion**")*

### B.  Substantive Motions

- *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to (A) Pay Prepetition Wages and Other Employee Obligations and (B) Maintain Employee Benefit Programs and Pay Related Administrative Obligations; and (III) Granting Related Relief*

- *Motion of the Debtors for Entry of an Interim and Final Order (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies and (II) Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Granting Related Relief*

- *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Foreign Vendors, and Customers*

- *Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing Continued Use of Their Existing Cash Management System and Bank Accounts, Payment of Related Prepetition Obligations and Continued Use of Business Forms; (II) Waiving Certain Deposit Requirements; and (III) Authorizing Continuance of Intercompany Transfers ("**Cash Management Motion**")*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Granting Liens and Superpriority Administrative Expense Claims, (II) Scheduling a Final Hearing, and (III) Granting Related Relief (the "**DIP Motion**")*

42.     The Debtors have narrowly tailored the relief requested in the First Day Motions to meet their goals of: (a) continuing their current operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of their vendors, employees, and other key constituencies and stakeholders; and (c) efficiently administering these Chapter 11 Cases.

43.     I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers, employees, and advisors.  I incorporate by reference the factual statements in each of the First Day Motions as though fully set forth herein.

44.     I believe that the relief sought in each of the First Day Motions is necessary to the successful implementation of the Debtors' efforts to maximize the value of their estates.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the

21

maintenance of the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

45.     As for the relief sought in the Creditor Matrix Motion related to redaction of the names and addresses of the Alpha Borrowers and Colombia Employees, I have been informed by the Company and Colombian counsel that such relief is required and necessary to comply with Colombian privacy law and the Company's data privacy protocols.

46.     The success of these Chapter 11 Cases depends upon the Debtors' ability to preserve their operations while they conduct the sale process for the Colombian Assets.  The relief requested in the First Day Motions is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

47.     Accordingly, I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

48.     I declare under penalty of perjury that the foregoing Declaration of John R. Castellano in Support of Debtors' Petitions and Requests for First Day Relief is true and correct.

Executed on:  August 2, 2021
                        Chicago, IL


/s/        *John Castellano*
John Castellano
Managing Director
AlixPartners, LLP

## Exhibit A

## Capital Structure



*In re Alpha Latam Management, LLC et al.*
Organizational Chart

1. Alpha Holding, S.A. de C.V. owns one (1) share in Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R. and transferred the remaining 40,142,291 shares to the irrevocable security trust number CIB/2620 in which it is the Trustor and Second Place Beneficiary, in order to guarantee certain obligations.
2. Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R. transferred 49,999 shares in Adelanto Express, S.A. de C.V., SOFOM, E.N.R. to the irrevocable security trust number CIB/2620 in which it is the Trustor and Second Place Beneficiary, in order to guarantee certain obligations