## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Alpha Latam Management, LLC, *et al.*,[1] | Case No. 21-[____] ( ) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL DIP ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING RELATED RELIEF

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned cases hereby file this motion (the "**Motion**") for entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "**Interim DIP Order**") and a final order (the "**Final DIP Order**") granting the relief described below.  In support of this Motion, the Debtors submit the *Declaration of Marcelo Messer in Support of the Debtors' Motion (i) Authorizing the Debtors to Obtain Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (ii) Scheduling a Final Hearing, and (iii) Granting Related Relief* (the "**Messer Declaration**") filed concurrently herewith.  In further support of the Motion, the Debtors, by and through their undersigned counsel, state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Alpha Latam Management, LLC (4610); Acsa Atento S.A.S. (766-6); Alpha Capital S.A.S. (717-5); AlphaCredit Latam S.A.S. (326-5); AlphaCredit Sudamérica, S. de R.L. (72 87); AlphaDebit, S.A. de C.V. (3FI4); and Vive Créditos Kusida S.A.S. (013-4). Alpha Latam Management, LLC's registered address is 1209 N Orange Street, Wilmington, DE 19801. The main address of the other Debtors is Carrera 14 No. 94 – 81, Bogotá, Colombia.

## PRELIMINARY STATEMENT[2]

1.      As more fully described in the *Declaration of John R. Castellano in Support of the Debtors' Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), the Debtors have commenced these Chapter 11 Cases to effectuate a sale of substantially all of the Debtors' assets.  Through the debtor-in-possession financing facility sought herein (the "**DIP Facility**"), the Debtors will have access to the necessary cash to fund these Chapter 11 Cases to effectuate that sale, including providing the liquidity necessary to pay for the administrative costs of these Chapter 11 Cases and preserve the value of the Debtors' estates.

2.      The DIP Facility will be provided by members of an ad hoc group of bondholders (the "**Ad Hoc Group**", and such members providing the DIP Facility, the "**DIP Note Purchasers**") pursuant to a Senior Secured Super-priority Debtor-in-Possession Note Purchase Agreement (the "**DIP Note Purchase Agreement**")[3] consistent with the terms set forth in the term sheet (the "**DIP Term Sheet**") attached as **Exhibit B** hereto, the form of Commitment Letter attached hereto as **Exhibit C** (the "**Commitment Letter**")[4] and the form of Fee Letter attached hereto as **Exhibit D**.  The DIP Facility will provide up to $45,000,000 of financing to the Debtors upon approval by the Court, $17,500,000 of which will be available upon entry of the Interim DIP Order.  The DIP Facility will be secured by liens on substantially all of the Debtors' assets but will not prime any existing liens, will have superpriority administrative claim status, and will not provide any special protections for prepetition creditors in that capacity.  As

---

[2]      Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them in the Motion.

[3]      A copy of the DIP Note Purchase Agreement will be filed separately.

[4]      Although the Debtors have not received a fully executed Commitment Letter from the DIP Note Purchasers as of the Petition Date, the Debtors received written confirmation from counsel to the Ad Hoc Group that they hold written email confirmations from all DIP Note Purchasers on their commitments, totaling $45 million.

described more fully below, the terms of the DIP Facility are favorable to the Debtors and provide the funding necessary to support these Chapter 11 Cases. Given the Debtors' current cash on hand, without the DIP Facility, the Debtors would not be able to fund this their operations or their sale process, thereby causing immediate and irreparable harm to the Debtors' estates.

3.      Despite a thorough marketing process, the Debtors were unable to obtain alternative financing on terms more favorable than those set forth in the DIP Facility. As such, the Debtors believe that entry into the DIP Facility is in the best interests of the Debtors' estates and that the DIP Facility provides the funding needed to maximize the value of the Debtors' assets and consummate a plan.

4.      For the reasons set forth herein, the Debtors believe it is appropriate and a sound exercise of their business judgment to enter into the DIP Facility.

## RELIEF REQUESTED

5.      By this Motion, pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-2, 9006-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedures for the District of Delaware (the "**Local Rules**") the Debtors seek entry of the Interim DIP Order (i) authorizing the Debtors to obtain secured superpriority postpetition financing and granting liens and superpriority administrative expense claims (ii) scheduling a final hearing, and (iii) granting related relief.

3

6. In addition, the Debtors request that the Court schedule a final hearing (the "**Final Hearing**") to consider the relief requested herein on a final basis and entry of the Final DIP Order.

7. For the reasons set forth herein, the Debtors submit that the relief requested is in the best interest of the Debtors, their estates, creditors, and other parties in interest, and therefore should be granted.

## JURISDICTION, VENUE, AND PREDICATES FOR RELIEF

8. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012 (Sleet, C.J.). This is a core proceeding under 28 U.S.C. § 157(b). Venue of these Chapter 11 Cases (as defined below) and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

9. The predicates for the relief requested by this Motion are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-2, 9006-1, and 9013-1.

10. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## BACKGROUND

### I. Overview of the Chapter 11 Cases

11. On August 1, 2021 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors have filed a separate procedural motion requesting that the Chapter 11

4

Cases be jointly administered.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has been appointed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), nor has a trustee or examiner been appointed in these Chapter 11 Cases.

12.     The Debtors and their Mexican non-Debtor affiliates (collectively, the "**Company**") operate a specialty finance company in Latin America.  By leveraging technology, the Company provides consumer and small and medium-business lending products to individual consumers and small and medium enterprises ("**SMEs**") in Mexico and Colombia.  The Company's consumer lending business is comprised of: (i) loans via payroll deductions to government and private sector employees in Mexico and Colombia ("**PDLs**") and (ii) automated clearing house debit loans to pensioners and retirees in Mexico ("**ACH Loans**"). The Company's SME business involves providing working capital, factoring and leasing products to SMEs in Mexico only ("**SME Loans**" and collectively with PDLs and ACH Loans, the "**Alpha Loans**").

13.     As discussed further in the First Day Declaration, the Company faced significant headwinds in the months leading up to the Petition Date precipitated by the need to restate its consolidated financials for the years 2018 and 2019 due to accounting errors related to its Mexican business (as publicly announced on April 20, 2021).  This, in turn, resulted in several defaults and events of default under the Company's various funded-debt obligations.  Though the Company endeavored to negotiate forbearance and waiver agreements with several of its lenders, such efforts were unsuccessful.  These events had the effect of blocking the Company's access to the new financing necessary to continue to originate new Alpha Loans, which, coupled with variability in loan collections, put significant pressure on the Company's liquidity.

14.     While the Company took swift action to cut costs, including ceasing all debt service payments, cutting overhead costs, and ceasing new loan originations, the Company determined that the optimal strategy to maximize value to stakeholders was to pursue a sale of substantially all of its Colombian assets in chapter 11.  To that end, the Debtors seek approval of the DIP Facility to provide the financing necessary to effectuate such a sale.

15.     As of the Petition Date, the Debtors had approximately $730,000,000 of funded debt obligations outstanding and all the Debtors' assets remained unencumbered.  The Debtors' prepetition unsecured debt included two series of unsecured notes totaling $700,000,000. Certain holders of those notes are members of the Ad Hoc Group and would act as DIP Note Purchasers under the DIP Facility.

16.     Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, their restructuring activities, and the events leading to the commencement of these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

## II.    Intercompany Loans

17.     In the ordinary course of the Company's business, certain of the entities comprising the Company engage in intercompany loan transactions.   The Company's intercompany loans are governed by written loan agreements with arm's length terms and conditions.  As set forth in greater detail in the *Motion of the Debtors for Entry of Interim and Final Orders (i) Authorizing Continued Use of their Existing Cash Management System and Bank Accounts, Payment of Related Prepetition Obligations and Continued Use of Business Forms; (ii) Waiving Certain Deposit Requirements; and (iii) Authorizing Continuance of Intercompany Transfers*, filed concurrently herewith, the Colombian Debtors engage in

6

intercompany transactions, whereby such intercompany transfers facilitate the Debtors' collections from Alpha Borrowers and disbursement of the Debtors' obligations including payroll and payment to vendors.

18.    Since the beginning of 2021, the Company has been focused on minimizing the support it needs from its Mexican entities to cover its day-to-day operations.  Notwithstanding these efforts, the Company's non-Debtor Mexican affiliates (the "**Mexican Affiliates**") continue to provide crucial support for the operations of the Debtors' business.  Specifically, the Mexican Affiliates provide the Debtors with essential back office services, personnel, and IT support functions.  Without the continued support by the Mexican Affiliates in the form of these services, the Debtors' operations in Colombia could not continue and the value of the Debtors' assets would be significantly impaired.

19.    Therefore, on August 1, 2021 (prior to the filing of these Chapter 11 Cases), Debtors AlphaDebit, S.A. de C.V. ("**AlphaDebit**") and  Alpha Capital S.A.S. ("**Alpha Capital**") entered into an intercompany working capital facility with certain of the Mexican Affiliates secured by the Mexican Affiliates' unencumbered loan portfolio and other assets (the "**Intercompany Facility**").  Under the Intercompany Facility, the Debtors' will use a substantial portion of the proceeds of the DIP Facility to on-lend to their Mexican Affiliates.  The Intercompany Facility is governed by that certain intercompany working capital loan agreement (the "**Intercompany Loan Agreement**") attached hereto as **<u>Exhibit E</u>** which has an interest rate of 2.00% per annum and matures on February 1, 2022 (provided that, if the DIP Facility is repaid in full and the DIP Obligations discharged prior to such date, the maturity date under the Intercompany Loan Agreement shall be extended to August 1, 2022).  Under the Intercompany Facility, each of the Mexican Affiliates may request a loan when desired and AlphaDebit and/or

7

Alpha Capital will fulfill the request.  Because the Intercompany Facility is funded from proceeds of the DIP Facility, the Intercompany Loan's covenants and events of default largely track those under the DIP Facility.  The purpose of the Intercompany Facility is to provide the Mexican Affiliates with the cash necessary to operate and thereby support the Debtors' businesses while the sale process for substantially all the Debtors' assets is being pursued.  No amounts will be drawn under the Intercompany Facility until the DIP Facility is approved and funded.  In the meantime, the Debtors and the DIP Note Purchasers continue to discuss options for the Mexican Affiliates to address the Mexican Affiliates' own obligations and maximize the value of the Mexican Affiliates' assets.

### III.    The Debtors' Immediate Need for Postpetition Financing

20.    As described in the First Day Declaration, a number of factors have contributed to the Debtors' liquidity constraints.  Following the announcement of accounting errors early in the year, the Company failed to obtain additional financing from existing or new lenders for origination of new Alpha Loans. Through an analysis of the Company's liquidity position and development of a cash flow forecast, the Company determined to cease origination of new Alpha Loans and make all efforts to preserve cash.  An immediate need exists for the Debtors to obtain funds and liquidity in order to satisfy in full the costs and expenses of administering these Chapter 11 Cases and to preserve the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize the return for all creditors requires the availability of the DIP Facility and the Debtors' honoring of their on-lending obligations under the Intercompany Facility.  In the absence of the availability of the DIP Facility, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates and creditors would occur.

8

## IV.    The Debtors' Efforts to Obtain Financing

21.    To address its liquidity crunch, and allow the Debtors the runway to conduct a competitive sale process for the Colombian loan portfolio, the Company determined early on that it would need DIP financing.  Starting in May 2021, the Debtors' investment banker, Rothschild & Co. ("**Rothschild**"), contacted approximately thirteen potential investors at the request and on behalf of the Debtors and eight parties executed non-disclosure agreements.  Messer Decl. ¶ 8. Rothschild distributed confidential information memoranda, confidential discussion materials, certain confidential reports and granted data room access to those parties under non-disclosure agreements.

22.    Between July 7 and 9, 2021, five potential lenders submitted DIP Financing proposals.  After several weeks of negotiations with these potential lenders, four lenders advanced to the second round process.  The Company ultimately determined that the proposal set forth by the Ad Hoc Group for a secured superpriority DIP facility of $45 million, as described in the DIP Term Sheet, was the highest and best proposal.  The DIP Facility will be secured by first priority senior liens on substantially all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code and junior liens on assets subject to permitted prior liens pursuant to section 364(c)(3) of the Bankruptcy Code, in each case subject to payment of the Carve-Out (as defined below).  The Debtors' obligations under the DIP Facility shall constitute superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code with priority over all other administrative claims in the Chapter 11 Cases, subject to payment of the Carve-Out.

## V.    Summary of the DIP Facility

23.    Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2 require that a motion for

authority to obtain postpetition financing summarize, and set out the location within the relevant

documents, all material provisions of the proposed credit agreement and form of order, including

the interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions.

The principal terms of the DIP Facility are as follows:[5]

| Summary and Material Terms | |
|---|---|
| **Borrowers:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Alpha Capital and Alpha Debit, as debtors in possession in the Chapter 11 Cases<br><br>*See* DIP Term Sheet at 1 (Borrowers). |
| **DIP Note Purchasers:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Certain members of the Ad Hoc Group, either directly or through one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such person).<br><br>*See* DIP Term Sheet at 2 (DIP Note Purchasers). |
| **Guarantors:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Each Debtor other than the Borrowers (collectively, the "**Guarantors**", and together with the Borrowers, the "**DIP Note Parties**").<br><br>*See* DIP Term Sheet at 1-2 (Guarantors). |
| **DIP Facility:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i) (B)* | The DIP Facility shall be a secured superpriority term facility in an aggregate principal amount of $45 million (the "**DIP Obligations**," and the notes issued thereunder collectively, the "**DIP Notes**" (and each note individually, a "**DIP Note**"))<br><br>*See* DIP Term Sheet at 2 (DIP Facility). |
| **DIP Availability:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A), (a)(iii)* | Subject in each case to satisfaction of the conditions set forth below under the headings "Conditions Precedent to Initial Availability," and "Conditions Precedent to Full Availability", as applicable:<br><br>(i) upon the date of entry of the Interim DIP Order, up to $17.5 million of the DIP Notes will be made available in a single draw (the "**Initial Availability**");<br><br>(ii) upon the date of entry of the Final DIP Order, the undrawn portion of the DIP Facility will be available in a single draw (the "**Subsequent** |

---

[5]     This summary is qualified, in its entirety, by the provisions of the DIP Term Sheet, the DIP Note Documents, and the Interim DIP Order.  Unless otherwise defined within this Motion, capitalized terms used within this summary only shall have the meanings ascribed to them in the DIP Term Sheet and the Interim DIP Order, as applicable.

| Summary and Material Terms | |
|---|---|
| | **Availability**"; together with the Initial Availability, the "**Full Availability**")<br><br>*See* DIP Term Sheet at 4 (Availability); Interim DIP Order ¶ 2(b). |
| **Maturity Date:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (a)(ii)* | The DIP Facility shall terminate and all amounts payable in respect of the DIP Facility will be automatically due and payable in full on the earliest to occur of any of the following (each, a "**Maturity Date**"): (a) six (6) months after the Petition Date (the "**Scheduled Maturity Date**"); (b) forty (40) days after entry of the Interim DIP Order if the Final DIP Order has not been entered prior to the expiration of such 40-day period; (c) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Majority DIP Note Purchasers; (d) filing of a motion by any Debtor which seeks the dismissal, or the entry of an order granting any party's request for the dismissal, of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Majority DIP Note Purchasers; (e) the consummation of a sale of all or substantially all of the DIP Collateral (a "**363 Sale**"), unless otherwise reasonably consented to in writing by the Administrative Agent and the Majority DIP Note Purchasers (it being understood that a sale pursuant to the Bid Procedures Order (as defined below) is deemed consented to by the Majority DIP Note Purchasers); (f) the effective date of the Approved Plan (as defined below) confirmed in the Chapter 11 Cases; and (g) the date that all principal and interest obligations shall become due and payable under the DIP Note Documents, whether by acceleration or otherwise; provided that upon the occurrence of either (x) a hearing before the Bankruptcy Court to consider the Debtors' motion seeking entry of an order approving a 363 Sale or (y) the approval of the Bankruptcy Court of a disclosure statement related to the Approved Plan, the Debtors may, in their sole discretion, extend the Scheduled Maturity Date by up to two (2) months.<br><br>"**Approved Plan**" shall mean a plan of reorganization, which shall (x) provide for the repayment of the DIP Obligations in full and in cash or such other treatment of the DIP Obligations as is acceptable to the Majority DIP Note Purchasers; (y) provide for customary provisions relating to bid procedures, deadlines, auction, approval and/or closing conditions, as relevant; and (z) provide for a customary exculpation of the DIP Agent, the DIP Note Purchasers (only in their capacity as such) and their representatives (only in their capacity as such) in connection with the DIP Facility.<br><br>*See* DIP Term Sheet at 4-5 (Maturity Date). |
| **Use of DIP Facility/Funding of Non-Debtors:**<br><br>*Bankruptcy Rule* | The Borrowers shall use the proceeds of the DIP Facility and the Cash Collateral (as defined below), in each case subject to the DIP Budget (as defined below) (subject to the Variance Limit, as defined below), only for the purposes of (i) providing liquidity for working capital and certain other general corporate purposes of the DIP Note Parties as set forth in the DIP |

| Summary and Material Terms | |
|---|---|
| *4001(c)(1)(B); Local Rule 4001-2(a)(i)(D) and 4001-2(a)(i)(E)* | Budget (and subject to the terms described under "DIP Budget; Variance Covenants; and other Financial Reporting"); (ii) paying reasonable and documented restructuring costs and fees of legal advisors and other estate professionals of the Debtors relating to the Chapter 11 Cases; (iii) paying obligations arising from or related to the Carve-Out (as defined below); (iv) making all permitted payments of costs of administration of the Chapter 11 Cases; (v) for on-lending, subject to the DIP Budget, by Alpha Debit, S.A. de C.V. to the Mexican Affiliates pursuant to the Intercompany Facility for the Mexican Affiliates' working capital and several corporate purposes and the fees, costs and expenses related to a *concurso mercantil* proceeding commenced for such Mexican Affiliates; <u>provided</u> that (x) the Debtors' rights under the Intercompany Facility shall be pledged in favor of the DIP Note Purchasers and (y) the collateral securing such Intercompany Facility shall be reasonably satisfactory to the Majority DIP Note Purchasers; and (vii) as approved by the Bankruptcy Court in the DIP Orders or any other order (to the extent permitted under the DIP Note Documents). |
| | None of the proceeds of the DIP Notes may be used, directly or indirectly, to challenge the amount, validity, perfection, priority or enforceability or, or assert any defense, counterclaim or offset to, the DIP Note Documents, or the security interests and liens securing any of the DIP Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the Agents or the DIP Note Purchasers. |
| | *See* DIP Term Sheet at 3 (Purpose/Use of Proceeds); Interim DIP Order ¶ 3. |
| **Conditions Precedent to Initial Availability:** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The Initial Availability on the Closing Date shall be subject to the satisfaction or waiver by the Majority DIP Note Purchasers of the conditions set forth below: |
| | (a) the Administrative Agent and the DIP Note Purchasers shall have received a 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date setting forth projected cash flows and disbursements, which disbursements shall include legal fees and expenses projected to be incurred by the Debtors, in form, scope and substance acceptable to the Majority DIP Note Purchasers (the "**Initial Approved DIP Budget**"), a copy of which is attached hereto as **Exhibit F**; |
| | (b) the Agents and the DIP Note Purchasers shall have received executed copies of each of the DIP Note Documents (including commercially reasonable efforts to provide required filings and registration of the guarantees and security agreements, to the extent required for perfection under applicable local law), which shall be in form and substance consistent with the DIP Term Sheet and reasonably satisfactory to the Majority DIP Note Purchasers; |

| Summary and Material Terms |
| --- |

(c) the representations and warranties of the DIP Note Parties contained in the DIP Note Documents shall be true and correct in all material respects (or, in the case of any representation and warranty that is qualified as to "materiality," in all respects) as of the Closing Date (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

(d) before or after giving effect to such funding, no default or Event of Default under the DIP Facility shall have occurred and be continuing;

(e) the Bankruptcy Court shall have entered the Interim DIP Order no later than five (5) calendar days after the filing of this Motion;

(f) the Interim DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated or subject to a stay pending appeal, in any manner, except as otherwise agreed to in writing by the Majority DIP Note Purchasers, acting reasonably;

(g) reasonable and documented transaction costs, fees, expenses (including, without limitation, reasonable and documented fees of Cleary Gottlieb Steen & Hamilton, Young Conaway Stargatt & Taylor, LLP, Sainz Abogados S.C., Cuatrecasas, Gonçalves Pereira S.A.S., Houlihan Lokey Capital, Inc. and Blink Capital Solutions) due and payable (the "**Transaction and Advisors Expenses**") and invoiced at least two (2) Business Days prior to the Closing Date incurred by the Agents and the DIP Note Purchasers in their capacity as such solely in connection with the preparation, negotiation and execution of the DIP Note Documents, and all other compensation owed to the Agents and the DIP Note Purchasers under the terms of the DIP Note Documents shall have been paid to the extent due;

(h) the Administrative Agent shall have received from the DIP Note Parties (at least three (3) Business Days prior to the Closing Date) beneficial ownership and other similar information that may be required by the Administrative Agent under customary "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(i) the Agents shall have received customary closing deliverables and officer's certificates, including customary legal opinions from New York and Colombian counsel for the DIP Note Parties, as required under the DIP Note Documents, in form and substance reasonably acceptable to the Agents;

(j) the Administrative Agent and the DIP Note Purchasers shall have received information showing the accounting of net funds flowing from Mexico to Colombia for the two-month period prior to the Petition Date;

| Summary and Material Terms | |
|---|---|
| | (k) the Agents shall have received applicable UCC and Colombian lien searches regarding each DIP Note Party; |
| | (l) each DIP Note Purchaser shall have received a certificated note or interest in a global note with respect to the principal and interest obligations, fees and expenses owed to each DIP Note Purchaser; |
| | (m) the Collateral Agent shall have established a deposit account with a financial institution located in the United States in the name of, or subject to a control agreement in favor of, the Collateral Agent for the benefit of the DIP Note Purchasers (the "**Cash Collateral Account**"); and |
| | (n) the Debtors and the Majority DIP Note Purchasers shall agree on a general strategy for a sale of the Mexican Affiliates' assets. |
| | *See* DIP Term Sheet at 5-7 (Conditions Precedent to Initial Availability). |
| **Conditions Precedent to Full Availability:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The Subsequent Availability is subject to the satisfaction or waiver by the Majority DIP Note Purchasers of the conditions set forth under the heading "Conditions Precedent to Initial Availability" above and the following conditions (unless waived in writing by the Majority DIP Note Purchasers):<br><br>(a) except as expressly provided with respect to the Initial Availability of the DIP Notes, all compensation then due and owing to the Agents and the DIP Note Purchasers due and payable under the terms of the DIP Note Documents, including any fees due and payable, as applicable, and the Transaction and Advisors Expenses, shall have been paid to the extent invoiced at least two (2) Business Days prior to the applicable borrowing date;<br><br>(b) before or after giving effect to such funding, no default or Event of Default under the DIP Facility shall have occurred and be continuing;<br><br>(c) the Agents and the DIP Note Purchasers shall have received executed copies of required filings and registration of the guarantees and security agreements, to the extent required for perfection under applicable local law;<br><br>(d) the Collateral Agent shall have received, evidence of (i) the formalization of the corresponding security interest in the possessory DIP Collateral in terms of the applicable law, and (ii) the registration of the DIP Collateral governed by Colombian law with the National Registry over Movable Assets (*Registro Nacional de Garantías Mobiliarias*) as specified in **Exhibit A** hereto;<br><br>(e) a Chief Restructuring Officer ("**Colombian CRO**") nominated by the Debtors from a list of pre-selected qualified candidates |

14

| Summary and Material Terms |
| --- |

provided to the Debtors by the advisors to the DIP Note Purchasers (which may be the same individual serving as Mexican CRO (as defined below)) (the "**Colombian List**") shall act as a restructuring advisor to the Debtors and (i) be vested with customary authority (with respect to the Chapter 11 Cases) to oversee the restructuring of the Debtors, subject to oversight by the board of directors in accordance with applicable law, (ii) attend any board of directors meetings and management meetings concerning the restructuring of the Debtors (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; provided that if any officer attends such executive session concerning the Colombian CRO shall also attend); (iii) report directly to the board of directors; (iv) provide updates to the Bankruptcy Court; (v) be vested with customary authority in accordance with applicable law to approve and reject expenses of the Debtors; and (vi) otherwise satisfy the requirements of 11 U.S.C. § 327;

(f) a Chief Restructuring Officer ("**Mexican CRO**") nominated by the Debtors from a list of pre-selected qualified candidates provided to the Debtors by the advisors to the DIP Note Purchasers (which may be the same individual serving as Colombian CRO) (the "**Mexican List**") shall act as a restructuring advisor to the Mexican Affiliates and (i) be vested with customary authority (with respect to any *concurso mercantil* proceeding) to oversee the restructuring of the Mexican Affiliates, subject to oversight by the board of directors in accordance with applicable law, (ii) attend any board of directors meetings and management meetings concerning the restructuring of the Mexican Affiliates (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; provided that if any officer attends such executive session concerning the Mexican CRO shall also attend); (iii) report directly to the board of directors; (iv) be vested with customary authority in accordance with applicable law to approve and reject expenses of the Mexican Affiliates;

(g) subject to clause (o) below, no insolvency or bankruptcy proceeding in Colombia shall have occurred with respect to any of the DIP Note Parties (except a proceeding requested by or consented to by the Majority DIP Note Purchasers);

(h) since the Petition Date, no event shall have occurred that results in or could reasonably be expected to result in a Material Adverse Effect (as defined below);

(i) no order, injunction, stay, restriction or other similar limitation in any foreign bankruptcy or debtor relief cases of the DIP Note Parties in any way prevents or restricts the DIP Note Parties' ability to consummate the transactions contemplated by the DIP

15

| Summary and Material Terms |
|---|

Note Documents;

(j) the Administrative Agent shall have received the Final DIP Order approving the DIP Facility on a final basis, no later than 40 calendar days following the date of entry of the Interim DIP Order;

(k) the Final DIP Order shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal in any manner except as otherwise agreed to in writing by the Majority DIP Note Purchasers;

(l) the DIP Liens on the DIP Collateral shall remain fully-perfected liens with the priority as set forth herein;

(m) the Administrative Agent and the DIP Note Purchasers shall have received executed copies of each of the DIP Note Documents;

(n) the Administrative Agent shall have received evidence that the DIP Note Parties have complied with all foreign exchange control regulations and have made all the relevant filings before the relevant foreign exchange authorities;

(o) if requested by the Majority DIP Note Purchasers, recognition proceedings under Chapter 15 of Title 11 of the Bankruptcy Code have been filed with the Bankruptcy Court with respect to any *concurso mercantil* proceeding or any similar insolvency or bankruptcy proceeding in Mexico, Colombia or any other jurisdiction outside of the U.S.; and

(p) a report validating the Colombian and Mexican loan portfolios, respectively (which shall include a review and examination of the Colombian and Mexican portfolios, as applicable) prepared by PricewaterhouseCoopers shall have been (i) provided to each of the advisors to the DIP Note Purchasers and (ii) reasonably satisfactory to the Majority DIP Note Purchasers; provided that such report will not be publically disclosed.

*See* DIP Term Sheet at 7-9 (Conditions Precedent to Full Availability).

---

**Milestones:**

*Bankruptcy Rule 4001(c)(1)(B)(v); Local Rule 4001-2(i)(H)*

DIP Note Parties shall comply with following deadlines ("**DIP Facility Milestones**") including the following:

- The Bankruptcy Court shall have entered the Interim DIP Order no later than seven (7) days after the filing of a motion seeking entry of the Interim DIP Order;

- Debtors shall have appointed the Colombian CRO no later than fifteen (15) calendar days after receipt of the Colombian List;

- The Bankruptcy Court shall have entered the Final DIP Order no later

16

| Summary and Material Terms | |
|---|---|
| | than forty (40) calendar days after the entry of the Interim DIP Order; |
| | • Debtors shall have filed with the Bankruptcy Court section 363 bid procedures for the sale of all or substantially all assets of the DIP Note Parties no later than twenty (20) calendar days after the entry of the Interim DIP Order, which procedures shall include customary provisions relating to bid procedures, deadlines, auction, approval and/or closing conditions, as relevant; |
| | • The Bankruptcy Court shall have entered an order in respect of the Bankruptcy Court section 363 bid procedures (the "**Bid Procedures Order**") no later than forty-five (45) calendar days after the entry of the Interim DIP Order; |
| | • Debtors shall have provided to each of the advisors to the Agents and the DIP Note Purchasers an initial draft of the Debtors' plan of reorganization and/or liquidation within sixty (60) calendar days after the entry of the Interim DIP Order; |
| | • An auction in respect of the Debtors' assets shall have been conducted no later than ninety (90) calendar days after the Petition Date; and |
| | • The Bankruptcy Court shall have entered an order confirming the Approved Plan no later than thirty (30) days prior to the Scheduled Maturity Date. |
| | *See* DIP Term Sheet at 18-19 (Milestones) |
| **Interest Rates:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii)* | 10.0% *per annum*, payable monthly in cash, in arrears, or at the sole option of the Borrowers.<br><br>Automatically after the occurrence of any Event of Default, the applicable interest rate ("**Default Interest Rate**") shall be the applicable interest rate plus 2.00%, which shall accrue on all overdue principal and other DIP Obligations and which shall be due immediately and payable on demand; provided, however, that the Default Interest Rate shall not exceed the maximum interest rate permitted by applicable law.<br><br>*See* DIP Term Sheet, Annex II. |
| **Fees:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(K)* | <u>**Commitment Fee**</u>: 2.0% of the DIP Obligations, payable in cash or in kind, at the election of the Debtors.<br><br><u>**Exit Fee**</u>: 2.0 % of DIP Obligations repaid or prepaid at the time of such repayment (including on the Maturity Date) or prepayment, payable in cash.<br><br>*See* Term Sheet, Annex II, Fee Letter. |
| **DIP Liens and** | Each DIP Note Party hereby and pursuant to the other DIP Note |

| Summary and Material Terms | |
|---|---|
| **Priorities; Liens on Unencumbered Assets:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(a)(i)(G)* | Documents, grants a security interest in all of its rights, title, and interests substantially all of its assets (i.e., the DIP Collateral), in each case to secure the DIP Obligations, which security interest (the "**DIP Liens**") shall have the priority and be fully perfected as described below:<br><br>(a) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests and liens upon all DIP Collateral of such DIP Note Party that are not otherwise subject to valid, perfected and unavoidable liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**") subject and junior to the Carve-Out; and<br><br>(b) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests and liens upon DIP Collateral of such DIP Note Party that is subject to Permitted Prior Liens (if any) which security interests and liens shall be subject and junior to the Prior Permitted Liens and the Carve-Out.<br><br>All DIP Obligations at all times shall be entitled to super-priority claim status in the Chapter 11 Case of each DIP Note Party pursuant to section 364(c)(1) of the Bankruptcy Code (together with the DIP Liens, collectively, the "**DIP Protections**"), which shall be senior to any administrative and unsecured claims against any of the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative claims granted pursuant to the DIP Orders, subject only to the Carve-Out.<br><br>*See* DIP Term Sheet at 10-13 (Security and Priority); Interim DIP Order ¶ 2(f); 2(h). |
| **Waiver of 506(c)/Surcharge; Marshaling Waiver:**<br><br>*Bankruptcy Rule4001(c)(1)(B)(ii); Local Rule 4001-2(a)(i)(V); (i)(X)* | Subject to entry of a Final DIP Order, the DIP Protections shall not be subject to any rights, claims, charges, or liens arising under section 506(c) of the Bankruptcy Code. Upon entry of a Final DIP Order, the obligations under the DIP Facility, including, without limitation, all of the DIP Obligations, shall not be subject to the equitable doctrine of marshaling.<br><br>*See* DIP Term Sheet at 12 (Security and Priority); Interim DIP Order ¶¶ 9; 14(f). |
| **Reporting:**<br><br>*Bankruptcy Rule 4001(c)(1)(B);* | Prior to or on the Closing Date, the Borrowers shall deliver the Initial Approved DIP Budget to the advisors to the Administrative Agent and the DIP Note Purchasers and thereafter, at the end of each four-week period, an updated budget ("**Updated DIP Budget**"); provided, that any |

| Summary and Material Terms | |
|---|---|
| *Local Rule 4001-2(a)(i)(E)* | material change in any Updated DIP Budget from the Initial Approved DIP Budget shall be in form and substance acceptable to the Majority DIP Note Purchasers in their sole discretion. Each Updated DIP Budget shall include a reconciliation of the changes in the previous period's DIP Budget against the corresponding period in the Updated DIP Budget. The term "**DIP Budget**" shall mean the Initial Approved DIP Budget until such time as an Updated DIP Budget is approved, following which such Updated DIP Budget shall constitute the DIP Budget until a subsequent Updated DIP Budget is so approved.   The Debtors' disbursements shall be consistent with the provisions of the DIP Budget (subject to the Variance Limit).<br><br>Bi-Weekly Reporting: Commencing on the first Thursday two weeks after the Closing Date (the "**Initial Reporting Date**"), the Borrowers shall provide (i) a "Variance Report" to the Administrative Agent certified by the chief financial officer of the Borrowers or the Colombian CRO, containing a report showing actual cash receipts and disbursements for the immediately two (2) preceding weeks, noting all variances on a line item basis from amounts set forth in the DIP Budget for such period, and explanations for all material variances and (ii) additional customary reporting to be agreed, including without limitation, estimated administrative claims in respect of tax and other liabilities.<br><br>No later than 4:00 p.m. Eastern Time on two weeks after the Initial Reporting Date and on each fourth Thursday thereafter (each such date, a "**Variance Testing Date**" and each such four-week period, the "**Testing Period**"), the Borrowers shall provide to the Administrative Agent (for circulation to the DIP Note Purchasers) a report detailing (i) the aggregate disbursements of the Debtors and the Mexican Affiliates, respectively, and aggregate receipts of the Debtors and the Mexican Affiliates, respectively, during the applicable Testing Period for (a) all other operating disbursements (excluding capital expenditures), and (b) the Debtors' and Mexican Affiliates professionals' fees; and (ii) any material variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the DIP Issuer against the aggregate disbursements for the Testing Period set forth in the applicable DIP Budget (the "**Variance Reports**").<br><br>The Borrowers shall comply with the following:<br><br>As of any Variance Testing Date, for the Testing Period ending on the Sunday preceding such Variance Testing Date, the Borrowers shall not allow the amount of all operating disbursements (excluding professional and advisory fees for the restructuring advisors payable by the Debtors and the Mexican Affiliates, respectively) in excess of the estimated aggregate disbursement budget for such Testing Period to be greater than 20% of the |

19

| Summary and Material Terms | |
|---|---|
| | estimated aggregate disbursement for such items in the DIP Budget for such Testing Period for the Debtors (in the aggregate) and the Mexican Affiliates (in the aggregate) (collectively, the "**Variance Limit**"). Additional material variances, if any, from the DIP Budget, and any proposed changes to the DIP Budget, shall be subject to the Administrative Agent's approval provided in accordance with the written direction of the Majority DIP Note Purchasers.<br><br>*See* DIP Term Sheet at 17-18 (DIP Budget; Variance Covenants; and other Financial Reporting). |
| **Carve-Out:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(F)* | The DIP Liens will be subject and subordinate to, in each case, the following (collectively, the "**Carve-Out**"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930 of Title 28 of the United States Code; (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) all professional fees and expenses of the professionals retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any official committee (a "**Committee**") appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code that are incurred on or prior to the Carve-Out Trigger Date (as defined below) that are allowed or become allowed at any time, whether by Interim DIP Order, procedural order or otherwise and whether such allowance occurs before or after the Carve-Out Trigger Date (as defined below); and (d) professional fees and expenses of the Debtors in an aggregate amount not to exceed $5,000,000 and any Committee in an aggregate amount not to exceed $500,000 incurred on and after the first business day following Carve Out Trigger Date to the extent allowed at any time, whether by Interim DIP Order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "**Post-Carve Out Trigger Notice Cap**" and collectively with the professional fees and expenses in clause (c), the "**Professional Fees**"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to object to the Professional Fees. The term "**Carve-Out Trigger Date**" shall mean the date on which the Administrative Agent provides written notice to the Debtors and lead counsel to the Debtors, with a copy of such notice to lead counsel for the Committee (if appointed) and the U.S. Trustee (the "**Carve Out Trigger Notice**"), that the Carve-Out is invoked, which Carve Out Trigger Notice shall only be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility and the termination of funding under the DIP Facility.<br><br>*See* DIP Term Sheet at 13-14 (Carve-Out); Interim DIP Order ¶ 7. |
| **Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B);* | The credit agreement for the DIP Facility will include events of default ("**Events of Default**") (and, as appropriate, grace periods) usual and customary for debtor-in-possession financings of this kind, including: |

RLF1 25769477v.1

| Summary and Material Terms | |
|---|---|
| *Local Rule 4001-2(a)(i)(M)* | <ul><li>failure to make payments when due,</li><li>failure to meet Milestones (subject to extensions and grace periods to be agreed),</li><li>defaults under post-petition indebtedness,</li><li>noncompliance with affirmative and negative covenants (subject to grace periods to be agreed),</li><li>breaches of representations and warranties,</li><li>an order shall be entered by the Bankruptcy Court terminating any of the Debtors' exclusive periods for proposing a plan of reorganization in connection with the Chapter 11 Cases (other than as a result of a motion or objection filed by or on behalf of the DIP Note Purchasers, in accordance with the written direction of the Majority DIP Note Purchasers),</li><li>dismissal of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under Chapter 7 or any action by the Debtors seeking to dismiss any Debtor's Chapter 11 Case without the express prior written consent of the Majority DIP Note Purchasers,</li><li>the filing of or confirmation of a plan of reorganization in the Chapter 11 Cases that is not an Approved Plan,</li><li>unstayed judgments against the Debtors in excess of specified amounts,</li><li>invalidity of a material portion of guarantees or liens on a material portion of the DIP Collateral,</li><li>"change of control" of any of the Debtors,</li><li>the Final DIP Order ceases to be in full force and effect,</li><li>commencement of a proceeding seeking the appointment under the Chapter 11 Cases of a custodian, trustee, receiver, liquidator, administrator, administrative receiver or other similar official for the Borrowers or any of the other Debtors or a substantial part of their respective assets, and such proceeding or petition shall remain undismissed for a period of ninety (90) days</li><li>commencement or filing of any *concurso mercantil* or other similar proceeding in Colombia or the U.S. (other than the Chapter 11 Cases) without the express prior written consent of the Majority DIP Note Purchasers,</li><li>any event has occurred with respect to the DIP Note Parties (taken as a whole) since the Petition Date that has resulted in or could reasonably be expected to result in a material adverse change in the operations, assets, revenues or financial condition of the Debtors, taken as a whole (other than by virtue of the Chapter 11</li></ul> |

| Summary and Material Terms | |
|---|---|
| | Cases and the events typically resulting from the filing of the Chapter 11 Cases) ("**Material Adverse Effect**"). |
| | Solely with respect to the Initial Availability, the Borrowers' failure to obtain a Final DIP Order within forty (40) days after entry of the Interim DIP Order shall constitute an "Event of Default" that permits the Majority DIP Note Purchasers, by notice to the Borrowers, to accelerate the obligations in respect thereof. |
| | *See* DIP Term Sheet at 19-20 (Events of Default). |
| **Waiver/Modification of the Automatic Stay:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(a)(i)(S)* | Any applicable stay (including, without limitation, under Bankruptcy Rules 4001(a)(3) 6004(h)) will be waived and shall not apply to the Interim DIP Order.<br><br>*See* Interim DIP Order ¶¶ 5, 14(l). |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vii); Local Rule 4001-2(a)(i)(S)* | The Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to (iii) permit the DIP Agent to make any filings, deliver any notices, make recordations, perform any searches, enter into control agreements, or take any other acts as may be necessary under state law or other applicable law or otherwise desirable in order to protect, preserve and/or enforce the security, perfection, or priority of the DIP Liens. The Debtors shall execute and deliver to the DIP Agent all such financing statements, mortgages, security agreements, notices and other documents as the DIP Agent may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of the DIP Liens.<br><br>*See* DIP Term Sheet at 12 (Security and Priority); Interim DIP Order ¶ 5. |
| **Indemnification:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The DIP Note Parties will indemnify the Agents and the DIP Note Purchasers (each, only in their capacity as such) and each of their affiliates and respective related parties (each an "**Indemnitee**"), and hold each of them harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, this DIP Term Sheet, the transactions contemplated thereby or hereby or by the DIP Facility or any claim, litigation, investigation or proceeding (including criminal proceedings) relating to any of the foregoing, in any jurisdiction, whether or not any of such Indemnified Person is a party thereto and whether or not brought by the Borrowers or |

| Summary and Material Terms | |
|---|---|
| | any other person; <u>provided</u> that no Indemnitee will be indemnified for any such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from any Indemnitee's gross negligence, bad faith, willful misconduct or breach of any obligation under the DIP Facility<br><br>*See* DIP Term Sheet at 21 (Indemnity/Release/Waiver; Expenses). |
| **Release:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(Q)* | The Final DIP Order shall include customary releases of the Agents, the DIP Note Purchasers (only in its capacity as such) and their representatives (only in their capacity as such) in connection with the DIP Facility; for the avoidance of doubt, it is expressly understood that such releases shall not include any liabilities or claims relating to the actions of the Agents or the DIP Note Purchasers in respect to their involvement with the Debtors or their affiliates other than with respect to the DIP Facility.<br><br>*See* DIP Term Sheet at 21 (Indemnity/Release/Waiver; Expenses). |
| **Liens on Certain Avoidance Actions:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U)* | The DIP Collateral shall not include liens on Avoidance Actions but shall include proceeds of any and all Avoidance Actions.<br><br>*See* DIP Term Sheet at 10-11 (Security and Priority); Interim DIP Order ¶ 2(d). |

## BASIS FOR RELIEF

### I.    Entry Into the DIP Facilities Is An Exercise of Sound Business Judgment

24.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents and perform under the DIP Facility. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant considerable deference to debtors acting in accordance with their business judgment in obtaining postpetition financing so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the

selection of the lender."); *In re Dura Auto Sys. Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) ("To determine if the business judgement [sic] test is met, the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'") (citation omitted); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 Bankr. LEXIS 1917, at *40 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.").

25.     The Debtors believe that the terms and conditions of the DIP Facility and the DIP Loan Documents are fair and reasonable, as they are the most advantageous terms available under the circumstances, and are market tested and the product of arms' length and good faith negotiations.

26.     The Debtors submit that their decision to enter into the DIP Facility and the DIP Loan Documents is a reasonable exercise of their business judgment and, consistent with this authority, that the Court should approve such decision.  Specifically, the Debtors, with the advice and counsel of their advisors, have determined that they will require immediate liquidity to fund the administrative costs of the Chapter 11 Cases and the ongoing needs of their business.  Indeed, without immediate additional liquidity, the Debtors may be unable to preserve their business and maximize value for their estates, to the detriment of the Debtors' creditors, employees, and other parties in interest.

27.     Moreover, the Debtors have made a concerted good faith effort to obtain credit on the most favorable terms available.  With the assistance of their legal and financial advisors, the Debtors carefully considered their options with respect to DIP financing and weighed the

advantages and disadvantages of the selected proposal and alternatives.  Specifically, the Debtors

sought DIP financing from a variety of third parties, and reached out to thirteen (13) potential

investors, none of whom offered viable or superior financing proposals.  Messer Decl. ¶¶ 8-10.

Ultimately, the DIP Facility provided by the DIP Note Purchasers will provide the Debtors with

necessary liquidity on the most advantageous terms with respect to pricing, flexibility on use of

proceeds, and collateral coverage.

28.    Against this backdrop, the Debtors carefully evaluated the proposed financing

structure from the DIP Note Purchasers, engaged in negotiations with the DIP Note Purchasers

regarding the proposed terms, and eventually agreed to the DIP Note Purchasers' proposal as

being best suited to the Debtors' needs.  Messer Decl. ¶ 10.  The terms and conditions of the DIP

Facility and the DIP Loan Documents were negotiated by the parties (with the assistance of their

legal and financial advisors) in good faith and at arms' length and, as outlined above, were

instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in

chapter 11 to preserve the value of the Debtors' assets.  *Id.* ¶¶ 13-15.  Keeping in mind the

advantages and disadvantages of the DIP Facility and the DIP Loan Documents, the Debtors

ultimately decided that moving forward with the DIP Facility and the DIP Loan Documents was

appropriate and in the Debtors' best interests, and that the DIP Facility was the best financing

facility available.  *Id.* ¶ 10.

29.    On the basis of the foregoing, the Debtors submit that entry into the DIP Facility

and the DIP Loan Documents is in the best interests of the Debtors' creditors, is necessary to

preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable

business judgment.

**II.    The Debtors Should Be Authorized To Obtain Postpetition Financing On A Secured
Superpriority Basis**

30.     In connection with the DIP Facility, the Debtors will provide the DIP Note Purchasers with security interests, liens, and superpriority claims pursuant to section 364(c) of the Bankruptcy Code.  The Debtors meet the requirements of section 364(c) of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

31.     In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether (a) unencumbered credit or alternative financing without superpriority status is available to the debtor, (b) the credit transactions are necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate.  *See, e.g.*, *In re L.A. Dodgers*, 457 B.R. at 312; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *Norris Square Civic Ass'n v. Saint Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

32.     The Debtors, through their advisors, solicited other potential debtor-in-possession financing sources but no party agreed to provide unsecured credit sufficient to meet the Debtors' financing needs.  Messer Decl. ¶¶ 8-10.  The best and only available alternative to the Debtors

was to obtain secured superpriority debtor-in-possession financing from the DIP Secured Parties. As the DIP Facility and the DIP Loan Documents provide the Debtors with the liquidity they need at the lowest cost and most favorable terms available, while placing the Debtors on an optimal path for a successful sale process under section 363 of the Bankruptcy Code, the Debtors submit that the requirements of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied. *Id.* ¶¶ 10.

### III.    The DIP Facility is Necessary to Preserve the Assets of the Debtors' Estates

33.    As debtors-in-possession, the Debtors have a fiduciary duty to maximize the value of their estates. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004).   The Debtors should be authorized to use the DIP Facility to finance their operations. First, the Debtors lack the liquidity to be able to continue to operate and need to obtain financing quickly.   Second, the Debtors need the protections of the Bankruptcy Code to implement a marketing and sale process pursuant to section 363 of the Bankruptcy Code.    Further, the Debtors should be authorized to use proceeds of the DIP Facility and Cash Collateral to on-lend to their Mexican Affiliates under the Intercompany Facility. As stated above, the Mexican Affiliates are vital to the survival of the Debtors' operations.   Without ensuring the Mexican Affiliates can continue their operations, the Debtors' operations would fail.   The Intercompany Facility ensures the survival of the Mexican Affiliates and will preserve the value of the Debtors' Colombian loan portfolio.

34.    If the Debtors are unable to obtain approval of the DIP Facility and the DIP Loan Documents, their ability to maintain their business operations as debtors-in-possession will be jeopardized, substantially reducing recoveries to all creditors.   Entry of the DIP Order is therefore critical to the Debtors' ability to preserve and maximize the value of Debtors' estates,

27

in the best interests of the Debtors and their estates, and necessary to avoid irreparable harm to the Debtors, their creditors and their assets, business, goodwill, reputation, and employees. Furthermore, use of the proceeds under the DIP Facility is necessary to avoid immediate and irreparable harm to the value of the Debtors' assets.

35.    As indicated above and set forth in further detail in the Messer Declaration, the proposed financing is critical to the Debtors' operation and their ability to preserve the value of their assets pending a successful sale under chapter 11 of the Bankruptcy Code.  Messer Decl. ¶¶ 19.  The proposed financing under the DIP Facility and the DIP Loan Documents is needed to maintain an appropriate level of liquidity, help fund the Debtors' day-to-day operations, and contribute capital to the Mexican Affiliates in order to preserve the Debtors' estates and maximize the value of the Debtors' assets.  *Id.*

## IV.    The Carve-Out Is Appropriate

36.    As provided in the proposed DIP Order, all liens and claims with respect to the DIP Facility, the DIP Loan Documents, and the DIP Obligations, are subject and subordinate to the Carve-Out.  Bankruptcy courts in this District routinely have approved carve-outs for professionals' fees in other chapter 11 cases.  *See, e.g.*, *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) [D.I. 123]; *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. March 20, 2018) [D.I. 130]; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) [D.I. 130]; *In re Am. Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) [D.I. 248].  The Carve-Out is consensual and represents agreement between the Debtors and the DIP Note Purchasers.  Messer Decl. ¶ 11.

37.    Without the Carve-Out, the Debtors may be harmed because the services for which professionals may be paid in these Chapter 11 Cases would be restricted.  *See In re Ames*

28

*Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out proposed in this case is reasonable under the circumstances, agreed to by the DIP Note Purchasers, and consistent with recent precedent.  Messer Decl. ¶ 15.

## V.    The DIP Note Purchasers Should Be Deemed Good Faith Lenders Under Section 364(e)

38.    The DIP Note Purchasers should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility and the DIP Loan Documents are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Note Purchasers will be fully protected with respect to any amounts previously disbursed.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

39.    Here, the Debtors believe the DIP Facility and the DIP Loan Documents embody the most favorable terms on which the Debtors could obtain debtor-in-possession financing.  As described in the Messer Declaration, all negotiations of the DIP Loan Documents with the DIP Note Purchasers were conducted in good faith and at arms' length.  The terms and conditions of the DIP Loan Documents, including the pricing, flexibility regarding use of proceeds, covenants, and case milestones, and collateral coverage are fair and reasonable.  Messer Decl. ¶ 18.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Loan Documents and the DIP Budget.  Further, no

29

consideration will be provided to any party to the DIP Loan Documents other than as described herein, and the DIP Order and any exhibits thereto. Accordingly, the Court should find that the DIP Note Purchasers are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## VI.   The Automatic Stay Should be Modified on a Limited Basis

40.     The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit the Debtors to, among other things, permit the DIP Agent to make any filings, deliver any notices, make recordations, perform any searches, enter into control agreements, or take any other acts as may be necessary under state law or other applicable law or otherwise desirable in order to protect, preserve and/or enforce (subject to paragraph 12 of the Interim DIP Order) the security, perfection, or priority of the DIP Liens.

41.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. *See, e.g., In re Exide Holdings, Inc.,* Case No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) [D.I. 123]; *In re Checkout Holding Corp.,* Case No. 18-12794 (KG) (Bankr. D. Del. Dec. 13, 2018) [D.I. 105]; *In re Mattress Firm, Inc.,* Case No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018) [D.I. 184]; *In re NORDAM Grp.,* Inc., Case No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) [D.I. 85]; *In re Claire's Stores, Inc.,* Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) [D.I. 130]..[6]

---

[6]        Due to their voluminous nature, these orders are not attached to this Motion, but are available on request.

30

## RESERVATION OF RIGHTS

42.     The Debtors reserve all rights.  Without limiting the generality of the foregoing, nothing contained herein is or should be construed as:  (a) an admission as to the validity, extent, perfection, priority, allowability, enforceability, or character of any claim or any security interest which purportedly secures such claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a promise to pay any claim; (d) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and nothing herein otherwise affects the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease with any party subject to this Motion; (f) granting third-party beneficiary status or bestowing any additional rights on any third party; or (g) being otherwise enforceable by any third party.  Nothing contained in the DIP Order shall be deemed to increase, reclassify, elevate or an administrative expense status, or otherwise affect any claim to the extent it is not paid.

## REQUEST FOR HEARING AND AUTHORITY TO MAKE INTERIM BORROWING UNDER THE DIP FACILITY

43.     Rule 4001(c) of the Bankruptcy Rules provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Fed. R. Bankr. P. 4001(c).  Upon request, however, this Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's

31

estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., *In re Simasko*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also *In re Ames Dep't Stores*, 115 B.R. at 38.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. See, e.g., *Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

44.    Pursuant to Rule 4001(c) of the Bankruptcy Rules, the Debtors respectfully request that this Court conduct a preliminary hearing on the Motion and authorize the Debtors from the entry of the Interim DIP Order until the Final Hearing to obtain access to up to $17.5 million of the DIP Notes (the "**Initial Availability**") upon the date of entry of the Interim DIP Order to avoid immediate and irreparable harm to the Debtors' estates pending a final hearing on the Motion.  Unless the DIP Facility is approved on an interim basis as requested, the Debtors will not have sufficient liquidity to bridge to a final hearing and the Debtors' estates would thereby be severely negatively impacted.

## SCHEDULING FINAL HEARING

45.    The Debtors respectfully request that the Court schedule the Final Hearing on the same date to consider confirmation of the Plan, and set a deadline to object to entry of the Final DIP Order as set forth in the proposed Interim DIP Order.

## WAIVER OF BANKRUPTCY RULES 4001(a)(3), 6004(a), AND 6004(h)

46.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) and waive the fourteen (14) day stay of an order authorizing (i) the use, sale or lease of property under Bankruptcy Rule

6004(h) and (ii) a modification of the automatic stay under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 4001(a)(1).  The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important relationships with customers, meet payroll for their employees, and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties-in-interest. As explained above and in the Messer Declaration, access to the DIP Proceeds under the DIP Facility is essential to prevent irreparable damage to the Debtors' estates.  Accordingly, ample cause exists to find the notice requirements of Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay under Bankruptcy Rules 4001(a)(3) and 6004(h).

<u>**NOTICE**</u>

47.    Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel: (i) the U.S. Trustee; (ii) counsel to the Ad Hoc Group of Bondholders; (iii) each of the Debtors' 30 largest unsecured creditors (on a consolidated basis); (iv) the Internal Revenue Service; (v) the United States Attorney's Office for the District of Delaware; (vi) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m); and (vii) any such other party entitled to receive notice pursuant to Bankruptcy Rule 2002.  The

33

Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## **NO PRIOR REQUEST**

48.     No previous request for the relief sought herein has been made by the Debtors to this Court or any other court.

34

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court grant the relief requested in this Motion, the DIP Order, and such other and further relief as is just and proper.

Dated: August 2, 2021

Respectfully submitted,

/s/ *Mark D. Collins*

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brendan J. Schlauch (No. 6115)
Megan E. Kenney (No. 6426)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
collins@rlf.com
knight@rlf.com
schlauch@rlf.com
kenney@rlf.com

*Proposed Co-Counsel to Debtors and Debtors in Possession*

**WHITE & CASE LLP**

John K. Cunningham (*pro hac vice* pending)
Richard S. Kebrdle (*pro hac vice* pending)
Amanda A. Parra Criste (*pro hac vice* pending)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
jcunningham@whitecase.com
rkebrdle@whitecase.com
aparracriste@whitecase.com

Philip M. Abelson (*pro hac vice* pending)
John J. Ramirez (*pro hac vice* pending)
Brett L. Bakemeyer (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
philip.abelson@whitecase.com
john.ramirez@whitecase.com
brett.bakemeyer@whitecase.com

*Proposed Co-Counsel to Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Proposed Interim DIP Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
|  | Case No. 21-[_____] ( ) |
| Alpha Latam Management, LLC, *et al.*,[1] | (Joint Administration Requested) |
| Debtors. | **Re:  Docket No. [●]** |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS, (II) SCHEDULING A FINAL HEARING AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of Alpha Latam Management, LLC and its affiliated debtors (the "**Debtors**") for entry of an order pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**") and Rules 2002-1, 4001-2, 9006-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedures for the District of Delaware (the "**Local Rules**") (i) authorizing the Debtors to obtain secured postpetition financing on a superpriority basis and granting liens and superpriority administrative claims, (ii) scheduling a final hearing, and (iii) granting related relief, the Debtors sought, among other things the following relief:

(i)        the Court's authorization, pursuant to section 364 of the Bankruptcy Code, for Alpha Capital, S.A.S. ("**Alpha Capital**") and AlphaDebit, S.A. de C.V. ("**AlphaDebit**" and,

---

[1]        The Debtors in these cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Alpha Latam Management, LLC (4610); Acsa Atento S.A.S. (766-6); Alpha Capital S.A.S. (717-5); AlphaCredit Latam S.A.S. (326-5); AlphaCredit Sudamérica, S. de R.L. (72 87); AlphaDebit, S.A. de C.V. (3FI4); and Vive Créditos Kusida S.A.S. (013-4). Alpha Latam Management, LLC's registered address is 1209 N Orange Street, Wilmington, DE 19801. The main address of the other Debtors is Carrera 14 No. 94 – 81, Bogotá, Colombia.

together with Alpha Capital, the "**DIP Borrowers**") to obtain a debtor-in-possession financing facility (the "**DIP Facility**"), and for each of the other Debtors other than the DIP Borrowers (the "**DIP Guarantors**" and, together with the DIP Borrowers, the "**DIP Obligors**") to enter into guarantees (the "**DIP Guarantees**"), pursuant to which the DIP Guarantors shall unconditionally, on a joint and several basis, guarantee, the DIP Facility, consisting of a term loan credit facility pursuant to the Senior Secured Super-priority Debtor-in-Possession Note Purchase Agreement attached hereto as **Exhibit A** (as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with its terms, and including the exhibits and schedules, the "**DIP Note Purchase Agreement**"[2] and, collectively with this order (the "**Interim Order**"), the Final Order (as defined below), the DIP Budget (as defined below), a definitive New York law governed security agreement, a Colombian law security agreement and all other agreements, documents and instruments delivered or executed in connection therewith, in each case as amended, restated, supplemented or otherwise modified from time to time and which will be in form and substance acceptable to the Majority DIP Note Purchasers (defined below), acting reasonably (the "**DIP Loan Documents**"), provided by UMB Bank, as administrative agent (in such capacity, the "**DIP Agent**"), and the purchasers thereunder (in such capacity, together with any successors and assigns permitted under the DIP Note Purchase Agreement, the "**DIP Note Purchasers**" and, together with the DIP Agent, the "**DIP Secured Parties**"), which shall be available, subject to the terms and conditions set forth in this Interim Order and the other DIP Loan Documents, (1) during the period (the "**Interim Period**") from the date hereof through and including the earlier to occur of (x) the date of entry of the Final Order

---

[2]        The DIP Note Purchase Agreement attached hereto as Exhibit A does not include the exhibits or schedules thereto.  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Note Purchase Agreement.

2

by this Court and (y) the Termination Date (as defined below), in a single draw in principal amount not to exceed $17,500,000 (the "**Initial DIP Term Loan**") and (2) upon entry of the Final Order, in an aggregate principal amount not to exceed $45,000,000, inclusive of the principal amount of the Initial DIP Term Loan (together with all other financial accommodations and extensions of credit under the DIP Facility, the "**DIP Extensions of Credit**");

(ii)    the Court's authorization for the Debtors to execute the DIP Note Purchase Agreement and the other DIP Loan Documents to which they are party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(iii)    the Court's authorization for the Debtors to use DIP Extensions of Credit (A) in accordance with the rolling cash forecast in form, scope and substance acceptable to the Majority DIP Note Purchasers, for a period of thirteen (13) weeks beginning on the Petition Date attached hereto as **Exhibit B** (as updated every four (4) weeks after the Petition Date in accordance with the terms of the DIP Loan Documents, including the requirement that the Majority DIP Note Purchasers consent to any modifications to the DIP Budget and any updated version of the DIP Budget, the "**DIP Budget**"), including any variances permitted under the DIP Note Purchase Agreement (the "**Permitted Variances**") and (B) in accordance with all other DIP Loan Documents;

(iv)    the Court's authorization to grant to the DIP Agent, for the benefit of the DIP Note Purchasers, in respect of the DIP Obligations (as defined below), (A) a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve-Out and (B) liens on and security interests in all assets and property of the Debtors (now

3

owned or hereafter acquired), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, in each case as, and to the extent, set forth below;

(v)      the modification or waiver by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including under Bankruptcy Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")) to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, this Interim Order and the other DIP Loan Documents and to provide for the immediate effectiveness of this Interim Order;

(vi)      the scheduling by the Court of an interim hearing (the "**Interim Hearing**") to consider entry of this Interim Order;

(vii)      the scheduling by the Court of a final hearing (the "**Final Hearing**") to consider entry of an order (the "**Final Order**" and the Interim Order and the Final Order, as applicable, the "**DIP Orders**") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

(viii)      approval of this Interim Order and the Final Order.

The Court having found that it has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (Sleet, C.J.); and consideration of the Motion and the Interim Hearing and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due, sufficient, and proper notice of the Motion and the Interim Hearing having been provided under the circumstances and

4

in accordance with the Bankruptcy Rules and the Local Rules; and it appearing that no other or further notice need be provided; and the Interim Hearing having been held to consider the relief requested in the Motion; and upon consideration of the First Day Declaration, the *Declaration of Marcelo Messer in Support of the Debtors' Motion (i) Authorizing the Debtors to Obtain Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (ii) Scheduling a Final Hearing, and (iii) Granting Related Relief*, and the record of the Interim Hearing; and the Court having found and determined that (A) the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, their creditors, their stakeholders, and all other parties-in-interest, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets and (B) that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

## THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    **Petition Date**.    On August 1, 2021 (the "**Petition Date**"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code (the "**Cases**") with the United States Bankruptcy Court for the District of Delaware (the "**Court**").    The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.    No trustee or examiner has been appointed in the Cases.

B.    **Jurisdiction and Venue**.    The Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. § 1334.    Consideration of the Motion constitutes a core proceeding under

5

28 U.S.C. § 157(b)(2).  Venue for the Cases and the proceedings on the Motion is proper in this

district pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.    **Notice**.  The Debtors have represented that notice of the Interim Hearing and the

relief requested in the Motion has been provided by the Debtors, to: (i) the Office of the United

States Trustee for the District of Delaware; (ii) counsel to the Ad Hoc Group; (iii) each of the

Debtors' 30 largest unsecured creditors (on a consolidated basis); (iv) Internal Revenue Service;

(v) the United States Attorney's Office for the District of Delaware; (vi) any such other party

entitled to notice pursuant to Local Rule 9013-1(m); and (vii) any such other party entitled to

receive notice pursuant to Bankruptcy Rule 2002.  Under the circumstances, such notice of the

Interim Hearing and the relief requested in the Motion constitutes due, sufficient and appropriate

notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and

4001(b) and (c) and the Local Rules and no other or further notice of the Motion with respect to

the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

        D.    **Immediate Need for Postpetition Financing**.  The Debtors have requested

immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).

Good cause has been shown for entry of this Interim Order.  An immediate need exists for the

Debtors to obtain the DIP Financing in order to continue operations, to satisfy in full the costs

and expenses of administering these Cases and to preserve the value of their estates. The ability

of the Debtors to finance their operations, to preserve and maintain the value of the Debtors'

assets and to maximize the return for all creditors requires the availability of the DIP Facility.  In

the absence of the availability of such funds and liquidity in accordance with the terms hereof,

the continued operation of the Debtors' businesses would not be possible and serious and

irreparable harm to the Debtors and their estates and creditors would occur.  Thus, the ability of

6

the Debtors to preserve and maintain the value of the assets and maximize the return for creditors requires the availability of working capital from the DIP Facility.

E.     **No Credit Available on More Favorable Terms**.   The DIP Note Purchasers have agreed to extend credit solely on the terms set forth in this Interim Order and the other DIP Loan Documents. The Debtors have been unable to obtain unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) of the Bankruptcy Code, on more favorable terms than those set forth in this Interim Order.  A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Agent, for the benefit of the DIP Note Purchasers, superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents.

F.     **Debtors' Acknowledgments and Stipulations.**  Without prejudice to the rights of any other party in interest, the Debtors admit, stipulate and agree that:

(i)    *Necessary Approvals*.  No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body, except for the Bankruptcy Court, is required for the due execution, delivery and performance by any Debtor of the DIP Note Documents.

(ii)   *DIP Liens and Obligations*.   Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the DIP Liens (as defined below) by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise, except with respect to (a) prior payment of

7

the Carve-Out and (b) the Permitted Prior Liens.  Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or; ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to prior payment of the Carve-Out.

(iii)    *Cash Collateral*.    For purposes of this Interim Order, the term "**Cash Collateral**" shall mean all cash and cash equivalents of the Debtors constituting DIP Collateral (as defined below), whenever or wherever acquired, and the proceeds of all DIP Collateral whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise and shall include, without limitation:

    a.  all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any DIP Collateral, whether such property existed as of the commencement of these Chapter 11 Cases or arose or was generated thereafter;

    b.   all of the respective deposits, refund claims and rights in retainers of the Debtors constituting DIP Collateral; and

    c.  the proceeds of any sale of DIP Collateral.

The Debtors' use of Cash Collateral shall be subject to the terms of this Interim Order.

G.    **Use of Proceeds of the DIP Facility and DIP Collateral**.  The Debtors require the proceeds of the DIP Facility (i) for working capital and general corporate purposes, including for AlphaDebit and Alpha Capital to on-lend to certain non-Debtor Mexican affiliates of the

8

Debtors (the "**Mexican Affiliates**"), pursuant to an intercompany working capital facility effectuated prepetition (the "**Intercompany Facility**"), which is secured by the Mexican Affiliates' unencumbered loan portfolio and other assets, (ii) to pay fees and expenses incurred by the DIP Note Purchasers in connection with the DIP Loan Documents as provided therein, (iii) to pay restructuring costs and Professional Fees (as defined below) of the Debtors relating solely to the Debtors, and (iv) for other purposes as provided in and subject to the terms of the DIP Note Purchase Agreement and subject to compliance with the DIP Budget and the Permitted Variances.  All loan proceeds of the DIP Facility and the DIP Collateral (net of any amounts used to pay fees, costs and expenses payable under this Interim Order) shall be used and/or applied by the Debtors in accordance with the terms and conditions of this Interim Order, the DIP Budget (subject to the Permitted Variances) and the other DIP Loan Documents.

H.    **Extension of Financing**.  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Note Purchase Agreement and the other DIP Loan Documents (including the conditions precedent set forth therein) and subject to: (i) the entry of this Interim Order, with respect to the Initial DIP Term Loan, and the Final Order; (ii) the applicable Debtors being authorized to perform under the Intercompany Facility; (iii) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (iv) findings by this Court that such financing is essential to the Debtors' estates, that the DIP Secured Parties are extending credit to the Debtors pursuant to the DIP Loan Documents and this Interim Order in good faith, and that the DIP Agent's and DIP Note Purchasers' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

J.        **Fair Consideration and Reasonably Equivalent Value.**  Each of the Debtors

has received and will receive fair and reasonable consideration in exchange for access to the DIP

Facility and all other financial accommodations provided under the DIP Loan Documents and

this Interim Order.  The terms of the DIP Loan Documents are fair and reasonable, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are

supported by reasonably equivalent value and fair consideration.

I.        **Business Judgment and Good Faith Pursuant to Section 364(e).**

(i)        The terms and conditions of the DIP Facility, including, without

limitation, the interest rates and fees owed thereunder are fair, reasonable, and the best available

under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are

supported by reasonably equivalent value and consideration;

(ii)        the DIP Facility was negotiated in good faith and at arm's length among

the Debtors and the DIP Secured Parties; and

(iii)        the use of the proceeds to be extended under the DIP Facility will be so

extended in good faith and for valid business purposes and uses, as a consequence of which the

DIP Secured Parties is entitled to the protection and benefits of section 364(e) of the Bankruptcy

Code and the DIP Agents and the DIP Note Purchasers (and the successors and assigns thereof)

shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that

this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or

otherwise.

J.        **Relief Essential; Best Interest**.  The relief requested in the Motion (and provided

in this Interim Order) is necessary, essential and appropriate for the continued operation of the

Debtors' businesses and the management and preservation of the Debtors' assets and property.  It

10

is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility and incur the DIP Obligations as contemplated herein.

K. **Permitted Priority Liens**. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Agent, the DIP Note Purchasers, or a Committee (if any) to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any alleged Permitted Prior Lien. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien and is expressly subject to the DIP Liens (as defined herein).

**NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1. **Motion Granted.** The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order, to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2. **DIP Facility.**

(a) **DIP Obligations**. The Debtors are expressly and immediately authorized and empowered to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with and subject to this Interim Order, the DIP Budget (subject to the Permitted

11

Variances) and the other DIP Loan Documents, to execute and/or deliver all DIP Loan Documents and all other related instruments, certificates, agreements and documents, and to take all actions which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein.  The Debtors are hereby authorized to pay all principal, interest, fees and expenses, indemnities and other amounts described herein and in the other DIP Loan Documents as such shall accrue and become due hereunder or thereunder, including, without limitation, the reasonable and documented fees and expenses of the attorneys and financial and other advisors and consultants of the DIP Secured Parties as, and to the extent, provided for herein, the DIP Budget (subject to the Permitted Variances) and in the other DIP Loan Documents (collectively, all loans, advances, extensions of credit, financial accommodations, fees, expenses and other liabilities and obligations (including indemnities and similar obligations) in respect of DIP Extensions of Credit, the DIP Facility and the DIP Loan Documents, the "**DIP Obligations**"); provided that the payment of any invoices of the DIP Secured Parties' professionals for fees and expenses incurred after entry of this Interim Order shall be subject to the notice and objection provisions of paragraph 14(b) hereof.  The DIP Loan Documents and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto in accordance with their terms.  No obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

12

(b)    **Authorization to Borrow.**  In order to continue to operate their business and preserve the value of their assets, subject to the terms and conditions of this Interim Order and the other DIP Loan Documents (including the DIP Budget), the DIP Borrowers are hereby authorized to borrow under the DIP Facility during the Interim Period in a single draw of $17,500,000.

(c)    **DIP Budget**.

(I)    The Debtors have delivered the DIP Budget to the DIP Secured Parties.  The DIP Budget shall at all times be in form, scope and substance reasonably satisfactory to the Majority DIP Note Purchasers.  The Debtors shall provide updates to the DIP Budget at least once every four (4) weeks, in accordance with the terms of the DIP Loan Documents; provided that any change in any updated DIP Budget from the prior DIP Budget shall be in form and substance satisfactory to the Majority DIP Note Purchasers in their sole discretion.  The Debtors shall also provide (i) a report to the DIP Agent certified by the chief financial officer of the Borrowers or the Colombian Chief Restructuring Officer (the "**Colombian CRO**") showing actual cash receipts and disbursements for the immediately two (2) preceding weeks, noting all variances on a line item basis from amounts set forth in the DIP Budget for such period, and explanations for all material variances (the "**DIP Budget Variance Report**") and (ii) additional customary reporting to be agreed among the Borrowers and the DIP Note Purchasers.  Funds borrowed under the DIP Credit Agreement and Cash Collateral used as permitted under this Interim Order, as well as other cash held by the Debtors, shall be used by the Debtors in accordance with the DIP Budget

13

(subject to the Permitted Variances), the DIP Loan Documents and this Interim Order. The consent of the Majority DIP Note Purchasers to any DIP Budget shall not be construed as a commitment to provide DIP Extensions of Credit or to permit the use of Cash Collateral (subject to the Carve-Out) after the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the DIP Budget have been expended.

(II)    Any amendments, supplements or modifications to the DIP Budget must be consented to in writing (which may be provided by an e-mail from counsel) by the Majority DIP Note Purchasers, in their sole discretion in accordance with the DIP Note Purchase Agreement, prior to the implementation thereof and shall not require further notice, hearing, or court order; provided, however, that the Debtors will provide written notice of any such amendment, supplement or modification to the Committee (if any).

(III)    The DIP Secured Parties (i) may assume the Debtors will comply with the DIP Budget (subject to the Permitted Variances), (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any DIP Budget. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be amended or modified from time to time. The DIP Agent and the DIP Note Purchasers are relying, in part, upon the Debtors' agreement to comply with the DIP Budget (subject to the Permitted Variances) as provided in the DIP Credit Agreement, the other DIP Loan Documents, and this Interim Order in determining

14

to enter into the postpetition financing arrangements provided for in this Interim Order.

(d)    **DIP Collateral**.    As used herein, "**DIP Collateral**" shall mean with respect to any DIP Obligor, all real and personal property of such DIP Obligor, including, without limitation: (a) all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments, supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, and accessions, loan assets and shares of the Debtors, rights under the Intercompany Facility, unencumbered performing and non-performing and written-off loan assets and government receivables in Colombia, and the equity interests owned by the Debtors, and proceeds (as defined in the Uniform Commercial Code ("**UCC**")) of the foregoing, wherever located, including insurance or other proceeds); (b) all owned real property, all leased real property, all rents and leases from any real property interests, and all other proceeds of real property; (c) subject to the entry of a Final Order, the proceeds of any avoidance actions brought pursuant to sections 502(d), 544, 545, 547, 548, 549 (except as set forth in clause (d) below), 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code; (d) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of

15

the DIP Collateral or post-petition transfer of proceeds of the DIP Notes and (e) subject to the entry of a Final Order, the Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof; provided that DIP Collateral shall not include (i) property that cannot be subject to liens pursuant to applicable law, rule, contract or regulation or restrictions of contract existing on the Termination Date or the time of entry of such contract (other than to the extent such restriction is ineffective under the UCC or other applicable law); (ii) avoidance actions brought pursuant to claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code; (iii) any funds held in escrow as a deposit in connection with a bid under the Bid Procedures Order until such deposit is applied in connection with consummating a sale; and (iv) other excluded property as set forth in the DIP Loan Documents. For the avoidance of doubt, the DIP Collateral shall include all the foregoing rights, property, claims, and interests, without regard as to whether such rights, property, claims, and interests came into the Debtors' estates, or otherwise arose, after the Petition Date.

(e)     **Valid and Binding Obligations**.  All DIP Obligations shall constitute valid, binding, and nonavoidable obligations of each of the Debtors, enforceable against each of them and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

16

(f)    **DIP Liens**.  Effective immediately upon the entry of this Interim Order, and subject and subordinate to the Carve-Out, as set forth more fully in this Interim Order, the DIP Agent for the ratable benefit of the DIP Secured Parties is hereby granted the following security interests and liens, which shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to this Interim Order, any Final Order and the other DIP Loan Documents, the "**DIP Liens**"):

(I)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected first priority senior security interests in and liens upon all DIP Collateral, whether existing on the Petition Date or thereafter acquired, that is not otherwise subject to valid, perfected and non-avoidable liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**"), subject and junior to the Carve-Out; and

(II)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests and liens upon DIP Collateral that is subject to Permitted Prior Liens, which security interests and liens shall be subject and junior to the Prior Permitted Liens and the Carve-Out.

(g)    **Effectiveness of DIP Liens**.    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of

17

the Petition Date, or created under sections 363 or 364 of the Bankruptcy Code or otherwise, other than (i) the Permitted Prior Liens and (ii) prior payment of the Carve-Out.

(h) **Superpriority Administrative Claim Status**. The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute (without the need to file a proof of claim or to take any further action or file any further document or pleading with the Bankruptcy Court or another court or governmental office) an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**") of the DIP Agent for the benefit of the DIP Secured Parties against each of the Debtors' estates with priority over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now existing or hereafter arising or incurred, of any kind whatsoever, including any and all administrative expenses or other claims of the Debtors of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 507, 546(c), 726, 1114, but shall in any event be subject and subordinate to the Carve-Out. The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. Except as referenced in this Interim Order, no other superpriority claims shall be granted or allowed in these Cases or in any Successor Case(s). The DIP Superpriority Claim shall be senior in all respects to any other superpriority claims granted in these Cases.

(i) **DIP Proceeds Account**. Any and all DIP Extensions of Credit shall be deposited into an account of the Debtors designated for the purpose of holding loan proceeds of the DIP Facility (the "**DIP Proceeds Account**"). The DIP Agent, for the ratable benefit of the DIP Secured Parties, shall hereby be granted a valid, enforceable, fully perfected and non-avoidable lien on the DIP Proceeds Account. Disbursements from the DIP Proceeds Account shall be made solely in accordance with this Interim Order and the other DIP Loan Documents.

18

3.       __Authorization to Use Proceeds of DIP Facility__.   Subject to the terms and
conditions of this Interim Order and the other DIP Loan Documents, the Debtors are authorized
during the Interim Period to use proceeds of the DIP Facility in the amounts and for the line item
expenditures set forth in the DIP Budget, including for on-lending and performing their other
obligations under the Intercompany Facility; __provided__ that any amounts recovered by
AlphaDebit under the Intercompany Facility shall be transferred as soon as commercially
practicable to Alpha Capital.  The DIP Budget may only be amended, supplemented, modified,
restated, replaced, or extended in accordance with the DIP Loan Documents, and in such case
without further order of the Court, and in all cases, subject to the prior written consent (which
may be provided by e-mail from counsel) of the Majority DIP Note Purchasers, in their sole
discretion in accordance with the DIP Note Purchase Agreement.  Notwithstanding anything
herein to the contrary, subject only to the Debtors' rights under paragraph 12 hereof and the
Carve-Out, the Debtors' right to request DIP Extensions of Credit or use proceeds of the DIP
Facility shall terminate on the Termination Date.

4.       __Authority to Execute and Deliver Necessary Documents.__

(a)       Each of the Debtors is authorized to negotiate, prepare, enter into, and
deliver the DIP Loan Documents, in each case including any amendments thereto.  Each of the
Debtors is further authorized to negotiate, prepare, enter into and deliver any UCC financing
statements, pledge and security agreements, deposit account control agreements, mortgages or
deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and
securing all of the Debtors' DIP Obligations under the DIP Loan Documents, each as may be
provided for under the DIP Note Purchase Agreement or as otherwise reasonably requested by
the DIP Secured Parties.

19

(b)     Each of the Debtors is further authorized to (i) perform all of its obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

5.     **DIP Liens Perfection**.   This Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.   Notwithstanding the foregoing, the automatic stay imposed under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit the DIP Agent to make any filings, deliver any notices, make recordations, perform any searches, enter into control agreements, or take any other acts as may be necessary under state law or other applicable law or otherwise desirable in order to protect, preserve and/or enforce (subject to paragraph 12 hereof) the security, perfection, or priority of the DIP Liens. The Debtors shall execute and deliver to the DIP Agent all such financing statements, mortgages, security agreements, notices and other documents as the DIP Agent may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of the DIP Liens.

6.     **Bar of Challenges and Claims**.   No portion of the Carve-Out, no loan proceeds of the DIP Facility, the DIP Collateral or DIP Extensions of Credit may be used, absent the consent of the Majority DIP Note Purchasers, for the payment of the fees and expenses of any person incurred (i) in investigating, challenging, or in relation to the challenge of, any of the DIP

20

Liens or DIP Obligations, or the initiation or prosecution of any claim or action against any of the DIP Secured Parties (in such capacity), including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, or any state, local or foreign law, in respect of the DIP Facility or (ii) in challenging any DIP Obligations or DIP Liens.

       7.    **Carve-Out**.

       (a)    As used in this Interim Order, the "**Carve-Out**" means the sum of: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a)(6) of Title 28 of the United States Code; (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) to the extent allowed at any time (including after the Carve-Out Trigger Date (as defined below)), whether by interim order, compensation or procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred or accrued by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and any statutory committee (a "**Committee**") appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals the "**Professionals**") that are incurred on or prior to the Carve-Out Trigger Date procedural order or otherwise; and (d) (x) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $5,000,000 and (y) if a Committee is appointed, the Allowed Professional Fees of any Committee Professionals in an aggregate amount not to exceed $500,000, in each case, incurred on and after the first business day following Carve Out Trigger Date to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "**Post-Carve Out Trigger Notice Cap**" and collectively with the fees and expenses described in

clause (c), the "**Professional Fees**"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to object to the Professional Fees.  The term "**Carve-Out Trigger Date**" shall mean the date on which the DIP Agent provides written notice to the Debtors and lead counsel to the Debtors, with a copy of such notice to lead counsel for the Committee (if any) and the U.S. Trustee (the "**Carve Out Trigger Notice**"), that the Carve-Out is invoked, which Carve Out Trigger Notice shall only be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      After the Carve-Out Trigger Date, the DIP Secured Parties shall permit the Debtors to use proceeds of the DIP Facility and Cash Collateral to fund the full amount of the Carve-Out, including the Post-Carve Out Trigger Notice Cap, into a segregated account (the "**Carve-Out Reserve Account**") held by the Debtors, to be applied to the Allowed Professional Fees and the U.S. Trustee and Clerk fees when due and payable (the "**Carve-Out Segregated Funds**"); *provided* that with respect to Cash Collateral no more than $1 million in the aggregate, and $500,000 in any one month shall be used to fund the Carve-Out Reserve Account prior to the Carve-Out Trigger Date.  The Carve-Out Reserve Account shall be maintained, and the funds therein shall be held in trust for the benefit of Professionals and shall be used to pay Allowed Professional Fees and other amounts constituting the Carve-Out prior to any and all other claims. Any and all amounts in the Carve-Out Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the DIP Loan Documents and the DIP Agents shall not be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the DIP Loan Documents.

(c)      Further, notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Carve-Out Segregated Funds to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (ii) in no way shall the DIP Budget, Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Segregated Funds, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors; provided that, for the avoidance of doubt, Professional Fees shall be a specified line item in the DIP Budget, which DIP Budget shall be subject to Majority DIP Note Purchaser approval as set forth herein.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, the Carve-Out, as provided for and capped by this Interim Order, shall be senior to all liens and claims securing the DIP Obligations. Notwithstanding the foregoing, the DIP Note Purchasers reserve all of their rights to challenge or otherwise object to any of the fees or expenses sought to be approved by any of the Professionals.

(d)      Without in any way limiting the Debtors' ability to use the Carve-Out Segregated Funds in the Carve-Out Reserve Account to pay Allowed Professional Fees and the U.S. Trustee and Clerk fees, the residual Carve-Out Segregated Funds shall remain encumbered by and subject to the DIP Liens.  To the extent the Carve-Out Segregated Funds in the Carve-Out Reserve Account exceed the allowed Professional Fees and the U.S. Trustee and Clerk fees, any such remaining amounts shall be promptly returned to the DIP Agent for the benefit of the DIP Secured Parties. Any payment of Allowed Professional Fees incurred after the delivery of a Carve-Out Trigger Notice shall permanently reduce the Post-Carve Out Trigger Notice Cap on a dollar-for-dollar basis.

8.      **Payment of Compensation**.    None of the DIP Agent or the DIP Note Purchasers shall be responsible for the payment or reimbursement of any fees or disbursements of any Debtor Professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent or the DIP Note Purchasers in any way, to pay compensation to, or to reimburse expenses of, any Debtor Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any of the Debtors or the Committee (if any) or shall limit or otherwise affect the right of the DIP Secured Parties or any other party in interest to object to the allowance and payment of any such fees and expenses.  No Professional's fees shall be paid absent a Court order allowing such payment, pursuant to a fee application on notice, or other procedure permitted by any Court order allowing interim compensation or the payment of fees of ordinary course professionals.  So long as no Event of Default exists that has not been waived in writing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed by the Court and payable under sections 330 and 331 of the Bankruptcy Code or compensation procedures approved by the Court, and the same shall not reduce the Post Carve-Out Trigger Notice Cap.

9.      **Section 506(c) Claims**.  Subject to the entry of the Final Order, as a further condition of the DIP Facility, any obligation of the DIP Secured Parties to make DIP Extensions of Credit, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, or the DIP Collateral.  Save and

24

except for the Carve-Out, nothing contained in this Interim Order, in the Final Order or in the other DIP Loan Documents shall be deemed a consent by the DIP Secured Parties to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral under 506(c) of the Bankruptcy Code or otherwise.

10.    **Disposition of DIP Collateral**.    The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Loan Documents or as approved by the Court.

11.    **Survival of Certain Provisions**.  In the event of the entry of any order converting any of these Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "**Successor Cases**"), the DIP Liens, the DIP Superpriority Claim, and the Carve-Out shall continue in these proceedings and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, and the Carve-Out shall maintain their respective priorities as provided by this Interim Order. Notwithstanding anything to the contrary herein, the proviso in paragraph 3 of this Interim Order shall survive repayment or termination of the DIP Facility and will control in any Successor Case.

25

12.    **Events of Default; Rights and Remedies Upon Event of Default**.

(a)    The term "**Termination Date**" shall mean: the earliest to occur of (i) forty (40) days after entry of this Interim Order (or such later date if agreed to by the DIP Secured Parties in its sole discretion) if the Final Order has not been entered by such date, (ii) the delivery of a Carve-Out Trigger Notice, (iii) the Maturity Date (as defined in the DIP Note Purchase Agreement) and (iv) this Interim Order ceasing to be in full force and effect for any reason.

(b)    Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified so that, upon and after the occurrence of the Termination Date, the DIP Agent shall, subject to subparagraph (c) of this paragraph 12, be immediately entitled to exercise all of its rights and remedies in respect of the DIP Collateral in accordance with this Interim Order and the other DIP Loan Documents.  Immediately following the giving of notice by the DIP Agent to the Debtors, counsel to the Debtors, the Committee (if any) and the U.S. Trustee of the occurrence of an Event of Default: (i) all Commitments of the DIP Note Purchasers to provide any DIP Extensions of Credit shall immediately be suspended; and (ii) the Debtors shall have no right to use any loan proceeds of the DIP Facility (whether or not held in the DIP Proceeds Account), other than towards the satisfaction of the DIP Obligations and the Carve-Out, as provided in the applicable DIP Loan Documents and this Interim Order; provided that, during the Default Notice Period (defined below), the Debtors shall be prohibited from requesting any further draws under the DIP Facility but shall be permitted to continue to use proceeds of the DIP Facility (to the extent drawn prior to the occurrence of an Event of Default) solely (x) in the ordinary course of business and in accordance with the DIP Budget and the other DIP Loan Documents and (y) to satisfy the Carve-Out.  The Debtors shall be

26

entitled to an emergency hearing before this Court (the "**Remedies Hearing**") within five (5) Business Days after the giving of written notice by the DIP Agent of the occurrence of an Event of Default (such five (5) Business Day period, the "**Default Notice Period**").  Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this paragraph, the DIP Agent may, in its discretion, enforce the DIP Liens, and, as applicable, take all other actions and exercise all other rights and remedies under the DIP Loan Documents, this Interim Order and applicable law that may be necessary or deemed appropriate to collect any of its DIP Obligations, proceed against or realize upon all or any portion of the DIP Collateral as if these Cases or any Successor Cases were not pending, and otherwise enforce any of the provisions of this Interim Order.  The DIP Agent's delay or failure to exercise rights and remedies under any DIP Loan Documents, this Interim Order or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed by the DIP Agent.  If the Debtors or any other party in interest do not contest the occurrence of the Event of Default within the Default Notice Period, or if the Debtors timely contest the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the DIP Agent will have automatic and immediate relief from the automatic stay with respect to the DIP Collateral.  Subject to entry of a Final Order, at any Remedies Hearing, each Debtor hereby waives, and shall not be entitled to assert (including, without limitation, under section 105 of the Bankruptcy Code), the right to challenge or dispute the effectiveness of any provision of the DIP Orders, to the extent such relief would impair or restrict the rights and remedies of the DIP

27

Agent or any DIP Note Purchaser as set forth in the DIP Orders or in any of the DIP Loan Documents.

13.    **Use of Cash Collateral**.    Prior to the Termination Date, the Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, the DIP Budget (subject to the Permitted Variances) and the DIP Loan Documents, without further approval by the Court.

14.    **Other Rights and Obligations**.

(a)    **Good Faith Under section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.    Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby.    Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Liens or of the DIP Superpriority Claim granted to or for the benefit of the DIP Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claim granted herein, with respect to any such claim.    Because the DIP Extensions of Credit are made in reliance on this Interim Order, the DIP Obligations incurred by the Debtors or owed to

28

the DIP Secured Parties prior to the effective date of any stay, modification or vacation of this Interim Order shall not, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Case, be disallowed or subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Note Purchasers under this Interim Order.

(b)     **Authorization for Payment of DIP Financing Fees and Expenses**.  All fees payable and all costs and/or expenses reimbursed or reimbursable (including, costs and expenses referred to in the DIP Loan Documents and the DIP Agent's and DIP Note Purchasers' and each of their respective affiliates' attorneys' and advisors' fees and expenses) under the DIP Loan Documents, by the Debtors to the DIP Secured Parties are hereby approved and shall not be subject to disgorgement by any party for any reason.  Subject to the notice provision below, the Debtors are hereby authorized to pay all such fees, costs and expenses in accordance with the terms of the DIP Loan Documents and this Interim Order, without any requirement that the Debtors, the DIP Agent, the DIP Note Purchasers or any of their respective counsel file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses.  To the fullest extent provided in the DIP Loan Documents and this Interim Order, the Debtors will pay all such fees and expenses incurred by the DIP Secured Parties, (including the reasonable and documented fees and disbursements of one legal counsel in each relevant jurisdiction that they shall retain and any internal or third-party appraisers, consultants, financial, restructuring or other advisors and auditors advising any such counsel as previously identified to the Debtors in writing) in connection with (i) the preparation, execution, delivery, funding and administration of the DIP Loan Documents, including, without limitation, all due diligence fees and expenses incurred or sustained in connection with the DIP Loan

29

Documents, (ii) the Cases or any Successor Case, (iii) the ongoing administration of the DIP Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto), (iv) enforcement of any rights or remedies under the DIP Loan Documents, including without limitation, creating, perfecting, recording, maintaining, and preserving the DIP Liens, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees and title insurance premiums and the custody or preservation of any of the DIP Collateral, (v) after the occurrence of a Default or an Event of Default, enforcing or preparing for enforcement of any DIP Obligations of or in collecting or preparing to collect any payments due from any Borrower under the DIP Note Purchase Agreement or under the other DIP Loan Documents by reason of such Default or Event of Default (including in connection with any actual or prospective sale of, collection from, or other realization upon any of the DIP Collateral), in each case whether or not the transactions contemplated hereby are fully consummated; provided that such expenses shall not be taken into account in connection with measuring compliance with the Budget or the Permitted Variances. Any such fees and expenses incurred prior to entry of this Interim Order shall be deemed fully earned, non-refundable and irrevocable as of the date of this Interim Order and shall be paid by the Debtors on, or promptly after, and in any event within five (5) Business Days from, the date of entry of this Interim Order.  Thereafter, any other provisions of this Interim Order the DIP Secured Parties, and their advisors and professionals, shall not be required to comply with the U.S. Trustee fee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court, but the DIP Secured Parties, and their advisors and professionals shall provide reasonably detailed statements (redacted if necessary for privileged, confidential or otherwise sensitive information, as to those statements

30

provided to any party other than the U.S. Trustee for fees incurred after entry of this Interim Order) to the Office of the U.S. Trustee, counsel for the Committee (if any) and the Debtors. Within ten (10) Business Days of presentment of such statements, if no written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made (the "**Professional Fee Review Period**"), the Debtors shall pay in cash all such fees and expenses of the DIP Secured Parties, and their advisors and professionals promptly, and in any event within five (5) calendar days after the expiration of the Professional Fee Review Period, without the need for further application to or order of the Court. Any objection to the payment of such fees or expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid and in any event within three (3) Business Days following the end of the Professional Review Period, without the need for further application to or order of the Court. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the objecting party and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice. This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

(c)    **Binding Effect**. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors)

31

whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such Chapter 11 or Chapter 7 case.

(d)    **No Waiver**.  The failure of the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the other DIP Loan Documents or otherwise, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' rights hereunder, thereunder or otherwise.

(e)    **No Third Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

(f)    **No Marshaling**.  Subject to the entry of the Final Order, the DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)    **Amendments**.  The Debtors and the DIP Agent (with the consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights under the DIP Loan Documents) may amend, modify, supplement or waive any provision of the DIP Loan Documents without further notice to or approval of the Court, unless such amendment, modification, supplement or waiver (w) increases the interest rate (other than as a result of the imposition of the default rate) or fees charged in connection with the DIP Facility, (x) increases the commitments of the DIP Note Purchasers to make DIP Extensions of Credit under the DIP Loan Documents, (y) changes the Maturity Date or (z) otherwise is materially adverse to the interests of the Debtors or their estates.  Except as otherwise provided herein, no waiver, modification or amendment of any of the provisions hereof shall be effective unless (i) set forth in writing, signed by, or on behalf of, the Debtors, the DIP Agent (after having obtained the

32

approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents) and (ii) approved by the Court after notice to parties in interest; provided that updates and supplements to the DIP Budget as required under this Interim Order and the other DIP Note Documents shall not require Court approval but shall be acceptable to the Majority DIP Note Purchasers.

(h)    **Priority of Terms**.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Note Purchase Agreement, the terms and provisions of this Interim Order shall govern.

(i)    **Survival of Interim Order**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (ii) to the extent authorized by applicable law, dismissing any of the Chapter 11 Cases, (iii) withdrawing of the reference of any of the Chapter 11 Cases from this Court or (iv) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court.  The terms and provisions of this Interim Order and the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claim granted pursuant to this Interim Order and the DIP Loan Documents and any priorities and protections granted to or for the benefit of the DIP Secured Parties hereunder and thereunder, shall continue in full force and effect to the fullest extent provided by section 364(e) of the Bankruptcy Code.

(j)    **Enforceability**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(k)    **No Waivers or Modification of Interim Order**.    The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Secured Parties (which consent shall not be unreasonably withheld), and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Secured Parties.  The Debtors may not seek to modify or to alter relative lien priority of the DIP Liens set forth in this Interim Order.

(l)    **Waiver of any Applicable Stay**.  Any applicable stay (including, without limitation, under Bankruptcy Rules 4001(a)(3) and 6004(h)) is hereby waived and shall not apply to this Interim Order.

15.    **Lender Liability**.  In determining to make any loan (whether under the DIP Note Purchase Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  So long as the DIP Secured Parties comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

16.    **Final Hearing**.

(a)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [●], 2021 at [●] [p.m.] (EST) at the United States Bankruptcy Court for the District of [Delaware].

(b)     On or before two business days after entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**"), together with copies of this Interim Order and the Motion, on the Notice Parties and to any other party that has filed a request for notices with this Court prior thereto.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than [●] at [●] [p].m. (EST), which objections shall be served so that the same are received on or before such date by: (i) the U.S. Trustee; (ii) counsel to the Ad Hoc Group; (iii)  each of the Debtors' 30 largest unsecured creditors (on a consolidated basis); (iv) the Internal Revenue Service; (v) the United States Attorney's Office for the District of Delaware; (vi) any such other party entitled to notice pursuant to Local Rule 9013-1(m); and (vii) any such other party entitled to receive notice pursuant to Bankruptcy Rule 2002.

17.     **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# **EXHIBIT A**

DIP NOTE PURCHASE AGREEMENT

**<u>EXHIBIT B</u>**

DIP BUDGET

**EXHIBIT B**

**DIP Term Sheet**

# ALPHA CAPITAL S.A.S.

## Subject to Rule 408 of the Federal Rules of Evidence – Not Admissible in Court

### $45,000,000 SENIOR DEBTOR IN POSSESSION CREDIT FACILITY
### SUMMARY OF TERMS AND CONDITIONS

*This summary of terms and conditions (the "**DIP Term Sheet**") of a proposed debtor-in-possession credit facility (the "**DIP Facility**") is intended for discussion purposes only and does not constitute a binding commitment to lend. Only execution and delivery of definitive documentation relating to the DIP Facility and approval by the Bankruptcy Court (as defined below) shall result in any binding or enforceable obligations of any party relating to the DIP Facility. This DIP Term Sheet does not purport to summarize all of the terms, conditions, representations, warranties and other provisions with respect to the transactions referred to herein. Capitalized terms used and not defined herein shall have the meanings assigned to them in (i) the indenture, dated as of December 19, 2017 (the "**2022 Indenture**") by and between Alpha Holding, S.A. de C.V., a variable capital stock corporation (sociedad anónima de capital variable) incorporated under the laws of Mexico ("**Alphacredit**"), the Guarantors party thereto and The Bank of New York Mellon, as trustee (the "**Trustee**"), registrar, paying agent and transfer agent and (ii) the indenture, dated as of February 10, 2020 (the "**2025 Indenture**"; together with the 2022 Indenture, the "**Indentures**"), by and between Alphacredit, the Guarantors party thereto and the Trustee as trustee, registrar, paying agent and transfer agent.*

| Material Provision | Summary Description |
|---|---|
| **Parties** ||
| **Borrowers:** | Alpha Capital S.A.S. and Alpha Debit, S.A. de C.V. (together the "**Borrowers**") as debtors in possession in a case (the "**Borrowers' Cases**") filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). |
| **Debtors:** | (i) The Borrowers and (ii) Acsa Atento S.A.S.; AlphaCredit Latam, S.A.S.; Vive Créditos Kusida S.A.S; Alpha Latam Management, LLC; and AlphaCredit Sudamérica, S. de R.L., (the "**Subsidiary Debtors**") in cases (collectively with the Borrowers' Cases, the "**Chapter 11 Cases**") under the Bankruptcy Code jointly administered with the Borrowers' Cases. The Borrowers and the Subsidiary Debtors are referred to herein as "**Debtors**" and each a "**Debtor**." <br><br> The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date.**" |
| **Guarantors:** | Each Debtor other than the Borrowers (collectively, the "**Guarantors**", and together with the Borrowers, the "**DIP Note Parties**"). <br><br> All DIP Obligations (as defined below) under the DIP Facility will be unconditionally, and jointly and severally, guaranteed by the Guarantors, including payment and performance under the DIP |

| | |
|---|---|
| | Facility.  Each guarantee shall be a guarantee of payment and not collection. |
| **DIP Note Purchasers:** | The financial institutions set forth on <u>Annex I</u> hereto, either directly or through one or more affiliated funds or financing vehicles (or funds or accounts advised or sub-advised by such person) (such participating funds, collectively, the "**DIP Note Purchasers**"), will provide commitments in the amounts set forth on <u>Annex I</u> hereto. The DIP Note Purchasers shall be entitled to receive the Commitment Fee as defined and set forth in <u>Annex II</u>. |
| **Administrative Agent:** | U.S. administrative agent to be agreed (in such capacity and together with its successors, the "**Administrative Agent**"). |
| **Collateral Agent:** | U.S. collateral agent to be agreed (in such capacity and together with its successors, the "**Collateral Agent**"; together with the Administrative Agent, the "**Agents**"). |
| **DIP Facility** | |
| **DIP Facility:** | The DIP Facility shall be a secured superpriority multi-draw term facility in an aggregate principal amount of $45 million (the "**DIP Obligations**," and the notes issued thereunder collectively, the "**DIP Notes**" (and each note individually, a "**DIP Note**")).  The DIP Notes will be issued in a private placement pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended. |
| **Documentation:** | The DIP Facility shall be documented, in a manner reasonably satisfactory to the Majority DIP Note Purchasers and the Administrative Agent, by a super-priority facility agreement (the "**DIP Note Agreement**," together with the DIP Notes, any related guarantees, and such other collateral documents as may be reasonably requested by the DIP Note Purchasers in connection with the Borrowers' grants and pledges in support of the DIP Facility, including without limitation a NY law governed security agreement, and the security documentation as set forth in **Exhibit A** hereto, the "**DIP Note Documents**").  The DIP Note Documents shall be in form and substance acceptable to the Majority DIP Note Purchasers, acting reasonably. |
| **Voting:** | Except as otherwise provided herein or in the DIP Note Documents, amendments, waivers or other modifications to the DIP Note Documents shall require the prior written consent of the Majority DIP Note Purchasers; <u>provided</u> that amendments, waivers or modifications to the DIP Note Documents affecting certain customary "sacred rights" shall require the prior written consent of each of the DIP Note Purchasers directly affected thereby and certain amendments, waivers or modifications to be mutually |

2

| | |
|---|---|
| | agreed will require the consent of a supermajority of the DIP Note Purchasers. |
| **Purpose/Use of Proceeds:** | The Borrowers shall use the proceeds of the DIP Facility and the Cash Collateral (as defined below), in each case subject to the DIP Budget (as defined below) (subject to the Variance Limit, as defined below), only for the purposes of (i) providing liquidity for working capital and certain other general corporate purposes of the DIP Note Parties as set forth in the DIP Budget (and subject to the terms described under "DIP Budget; Variance Covenants; and other Financial Reporting"); (ii) paying reasonable and documented restructuring costs and fees of legal advisors and other estate professionals of the Debtors relating to the Chapter 11 Cases; (iii) paying obligations arising from or related to the Carve-Out (as defined below); (iv) making all permitted payments of costs of administration of the Chapter 11 Cases; (v) for on-lending, subject to the DIP Budget, by Alpha Debit, S.A. de C.V. to certain of the Debtors' non-Debtor Mexican affiliates (the "**Mexican Affiliates**") pursuant to an intercompany working capital facility established prepetition and secured by first liens on the Mexican Affiliates' unencumbered loan portfolios, government receivables and other assets (including any and all beneficiary rights owned or held by such Mexican Affiliates over certain Mexican Trusts regarding loan portfolios, and any assets and loan portfolios currently pledged that may become unencumbered), (the "**Intercompany Facility**")[1] for the Mexican Affiliates' working capital and several corporate purposes and the fees, costs and expenses related to a *concurso mercantil* proceeding commenced for such Mexican Affiliates; <u>provided</u> that (x) the Debtors' rights under the Intercompany Facility shall be pledged in favor of the DIP Note Purchasers[2] and (y) the collateral securing such Intercompany Facility shall be reasonably satisfactory to the Majority DIP Note Purchasers; and (vii) as approved by the Bankruptcy Court in the DIP Orders or any other order (to the extent permitted under the DIP Note Documents) (collectively, "**Permitted Uses**").<br><br>None of the proceeds of the DIP Notes may be used, directly or indirectly, to challenge the amount, validity, perfection, priority or enforceability or, or assert any defense, counterclaim or offset to, the DIP Note Documents, or the security interests and liens securing any of the DIP Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against the Agents or the DIP Note Purchasers. |

---

[1] The Intercompany Facility shall be governed by New York law and have many of the protections included in the DIP Facility, including but not limited to a budget, variance testing, covenants and conditions to disbursement.

[2] DIP Budget will specify the amount and timing of funds required in Mexico.

3

| Availability: | Subject in each case to satisfaction of the conditions set forth below under the headings "Conditions Precedent to Initial Availability," and "Conditions Precedent to Full Availability", as applicable: |
|---|---|
| | (i) upon the date of entry of an order by the Bankruptcy Court granting interim approval of the DIP Facility that is in form and substance reasonably acceptable to the Majority DIP Note Purchasers and the Borrowers (the "**Interim Order**"), up to $17.5 million of the DIP Notes will be made available (the "**Initial Availability**"); |
| | (ii) upon the date of entry of an order by the Bankruptcy Court granting final approval of the DIP Facility that is substantially in the form of the Interim Order with such changes as are reasonably acceptable to the Majority DIP Note Purchasers (the "**Final Order**", and together with the Interim Order, the "**DIP Orders**"), the undrawn portion of the DIP Facility will be available in a single draw (the "**Subsequent Availability**"; together with the Initial Availability, the "**Full Availability**"). |
| **Maturity Date:** | The DIP Facility shall terminate and all amounts payable in respect of the DIP Facility will be automatically due and payable in full on the earliest to occur of any of the following (each, a "**Maturity Date**"): (a) six (6) months after the Petition Date (the "**Scheduled Maturity Date**"); (b) forty (40) days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 40-day period; (c) the date of the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Majority DIP Note Purchasers; (d) filing of a motion by any Debtor which seeks the dismissal, or the entry of an order granting any party's request for the dismissal, of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Majority DIP Note Purchasers; (e) the consummation of a sale of all or substantially all of the DIP Collateral (a "**363 Sale**"), unless otherwise reasonably consented to in writing by the Administrative Agent and the Majority DIP Note Purchasers (it being understood that a sale pursuant to the Bid Procedures Order (as defined below) is deemed consented to by the Majority DIP Note Purchasers); (f) the effective date of the Approved Plan (as defined below) confirmed in the Chapter 11 Cases; and (g) the date that all principal and interest obligations shall become due and payable under the DIP Note Documents, whether by acceleration or otherwise; provided that upon the occurrence of either (x) a hearing before the Bankruptcy Court to consider the Debtors' motion seeking entry of an order approving a 363 Sale or (y) the approval of the Bankruptcy Court of a disclosure statement related to the Approved Plan, the Debtors may, in their |

4

| | sole discretion, extend the Scheduled Maturity Date by up to two (2) months. |
| | "**Business Day**" shall mean a day (other than a Saturday or Sunday) on which banks are open for domestic and foreign exchange business in New York City and Bogotá D.C., Colombia. |
| | "**Approved Plan**" shall mean a plan of reorganization, which shall (x) provide for the repayment of the DIP Obligations in full and in cash or such other treatment of the DIP Obligations as is acceptable to the Majority DIP Note Purchasers; (y) provide for customary provisions relating to bid procedures, deadlines, auction, approval and/or closing conditions, as relevant; and (z) provide for a customary exculpation of the Agents, the DIP Note Purchasers (only in their capacity as such) and their representatives (only in their capacity as such) in connection with the DIP Facility. |
| **Amortization** | As described in Cash Sweep |
| **Interest Rates and Fees:** | As set forth in <u>Annex II</u>. |
| **Closing Date**: | The date on which the conditions precedent set forth below under "Conditions Precedent to Initial Availability" are satisfied (the "**Closing Date**"). |
| **Conditions Precedent to Initial Availability:** | The Initial Availability on the Closing Date shall be subject to the satisfaction or waiver by the Majority DIP Note Purchasers of the conditions set forth below: |
| | (a) the Administrative Agent and the DIP Note Purchasers shall have received a 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date setting forth projected cash flows and disbursements, which disbursements shall include legal fees and expenses projected to be incurred by the Debtors, in form, scope and substance acceptable to the Majority DIP Note Purchasers (the "**Initial Approved DIP Budget**"); |
| | (b) the Agents and the DIP Note Purchasers shall have received executed copies of each of the DIP Note Documents (including commercially reasonable efforts to provide required filings and registration of the guarantees and security agreements, to the extent required for perfection under applicable local law), which shall be in form and substance consistent with this DIP Facility Term Sheet and reasonably satisfactory to the Majority DIP Note Purchasers; |
| | (c) the representations and warranties of the DIP Note Parties contained in the DIP Note Documents shall be true and correct in all material respects (or, in the case of any |

5

representation and warranty that is qualified as to "materiality," in all respects) as of the Closing Date (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

(d) before or after giving effect to such funding, no default or Event of Default under the DIP Facility shall have occurred and be continuing;

(e) the Bankruptcy Court shall have entered the Interim Order no later than five (5) calendar days after the filing of a motion seeking entry of the Interim Order, approving and authorizing the DIP Facility on an interim basis, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and in form and substance reasonably acceptable to the Majority DIP Note Purchasers;

(f) the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated or subject to a stay pending appeal, in any manner, except as otherwise agreed to in writing by the Majority DIP Note Purchasers, acting reasonably;

(g) reasonable and documented transaction costs, fees, expenses (including, without limitation, reasonable and documented fees of Cleary Gottlieb Steen & Hamilton, Young Conaway Stargatt & Taylor, LLP, Holland & Knight, Sainz Abogados S.C., Cuatrecasas, Gonçalves Pereira S.A.S., Houlihan Lokey Capital, Inc. and Blink Capital Solutions) due and payable (the "**Transaction and Advisors Expenses**") and invoiced at least two (2) Business Days prior to the Closing Date incurred by the Agents and the DIP Note Purchasers in their capacity as such solely in connection with the preparation, negotiation and execution of the DIP Note Documents, and all other compensation owed to the Agents and the DIP Note Purchasers under the terms of the DIP Note Documents shall have been paid to the extent due;

(h) the Administrative Agent shall have received from the DIP Note Parties (at least three (3) Business Days prior to the Closing Date) beneficial ownership and other similar information that may be required by the Administrative Agent under customary "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(i) the Agents shall have received customary closing deliverables and officer's certificates, including customary legal opinions from New York and Colombian counsel for the DIP Note Parties, as required under the DIP Note Documents, in form and substance reasonably acceptable to the Agents;

(j) the Administrative Agent and the DIP Note Purchasers shall have received information showing the accounting of

6

<table>
<tr><td></td><td>net funds flowing from Mexico to Colombia for the two-month period prior to the Petition Date;</td></tr>
</table>

|  |  |
| --- | --- |
|  | (k) the Agents shall have received applicable UCC and Colombian lien searches regarding each DIP Note Party;<br><br>(l) each DIP Note Purchaser shall have received a certificated note or interest in a global note with respect to the principal and interest obligations, fees and expenses owed to each DIP Note Purchaser;<br><br>(m) the Collateral Agent shall have established a deposit account with a financial institution located in the United States in the name of, or subject to a control agreement in favor of, the Collateral Agent for the benefit of the DIP Note Purchasers (the "**Cash Collateral Account**"); and<br><br>(n) the Debtors and the Majority DIP Note Purchasers shall agree on a general strategy for a sale of the Mexican Affiliates' assets. |
| **Conditions Precedent to Full Availability:** | The Subsequent Availability is subject to the satisfaction or waiver by the Majority DIP Note Purchasers of the conditions set forth under the heading "Conditions Precedent to Initial Availability" above and the following conditions (unless waived in writing by the Majority DIP Note Purchasers):<br><br>(a) except as expressly provided with respect to the Initial Availability of the DIP Notes, all compensation then due and owing to the Agents and the DIP Note Purchasers due and payable under the terms of the DIP Note Documents, including any fees due and payable, as applicable, and the Transaction and Advisors Expenses, shall have been paid to the extent invoiced at least two (2) Business Days prior to the applicable borrowing date;<br><br>(b) before or after giving effect to such funding, no default or Event of Default under the DIP Facility shall have occurred and be continuing;<br><br>(c) the Agents and the DIP Note Purchasers shall have received executed copies of required filings and registration of the guarantees and security agreements, to the extent required for perfection under applicable local law;<br><br>(d) the Collateral Agent shall have received, evidence of (i) the formalization of the corresponding security interest in the possessory DIP Collateral in terms of the applicable law, and (ii) the registration of the DIP Collateral governed by Colombian law with the National Registry over Movable Assets (*Registro Nacional de Garantías Mobiliarias*) as specified in **Exhibit A** hereto;<br><br>(e) a Chief Restructuring Officer ("**Colombian CRO**") nominated by the Debtors from a list of pre-selected qualified candidates provided to the Debtors by the advisors |

7

to the DIP Note Purchasers (which may be the same individual serving as Mexican CRO (as defined below)) (the "**Colombian List**") shall act as a restructuring advisor to the Debtors and (i) be vested with customary authority (with respect to the Chapter 11 Cases) to oversee the restructuring of the Debtors, subject to oversight by the board of directors in accordance with applicable law, (ii) attend any board of directors meetings and management meetings concerning the restructuring of the Debtors (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; <u>provided</u> that if any officer attends such executive session concerning the Colombian CRO shall also attend); (iii) report directly to the board of directors; (iv) provide updates to the Bankruptcy Court; (v) be vested with customary authority in accordance with applicable law to approve and reject expenses of the Debtors; and (vi) otherwise satisfy the requirements of 11 U.S.C. § 327;

(f) a Chief Restructuring Officer ("**Mexican CRO**") nominated by the Debtors from a list of pre-selected qualified candidates provided to the Debtors by the advisors to the DIP Note Purchasers (which may be the same individual serving as Colombian CRO) (the "**Mexican List**") shall act as a restructuring advisor to the Mexican Affiliates and (i) be vested with customary authority (with respect to any *concurso mercantil* proceeding) to oversee the restructuring of the Mexican Affiliates, subject to oversight by the board of directors in accordance with applicable law, (ii) attend any board of directors meetings and management meetings concerning the restructuring of the Mexican Affiliates (it being understood that nothing herein prohibits or otherwise limits the board of directors from meeting in executive session; <u>provided</u> that if any officer attends such executive session concerning the Mexican CRO shall also attend); (iii) report directly to the board of directors; (iv) be vested with customary authority in accordance with applicable law to approve and reject expenses of the Mexican Affiliates;

(g) subject to clause (o) below, no insolvency or bankruptcy proceeding in Colombia shall have occurred with respect to any of the DIP Note Parties (except a proceeding requested by or consented to by the Majority DIP Note Purchasers);

(h) since the Petition Date, no event shall have occurred that results in or could reasonably be expected to result in a Material Adverse Effect (as defined below);

(i) no order, injunction, stay, restriction or other similar limitation in any foreign bankruptcy or debtor relief cases of the DIP Note Parties in any way prevents or restricts the

8

|  | DIP Note Parties' ability to consummate the transactions contemplated by the DIP Note Documents; |
|  | (j) the Administrative Agent shall have received the Final Order approving the DIP Facility on a final basis, no later than 40 calendar days following the date of entry of the Interim Order; |
|  | (k) the Final Order shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal in any manner except as otherwise agreed to in writing by the Majority DIP Note Purchasers; |
|  | (l) the DIP Liens on the DIP Collateral shall remain fully-perfected liens with the priority as set forth herein; |
|  | (m) the Administrative Agent and the DIP Note Purchasers shall have received executed copies of each of the DIP Note Documents; |
|  | (n) the Administrative Agent shall have received evidence that the DIP Note Parties have complied with all foreign exchange control regulations and have made all the relevant filings before the relevant foreign exchange authorities; |
|  | (o) if requested by the Majority DIP Note Purchasers, recognition proceedings under Chapter 15 of Title 11 of the Bankruptcy Code have been filed with the Bankruptcy Court with respect to any *concurso mercantil* proceeding or any similar insolvency or bankruptcy proceeding in Mexico, Colombia or any other jurisdiction outside of the U.S.; and |
|  | (p) a report validating the Colombian and Mexican loan portfolios, respectively (which shall include a review and examination of the Colombian and Mexican portfolios, as applicable) prepared by PricewaterhouseCoopers shall have been (i) provided to each of the advisors to the DIP Note Purchasers and (ii) reasonably satisfactory to the Majority DIP Note Purchasers; provided that such report will not be publically disclosed. |
| **Cash Collateral:** | All cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all DIP Collateral, constitute cash collateral of the DIP Note Purchasers as contemplated by section 363 of the Bankruptcy Code, subject to exceptions to be set forth in the DIP Note Documents ("**Cash Collateral**"). Cash Collateral may be used only for Permitted Uses and in accordance with the Interim Order and the Final Order. The Cash Collateral will be maintained (i) in the Cash Collateral Account; and (ii) in one or more accounts with financial institutions located in Colombia, subject to a security interest in favor of the Collateral Agent (each such account, a "**Secured Account**"), provided that the Secured Accounts shall not be permitted to have an aggregate balance in excess of $5 million, with any amounts in excess to be transferred to the Cash Collateral Account on a bi-weekly basis; provided |

9

| | further that amounts under the Intercompany Facility kept onshore in Mexican accounts shall not be permitted to have an aggregate balance in excess of $7.5 million, with any amounts in excess to be transferred on a bi-weekly basis to an account in the name of AlphaDebit, S.A. de C.V. that is pledged to the DIP Note Purchasers. |
|---|---|
| **Cash Sweep:** | The Borrowers shall cause (i) all proceeds from any sale or disposition of any assets of the Debtors (net of amounts required to repay pre-petition obligations secured by a lien on such DIP Collateral that is senior to the DIP Liens and related administrative claims), equity issuances, new debt incurrence, or unwinding of any derivative positions, in each case subject to certain minimum thresholds and other exceptions to be agreed and (ii) subject to entry of a Final Order, starting on October 15, 2021, and on the 15th of every month thereafter, a cash sweep of the consolidated cash balance of the Debtors (other than cash balances held in trust for or otherwise pledged to secured creditors) in excess of $15 million to be applied in the following order of priority: <br><br> • *First,* to pay cash interest on the DIP Facility; and <br><br> • *Second*, all remaining proceeds shall be used to amortize (including capitalized interest) and pay corresponding exit fees of the DIP Facility. |
| **Security and Priority:** | Each DIP Note Party hereby and pursuant to the other DIP Note Documents, grants a security interest in all of its rights, title, and interests in its DIP Collateral (as defined below), in each case to secure the DIP Obligations, which security interest (the "**DIP Liens**") shall have the priority and be fully perfected as described below: <br><br> (a) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests and liens upon all DIP Collateral of such DIP Note Party that are not otherwise subject to valid, perfected and unavoidable liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code (the "**Permitted Prior Liens**") subject and junior to the Carve-Out; and <br><br> (b) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests and liens upon DIP Collateral of such DIP Note Party that is subject to Permitted Prior Liens (if any) which security interests and liens shall be subject and junior to the Prior Permitted Liens and the Carve-Out. <br><br> "**DIP Collateral**" shall mean, with respect to any DIP Note Party, |

10

all real and personal property of such DIP Note Party, including, without limitation: (a) all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments, supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all  substitutions, books and records related to the foregoing, and accessions, loan assets and shares of the Debtors, rights to the Intercompany Facility, unencumbered performing and non-performing and written-off loan assets and government receivables in Colombia, and the shares of all Debtors and direct subsidiaries of Debtors, and proceeds (as defined in the Uniform Commercial Code ("**UCC**")) of the foregoing, wherever located, including insurance or other proceeds); (b) all owned real property,  all leased real property, all rents and leases from any real property interests, and all other proceeds of real property; (c) subject to the entry of a Final Order, the proceeds of any avoidance actions brought pursuant to sections 502(d), 544, 545, 547, 548, 549 (except as set forth in clause (d) below), 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code; (d) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of the DIP Collateral or post-petition transfer of proceeds of the DIP Notes and (e) subject to the entry of a Final Order, the DIP Note Parties' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof; provided that DIP Collateral shall not include (i) property that cannot be subject to liens pursuant to applicable law, rule, contract or regulation or restrictions of contract existing on the Closing Date or the time of entry of such contract (other than to the extent such restriction is ineffective under the UCC or other applicable law); (ii) avoidance actions brought pursuant to claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code; (iii) any funds held in escrow as a deposit in connection with a bid under the Bid Procedures Order until such deposit is applied in connection with consummating a sale; and (iv) other excluded property to be agreed. For the avoidance of doubt, the DIP Collateral shall include all the foregoing rights, property, claims, and interests, without regard as to whether such rights, property, claims, and interests came into the DIP Note Parties' estates, or otherwise arose, after the Petition Date.

11

All DIP Obligations at all times shall be entitled to super-priority claim status in the Chapter 11 Case of each DIP Note Party pursuant to section 364(c)(1) of the Bankruptcy Code (together with the DIP Liens, collectively, the "**DIP Protections**"), which shall be senior to any administrative and unsecured claims against any of the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code other than any administrative claims granted pursuant to the DIP Orders, subject only to the Carve-Out.

Subject to entry of a Final Order, the DIP Protections shall not be subject to any rights, claims, charges, or liens arising under section 506(c) of the Bankruptcy Code. Upon entry of a Final Order, the obligations under the DIP Facility, including, without limitation, all of the DIP Obligations, shall not be subject to the equitable doctrine of marshaling.

All DIP Protections will survive any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or the dismissal of any of the Chapter 11 Cases.

The proceeds of the DIP Facility shall be deposited into the Cash Collateral Account or a Secured Account and may only be withdrawn in accordance with the DIP Note Documents for Permitted Uses thereunder.

All DIP Liens granted pursuant to the DIP Note Documents (other than the DIP Orders) and all DIP Liens authorized and granted pursuant to the DIP Orders entered by the Bankruptcy Court shall be deemed effective and perfected upon entry of, and pursuant to, the Interim Order and Final Order, respectively, to the extent permitted by applicable law as of the Petition Date, and no further filing, notice, or act under applicable law or otherwise will be required to effect such perfection; provided that the DIP Note Parties and the Agents may make any filings, deliver any notices, make recordations, perform any searches, enter into control agreements, or take any other acts as may be necessary under state law or other applicable law or otherwise desirable in order to protect, preserve and/or enforce the security, perfection, or priority of the DIP Liens, and the DIP Note Parties shall (at the request of the DIP Note Purchasers and in consultation with Colombian counsel) enter into customary non-US security documentation with respect to such DIP Collateral owned by the non-US entities or located in non-US jurisdictions.  In addition, the DIP Note Parties shall be required to take the following actions to perfect the DIP Liens under Colombian law:

12

| | |
|---|---|
| | (a) all of the Colombian loan assets and any other assets held by Colombian subsidiaries shall be conveyed to a guaranty trust established under Colombian law, or otherwise pledged in favor of the DIP Note Purchasers, and registered with the National Registry over Movable Assets (*Registro Nacional de Garantías Mobiliarias*); and<br><br>(b) the Debtors shall use commercially reasonable efforts to take such additional actions as may be necessary to perfect the DIP Liens under Colombian law.<br><br>The DIP Note Parties shall cause any Mexican Affiliate that is a borrower under the Intercompany Facility to acknowledge the liens on the Intercompany Facility in favor of the DIP Note Purchasers. |
| **Carve-Out:** | The DIP Liens will be subject and subordinate to, in each case, the following (collectively, the "**Carve-Out**"):  (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930 of Title 28 of the United States Code; (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) all professional fees and expenses of the professionals retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any official committee (a "**Committee**") appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code that are incurred on or prior to the Carve-Out Trigger Date (as defined below) that are allowed or become allowed at any time, whether by interim order, procedural order or otherwise and whether such allowance occurs before or after the Carve-Out Trigger Date (as defined below); and (d) professional fees and expenses of the Debtors in an aggregate amount not to exceed $5,000,000 and any Committee in an aggregate amount not to exceed $500,000 incurred on and after the first business day following Carve Out Trigger Date to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "**Post-Carve Out Trigger Notice Cap**" and collectively with the professional fees and expenses in clause (c), the "**Professional Fees**"); provided that nothing herein shall be construed to impair the ability of any party to object to the Professional Fees.  The term "**Carve-Out Trigger Date**" shall mean the date on which the Administrative Agent provides written notice to the Debtors and lead counsel to the Debtors, with a copy of such notice to lead counsel for the Committee (if appointed) and the U.S. Trustee (the "**Carve Out Trigger Notice**"), that the Carve-Out is invoked, which Carve Out Trigger Notice shall only be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility and the termination of funding under the DIP Facility. |

13

| | |
|---|---|
| | After the Carve-Out Trigger Date, the DIP Note Purchasers shall permit the Debtors to use proceeds of the DIP Facility to fund the full amount of the Carve-Out, including the Post-Carve Out Trigger Notice Cap, into a segregated account (the "**Carve-Out Reserve Account**") held by the Debtors, to be applied to the Professional Fees and the U.S. Trustee and Clerk fees when due and payable (the "**Carve-Out Segregated Funds**") and, in the case of Professional Fees, as allowed by the Bankruptcy Court.  Without in any way limiting the Debtors' ability to use the Carve-Out Segregated Funds in the Carve-Out Reserve Account to pay the allowed Professional Fees and the U.S. Trustee and Clerk fees, the Carve-Out Segregated Funds shall remain encumbered by and subject to the DIP Liens. To the extent the Carve-Out Segregated Funds in the Carve-Out Reserve Account exceed the allowed Professional Fees and the U.S. Trustee and Clerk fees, any such remaining amounts shall be promptly returned to the Administrative Agent for the benefit of the DIP Note Purchasers. |
| **Voluntary Prepayments:** | The DIP Notes may be voluntarily prepaid in whole or in part prior to the Maturity Date subject to payment of the Exit Fee with respect to any such prepayment. |
| **Mandatory Prepayments:** | Mandatory prepayment of DIP Obligations in an amount equal to 100% of the net proceeds (i) received from the incurrence of indebtedness by any of the Debtors that is not otherwise explicitly permitted under the DIP Facility, upon receipt by any DIP Note Party and (ii) of the Cash Sweep as described above; provided, however, that the Majority DIP Note Purchasers shall have the ability to decline any mandatory prepayment. |
| **Representations and Warranties:** | The DIP Note Documents shall contain representations and warranties customary for debtor in possession financings of this type, subject to appropriate exceptions and qualifications. |
| **Affirmative Covenants:** | The DIP Note Documents shall contain affirmative covenants customary for a DIP facility of this type (which shall be subject to appropriate and customary exceptions, thresholds, qualifications and carve-outs typical for a DIP facility of this type agreed by the Majority DIP Note Purchasers and the Borrowers, and consistent with asset preservation and facilitating recoveries), including but not limited to the following:<br><br>(a) Preservation and maintenance of existence, business and properties;<br>(b) Maintenance of existing insurance, insurance certificates and endorsements;<br>(c) DIP Collateral ownership;<br>(d) Maintenance of priority of liens, other than customary permitted lien exceptions; |

14

|  | (e) Payment of income taxes and other material taxes and other claims; |
|---|---|
|  | (f) Material litigation and other notices; |
|  | (g) Compliance with laws and regulations; |
|  | (h) Maintenance of records; |
|  | (i) Use of proceeds; |
|  | (j) Compliance with applicable laws and regulations; |
|  | (k) Payment of post-petition obligations; |
|  | (l) Notification to the Administrative Agent of any Event of Default and certain other customary material events; |
|  | (m) All material pleadings affecting the DIP Facility delivered to counsel to the Agents and the DIP Note Purchasers at least two (2) days in advance of filing to the extent practicable to permit review and to be reasonably acceptable to the Majority DIP Note Purchasers; |
|  | (n) Copies of all financial information and other substantive documents distributed by or on behalf of any DIP Note Party to any Committee provided to the Administrative Agent (for distribution to the DIP Note Purchasers); |
|  | (o) DIP Note Purchaser calls with management of the Borrowers as reasonably requested by the Administrative Agent; |
|  | (p) AlixPartners will have weekly calls with the DIP Note Purchasers and will consult with the DIP Note Purchasers on such calls regarding all anticipated expenditures by the Debtors and the Mexican Affiliates; |
|  | (q) Additional Guarantors and grantors; |
|  | (r) Notice of material events; |
|  | (s) Access to books and records; |
|  | (t) Certain bankruptcy matters; |
|  | (u) AlixPartners to provide a summary every week of cash inflows and outflows for the Mexican Affiliates in the aggregate and the Debtors in the aggregate; |
|  | (v) Use commercially reasonable efforts to engage a backup servicer in Colombia as promptly as practicable, and in any event within 45 calendar days of the Petition Date in the aggregate, which shall be automatically extended by 25 calendar days if a backup servicer has been identified and the related engagement agreement remains subject to negotiation; and |
|  | (w) Use commercially reasonable efforts to appoint the Mexican CRO as promptly as practicable, and in any event within 10 calendar days from receipt of the Mexican List; |
|  | (x) Further assurances to be agreed. |
| **Negative Covenants:** | The DIP Note Documents shall contain negative covenants customary for debtor in possession financings of this type (which |

15

shall be subject to appropriate and customary exceptions for, thresholds, qualifications, and carve-outs typical for a DIP facility of this type agreed by the Majority DIP Note Purchasers and the Borrowers and consistent with asset preservation and facilitating recoveries), including but not limited to the following:

(a) No incurrence of indebtedness between the Debtors and any third party (including intercompany indebtedness between Debtors and non-Debtors other than the Intercompany Facility);

(b) Limitation on liens on the DIP Collateral, other than the DIP Liens, liens in existence on the Petition Date, and other customary permitted liens;

(c) Restriction on creation of any other super-priority claim which is *pari passu* with or senior to the DIP Superpriority Claims, except for the Carve-Out;

(d) Limitation on any sale of DIP Collateral in excess of $1 million in the aggregate (provided that sales of DIP Collateral comprised of portfolios of loans or receivables shall not exceed $500,000 in the aggregate) and other than as contemplated by the Bid Procedures Order (as defined below);

(e) No commencement or voluntary filing, or consent to any third party's involuntary filing, by the Debtors of any insolvency proceeding in Colombia other than a recognition proceeding with respect to the Chapter 11 Cases;

(f) No investments and restricted payments;

(g) Restriction on payment of pre-petition indebtedness other than as approved by the Bankruptcy Court;

(h) No transactions with non-Debtor affiliates (other than the Intercompany Facility) unless the Majority DIP Note Purchasers otherwise provide prior written consent;

(i) No business activities other than those engaged in on the Petition Date;

(j) Limitations on changes of fiscal year;

(k) No mergers, fundamental changes or asset dispositions other than as contemplated in the Bid Procedures;

(l) No creation of new subsidiaries;

(m) Limitation on negative pledge clauses;

(n) No use of proceeds in violation of customary anti-corruption laws, anti-money laundering, and sanctions laws;

(o) No adequate protection payments shall be made without the consent of the Majority DIP Note Purchasers;

(p) No settlements of material claims, including without limitation claims against existing or prior officers, directors or direct or indirect shareholders of the Borrowers or the former auditors of the Borrowers without the Majority DIP

16

|  | Note Purchasers' prior written consent; |
|---|---|
|  | (q) No changes to any policies used to determine the delinquency of loans or policies for provisioning against loans; |
|  | (r) No nominating, appointing, engaging or entering into any new employment or retention agreements with executive officers without the Majority DIP Note Purchasers' prior written consent, such consent, in connection with replacing existing officers, not to be unreasonably withheld; |
|  | (s) If at any time (i) the Mexican Affiliates of the Debtors have more than $15 million of liquidity in Mexico or (ii) there is any successful challenge to the recognition or enforceability of, or the perfection or priority of any liens securing the Intercompany Facility or (iii) any of the Mexican Affiliates is the subject of a liquidation (*quiebra*) proceeding or (iv) a material adverse change since the Petition Date occurs with respect to the assets subject to liens securing the Intercompany Facility or (v) there is any default or event of default under the Intercompany Facility, or (vi) any conditions to funding set forth in the documentation effecting the Intercompany Facility are not met, no amounts under the Intercompany Facility shall be disbursed (and no amounts may be disbursed under the DIP Facility to fund such disbursements); and |
|  | (t) Bankruptcy related matters. |
| **DIP Budget; Variance Covenants; and other Financial Reporting:** | Prior to or on the Closing Date, the Borrowers shall deliver the Initial Approved DIP Budget to the advisors to the Administrative Agent and the DIP Note Purchasers and thereafter, at the end of each four-week period, an updated budget ("**Updated DIP Budget**"); provided, that any material change in any Updated DIP Budget from the Initial Approved DIP Budget shall be in form and substance acceptable to the Majority DIP Note Purchasers in their sole discretion. Each Updated DIP Budget shall include a reconciliation of the changes in the previous period's DIP Budget against the corresponding period in the Updated DIP Budget.  The term "**DIP Budget**" shall mean the Initial Approved DIP Budget until such time as an Updated DIP Budget is approved, following which such Updated DIP Budget shall constitute the DIP Budget until a subsequent Updated DIP Budget is so approved.  The Debtors' disbursements shall be consistent with the provisions of the DIP Budget (subject to the Variance Limit). |
|  | Bi-Weekly Reporting: Commencing on the first Thursday two weeks after the Closing Date (the "**Initial Reporting Date**"), the Borrowers shall provide (i) a "Variance Report" to the Administrative Agent certified by the chief financial officer of the Borrowers or the Colombian CRO, containing a report showing |

17

|  | actual cash receipts and disbursements for the immediately two (2) preceding weeks, noting all variances on a line item basis from amounts set forth in the DIP Budget for such period, and explanations for all material variances and (ii) additional customary reporting to be agreed, including without limitation, estimated administrative claims in respect of tax and other liabilities.<br><br>No later than 4:00 p.m. Eastern Time two weeks after the Initial Reporting Date and on each fourth Thursday thereafter (each such date, a "**Variance Testing Date**" and each such four-week period, the "**Testing Period**"), the Borrowers shall provide to the Administrative Agent (for circulation to the DIP Note Purchasers) a report detailing (i) the aggregate disbursements of the Debtors and the Mexican Affiliates, respectively, and aggregate receipts of the Debtors and the Mexican Affiliates, respectively, during the applicable Testing Period for (a) all other operating disbursements (excluding capital expenditures), and (b) the Debtors' and Mexican Affiliates' professionals' fees; and (ii) any material variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the DIP Issuer against the aggregate disbursements for the Testing Period set forth in the applicable DIP Budget (the "**Variance Reports**").<br><br>The Borrowers shall comply with the following:<br><br>As of any Variance Testing Date, for the Testing Period ending on the Sunday preceding such Variance Testing Date, the Borrowers shall not allow the amount of all operating disbursements (excluding professional and advisory fees for the restructuring advisors payable by the Debtors and the Mexican Affiliates, respectively) in excess of the estimated aggregate disbursement budget for such Testing Period to be greater than 20% of the estimated aggregate disbursement for such items in the DIP Budget for such Testing Period for the Debtors (in the aggregate) and the Mexican Affiliates (in the aggregate) (collectively, the "**Variance Limit**"). Additional material variances, if any, from the DIP Budget, and any proposed changes to the DIP Budget, shall be subject to the Administrative Agent's approval provided in accordance with the written direction of the Majority DIP Note Purchasers. |
| **Milestones:** | DIP Note Parties shall comply with following deadlines ("**DIP Facility Milestones**") including the following: |

18

| | |
|---|---|
| | • The Bankruptcy Court shall have entered the Interim Order no later than seven (7) days after the filing of a motion seeking entry of the Interim Order; |
| | • Debtors shall have appointed the Colombian CRO no later than fifteen (15) calendar days after receipt of the Colombian List; |
| | • The Bankruptcy Court shall have entered the Final Order no later than forty (40) calendar days after the entry of the Interim Order; |
| | • Debtors shall have filed with the Bankruptcy Court section 363 bid procedures for the sale of all or substantially all assets of the DIP Note Parties no later than twenty (20) calendar days after the entry of the Interim Order, which procedures shall include customary provisions relating to bid procedures, deadlines, auction, approval and/or closing conditions, as relevant; |
| | • The Bankruptcy Court shall have entered an order in respect of the Bankruptcy Court section 363 bid procedures (the "**Bid Procedures Order**") no later than forty-five (45) calendar days after the entry of the Interim Order; |
| | • Debtors shall have provided to each of the advisors to the Agents and the DIP Note Purchasers an initial draft of the Debtors' plan of reorganization and/or liquidation within sixty (60) calendar days after the entry of the Interim Order; |
| | • An auction in respect of the Debtors' assets shall have been conducted no later than ninety (90) calendar days after the Petition Date; and |
| | • The Bankruptcy Court shall have entered an order confirming the Approved Plan no later than thirty (30) days prior to the Scheduled Maturity Date. |
| **Events of Default:** | The credit agreement for the DIP Facility will include events of default ("**Events of Default**") (and, as appropriate, grace periods) usual and customary for debtor-in-possession financings of this kind, including failure to make payments when due, failure to meet Milestones (subject to extensions and grace periods to be agreed), defaults under post-petition indebtedness, noncompliance with affirmative and negative covenants (subject to grace periods to be agreed), breaches of representations and warranties, an order shall be entered by the Bankruptcy Court terminating any of the Debtors' exclusive periods for proposing a plan of reorganization in connection with the Chapter 11 Cases (other than as a result of a motion or objection filed by or on behalf of the DIP Note Purchasers, in accordance with the written direction of the Majority |

19

|  | DIP Note Purchasers), dismissal of the Borrowers' Cases or conversion of any of the Chapter 11 Cases to a case under Chapter 7 or any action by the Debtors seeking to dismiss any Debtor's Chapter 11 Case without the express prior written consent of the Majority DIP Note Purchasers, the filing of or confirmation of a plan of reorganization in the Chapter 11 Cases that is not an Approved Plan, unstayed judgments against the Debtors in excess of specified amounts, invalidity of a material portion of guarantees or liens on a material portion of the DIP Collateral, "change of control" of any of the Debtors (to be defined in a mutually agreed upon manner), the Final Order ceases to be in full force and effect, commencement of a proceeding seeking the appointment under the Chapter 11 Cases of a custodian, trustee, receiver, liquidator, administrator, administrative receiver or other similar official for the Borrowers or any of the other Debtors or a substantial part of their respective assets, and such proceeding or petition shall remain undismissed for a period of ninety (90) days or commencement or filing of any *concurso mercantil* or other similar proceeding in Colombia or the U.S. (other than the Chapter 11 Cases) without the express prior written consent of the Majority DIP Note Purchasers, or any event has occurred with respect to the DIP Note Parties (taken as a whole) since the Petition Date that has resulted in or could reasonably be expected to result in a material adverse change in the operations, assets, revenues or financial condition of the Debtors, taken as a whole (other than by virtue of the Chapter 11 Cases and the events typically resulting from the filing of the Chapter 11 Cases) ("**Material Adverse Effect**"). |
|  | Solely with respect to the Initial Availability, the Borrowers' failure to obtain a Final Order within forty (40) days after entry of the Interim Order shall constitute an "Event of Default" that permits the Majority DIP Note Purchasers, by notice to the Borrowers, to accelerate the obligations in respect thereof. |
| **Assignments and Participations:** | The DIP Note Purchasers shall have the right to assign any or all of their DIP Notes without consultation with or consent of the Borrowers.  The DIP Note Purchasers will also have the right to sell participations to eligible participants (to be defined on the DIP Note Documents), subject to customary limitations on voting rights, in their respective shares of the DIP Facility. |
| **Majority DIP Note Purchasers:** | "**Majority DIP Note Purchasers**" shall mean DIP Note Purchasers holding more than 50.0% of total commitments or exposure under the DIP Facility, *except that* with respect to such matters relating to the reduction of principal or fees, changes in interest rates, changes in maturity, changes in the pro rata sharing clause and release of material collateral, the Majority DIP Note Purchasers shall consist of each affected DIP Note Purchaser. |
| **Taxes:** | All payments under the DIP Facility made by the DIP Note Parties shall be made free and clear of any taxes (other than taxes on |

20

| | |
|---|---|
| | overall net income or franchise taxes imposed in lieu of net income taxes), imposts, levies, duties, charges, fees, assessments, withholdings (including backup withholding) or other deductions whatsoever ("**Taxes**"), except as required by law.  If any such Taxes are so imposed on any payments under the DIP Facility, the DIP Note Parties shall withhold or deduct such Taxes, as applicable, and remit the full amount of such Taxes to the corresponding tax authorities and gross up or pay such additional amounts as may be necessary so that every net payment of amounts due hereunder shall be equal to the amounts that would have been receivable in the absence of such deduction or withholding; provided that with respect to payments the DIP Note Parties shall have no obligation to pay such additional amounts in respect of Taxes to the extent of the portion of such Taxes that are withheld or deducted at a rate in excess of any other applicable tax treaty or applicable laws.  The DIP Note Purchasers will furnish to the Administrative Agent appropriate certificates or other evidence of exemption from U.S. federal tax withholding and reduction of Colombian withholding tax under any other applicable tax treaty or applicable laws. |
| **Indemnity/Release/Waiver; Expenses:** | The DIP Note Parties will indemnify the Agents and the DIP Note Purchasers (each, only in their capacity as such) and each of their affiliates and respective related parties (each an "**Indemnitee**"), and hold each of them harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, this DIP Term Sheet, the transactions contemplated thereby or hereby or by the DIP Facility or any claim, litigation, investigation or proceeding (including criminal proceedings) relating to any of the foregoing, in any jurisdiction, whether or not any of such Indemnified Person is a party thereto and whether or not brought by the Borrowers or any other person; provided that no Indemnitee will be indemnified for any such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from any Indemnitee's gross negligence, bad faith, willful misconduct or breach of any obligation under the DIP Facility.<br><br>The Final Order shall include customary releases of the Agents, the DIP Note Purchasers (only in its capacity as such) and their representatives (only in their capacity as such) in connection with the DIP Facility; for the avoidance of doubt, it is expressly understood that such releases shall not include any liabilities or claims relating to the actions of the Agents or the DIP Note Purchasers in respect to their involvement with the Debtors or their affiliates other than with respect to the DIP Facility. |

21

|  | The DIP Note Parties will reimburse the DIP Note Purchasers for (a) their reasonable and documented out-of-pocket transaction expenses in connection with the preparation, negotiation and execution of the DIP Note Documents including any amendment or waiver thereof (including without limitation the fees and expenses of counsel with respect to the DIP Facility), (b) all reasonable and documented out-of-pocket expenses of the DIP Note Purchasers (including the fees, disbursements and other charges of counsel in connection with the enforcement of the DIP Note Documents, and (c) all reasonable and documents out-of-pocket expenses of the Agents associated with the administration of the DIP Facility. |
|---|---|
| **Governing Law and Jurisdiction:** | State of New York (and, to the extent applicable, the Bankruptcy Code), other than collateral documents governed by Colombian law, which shall be governed by Colombian law. |

22

**Annex I**

| Name of Institution | Commitment |
|---|---|
| [●] | [●] |

**Annex II**

| | |
|---|---|
| **Interest Rate:** | 10.0 % *per annum*, payable monthly in cash, in arrears, or at the sole option of the Borrowers, subject to the terms set forth under the "Cash Sweep" section above, in kind. |
| **Default Interest Rate:** | Automatically after the occurrence of any Event of Default, the applicable interest rate ("**Default Interest Rate**") shall be the applicable interest rate plus 2.00%, which shall accrue on all overdue principal and other DIP Obligations and which shall be due immediately and payable on demand; <u>provided</u>, <u>however</u>, that the Default Interest Rate shall not exceed the maximum interest rate permitted by applicable law. |
| **Commitment Fee:** | 2.0% of the DIP Obligations, payable in cash or in kind, at the election of the Debtors on the Closing Date. |
| **Exit Fee:** | 2.0 % of DIP Obligations repaid or prepaid at the time of such repayment (including on the Maturity Date) or prepayment, payable in cash. |

**EXHIBIT A**

**Exhibit A to Term Sheet**
Overview of Collateral: Timing and Perfection

| Description | Documentation and Perfection Steps | Timing for delivery of locally perfected collateral [1] |
|---|---|---|
| **COLOMBIA** | | |
| **A. LIEN ON SPECIFIED COLOMBIAN DEBTOR SHARES** | • DIP Interim Order<br><br>• Colombian law governed share pledges<br><br>    o Share pledge agreements (*contrato de garantía mobiliaria sobre acciones*) over 100% of the share capital of Alpha Capital S.A.S., Vive Créditos Kusida S.A.S., Acsa Atento S.A.S. and AlphaCredit LatAm S.A.S.<br><br>    o Execution of the share pledge agreements.<br><br>    o Registration of the share pledge agreements before the *Registro Nacional de Garantías Mobiliarias*<br><br>    o Registration of the respective share pledge agreement in the share ledger of Alpha Capital S.A.S., Vive Créditos Kusida S.A.S., Acsa Atento S.A.S. and AlphaCredit LatAm S.A.S. | • As of Closing Date[2] |
| **B. COMMERCIAL ESTABLISHMENT PLEDGE AGREEMENTS** | • DIP Interim Order<br><br>• Colombian law governed commercial establishment pledge<br><br>    o Commercial establishments pledge agreement (*garantía mobiliaria sobre establecimientos de comercio*) over the commercial establishments of Alpha Capital S.A.S. (excluding liabilities), Vive Créditos Kusida S.A.S. (excluding liabilities) and Acsa Atento S.A.S. (excluding liabilities).<br><br>    o Execution of the commercial establishments pledge agreement.<br><br>    o Registration of the commercial establishments pledge agreement before the *Registro Nacional de Garantías Mobiliarias*. | • As of Closing Date |

---

[1] All liens will be created pursuant to Interim DIP Order, timelines here relate only to creation of local Colombian, Mexican and Panamanian law governed liens (and in some cases, NY law governed liens, as applicable). Perfection of liens outside of the DIP Order (i) is subject to automatic extension in the event of filing office/system unavailability, closure, delays or disruptions and (ii) may be extended with the prior written consent of the Majority DIP Note Purchasers not to be unreasonably refused, conditioned or delayed). Assumes U.S. or Colombian Collateral Agent POA, as applicable, will be in place as of the Closing Date for all liens, as applicable.

2 Cuatrecasas to provide draft share pledge agreement as soon as possible.

| Description | Documentation and Perfection Steps | Timing for delivery of locally perfected collateral [1] |
|---|---|---|
| **C. FIDUCIARY RIGHTS PLEDGE AGREEMENTS** | • DIP Interim Order<br><br>• Colombian law governed fiduciary rights pledge<br><br>   o Fiduciary rights pledge agreement (*garantía mobiliaria sobre derechos fiduciarios*) over the fiduciary rights belonging to Alpha Capital S.A.S. in the trust created pursuant to the trust agreement (*contrato de fiducia mercantil de administración y pagos*) dated as of June 24, 2020, among Alpha Capital S.A.S., as settlor (*fideicomitente*), and Fiduciaria Colpatria S.A., as trustee (*fiduciario*) (the "Colpatria Trust Agreement").<br><br>   o Fiduciary rights pledge agreement (*garantía mobiliaria sobre derechos fiduciarios*) over the fiduciary rights belonging to Alpha Capital S.A.S. and Vive Créditos Kusida S.A.S. in the trust created pursuant to the trust agreement (*contrato de fiducia mercantil de administración y pagos*) dated as of June 22, 2018, among Alpha Capital S.A.S., as settlor (*fideicomitente*) and Fiduciaria Coomeva S.A., as trustee (*fiduciario*) (together with the Colpatria Trust Agreement, the "Trust Agreements").<br><br>   o Execution of the fiduciary rights pledge agreement.<br><br>   o Registration before the *Registro Nacional de Garantías Mobiliarias.* | • As of Closing Date |
| **D. ACCOUNTS CONTROL AGREEMENTS** | • DIP Interim Order<br><br>   o Account control agreements over certain bank accounts of: [3]<br><br>     (i) Alpha Capital S.A.S. in Banco de Occidente S.A., Banco Colpatria S.A. and BBVA S.A.;<br><br>     (ii) Patrimonio Autónomo FD-034 and Patrimonio Autónomo FC- Alpha Capital S.AS. in Banco Colpatria S.A. and Banco de Occidente S.A.; | • Draft account control agreements to be distributed to depositary banks on the Closing Date at the latest.<br><br>• Execution of the account control agreements promptly after the Closing Date once the depositary banks complete the internal proceedings required to approve the execution and delivery of the account control agreements.[4] |

---

3 Accounts Control Agreements to cover accounts representing at least 90% of the Debtors' funds in Colombia.

4 Execution and delivery of the account control agreements depend on third party actions, including the internal approvals required by each depositary bank to execute the account control agreements and the Onshore Collateral Agent providing all KYC documentation required by the depositary banks. Parties to use best efforts to obtain all necessary third party consents.

AMERICAS 108213616<br>RLF1 25769470v.1

| Description | Documentation and Perfection Steps | Timing for delivery of locally perfected collateral [1] |
|---|---|---|
| | (iii)   Vive Créditos Kusida S.A.S. in Banco de Occidente S.A, and BBVA S.A.;<br><br>(iv)   Acsa Atento S.A.S. in Banco de Occidente S.A. and BBVA S.A.; and<br><br>(v)   AlphaCredit LatAm S.A.S. in BBVA.<br><br>o   Execution of the account control agreements.<br><br>o   Registration of the account control agreements before the *Registro Nacional de Garantías Mobiliarias.* | |
| **E. AMENDMENTS TO TRUSTS** | • DIP Interim Order<br><br>o   Amendment to the Trusts Agreements to transform the trusts into a collateral trusts (*patrimonios autónomos de garantía*) for the benefit of the DIP Note Purchasers or any collateral agent designated by the DIP Note Purchaser.[5]<br><br>o   Execution of amendments to the Trust Agreements.<br><br>o   Registration of the trust agreements before the *Registro Nacional de Garantías Mobiliarias.* | • Draft amendments to be distributed to Fiduciaria Colpatria S.A. and Fiduciaria Coomeva S.A. no later than 5 business days after Colombian counsel to the Note Purchasers delivers the proposed amendments to Debtors and their Colombian counsel.<br><br>• Execution of the amendments to the Trust Agreements promptly after the Closing Date once the trustees complete the internal proceedings required to approve the execution and delivery of the of the amendments to the Trust Agreements. |
| | **MEXICO** | |
| **A. MEXICAN NON-POSSESSORY PLEDGE AGREEMENT OVER ALL UNENCUMBERED ASSETS (INCLUDING COLLECTION RIGHTS OVER INTERCOMPANY LOANS) TO GUARATEE THE INTERCOMPANY FACILITY LOAN AGREEMENT** | • DIP Interim Order.<br><br>• Non-Possessory pledge agreement (*contrato de prenda sin transmission de posesión*) over all unencumbered assets of Alpha Debit, S.A. de C.V. (and any future released assets currently pledged) which shall include, without limitation, collection rights over intercompany loans derived from the use of DIP Loan amounts<br><br>o   Execution of the Non-possessory pledge agreement.<br><br>o   Formalization (ratification of signatures) of the Non-possessory pledge agreement before Mexican Public Notary | • Perfection prior to Initial Disbursement.<br><br>o   Execution: Closing Date.<br><br>o   Filing for registration shall occur within 5 Business Days following the execution date |

---

5 Parties to use commercially reasonable efforts to so amend the Fiduciaria Coomeva Alpha Trust Agreement.

AMERICAS 108213616<br>RLF1 25769470v.1

| Description | Documentation and Perfection Steps | Timing for delivery of locally perfected collateral [1] |
|---|---|---|
| | o   Registration of the pledge before the Mexican Sole Registry of Liens over Movable Assets (Registro Único de Garantías Mobiliarias) (RUG)<br><br>o   Execution of an irrevocable special POA in case of an event of default under the terms of the Non-Possessory pledge agreement<br><br>•   Collateral Agent POA duly granted before a US Notary Public and apostilled and formalized before a Mexican public notary, as applicable ("<u>Collateral Agent POA</u>"). | |
| **B. MEXICAN STOCK PLEDGE AGREEMENT** | •   DIP Interim Order<br><br>•   Share pledge agreement (*contrato de prenda sobre acciones*) over 100% of the shares representative of the capital stock of Alpha Debit, S.A. de C.V.<br><br>o   Execution of the share pledge agreement.<br><br>o   Physical delivery of the stock certificates in favor of collateral, through the corresponding endorsement.<br><br>o   Registration in the share ledger of the issuers of shares<br><br>o   Execution of an irrevocable special POA in case of an event of default under the terms of the Stock pledge agreement | •   As of Closing Date<br><br>o   Filing for registration shall occur within 5 Business Days following the execution date |
| | **PANAMA** | |
| **A. PLEDGE OVER QUOTAS OF ALPHACREIDT SUDAMÉRICA S. DE R.L.** | •   DIP Interim Order<br><br>•   Panama law governed quota pledge agreement<br><br>o   Quota pledge agreement (*contrato de prenda mercantil sobre cuotas*) over 100% of the quota capital of AlphaCredit Sudamérica S. de R.L.<br><br>o   Execution of the quota pledge agreement.<br><br>o   Physical delivery of quota certificates to | •   To be entered into and perfected within 20 days of Closing Date, and to be a condition precedent to Subsequent Funding[6] |

---

[6] Unless waived or agreed otherwise by the Majority DIP Purchasers, or counsel thereto.

29

| Description | Documentation and Perfection Steps | Timing for delivery of locally perfected collateral [1] |
|---|---|---|
| | collateral agent, together with blank stock powers duly endorsed by each of the pledgors.<br><br>  o   Registration in the quota registry of AlphaCredit Sudamérica S. de R.L.<br><br>  o   Legal opinion to be delivered from Panamanian counsel to pledgor | |
| **U.S.** | | |
| **A. DACAs** | • **DIP Interim Order**<br><br>• **DACA to be put in place and all cash held in controlled accounts in accordance with the Term Sheet** | • **As of Closing Date** |
| **B. NY LAW SECURITY AGREEMENT** | • **DIP Interim Order**<br><br>• **NY Law Pledge and Security Agreement** | • **As of Closing Date** |

30

# EXHIBIT C

**Commitment Letter**

Agreed-Upon Form – Execution Version

**PERSONAL AND CONFIDENTIAL**

**ALPHA CAPITAL, S.A.S.**
Carrerra 14 No. 94 - 81
Bogota, D.C., Colombia

**ALPHADEBIT, S.A. DE C.V.**
Calle Antonio Dovali Jaime 70
Tower C, 7th Floor
Mexico City, Mexico 01210

Ref.: DIP Financing Commitment Letter

Ladies and Gentlemen:

Reference is hereby made to the Chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") that Alpha Capital, S.A.S., and Alpha Debit, S.A. de C.V. (together, the "**Borrowers**"), and certain of their affiliates as debtors and debtors in possession (collectively, the "**Debtors**" and, together with the Borrowers, "**you**") intend to file in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

The institutions set forth on Annex I hereto, either directly or through one or more affiliated funds or financing vehicles (or such funds or accounts advised or sub-advised by such persons) (the "**Commitment Parties**," "**we**" or "**us**") are pleased to confirm our agreement to provide debtor-in-possession financing to the Debtors on the terms and subject to the conditions hereinafter set forth in this commitment letter and on the terms and subject to the conditions set forth in the DIP Term Sheet attached hereto as Exhibit A (collectively, this "**Commitment Letter**"). To the extent not defined in the body of this Commitment Letter, each capitalized term shall have the meaning assigned to it in the DIP Term Sheet attached hereto as Exhibit A.

You have informed us that the Debtors desire to, in accordance with the terms hereof, enter into a secured super-priority debtor in possession multi-draw term notes facility in an aggregate principal amount of $45,000,000 (the "**DIP Facility**"). The Debtors and the Commitment Parties mutually agree to negotiate DIP Note Documents in good faith in accordance with the provisions hereof. The transactions described above are referred to herein as the "**Transaction**."

Our fees for our commitment and other matters related to the DIP Facility are set forth in a separate fee letter (the "**Fee Letter**") entered into by the Borrowers and the Commitment Parties on the date hereof and attached as Exhibit B hereto.

1.     **Commitment.**

The Commitment Parties agree to provide 100% of the DIP Facility upon the terms and subject to the conditions contained in this Commitment Letter. It is understood and agreed that the agreements and obligations of the Commitment Parties under this Commitment Letter shall be several and not joint. You agree that no compensation (other than contemplated by this Commitment Letter, including the DIP Term Sheet attached hereto as Exhibit A and the Fee Letter attached as Exhibit B) will be paid to any Commitment Party in order to obtain its commitment to participate in the DIP Facility unless you and we shall so agree.

2.      **Conditions Precedent.**

The Commitment Parties' agreements and obligations hereunder to fund the DIP Facility are subject to the satisfaction of the conditions precedent applicable to the applicable funding described in the sections entitled "Conditions Precedent to Initial Availability" and "Conditions Precedent to Full Availability" in the DIP Term Sheet attached hereto as Exhibit A.

The Commitment Parties' agreements and obligations are also conditioned upon the Bankruptcy Court having entered, substantially in the form of Annex A hereto, an interim order approving all reasonable and documented transaction costs, fees and expenses pursuant to this Commitment Letter.

3.      **Information.**

The Debtors jointly and severally represent and covenant (and it shall be a condition to the Commitment Parties' commitments hereunder and agreement to perform the services described herein) that (i) all information, documentation and materials delivered to the Commitment Parties in connection with the transactions and agreements contemplated thereby (collectively, the "**Information**") other than the financial projections, forecasts and other forward looking statements (collectively, the "**Projections**") made available to the Commitment Parties in connection with the transactions contemplated hereunder is, except as previously disclosed to the Commitment Parties, true to the best of the Debtors' knowledge and the Debtors have disclosed any known material misstatement in any such Information; and (ii) the Projections that have been or will be made available to the Commitment Parties by or on behalf of the Borrowers or any of their representatives have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time such Projections are furnished to the Commitment Parties, it being understood and agreed that the Projections are not a guarantee of financial performance and actual results may differ from the Projections and such differences may be material.  You agree that if at any time prior to the Closing Date any of the representations in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, including to the extent that prior to the Closing Date, any event that has occurred results in or could reasonably be expected to result in a Material Adverse Effect, then you will promptly supplement, or cause to be supplemented, the Information and Projections so that such representations will be correct in all material respects under those circumstances on the Closing Date; it being understood, in each case, that such supplement shall cure any breach of such representations and warranties. In committing to provide the DIP Facility, the Commitment Parties and our affiliates shall be entitled to rely upon on the Information and the Projections without any obligation to conduct any independent evaluation or appraisal of the assets or liabilities of the Debtors, their Mexican affiliates (the "**Mexican Affiliates**") or any other party or to advise or opine on any related solvency issues.

4.      **Indemnification and Related Matters.**

To induce the Commitment Parties to enter into this Commitment Letter, you agree to indemnify and hold harmless each Commitment Party, its affiliates and the respective officers, directors, employees, agents, advisors and other representatives and successors of each of the foregoing (each, an "**Indemnified Person**"), from and against any and all losses, claims, damages and liabilities (collectively, "**Losses**") and the reasonable and documented or invoiced out-of-pocket fees and expenses, joint or several, to which any such Indemnified Person may become subject, including to the extent arising out of, resulting from, or in connection with, any actual or threatened claim, litigation, investigation or proceeding (including any inquiry or investigation) relating to this Commitment Letter (including the DIP Term Sheet), the Transaction or any related transaction contemplated hereby, the DIP Facility or any use of the proceeds thereof (any of the foregoing, a "**Proceeding**"), regardless of whether any such Indemnified Person is a party thereto and whether or not such Proceedings are brought by you, your equity holders, affiliates or

2

creditors or any other third person, and to reimburse each such Indemnified Person promptly for any reasonable and documented or invoiced out-of-pocket legal fees and expenses incurred in connection with investigating, responding to, or defending any of the foregoing and other reasonable and documented or invoiced out-of-pocket fees and expenses incurred in connection with investigating, responding to, or defending any of the foregoing; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses or related expenses to the extent that they have resulted from the willful misconduct or gross negligence of such Indemnified Person or any of such Indemnified Person's controlled affiliates or any of its or their respective officers, directors, employees, agents, advisors or other representatives or successors of any of the foregoing (as determined by a court of competent jurisdiction in a final and non-appealable decision).

Notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall be liable for (i) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems except to the extent such damages are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of the Indemnified Person, or (ii) any indirect, special, punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) in connection with this Commitment Letter, the Transaction (including the DIP Facility and the use of proceeds thereunder), or with respect to any activities related to the DIP Facility, including the preparation of this Commitment Letter and the DIP Note Documents, provided that nothing contained in clause (ii) above shall limit your indemnity and reimbursement obligations set forth in the immediately preceding paragraph to the extent such indirect, special, punitive or consequential damages are included in any claim by a third party unaffiliated with the applicable Indemnified Person in connection with which the applicable Indemnified Person is entitled to indemnification or reimbursement as set forth in the immediately preceding paragraph.

You acknowledge and agree that (i) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, (ii) each Commitment Party, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of any Commitment Party, (iii) you are capable of evaluating and understanding, and you understand, and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (iv) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, and (v) you waive any claims you may have against any Commitment Party for breach of fiduciary duty or alleged breach of fiduciary duty and agree that the Commitment Parties shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

Additionally, you acknowledge and agree that the Commitment Parties are not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby, and no Commitment Party shall have any responsibility or liability to you with respect thereto. Any review by any of the Commitment Parties of the Borrowers, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of such Commitment Party and shall not be on behalf of you or any of your affiliates.

RLF1 25769471v.1

**5.      Assignments; Amendments.**

This Commitment Letter (i) may not be assigned by you or us without the prior written consent of each Commitment Party (and any purported assignment without such consent will be null and void) and the Borrowers (which consent may be provided by e-mail), except that any Commitment Party may assign all or a portion of its Commitments hereunder to any of the members of the ad hoc group of bondholders described in Annex I and upon such assignment, such Commitment Party shall be relieved with respect to the obligations so assigned, (ii) is intended to be solely for the benefit of the Commitment Parties and (iii) except as set forth in Section 4 above, is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.

Any and all obligations of, and services to be provided by, each of us hereunder (including, without limitation, our commitments as a Commitment Party) may be performed and any and all of our rights hereunder may be exercised by or through any of our respective affiliates or branches and, in connection with such performance or exercise, we may, subject to Section 6, exchange with such affiliate or branches information concerning you and your affiliates that may be the subject of the transactions contemplated hereby and, to the extent so employed, such affiliates and branches  shall be entitled to the benefits afforded to us hereunder and be subject to the obligations undertaken by us hereunder. This Commitment Letter may not be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto, and any term or provision hereof may be amended or waived only by a written agreement executed and delivered by all parties hereto.

**6.      Confidentiality.**

Please note that this Commitment Letter and any written communications provided by, or oral discussions with, the Commitment Parties in connection with this arrangement are exclusively for the information of the Borrowers and may not be disclosed by you to any third party or circulated or referred to publicly without our prior written consent except, after providing written notice to the Commitment Parties, pursuant to a subpoena or order issued by a court of competent jurisdiction or by a judicial, administrative or legislative body or committee; provided that we hereby consent to your disclosure of (i) this Commitment Letter and such communications and discussions to the Borrowers, their affiliates that will be DIP Note Parties under the DIP Facility and their respective employees, attorneys, financial advisors, officers, directors, agents and advisors who are directly involved in the consideration of the DIP Facility and who have been informed by you of the confidential nature of such advice and this Commitment Letter and who have agreed to treat such information confidentially, (ii) this Commitment Letter or the information contained herein to the extent required in motions, in form and substance reasonably satisfactory to each Commitment Party, that may be filed with the Bankruptcy Court where the Borrowers are a debtor solely in connection with the Borrowers seeking to obtain the entry of an order approving your execution, delivery and performance of this Commitment Letter and/or the definitive DIP Note Documents, (iii) this Commitment Letter as required by applicable law (including, without limitation, stock market exchange rules and regulations or antitrust laws, among others), or compulsory legal process (in which case, to the extent permitted by law, you agree to inform us promptly thereof prior to disclosure), (iv) with each Commitment Party's prior written consent to the proposed disclosure, (v) to any official committee appointed in the Chapter 11 Cases (and their advisors) so long as you obtain from the applicable persons or entities a confidentiality agreement with respect to such information in form and substance acceptable to each Commitment Party and (vi) to any prospective assignees and participants that have agreed to confidentiality provisions substantially in the form of the confidentiality provisions hereof. The Commitment Parties reserve the right to review and approve, in advance, all materials, press releases, advertisements, and disclosures that you or your affiliates prepare that contain the Commitment Parties' or any of their respective affiliates' name or describe the Commitment Parties' financing commitment, provided that such approval shall not be unreasonably withheld or delayed.

Each Commitment Party and its affiliates will use all non-public information provided to it or such affiliates by or on behalf of you hereunder or in connection with the Transaction solely for the purpose of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information and shall not publish, disclose or otherwise divulge, such information; provided that nothing herein shall prevent such Commitment Party and its affiliates from disclosing any such information (i) with your consent, (ii) pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, rule or regulation or compulsory legal process based on the reasonable advice of counsel (in which case such Commitment Party agrees, to the extent not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (iii) upon the request or demand of any regulatory authority (including any self-regulatory authority) having jurisdiction over such Commitment Party or any of its affiliates (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority (including any self-regulatory authority) exercising examination or regulatory authority), to the extent not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (iv) to the extent that such information becomes publicly available other than by reason of improper disclosure by such Commitment Party, any of its affiliates or any of its or their Related Parties in violation of any confidentiality obligations (including those set forth in this paragraph) owing to you or any of your or affiliates or any of your Related Parties, (v) to such Commitment Party's affiliates and managed funds and to its and their respective directors, officers, employees, shareholders, legal counsel, independent auditors, professionals and other experts or agents (such persons, "**Related Parties**") who need to know such information in connection with the Transaction and who are informed of the confidential nature of such information and who are subject to customary confidentiality obligations of professional practice or who agree in writing to be bound by the terms of this paragraph (or language substantially similar to this paragraph) (with such Commitment Party being responsible for such compliance), (vi) to any Lenders, participants or hedging counterparties or prospective Lenders, participants or hedging counterparties who have agreed to be bound by confidentiality and use restrictions in accordance with the proviso to this sentence and (vii) as is necessary or advisable in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter; provided that the disclosure of any such information to any Lenders, prospective Lenders, participants, prospective participants, hedging counterparties or prospective hedging counterparties referred to above shall be made subject to the acknowledgment and acceptance by such Lender, prospective Lender, participant, prospective participant, hedging counterparty or prospective hedging counterparty that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and us, including, without limitation, as agreed in any confidential information memorandum or other marketing materials) in accordance with our standard processes or customary market standards for dissemination of such type of information.  The Commitment Parties' and their affiliates', if any, obligations under this paragraph shall terminate automatically and be superseded by the confidentiality provisions in the definitive documentation relating to the DIP Facility, or will otherwise expire one year after the date hereof if not superseded.

7.      **Governing Law and Jurisdiction.**

**Each of the parties hereto for itself and its affiliates agrees that any suit or proceeding arising in respect of this Commitment Letter or the Commitment Parties' agreements or obligations hereunder will be tried exclusively in the Bankruptcy Court or, if the Bankruptcy Court does not have subject matter jurisdiction, in any Federal court of the United States of America sitting in the Borough of Manhattan or, of that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and each of the parties hereby submits to the exclusive jurisdiction of, and to venue in, such court  Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of this Commitment Letter or any matter referred to in this**

**Commitment Letter is hereby waived by the parties hereto.  The parties hereto for itself and its affiliates agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses above shall be effective service of process against such party for any suit, action or proceeding brought in any such court.  This Commitment Letter will be governed by and construed in accordance with the laws of the State of New York.**

8.    **Miscellaneous.**

The agreements and obligations of the Commitment Parties hereunder will terminate, unless the Commitment Parties shall have received this Commitment Letter signed by the Borrowers prior to 11:59 p.m. New York City time on August 6, 2021.  The agreements and obligations of the Commitment Parties under this Commitment Letter shall terminate on the date that is sixty (60) days after the signing of this Commitment Letter if the DIP Note Documents shall not have been entered into by such date, unless such deadline is extended by mutual agreement of the Borrowers and the Commitment Parties.

The provisions set forth under Sections 3, 5, and 6 hereof and this Section 8 will remain in full force and effect regardless of whether definitive DIP Note Documents are executed and delivered, except to the extent any such sections are by their terms expressly superseded by the terms of the definitive DIP Note Documents.  The provisions set forth under Sections 3, 5, and 6 hereof and this Section 8 will remain in full force and effect notwithstanding the expiration or termination of this Commitment Letter or the Commitment Parties' agreements and obligations hereunder.

In addition, you hereby agree to reimburse the Commitment Parties (in the case of reimbursement on the Closing Date, to the extent you have been provided an invoice therefor at least three (3) business days prior to the Closing Date) for all reasonable documented out-of-pocket costs, fees and expenses (including, without limitation, reasonable documented out-of-pocket expenses of the Commitment Parties' due diligence investigation, advisor fees, and reasonable fees, disbursements and other charges of counsel, and any other fees provided for in the DIP Term Sheet attached hereto as Exhibit A) incurred in connection with the preparation of this Commitment Letter and the DIP Note Documents on the Closing Date and such later dates as contemplated in the DIP Note Documents.

Notwithstanding any other provision of this Commitment Letter, the obligations under this Commitment Letter with respect to the DIP Facility are joint and several obligations of the Borrowers and the other Debtors.

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in pdf format) will be effective as delivery of a manually executed counterpart hereof.  The words "execution," "executed", "signed," "signature," and words of like import in this Commitment Letter shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. This Commitment Letter is the only agreement that has been entered into among the parties hereto with respect to the DIP Facility and set forth the entire understanding of the parties with respect thereto and supersede any prior written or oral agreements among the parties hereto with respect to the DIP Facility and the Transaction.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 10756 (signed into law October 26, 2001) (the "**Patriot Act**")) and the requirements of 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), each of us and each of the DIP Note Purchasers may be required to obtain, verify and record information that identifies the Borrowers and each other DIP Note Party, which information may include its name and address and other information that will allow each of us and the lenders to identify the Borrowers and each other DIP Note Party in accordance with the Patriot Act or the Beneficial Ownership Regulation, as applicable.  This notice is given in accordance with the requirements of the Patriot Act and is effective for each of us and the DIP Note Purchasers.

[Remainder of page intentionally left blank]

7

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transaction.

Very truly yours,

**[DIP NOTE PURCHASER]**

By: _____
Name:
Title:

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transaction.

Very truly yours,

**[DIP NOTE PURCHASER]**

By: _____
       Name:
       Title:

[Signature Page to Commitment Letter]

**ACCEPTED AND AGREED AS OF** _____, **2021:**

**ALPHA CAPITAL, S.A.S**


By:_____
Name:
Title:


**ALPHADEBIT, S.A. DE C.V.**

By:_____
Name:
Title:

[Signature Page to Commitment Letter]

**Annex I**

| Name of Institution | Commitment |
|---|---|
| [●] | [●] |

**Exhibit A**

**ALPHA CAPITAL, S.A.S.**

SENIOR DEBTOR IN POSSESSION CREDIT FACILITY SUMMARY OF TERMS AND
CONDITIONS

**Exhibit B**

FEE LETTER

**Annex A**

FORM OF INTERIM ORDER

# **EXHIBIT D**

**Fee Letter**

**PERSONAL AND CONFIDENTIAL**

[•], 2021

**ALPHA CAPITAL, S.A.S.**
Carrerra 14 No. 94 - 81
Bogota, D.C., Colombia

**ALPHADEBIT, S.A. DE C.V.**
Calle Antonio Dovali Jaime 70
Tower C, 7th Floor
Mexico City, Mexico 01210

Ref.: DIP Financing Fee Letter

Ladies and Gentlemen:

Reference is hereby made to the Chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") that Alpha Capital, S.A.S., and Alpha Debit, S.A. de C.V. (together, the "**Borrowers**"), and certain of their affiliates as debtors and debtors in possession (collectively, the "**Debtors**" and, together with the Borrowers, "**you**") intend to file in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). We also refer to the Commitment Letter dated as of the date hereof (to which this fee letter is enclosed as Exhibit B) among certain financial institutions set forth on Annex I to the Commitment Letter, either directly or through one or more affiliated funds or financing vehicles (or such funds or accounts advised or sub-advised by such persons) (the "**Commitment Parties**") and Alpha Capital (the "**Commitment Letter**") in connection with a proposed super-priority debtor-in-possession term loan facility in an aggregate amount of approximately $45 million (the "**DIP Commitments**") consisting of a secured facility (the "**DIP Facility**") in an aggregate principal amount of $45 million, and the notes issued thereunder. To the extent not defined in the body of this letter (this "**DIP Financing Fee Letter**"), each capitalized term shall have the meaning assigned to it in the Commitment Letter (including the DIP Term Sheet attached thereto as Exhibit A thereto). The transactions described above are referred to herein as the "**Transaction**".

In consideration for the commitments under the Commitment Letter, you acknowledge and agree that the Company shall file the necessary or appropriate motions in the Chapter 11 Cases, seeking approval of payment by the Company of all fees described in this letter at the interim hearing on [•], 2021 (the "Interim Hearing"), and to use commercially reasonable efforts to obtain the Bankruptcy Court's approval of the payment of all such fees.

**1.     Commitment Fee.**

The Company shall pay the Commitment Parties a commitment fee equal to 2.00% of the DIP Commitments, payable in cash or in kind (in the form of an additional principal amount of DIP Notes), at the election of the Debtors.

**2.     Exit Fee.**

The Company shall pay the Commitment Parties an exit fee equal to 2.0% on the principal amount of DIP Notes repaid or prepaid (on or prior to the Maturity Date), which exit fee shall be payable in cash on the date of such repayment or prepayment.

**3.     General.**

You agree that, once paid, the fees or any part thereof payable hereunder and under the Commitment Letter will not be refundable under any circumstances. All fees payable hereunder and under the Commitment Letter will be paid in U.S. Dollars in immediately available funds and shall not be subject to reduction by way of setoff or counterclaim.  In addition, all such payments shall be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local tax authority ("Taxes") except as required by the applicable law. If any such Taxes are so imposed, then you shall (a) withhold or deduct such Taxes, as applicable, and remit the full amount of such Taxes to the corresponding tax authorities and pay such additional amounts as may be necessary so that every net payment of amounts due hereunder shall be equal to the amounts that would have been receivable in the absence of such deduction or withholding, and (b) promptly deliver to the Commitment Parties evidence of such payments.  To the fullest extent permitted by law, your obligation to pay any amount due or payable hereunder will, notwithstanding any payment in any other currency (whether pursuant to a judgment or otherwise), be discharged only to the extent of the amount in Dollars (the "**Relevant Currency**") that the Commitment Parties may, in accordance with their normal procedures, purchase with the sum paid in such other currency (after any costs of exchange (including any premium payable thereon)) on the Business Day immediately following the day on which the Commitment Parties receive such payment. If the amount in the Relevant Currency that may be so purchased for any reason falls short of the amount originally due, you will pay such additional amounts, in the Relevant Currency, as may be necessary to compensate for the shortfall. Any such additional amounts will, to the fullest extent permitted by applicable law, be due as a separate and independent obligation and, until discharged as provided herein, will continue in full force and effect. If the amount in the Relevant Currency that may be so purchased for any reason exceeds the sum originally due, you shall be entitled to retain (or we will remit to you) such excess.

All fees received by the Commitment Parties hereunder or under the Commitment Letter may be shared among the Commitment Parties and their affiliates as the Commitment Parties may determine in their sole discretion.

Notwithstanding any other provision of this DIP Financing Fee Letter, the obligations under this DIP Financing Letter with respect to the DIP Facility are joint and several obligations of the Borrowers and the other Debtors.

It is understood that this DIP Financing Fee Letter shall not constitute or give rise to any obligation on the part of the Commitment Parties or their affiliates to provide or arrange any financing.  This DIP Financing Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto.  **THIS DIP FINANCING FEE LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS DIP FINANCING FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**  This DIP Financing Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this DIP Financing Fee Letter by facsimile transmission or other electronic transmission (i.e., a "*pdf*" or "*tif*") shall be effective as delivery of a manually executed counterpart of this DIP Financing Fee Letter.  The words "execution", "signed", "signature", "delivery" and words of like import in or relating to this Fee Letter and/or any document to be signed in connection with this Fee Letter and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form (including deliveries by fax, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.  Section headings used herein are for convenience of reference only, are not part of this DIP Financing Fee Letter and are not to affect the construction of, or to be taken

into consideration in interpreting, this DIP Financing Fee Letter. The provisions of Sections 4, 7 and the third paragraph of Section 8 of the Commitment Letter are incorporated herein as though fully set forth herein.

All accruing fees hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). Any amount not paid when due as provided in this letter shall bear default interest at a rate per annum of the applicable interest rate for the DIP Facility plus 2%.

You agree that you will not disclose this DIP Financing Fee Letter or the contents hereof other than as permitted by Section 6 of the Commitment Letter.

The agreements and obligations of the Commitment Parties hereunder will automatically terminate on the date (the "**Termination Date**") which is the later of (a) the date on which there remain no amounts outstanding under the DIP Facility, and (b) the date on which there remain no available unused DIP Commitments. Upon any termination pursuant to the terms herein, this letter shall forthwith become void and there shall be no further obligations or liabilities on our part; provided that the obligations under the immediately preceding paragraph shall survive the Termination Date in accordance with the terms of Section 6 of the Commitment Letter.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**Patriot Act**")) and the requirements of 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), each of us and each of the DIP Lenders may be required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information may include its name and address and other information that will allow each of us and the lenders to identify the Borrower and each other Loan Party in accordance with the Patriot Act or the Beneficial Ownership Regulation, as applicable. This notice is given in accordance with the requirements of the Patriot Act and is effective for each of us and the DIP Lenders.

[Remainder of page intentionally left blank]

Very truly yours,

**[LENDER]**

By: _____
     Name:
     Title:

Very truly yours,

**[LENDER]**


By: _____
       Name:
       Title:

[Signature Page to Fee Letter]

Agreed-Upon Form - Execution Version

**ACCEPTED AND AGREED AS OF _____, 2021:**

**ALPHA CAPITAL, S.A.S.**

By:_____
Name:
Title:

**ALPHADEBIT, S.A. DE C.V.**

By:_____
Name:
Title:

[Signature Page to Fee Letter]

# **EXHIBIT E**

**Intercompany Loan Agreement**

EXECUTION VERSION

**INTERCOMPANY WORKING CAPITAL LOAN AGREEMENT**

**dated as of August 1, 2021**

**among**

**ALPHA HOLDING, S.A. DE C.V., as a Borrower,**

**THE SUBSIDIARIES OF ALPHA HOLDING, S.A. DE C.V. FROM TIME TO TIME
PARTY HERETO, as Borrowers,**

**and**

**ALPHADEBIT S.A. DE C.V. and ALPHA CAPITAL S.A.S.,
as Lenders**

**ALPHADEBIT S.A. DE C.V.,
as Security Agent for the Lenders**

## TABLE OF CONTENTS

Page

Section 1.    **Definitions** ...................................................................................2

Section 2.    **The Commitment and Credit Extension** ..........................................12

Section 3.    **Representations and Warranties** .....................................................15

Section 4.    **Conditions Precedent** ........................................................................17

Section 5.    **Affirmative Covenants** .......................................................................20

Section 6.    **Negative Covenants** ...........................................................................24

Section 7.    **Events of Default** ...............................................................................27

Section 8.    **Use of Proceeds** .................................................................................30

Section 9.    **Application of Proceeds** .....................................................................30

Section 10.   **Miscellaneous** ...................................................................................31

Section 11.   **Guarantee** ........................................................................................34

Section 12.   **Third Party Beneficiaries** ................................................................38

Section 13.   **Taxes, Withholding, Etc.** .................................................................38

Section 14.   Appointment of Agent .........................................................................41

Schedules

Schedule A – Existing Indebtedness
Schedule B – Existing Affiliate Transactions
Schedule C – Existing Liens
Schedule D – Existing Investment
Schedule E – Existing Restrictions on Subsidiaries

AMERICAS 108425130

## INTERCOMPANY WORKING CAPITAL CREDIT AGREEMENT

This INTERCOMPANY WORKING CAPITAL CREDIT AGREEMENT (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of August 1, 2021, among ALPHA HOLDINGS, S.A. DE C.V., a company organized under the laws of Mexico ("Alpha Holdings") and each Subsidiary of Alpha Holdings party hereto as a borrower, (each, a "Borrower" and together, the "Borrowers"), each of ALPHADEBIT S.A. DE C.V. and ALPHA CAPITAL S.A.S., as a lender (each in such capacity, together with its successors and assigns permitted hereunder, a "Lender" and together, the "Lenders"), and ALPHADEBIT S.A. DE C.V., as security agent for the Lenders (in such capacity, the "Security Agent").

## RECITALS

WHEREAS, on or about August 1, 2021 (the "Petition Date"), Alpha Capital, S.A.S. (the "Company") AlphaDebit, S.A. de C.V. and certain direct and indirect subsidiaries of the Company (collectively, and together with any other Affiliates of the Company that become debtors-in-possession in the Chapter 11 Cases, the "Debtors") intend to file voluntary proceedings for relief under chapter 11 of title 11 of the United States Code entitled "Bankruptcy" (as amended, the "Bankruptcy Code") (each, a "Chapter 11 Case" and, collectively the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and such Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Company and certain Subsidiaries and affiliates of the Company intend to enter into a Senior Secured Super-Priority Debtor-in-Possession Note Purchase Agreement to be entered into after the Petition Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "DIP Note Purchase Agreement") by and among the Company and AlphaDebit, S.A. de C.V. as co-issuers, the guarantors party thereto, the purchasers party thereto from time to time, UMB Bank, N.A., as paying agent, U.S. collateral agent and U.S. accounts bank (in such capacities, the "DIP Notes U.S. Agent"), and TMF Group, as Colombian collateral agent (in such capacity, the "DIP Notes Colombian Agent" and collectively, the "DIP Agent"), the Debtors obtained a $45,900,000.00 debtor-in-possession notes facility (the "DIP Facility");

WHEREAS, the Borrowers have requested that the Lenders provide a working capital credit facility to the Borrowers up to an aggregate principal amount of $45,000,000.00 (the "Credit Facility");

WHEREAS, the Lenders have agreed to use a portion of the proceeds of the DIP Facility to provide the Credit Facility for the Permitted Uses;

WHEREAS, the Borrowers acknowledge that they each will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations as provided in this Agreement and that the Lenders, as Affiliates of the Borrowers, is receiving significant benefits from the services provided by the Borrowers to the Lenders.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the foregoing, and the conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1.    **Definitions**.

"<u>Affiliate</u>" means, when used with respect to a certain person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.  For purposes of this definition, "<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meaning correlative thereto.

"<u>Agreement</u>" has the meaning as provided in the first paragraph of this Agreement.

"<u>AML Laws</u>" means any and all requirements of law related to engaging in, financing, or facilitating terrorism, money laundering, or financial recordkeeping, including the PATRIOT Act, The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§5311 5330 and 12 U.S.C. §§1818(s), 1820(b) and 1951 1959), Trading With the Enemy Act (50 U.S.C. §1 et seq.), Executive Order 13224 (effective September 24, 2001) and each of the laws, regulations, and executive orders administered by OFAC (31 C.F.R., Subtitle B, Chapter V) as well as the Federal Law for the Prevention and Identification of Transactions with Illicit Proceeds (Ley Federal para la Prevención e Identificación de Operaciones con Recursos de Procedencia Ilícita) for Mexico and other Mexican laws, regulations, and executive orders relating to engaging in, financing, or facilitating terrorism, money laundering, or financial recordkeeping.

"<u>Anti-Corruption Laws</u>" means any and all requirements of applicable law related to anti-bribery or anticorruption matters, including the United States Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act, and any laws intended to implement the OECD Convention on Combating Bribery of Foreign Public Officials including the General Law of Administrative Responsibilities (Ley General de Responsabilidades Administrativas) for Mexico and Articles 222 and 222-Bis of the Mexican Federal Criminal Code (Código Penal Federal), as well as any other laws, regulations or guidelines regarding anti-corruption or anti-bribery matters, promulgated by, or in force in Mexico City or in any of the other states or municipalities of Mexico.

"<u>Applicable Rate</u>" means 2.00% per annum.

"<u>Asset Sale</u>" means any sale, transfer, lease, sublease, exchange or other Disposition (including any sale and leaseback of assets) of any business units, assets or other property of the Borrowers (including any sale, transfer or other Disposition of any Capital Stock of any Subsidiary of the Borrowers) in each case in one transaction or in a series of related transactions. Notwithstanding the foregoing, the term "Asset Sale" shall not include any Disposition permitted under Section 6.

AMERICAS 108425130

"Borrower" and "Borrowers" have the meaning as provided in the first paragraph of this Agreement.

"Budget" means the budget and operating plan with respect to the operation and maintenance of the Borrowers' business, prepared substantially in the form delivered to the Lenders, as may be amended from time to time with the consent of the Lenders (who may only act with the consent of the Requisite Purchasers)  delivered under the DIP..

"Business Day" means any day except Saturday, Sunday and any day which shall be in New York, New York, Mexico City, Mexico or Bogotá D.C., Colombia, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"Capital Stock" means, with respect to any person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting) such person's equity or ownership, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"Cash" means money, currency or a credit balance in any demand or deposit account.

"Cash Equivalents" means each of the following:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one (1) year from the date of acquisition thereof;

(b)     any irrevocable standby letter of credit on customary terms issued by a U.S. bank or branch having a long term unsecured debt rating of at least A (or the equivalent) or better by S&P, Moody's or Fitch;

(c)     investments in commercial paper maturing within 365 days from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-2 (or the equivalent thereof) from S&P or P-2 (or the equivalent thereof) from Moody's;

(d)     investments in certificates of deposit (including investments made through an intermediary, such as the certificated deposit account registry service), banker's acceptances, time deposits, eurodollar time deposits and overnight bank deposits maturing within one (1) year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any other commercial bank of recognized standing organized under the laws of the United States or any State thereof that has a combined capital and surplus and undivided profits of not less than $250.0 million;

(e)     fully collateralized repurchase agreements with a term of not more than six (6) months for underlying securities that would otherwise be eligible for investment;

(f)      investments in money in an investment company registered under the Investment Company Act of 1940, as amended, or in pooled accounts or funds offered through mutual funds, investment advisors, banks and brokerage houses which invest its assets in obligations of the type described in clauses (a) through (e) above.  This could include, but not be limited to, money market funds or short- term and intermediate bonds funds;

(g)      money market funds that (A) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (B) are rated AAA (or the equivalent thereof) by S&P and Aaa (or the equivalent thereof) by Moody's and (C) have portfolio assets of at least $5.0 billion;

(h)      deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $100.0 million;

(i)      securities with maturities of one (1) year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A- by S&P or A3 by Moody's; and

(j)      any other securities or pools of securities that are classified under IFRS as Cash Equivalents or short-term investments on a balance sheet.

"Change of Control" shall mean the occurrence of one or more of the following events: (i) the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders is or becomes the "beneficial owner" (as such term is used in Rule 13d 3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Capital Stock of Alpha Holdings; (ii) any sale, lease, exchange or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the assets of Alpha Holdings and its Subsidiaries, taken as a whole, to any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), to any transferee person other than the Permitted Holders or (iii) the Permitted Holders shall own less than 40% of the Voting Capital Stock of the Alpha Holdings.

"Closing Date" means the date on which the conditions precedent in Section 4(a) below shall have been met.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" means all assets and property of each Borrower, now owned or hereafter acquired, which is subject to the (i) Liens granted by such Borrower (or intended to be subject to Liens granted by such Borrower) pursuant to the Collateral Documents, including, for the avoidance of doubt, the Borrowers' unencumbered loan portfolios, government receivables and other assets (including any and all fiduciary rights owned or held by such Borrowers over certain Mexican trusts regarding loan portfolios) and (ii) "subordinated liens" (*prendas subordinadas*)

on the Borrowers' encumbered assets and loan portfolios.

"Collateral Documents" means, collectively, the Pledge Agreement, and all other security agreements, pledge agreements or other similar agreements delivered to the Security Agent pursuant to this Agreement, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Security Agent for the benefit of the Lenders.

"Commitment" means an aggregate principal amount of $45,000,000.00, as the same may be reduced from time to time or terminated pursuant to Section 2(f), 2(g) or 2(h).

"Commitment Termination Date" means the date on which the Discharge of DIP Facility occurs.

"Contingent Obligation" means, as to any person, any obligation of such person guaranteeing any Indebtedness ("primary obligations") of any other person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the holder of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"Default" means any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" means, with respect to overdue principal on outstanding Loans, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to the Loans plus 2.00% per annum, which, in each case, shall be payable on demand.

"Derivatives Transaction" means any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"DIP Budget" means the Initial Approved DIP Budget until such time as an Updated DIP Budget is approved, following which such Updated DIP Budget shall constitute the DIP Budget until a subsequent Updated DIP Budget is so approved.

AMERICAS 108425130

"<u>DIP Facility</u>" has the meaning set forth in the recitals hereto.

"<u>DIP Note Documents</u>" means the "Note Documents" as defined in the DIP Note Purchase Agreement.

"<u>Discharge of DIP Facility</u>" means (a) payment in full in cash of the DIP Facility (other than contingent obligations or indemnification obligations, in each case for which no claim has been asserted) and (b) the making of adequate provision for any contingent or unliquidated obligations under the DIP Facility for which a claim has been asserted.

"<u>Disposition</u>" means the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a sale and leaseback transaction) of the Borrowers (in each case, other than qualified capital stock of Alpha Holdings).

"<u>Event of Default</u>" has the meaning provided in Section 7.

"<u>Final DIP Order</u>" means a final order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, authorizing and approving the DIP Facility and the DIP Note Documents, that is substantially in the form of the Interim DIP Order with such changes as are reasonably acceptable to the Lenders.

"<u>Governmental Authority</u>" means the government of the United States, Mexico, or any other nation, or of any political subdivision thereof, whether state, regional, county, municipal or local, and any agency, authority, instrumentality, regulatory body, ministry, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Guarantee</u>" means the guarantee of each Guarantor set forth in Section 9.

"<u>Guaranteed Obligations</u>" has the meaning as provided in Section 11(a).

"<u>Guarantors</u>" means each Borrower in its capacity as guarantor of the obligations of each other Borrower pursuant to Section 9.

"<u>IFRS</u>" means International Financial Reporting Standards as issued by the International Accounting Standards Board, in each case as in effect from time to time.

"<u>Indebtedness</u>" means, with respect to any person, without duplication, (i) all indebtedness (including principal, interest, fees and charges) of such person for borrowed money, (ii) all obligations of such person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such person to pay the deferred purchase price of property or services other than in the ordinary course of business, (iv) all obligations of such person under finance or capital leases which would be shown as an obligation in a balance sheet prepared in accordance with IFRS, (v) all liabilities secured by any Lien on any property owned by such person, whether or not such liabilities have been assumed by such person, (vi) the aggregate amount of capitalized lease obligations and obligations under synthetic leases and other off-

6

balance sheet transactions of such person, (vii) all Derivative Transactions of such person to the extent constituting indebtedness under IFRS, (viii) all Contingent Obligations of such person, (ix) all redemption obligations of such person in respect of mandatorily redeemable preferred stock, (x) the aggregate amount of all obligations incurred by such person pursuant to any securitizations or other asset-backed structured financing, (xii) all of such person's liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account banks or other financial institutions (whether or not representing obligations for borrowed money), (xiii) all indebtedness of others with respect to obligations referred to in (i) to (xii) above, guaranteed in any manner, directly or indirectly, by such person, and (xiv) all net reimbursement obligations of such person with respect to letters of credit, foreign currency sale agreements and bankers' acceptances, except such as are obtained by such person to secure performance of obligations (other than for borrowed money or similar obligations). Notwithstanding the foregoing, trade payables and accounts receivable (including intercompany payables and receivables, but excluding trade payables that are overdue by more than ninety (90) days) incurred in the ordinary course of business shall not constitute "Indebtedness"; however, all liabilities created or arising under any conditional sale or title retention agreement with respect to any such property shall constitute "Indebtedness".

"Initial Approved DIP Budget" means a 13-week cash flow forecast of receipts and disbursements for the period from the Closing Date setting forth projected cash flows and disbursements, which disbursements include legal fees and expenses projected to be incurred by the Borrowers, in form, scope and substance acceptable to the Lenders.

"Interim DIP Order" means an interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, granting interim approval of the proposed DIP Facility that is in form and substance reasonably acceptable to the DIP Agent and the Lenders.

"Investment" means (i) any direct or indirect purchase or other acquisition by the Borrowers or any of their respective Subsidiaries of, or of a beneficial interest in, any of the Securities of any other person, including the establishment or other creation of a Subsidiary or any other interest in the Securities of any person; (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of a Borrower from any person, of any Capital Stock of such person; and (iii) any direct or indirect loan, advance (other than advances to employees for customary moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business and consistent with past practice) or capital contributions by the Borrowers or any of their respective Subsidiaries to any other person, including all indebtedness and accounts receivable from that other person that are not current assets or did not arise from sales of inventory to that other person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Lender" has the meaning as provided in the first paragraph of this Agreement.

"Lien" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional

sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"Loan Documents" means this Agreement, each Collateral Document and each other document delivered to the Security Agent and/or Lenders in connection with this Agreement and/or the credit extended hereunder, in each case, as amended, restated, supplemented or otherwise modified from time to time.

"Material Adverse Effect" means any event has occurred with respect to the Borrowers (taken as a whole) since the Petition Date, including with respect to the Collateral Securing this Credit Facility that has resulted in or could reasonably be expected to result in a material adverse change in the operations, assets, revenues or financial condition of the Borrowers, taken as a whole (other than by virtue of the Chapter 11 Cases and the events typically resulting from the filing of the Chapter 11 Cases).

"Maturity Date" means February 1, 2022; provided that if the Discharge of DIP Facility has occurred prior to such date, the Maturity Date shall be extended to August 1, 2022.

"Mexico" means the United Mexican States.

"Net Insurance/Condemnation Proceeds" means an amount equal to: (i) any Cash payments or proceeds received by the Borrowers (a) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, less any applicable taxes payable with respect thereto or (b) as a result of the taking of any assets of the Borrowers by any person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by the Borrowers in connection with the adjustment or settlement of any claims of the Borrowers in respect thereof, and (b) any bona fide costs and expenses incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition to the extent paid or payable to non-Affiliates, including any income or gains taxes payable by the Borrowers as a result of any gain recognized in connection therewith during the tax period the Cash payments or proceeds are received.

"Net Proceeds" means (i) with respect to any incurrence of Indebtedness, the cash received by any Borrower in respect of such incurrence net of reasonable and customary fees, commissions, costs and expenses incurred in connection therewith and (ii) the aggregate cash and Cash Equivalents received by any Borrower in respect of any Asset Sale (including, without limitation, any Cash or Cash Equivalents received in respect of or upon the sale or other Disposition of any non cash consideration received in any Asset Sale), net of: (a) the direct costs and expenses relating to such Asset Sale and incurred by the Borrowers or a Subsidiary (including the sale or Disposition of such non cash consideration) to the extent paid or payable to a person that is not an Affiliate, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, (b) taxes paid or payable as a direct result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements (provided

AMERICAS 108425130

that, to the extent and at the time that any such taxes are no longer required to be paid or payable, such amounts then constitute Net Proceeds); (c) any reserve for adjustment or indemnification obligations in respect of the sale price of such asset or assets established in accordance with IFRS; and (d) any portion of the purchase price from an Asset Sale placed in escrow pursuant to the terms of such Asset Sale (either as a reserve for adjustment of the purchase price or for satisfaction of indemnities in respect of such Asset Sale) until the termination of such escrow.

"Officer" means, as applied to any person that is an entity, any duly authorized individual natural person holding the position of chairman of the board of directors (if an officer), chief executive officer, president, vice president, Chief Financial Officer, Chief Restructuring Officer (or designee thereof), member, manager or any other officer position with similar authority.

"Obligations" means all obligations of every nature of the Borrowers under the Loan Documents, including, without limitation, any liability of such Borrower on any claim, whether or not the right to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any bankruptcy, insolvency, reorganization or other similar proceeding.  Without limiting the generality of the foregoing, the Obligations of the Borrowers under this Agreement include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrowers under any Loan Document and (b) the obligation to reimburse any amount in respect of any of the foregoing that the Security Agent or any Lender, in its sole discretion, may elect to pay or advance on behalf of any Borrower.

"Organizational Documents" means (i) with respect to any corporation or company, its certificate, memorandum, or articles of incorporation or organization, and its by laws, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership and its partnership agreement, (iii) with respect to any general partnership, its partnership agreement, and (iv) with respect to any limited liability company, its articles of organization and its operating agreement.  In the event any term or condition of this Agreement or any other Note Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Taxes" means any and all present or future stamp, court, intangible, recording, filing or documentary, excise, property or similar Taxes arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Note Document.

"PATRIOT Act" has the meaning provided in **Error! Reference source not found.**.

"Permitted Holders" means in respect of Alpha Capital S.A.S., Alpha Capital S.A.S., Vive Créditos Kusida S.A.S. and Acsa Atento S.A.S.., and in respect of Alpha Debit, S.A. de C.V., AlphaCredit Capital, S.A. de C.V., SOFOM, E.N.R., ALPHA HOLDING, S.A. DE C.V. and/or Augusto Álvarez de Iturbe.

9

"Permitted Indebtedness" means: (a) indebtedness under this Agreement; (b) the Prepetition Notes, (c) other indebtedness outstanding on the date hereof and set forth on Schedule A hereto; and (d) intercompany Indebtedness owing by a Borrower to any other Borrower in the ordinary course consistent with past practice, that is expressly subordinated in right of payment to the Obligations under this Agreement and in respect of which the creditors would be considered "subordinated" pursuant to Article 222 Bis of the *Ley de Concursos Mercantiles*.

"Permitted Liens" means:

(a)     Liens held by the Security Agent on behalf of the Lenders securing the Obligations and the Guaranteed Obligations;

(b)     valid, perfected and unavoidable Liens that were in existence immediately prior to the Petition Date or that are perfected as permitted by Section 546(b) of the Bankruptcy Code;

(c)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(d)     Liens imposed by law, including carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business, which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with IFRS, and which are not securing financing indebtedness; provided that such Liens (including exercise of remedies thereunder) would not be expected to have a Material Adverse Effect;

(e)     (A) any overdrafts and related liabilities arising from treasury, netting, depository and cash management services or in connection with any automated clearing house transfers of funds, in each case as it relates to cash or Cash Equivalents, if any, and entered into in the ordinary course of business and (B) Liens arising by operation of law or contract or that are contractual rights of set-off in favor of the depository bank in respect of any deposit account or securities account, provided that such liabilities or Liens have not or would not be expected to have a Material Adverse Effect;

(f)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation and benefits, unemployment insurance and other labor and social security laws or regulations, or Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with IFRS; or

(g)     easements, zoning restrictions, licenses, title restrictions, rights-of-way and similar encumbrances on real property imposed by law or incurred or granted by any Borrower in the ordinary course of business that do not secure any material monetary obligations

10

and, individually or in the aggregate, do not detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower.

"Permitted Variances" is defined in Section 5(r).

"Pledge Agreements" means the Non-Possessory Pledge Agreement (*Contrado de Prenda sin Transmisión de Posesión*) dated as of the Closing Date, executed by the Borrowers, as pledgers, in favor of the Security Agent, on behalf of the Lenders, as they may be amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Notes" means any of Alpha Holding's outstanding $300,000,000 10.000% Senior Notes due 2022 and $400,000,000 9.000% Senior Notes due 2025 issued by Alpha Holdings pursuant to (i) an indenture, dated as of December 19, 2017 by and between Alpha Holdings, the guarantors party thereto and The Bank of New York Mellon, as trustee, registrar, paying agent and transfer agent and (ii) an indenture, dated as of February 10, 2020, by and between Alpha Holdings, the guarantors party thereto and The Bank of New York Mellon, as trustee, registrar, paying agent and transfer agent.

"Process Agent" means White & Case LLP with business address at 1221 Avenue of the Americas, New York, NY 10020, Attention: Andrew Zatz.

"Purchaser" means each financial institution party to the DIP Note Purchase Agreement as a purchaser.

"Requirements of Law" means, with respect to any person, any and all requirements of any Governmental Authority applicable to such person having the force of law, including any and all laws, judgments, orders, decrees, ordinances, rules, regulations, statutes or case law.

"Requisite Purchasers" has the meaning set forth in the DIP Note Purchase Agreement.

"Sanctioned Country" means, at any time, a country, territory or region that is, or whose government is, the subject or target of any Sanctions, including, as of the Closing Date, the Crimea region of Ukraine, Cuba, Iran, North Korea, Sudan, and Syria.

"Sanctioned Person" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. (including by OFAC, the U.S. Department of the Treasury, or the U.S. Department of State), or by the United Nations Security Council, the European Union or any EU member state, Her Majesty's Treasury of the United Kingdom or any other relevant sanctions authority, (ii) any Person located, operating, organized or resident in a Sanctioned Country or (iii) any Person owned or controlled, directly or indirectly, by any such Person described in clause (i) or (ii) of this definition.

"Sanctions" means sanctions or trade embargoes enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by OFAC, U.S. Department of State, or U.S. Department of Commerce, (ii) the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury of the United Kingdom, or (iii) any other relevant sanctions authority.

AMERICAS 108425130

"Secured Obligations" means (i) all Obligations hereunder, (ii) all Guaranteed Obligations and (iii) the due and punctual payment and performance of all other obligations of the Borrowers hereunder.

"Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, including any Capital Stock and any Derivative Transactions.

"Subsidiary" means, with respect to any person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election or appointment of the person or persons (whether directors, trustees, or other persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that person or one or more of the other Subsidiaries of that person or a combination thereof; provided, in determining the percentage of ownership interests of any person controlled by another person, no ownership interest in the nature of a "qualifying share" of the former person shall be deemed to be outstanding.

"Taxes" has the meaning provided in Section 10(c).

"Updated DIP Budget" means the updated budget delivered by Borrowers to the Lenders at the end of each four-week period following the delivery of the Initial Approved DIP Budget.

"U.S. Tax Compliance Certificate" means a certificate substantially in the form required by the Borrower from each foreign non-partnership Lender claiming the benefits of the portfolio interest exemption to receive payments from the Borrowers free of Withholding Taxes.

"Withholding Taxes" has the meaning provided in Section 10(c).

Section 2.    **The Commitment and Credit Extension**.

(a)    Commitment and Borrowing.  Subject to the terms and conditions set forth herein, each Lender agrees to make available to the Borrowers prior to the Maturity Date one or more term loans (each a "Loan" and, collectively, the "Loans") in an aggregate principal amount not to exceed such Lender's Commitment on the applicable date of Borrowing; provided that, notwithstanding anything to the contrary herein, (i) no Lender shall be required to make Commitments or Loans available to the Borrowers (x) in excess of $17,500,000 on the Closing Date and (y) after the Closing Date, subject to the entry of the Final DIP Order, in excess of $27,500,000 and (ii) no additional Loans may be disbursed after the Commitment Termination Date.  The Loans shall be incurred pursuant to one or more borrowings (each a "Borrowing," and, collectively, the "Borrowings").

AMERICAS 108425130

(b)     Request for Borrowing.   Whenever a Borrower desires to incur Loans hereunder, such Borrower shall give the Lenders written notice (which may be via electronic mail) of such Borrowing of Loans, not later than 12:00 p.m., New York City time (or such later time as may be acceptable to the Lenders in their sole discretion), specifying the following information: (i) the date of such Borrowing, which shall be a Business Day and (ii) the aggregate principal amount of such Borrowing.  No notice may be delivered (i) under this paragraph (b) until the conditions set forth in Section 4(a) or (b), as applicable, are satisfied or waived or (ii) if any Default or Event of Default shall have occurred and be continuing.

(c)     Disbursement of Funds.   Each Lender shall credit the account of the relevant Borrower as directed by such Borrower in writing with the aggregate amount of Loans requested pursuant to paragraph (b) above; provided that the Lenders shall not credit any amount to the relevant Borrower to the extent such disbursement would cause the Onshore Intercompany Accounts to have a balance in excess of $7,500,000 at the time of such disbursement, after giving effect to the use of proceeds thereof.

(d)     Maturity Date.   The aggregate principal amount of the Loans outstanding on the Maturity Date, together with all accrued and unpaid interest thereon, shall become due and payable in full on the Maturity Date.

(e)     Interest and Fees.

(i)     Interest Rate.   The Loans shall bear interest on the outstanding principal amount thereof from the applicable date of Borrowing at a rate per annum equal to the Applicable Rate.  Interest accruing on each Loan shall be due and paid in cash or in kind in arrears by being added to the principal balance of the Loans on the last Business Day of each calendar month prior to the Maturity Date and on the Maturity Date unless previously paid in cash pursuant to Section 2(f) below.

(ii)    Default Rate.   The Borrowers shall pay interest on past due amounts owing by it hereunder at a rate per annum equal to the Default Rate to the fullest extent permitted by law.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable on demand.

(f)     Optional Prepayments and Commitment Reductions.   The Borrowers may voluntarily reduce the unutilized portion of the Commitment and/or repay the Loans at any time without premium or penalty upon at least three (3) Business Days' prior written notice (or such shorter period as agreed by the Lenders in their sole discretion), which notice shall specify the amount of such prepayment; provided that each such reduction or prepayment shall be in an aggregate principal amount of at least $500,000 (or such lesser amount as agreed to by the Lenders in their sole discretion).  Any prepayment of Loans shall be accompanied by all accrued interest on the amount of such repaid Loans.

(g) <u>Mandatory Reduction of Commitments</u>.  The Commitment shall automatically be permanently reduced on each date of Borrowing of Loans (after giving effect to the Loans incurred on such date) by an amount equal to the aggregate principal amount of the Loans incurred on such Borrowing date.

(h) <u>Termination of Commitment</u>.  The Commitment shall terminate in its entirety on the earlier of the Maturity Date and the Commitment Termination Date.

(i) <u>Mandatory Prepayments</u>.

(i) <u>Issuance of Debt</u>.  On the date of receipt by any Borrower of any Net Proceeds from the incurrence of any Indebtedness of any Borrower, the Borrowers shall prepay the Loans in accordance with the requirements in Section 2(j) and Section 9 in an aggregate amount equal to 100% of such Net Proceeds, <u>provided</u> that no prepayment shall be required with respect to any Net Proceeds received with respect to any Permitted Indebtedness;

(ii) <u>Equity Issuances.</u> On the date of receipt by any Borrower of any Net Proceeds from any equity issuances for Cash or Cash Equivalents, the Borrowers shall prepay the Loans in accordance with the requirements in Section 2(j) and Section 9 in an aggregate amount equal to 100% of such Net Proceeds.

(iii) <u>Cash Sweep</u>.  On a bi-weekly basis, commencing on the second Friday after the Closing Date, to the extent the proceeds of the Loans held in accounts in Mexico (the "**Onshore Intercompany Accounts**") exceed $7,500,000 in the aggregate, the Borrowers shall prepay the Loans in accordance with the requirements in Section 2(j) and Section 9 in an aggregate amount equal to 100% of such excess amount.

(iv) <u>Insurance/Condemnation Proceeds</u>.  No later than the third Business Day following the date of receipt by any Borrower of any Net Insurance/Condemnation Proceeds, the Borrower shall prepay the Loans in accordance with the requirements in Section 2(j) and Section 9 in an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds.

(v) <u>Asset Sales</u>.  No later than the third Business Day following the date of receipt by any Borrower or any of its Subsidiaries of any Net Proceeds from any Asset Sales of Collateral, the Borrowers shall prepay the Loans in accordance with the requirements in Section 2(j) and Section 9 in an aggregate amount equal to 100% of such Net Proceeds.

(j) <u>Prepayment Certificate</u>.  Concurrently with any prepayment of the Loans pursuant to Section 2(f) and 2(i) above, the Borrowers shall deliver to Lenders a certificate of an

Officer demonstrating the calculation of the amount of the applicable net proceeds and compensation owing to Lenders under any of the Loan Documents, if any, as the case may be. In the event that the Borrowers shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrowers shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and the Borrowers shall concurrently therewith deliver to the Lenders a certificate of an Officer demonstrating the derivation of such excess.

(k)    Security.  The Secured Obligations shall be and hereby are secured by valid and enforceable first priority Liens in and to the Collateral (any and all such charges, liens and security interests contemplated by the foregoing, collectively, the "Liens"), subject to Permitted Liens and to the completion of required filings and registration of applicable guarantees and security agreements, to the extent required for perfection under Mexican law.

Section 3.    **Representations and Warranties.**    Each Borrower represents and warrants that:

(a)    Each Borrower (i) is duly organized, validly existing and in good standing (to the extent such concept or an equivalent is applicable in the applicable jurisdiction) under the laws of its jurisdiction of organization; (ii) has all requisite corporate or limited liability company (or equivalent) power and authority to own and operate its properties and to carry on its business as now conducted and (iii) is qualified to do business and in good standing (to the extent such concept or an equivalent is applicable in the applicable jurisdiction) in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing (to the extent such concept or an equivalent is applicable in the applicable jurisdiction) would not be reasonably expected to have, a Material Adverse Effect.

(b)    Each Borrower has the organizational power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and to obtain or guarantee (as applicable) extensions of credit thereunder.

(c)    Each Borrower has taken all necessary organizational and corporate action to authorize the extensions or guarantees (as applicable) of credit on the terms and conditions of the Loan Documents, and prior to the execution of each Loan Document to which each Borrower is a party, such Borrower has taken all necessary organizational and corporate action to authorize the execution, delivery and performance of such Loan Document, which action are in full force and effect as of the execution of each such Loan Documents.

(d)    Each Loan Document to which any Borrower is a party on the Closing Date has been duly executed and delivered on behalf of such Borrower and will constitute a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization or moratorium or similar laws affecting the rights of creditors generally an subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

AMERICAS 108425130

(e)    The execution, delivery and performance by each Borrower of the Loan Documents to which it is a party and the consummation of the transactions contemplated by the Loan Documents do not (a) violate any provision of any law or any governmental rule or regulation applicable to such Borrower, or any order, judgment or decree of an court or other agency of government binding on the applicable Borrower, (b) violate any of the Organizational Documents of the applicable Borrower, or (c) result in a breach or default under any contractual provision binding upon it, except for any default arising under any documentation governing Indebtedness entered into by the Company prior to the commencement of the Chapter 11 Cases (including the documentation governing the Prepetition Notes).

(f)    No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body, except for the court, is required for the due execution, delivery and performance by any Borrower of the Loan Documents.

(g)    There are no actions, suits, proceedings or investigations pending or, to the knowledge of the Borrowers, threatened against the Borrowers or any of their respective properties (including any properties or assets that constitute Collateral under the terms of the Loan Documents), before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that would reasonably be expected to result in a Material Adverse Effect.

(h)    Each of the Borrowers has filed or caused to be filed all income and other material Tax returns or reports that are required to be filed (taking into account all proper extensions) and has timely paid all income and other material Taxes levied or imposed upon it or its properties, income or assets otherwise due and payable (other than any Taxes (i) the amount or validity of which are currently being contested in good faith by appropriate proceedings, the collection of which has been suspended on account of such contest and with respect to which reserves in conformity with IFRS have been provided on the books of such Borrowers or (ii) the nonpayment of which would not reasonably be expected to result in a Material Adverse Effect).

(i)    The Borrowers are not aware of any other Tax or assessment that could reasonably be expected to have a Material Adverse Effect.

(j)    Except as would not reasonably be expected to have a Material Adverse Effect individually or in the aggregate, the Borrowers have (i) good, sufficient and legal title to or (ii) valid leasehold interests in all Collateral owned by the Borrowers, all of which are free and clear of all Liens other than Permitted Liens.

(k)    No Default or Event of Default (which has not been waived) under the Credit Facility has occurred and is continuing under this Agreement or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(l)    Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each Borrower, to its knowledge, is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and ownership of its property.

AMERICAS 108425130

(m)     The proceeds of the Loans shall be used in accordance with Section 8 hereof.

Section 4.     **Conditions Precedent**:

(a)     Conditions to Initial Availability. The funding of the initial Loans on the Closing Date shall be subject to the satisfaction of the following conditions precedent (unless waived by the Lenders):

(i)     There shall have been delivered to the Lender and the Security Agent an executed counterpart of this Agreement and each other Loan Document.

(ii)     The Lenders shall have received the Initial Approved DIP Budget, in form and substance reasonably satisfactory to the Lenders.

(iii)     The Bankruptcy Court shall have entered the Interim DIP Order no later than five (5) calendar days after the filing of a motion seeking entry of the Interim DIP Order, approving and authorizing on an interim basis the DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c), and in form and substance reasonably acceptable to the Lenders, and the Interim DIP Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated or subject to a stay pending appeal, in any manner, except as otherwise agreed to in writing by the Lenders, acting reasonably.

(iv)     The Lenders shall have received from each Borrower a certificate, executed by a duly authorized officer or director of such Borrower attaching copies of the public deeds evidencing the authorities of the officers or attorneys-in-fact authorized to execute, deliver and take actions under the Loan Documents for and on behalf of each of the Borrowers and the transactions contemplated thereby, certified by an Officer of such Borrower that as of the date of the certificate such authorities have not been amended, modified, revoked or rescinded.

(v)     The Lenders shall have received evidence of a perfected security interest in the Collateral, in favor of the Security Agent with respect to the Loans in accordance with the requirements hereunder and under the other Loan Documents (subject to (i) required filings and registration of applicable guarantees and security agreements, to the extent required for perfection under applicable local law, and (ii) the registration of the Collateral governed by Mexican law with the Mexican Sole Registry of Mobile Security Interests (*Registro Único de Garantias Mobiliarias*), in each case of the foregoing, to the extent required

17

for perfection of the security interest in the Collateral and pursuant to the terms of each Loan Document, provided, further, that for purposes of the Mexico law-governed Collateral Documents, the Security Agent shall have received copies of the notarial deeds or instruments formalizing the corresponding Collateral Documents as required by applicable law.

(vi)     All representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of the Closing Date (both before and after giving effect thereto and the application of proceeds from the Loans) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; provided that any representation or warranty that is qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, as though made on and as of the applicable date, before and after giving effect to such Loans.

(vii)    On the Closing Date, no Default or Event of Default shall have occurred and be continuing nor shall any such Event of Default or Default occur by reason of the making of the Loans and the application of proceeds thereof.

(viii)   The Borrowers shall not have in excess of $15,000,000 of Cash and Cash Equivalents on a combined basis after giving effect to the relevant disbursement and the application of the proceeds in accordance with the Budget and DIP Budget over the subsequent two (2) week period.

(ix)     Since the Petition Date, there shall have been no development, event, effect, condition or occurrence that, individually or in the aggregate, has had a Material Adverse Effect.

(x)      The Lenders shall have received an officer's certificate of the Borrowers, dated as of the Closing Date, confirming compliance with the conditions set forth in this Section 4(a).

(b)      Conditions Precedent to Each Borrowing After the Closing Date. The funding of Loans on each date of Borrowing after the Closing Date shall be subject to the satisfaction of the following conditions precedent:

(i)      The Bankruptcy Court shall have entered the Final DIP Order no later than forty (40) days after the date of entry of the Interim DIP Order and such order (i) shall have become a Final DIP Order, and (ii) shall not have been vacated, reversed, modified, amended or stayed, except as otherwise agreed in writing by the Lenders;

18

(ii)    All representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of the applicable Borrowing (both before and after giving effect thereto and the application of proceeds from the Loans) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; provided that any representation or warranty that is qualified by materiality or "Material Adverse Effect" shall be true and correct in all respects, as though made on and as of the applicable date, before and after giving effect to such Loans.

(iii)    On the date of the applicable Borrowing, no Default or Event of Default shall have occurred and be continuing nor shall any such Event of Default or Default occur by reason of the making of the Loans and the application of proceeds thereof.

(iv)    Since the Petition Date, there shall have been no development, event, effect, condition or occurrence that, individually or in the aggregate, has had a Material Adverse Effect.

(v)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or examiner or receiver with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed or designated with respect to the Debtors or their respective business, properties or assets under any of the Chapter 11 Cases.

(vi)    No order, injunction, stay, restriction or other similar limitation in any foreign bankruptcy or debtor relief cases of the Borrowers in any way prevents or restricts the Borrowers' ability to consummate the transactions contemplated by the Loan Documents.

(vii)    The Lenders shall have received all compensation (to the extent due) and all reasonable and documented transaction costs, fees, expenses (including, without limitation, reasonable and documented out of pocket expenses of counsel and other advisors, and including in connection with the preparation, negotiation and execution of the Loan Documents) required to be paid on or prior to the date of such Borrowing in each case to the extent invoices have been presented at least two (2) Business Days prior to such date.

(viii)    A report validating the Mexican loan portfolios (which shall include a review and examination of the Mexican loan portfolios) prepared by PricewaterhouseCoopers shall have been (i) provided to the Lenders and (ii) reasonably satisfactory to the Lenders.

(ix)    The Borrowers shall have provided a certificate to the Lenders confirming that all conditions to the date of such Borrowing have been met.

(x)    The Borrowers shall not have in excess of $15,000,000 of Cash and Cash Equivalents on a combined basis after giving effect to the relevant disbursement and the application of the proceeds in accordance with the Budget and DIP Budget over the subsequent two (2) week period.

(xi)    A Mexican Chief Restructuring Officer shall have been appointed in accordance with the terms of the DIP Note Purchase Agreement.

(xii)    If requested by the Lenders (acting at the direction of the Requisite Purchasers), recognition proceedings under Chapter 15 of Title 11 of the Bankruptcy Code have been filed with the Bankruptcy Court with respect to any *concurso mercantil* proceeding or any similar insolvency or bankruptcy proceeding in Mexico shall have occurred.

Section 5.    **Affirmative Covenants**. On and after the effective date of this Agreement and until the date that the Commitment hereunder has terminated and the principal of, and interest on, each Loans and all fess, expenses and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been paid in full in cash, each Borrower covenants and agrees to perform, and to cause its Subsidiaries to perform, all covenants set forth in this Section 5:

(a)    Promptly after an Officer of any of the Borrowers obtains actual knowledge thereof, notice of the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action such Borrower propose to take with respect thereto.

(b)    Prompt notice after any Officer of the Borrowers becomes aware of any actions, suits, proceedings or investigations pending or, to the knowledge of the Borrowers, threatened against the Borrowers or any of their respective properties (including any properties or assets that constitute Collateral under the terms of the Loan Documents), before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that (i) are likely to have a Material Adverse Effect, (ii) could reasonably be expected to affect the legality, validity, binding effect or enforceability of the Loan Documents or, in any material respect, the rights and remedies of the Security Agent or Lenders thereunder or in connection with the transactions or (iii) could reasonably be expected to affect the legality, validity, binding effect or enforceability of the Liens granted by the Lenders in their rights under this Agreement and the other Loan Documents or, in any material respect, the rights and remedies of the DIP Agent or Purchasers thereunder or in connection with such transactions.

AMERICAS 108425130

(c)     As soon as practicable in advance, and in any event no less than two (2) calendar days in advance of filing to the extent practicable to permit review, copies of all the Borrowers' material pleadings affecting the Credit Facility in any *concurso* or other such proceeding in Mexico shall be delivered to the Lenders (for transmission to the DIP Agent and Purchasers) and shall be reasonably acceptable to the Lenders (acting on the instructions of the Requisite Purchasers); provided the Borrowers shall not be required to provide material pleadings relating to the Credit Facility if doing so would violate any applicable legal rule or such material pleadings contain privileged information.

(d)     The Borrowers shall comply in all material respects, with all applicable federal, state and municipal laws, rules, regulations and orders of any Governmental Authority (including Sanctions and Anti-Corruption Laws) applicable to it or its business or property.

(e)     Each Borrower shall maintain policies, procedures and controls that are reasonably designed (and otherwise comply with applicable law) to promote compliance by each Borrower with applicable Anti-Corruption Laws, Sanctions, and AML Laws.

(f)     No Borrower shall repay or prepay any Loans, or otherwise transfer any Loans to any other Borrower, that it knows, or has reasonable grounds to believe, are (i) derived from illegal activity or (ii) derived from a Sanctioned Person or any activity prohibited by Sanctions.

(g)     No Borrower shall (i) deal in, or otherwise engage in any transactions relating to, any property or interests in property blocked pursuant to any AML Laws or Sanctions in violation of Sanctions by any person, (ii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of avoiding, or attempts to violate, any AML or Sanctions, or (iii) permit a Sanctioned Person to have any direct or, to its knowledge after reasonable inquiry, indirect interest in any Borrower.

(h)     The Borrowers shall promptly notify the Lenders in the event that any Borrower becomes aware that any Borrower or any of its Subsidiaries or any directors, officers or employees thereof becomes the subject of any action, proceeding, litigation, claim or investigation with regard to any actual or alleged violations of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions.

(i)     The Borrowers shall pay all taxes, assessments, and governmental levies as the same shall become due and payable (taking into account any applicable extensions (including any grace period provided under applicable law)) other than taxes, assessments and levies (i) being contested in good faith by appropriate proceedings, the collection of which has been suspended on account of such contest, and subject to maintenance of appropriate reserves in accordance with IFRS or (ii) the failure to effect such payment of which are not reasonably be expected to result in a Material Adverse Effect.

(j)     The Borrowers covenant (to the extent that it may lawfully do so) to not, at any time, insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in

AMERICAS 108425130

force, that may affect the covenants or the performance of this Agreement; and the Borrowers (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Lenders, but will suffer and permit the execution of every such power as though no such law has been enacted.

(k)     The Borrowers shall, at their sole cost and expense, (i) keep all Collateral that is tangible property insured at all times against such risks, including risks insured against by extended coverage, as is prudent and customary in each case with companies of the same or similar size in the same or similar businesses and predominately operating in the same jurisdictions as the Borrowers, and (ii) maintain such other insurance or self-insurance as may be required by law and to the extent the terms and conditions of coverage are not specified by law, they shall contract insurance in compliance with what is provided by law and as is prudent and customary in each case with companies of the same or similar size in the same or similar businesses and predominately operating in the same jurisdictions as the Borrowers.

(l)     In the event any Borrower acquires or otherwise owns any new assets constituting Collateral, such Borrower shall, within thirty (30) days of obtaining such new Collateral, execute, acknowledge and deliver or shall cause to be executed, acknowledged and delivered, all such further agreements, instruments, notices, authorizations, certificates,  and documents as are necessary in the reasonable opinion of the Security Agent.

(m)     The Borrowers shall maintain the Liens granted under the Collateral Documents in the priority set out therein and herein and shall execute, acknowledge and deliver or shall cause to be executed, acknowledged and delivered, all such further agreements, instruments, notices, authorizations, certificates, documents, opinions, surveys or appraisals as are necessary, or that the Purchasers shall reasonably request, in order to perfect, protect and/or maintain, as applicable, the priorities, control rights, transfers, security interests and remedies required or purported to be made or granted pursuant to the terms of the applicable Collateral Documents.

(n)     The Borrowers shall promptly correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral.

(o)     The Borrowers shall furnish to the Lenders and the advisors to the Purchasers prompt written notice (in any event within ten (10) Business Days) of any change in any Borrower's (A) corporate or organization name, (B) identity or organizational structure, or (C) organizational identification number; provided that none of the Borrowers shall effect or permit any such change unless all filings have been made, or will have been made within any statutory period that are required in order for the Security Agents to continue at all times following such change to have a valid, legal and perfected security interest in the Collateral for the benefit of the Purchasers.

AMERICAS 108425130

(p)    Each Borrower shall (i) maintain proper books of record and account, in which full, true and correct entries in conformity with IFRS shall be made of all financial transactions and matters involving the assets and business of the Borrowers, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrowers.

(q)    The proceeds of the Credit Facility will be used by the Borrowers as provided in Section 8 herein.

(r)    Commencing on the second Thursday after the Closing Date (the "**Initial Reporting Date**"), and then bi-weekly, the Borrowers shall provide a report to the Lenders (which shall be made available by the Lenders to the Purchasers) certified by the chief financial officer or the Mexican Chief Restructuring Officer of the Borrowers (A) showing actual cash receipts and disbursements for the two (2) week period ending prior to the week prior to the reporting date, (B) noting therein variances for such two (2) week period from amounts set forth in the Budget for such period on a line item basis, (C) providing an explanation for all material variances thereto, and (D) showing compliance with Section 2(i)(iii) for the preceding two (2) week period; provided that to the extent the Lenders provide a consolidated or combined report covering the information with respect to the Borrowers required in this Section 6(p) to the Purchasers under and in connection with the DIP Note Purchase Agreement, no additional or separate reporting shall be required to be delivered to the Lenders by the Borrowers.

(s)    No later than 4:00 p.m. New York City time on the Initial Reporting Date and on each Thursday thereafter that is the four (4)-week anniversary of the Initial Reporting Date (each such date, a "**Variance Testing Date**" and each such four-week period, the "**Testing Period**"), the Borrowers shall provide to the Lenders (which shall be made available by the Lenders to the Purchasers) a report detailing (i) the aggregate disbursements of the Borrowers and aggregate receipts during the applicable Testing Period for (a) all other operating disbursements (excluding capital expenditures), and (b) the Borrowers' professionals' fees; and (ii) any material variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the Company against the aggregate disbursements for the Testing Period, as set forth in the applicable Budget (the "**Variance Reports**"); provided that to the extent the Lenders provide a consolidated or combined Variance Report covering the information with respect to the Borrowers and the Company required in this Section 6(q) to the Purchasers under and in connection with the DIP Note Purchase Agreement, no additional or separate Variance Report shall be required to be delivered to the Lenders by the Borrowers.

(t)    As of any Variance Testing Date, for the Testing Period ending on the Sunday preceding such Variance Testing Date, the Borrowers shall not allow the amount of all operating disbursements in excess of the estimated aggregate disbursement budget for such Testing Period to be greater than 10% of the estimated aggregate disbursement for such items in the Budget for such Testing Period (collectively, the "**Permitted Variance**").

AMERICAS 108425130

(u)     Additional material variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the Lenders' approval (acting at the direction of the Requisite Purchasers, acting reasonably).

(v)     Prior to commencing any process for the Disposition of any Collateral, the Borrowers shall provide a draft of any terms of sale, auction terms or similar materials at least ten (10) calendar days in advance, and that the Borrowers shall not commence the sales process unless the Lenders have approved the terms (for the avoidance of doubt, with the consent of the Requisite Purchasers, acting reasonably).

(w)     A chief restructuring officer who shall be vested with customary authority shall be appointed in Mexico (the "**Mexican Chief Restructuring Officer**") within fifteen (15) calendar days of the date hereof.

(x)     The Borrowers shall do or cause to be done all things reasonably necessary to preserve and keep in full force and effect (1) their corporate existence, and the corporate, partnership or other existence, in accordance with the respective organizational documents (as the same may be amended from time to time); and (2) their rights (charter and statutory), licenses, concessions, permits and material franchises.

(y)     Each of the Borrowers will continue to maintain its interest in and right to use all property and assets (tangible or intangible) in its reasonable judgment necessary for the conduct of its business, taken as a whole. The Borrowers shall use, operate and maintain the Collateral in the same manner and with the same care as shall be the case with similar assets owned by the Borrowers without discrimination.

(z)     The Borrowers shall (i) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (ii) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (iii) use the standard of care typical in the industry in the operation and maintenance of its facilities.

(aa)     The Borrowers agree to continue to provide the Lenders and their Affiliates with loan servicing, management, accounting, legal, administrative, IT, personnel and similar operational and support services in a manner consistent with past practice prior to the date of this Agreement.

Section 6.     **Negative Covenants**. Each Borrower hereby covenants and agrees, on and after the effective date of this Agreement and until the date that the Commitment hereunder has terminated and the principal of and interest on each Loans and all fees, expenses and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been paid in full in cash, each Borrower will not, and will not permit any of its subsidiaries to:

(a)     Other than with the consent of the Lenders acting at the direction of the Requisite Purchasers, no Borrower shall convey, sell, lease, sub lease, exchange, assign, transfer, enter into a sale-leaseback transaction or otherwise dispose of Collateral, except

24

for any sales of Collateral that do not exceed $1,000,000 in the aggregate (taken together with any similar restriction set forth in the DIP Note Purchase Agreement with respect to the Borrowers and their respective Affiliates).

(b)    No Borrower shall directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, exchange or Disposition of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any of its Affiliates other than (i) transactions existing as of the Petition Date and listed on Schedule B, (ii) transactions solely between or among the Borrowers and (iii) transactions approved by the Lenders (acting on the instructions of the Requisite Purchasers), and (iv) transactions in compliance with the Credit Facility.

(c)    No Borrower will, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind, including any local law liens, on the Collateral, except (i) Liens in existence as of the Petition Date as set forth on Schedule C and (ii) Permitted Liens.

(d)    No Borrower shall (i) enter into any transaction of merger or consolidation with any entity, liquidate or dissolve itself (or suffer any liquidation or dissolution), (ii) dispose, in one transaction or a series of transactions, all or substantially all of its business, assets or property, or (iii) dispose of any assets in one or more transactions, except (i) a Borrower may merge or consolidate into another Borrower so long as no Default or Event of Default exists and a Borrower is the surviving entity and (ii) a Subsidiary that is not a Borrower may merge or consolidate into another Subsidiary that is not a Borrower.

(e)    The Borrowers will not use, lease/sub lease or otherwise operate or maintain any Collateral except in a manner permitted by this Agreement and the applicable Collateral Documents.

(f)    No Borrower shall (i) directly or indirectly, create, incur, assume or guaranty or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except for Permitted Indebtedness; or (ii) issue any preferred Capital Stock or other preferred Capital Stock.

(g)    No Borrower shall directly or indirectly, make or own any Investment in any, except (i) Investments outstanding on the Petition Date and identified on Schedule D; (ii) Investments (A) constituting deposits, prepayments and other credits to suppliers, and/or (B) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, made in the ordinary course of business and consistent with the past practices of the Borrowers and approved by the Mexican Chief Restructuring Officer and, in the case of clause (B), to extent reasonably necessary to maintain the ordinary course of supplies; (iii) Investments in any other Borrower; and (iv) advances under the Credit Facility, to the extent constituting Investments.

AMERICAS 108425130

(h)     No Borrower will make (or agree to make) directly or indirectly, any payments of unsecured Indebtedness existing prior to the Petition Date, other than pursuant to a *convenio concursal* duly approved in a *concurso mercantil* proceeding.

(i)     The Borrowers will not declare or pay any dividends (other than dividends payable solely in its Capital Stock) or return any capital to its stockholders or make any other distribution, payment or delivery of property or cash to its stockholders as such, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for consideration, any shares of any class of its Capital Stock or the Capital Stock of any direct or indirect parent now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock), or set aside any funds for any of the foregoing purposes, or purchase or otherwise acquire for consideration any shares of any class of the Capital Stock of the Company, now or hereafter outstanding (or any options or warrants or stock appreciation rights issued with respect to any of its Capital Stock) (all of the foregoing "dividends"), in each case, except to the extent agreed in writing by the Lenders (acting at the direction of the Requisite Purchasers); <u>provided</u> that nothing set forth in this clause shall prohibit the payment of any dividends or other amounts hereunder to the Lenders, the Security Agent or their permitted successors and assigns.

(j)     No Borrower will directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Borrower to create, incur, assume or permit to exist any Lien on any Collateral securing the Secured Obligations; <u>provided</u> that the foregoing shall not apply to restrictions and conditions (i) imposed by law or by this Agreement or any of the other Loan Documents, (ii) existing prior to the Petition Date identified on Schedule E, (iii) contained in agreements relating to any asset sale, provided that, such restrictions and conditions apply only to the asset that is to be sold and to the extent such sale is permitted hereunder, (iv) imposed by any agreement related to secured Indebtedness or other obligations permitted by this Agreement if such restriction or condition applies only to property secured or financed by such Indebtedness or other obligations, or (v) in leases, licenses and other contracts relating to the use and occupancy of airport premises and facilities restricting the assignment thereof.

(k)     No Borrower shall create a new Subsidiary.

(l)     No Borrower shall settle any material claims, including without limitation claims against existing or prior officers, directors or direct or indirect shareholders or former auditors of any of the Borrowers, without the Lenders' prior written consent (acting at the direction of the Requisite Purchasers).

(m)     No Borrower shall nominate, appoint, engage or enter into any new employment or retention agreements with executive officers without the Lenders' (acting at the direction of the Requisite Purchasers) prior written consent, such consent, in connection with replacing existing officers, not to be unreasonably withheld.

(n)     No Borrower shall consent to any involuntary filing for commencement, of a Mexican *concurso mercantil*, foreclosure, liquidation, *quiebra*, bankruptcy or similar

AMERICAS 108425130

proceeding, excluding appeals, according to the Mexican Insolvency Law (*Ley de Concurso Mercantiles*),without the consent of the Lenders (acting at the direction of the Requisite Purchasers).

Section 7.    **Events of Default**.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court, the occurrence of any one or more of the following events, regardless of the reason therefore, shall constitute an "Event of Default" hereunder:

(a)    the failure of the Borrowers to pay any principal when due, whether at stated maturity, by acceleration, by required prepayment or otherwise, or shall fail to pay any installment of interest or other amount payable hereunder within three (3) Business Days of the date when due;

(b)    any representation, warranty or statement made or deemed made by any Borrower herein or in any other document related hereto or in any certificate delivered to the Security Agent or any Lender pursuant hereto shall prove to be untrue in any material respect (or, in the case of any representation, warranty or statement qualified by materiality, in any respect) on the date as of which made or deemed made;

(c)    the Borrowers or any of their respective subsidiaries fail to perform or observe any term, covenant or agreement contained in any of Section 5(a), Section 5(e) (limited to failure to comply with Sanctions and Anti-Corruption Laws), Section 5(x) (with respect to each Borrower's existence) and Section 6.

(d)    the Borrowers or any of their respective subsidiaries fail to perform or observe any other provision of this Agreement (other than those set forth in clauses (a), (b) and (c) above) and such default shall continue unremedied for a period of thirty (30) days after the earlier of (i) the date on which such default shall first become known to any officer of the Borrowers or (ii) the date on which written notice thereof is given to the defaulting party by the Security Agent or the Lenders;

(e)    actual or asserted (by any Borrower or any Affiliate thereof) invalidity or impairment of this Agreement or any related Loan Document (including the failure of any Lien to remain perfected and any challenge or threatened challenge to enforce the perfection or priority of Liens securing this Credit Facility);

(f)    There shall have occurred a (i) default in making any payment of any principal of any post-petition or unstayed Indebtedness or any interest on any such post-petition or unstayed Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (ii) default in the observance or performance of any other agreement or condition relating to any such post-petition or unstayed Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such post-petition or unstayed

27

Indebtedness to become due prior to its stated maturity or (in the case of any such post-petition or unstayed Indebtedness constituting a Guaranteed Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (f) shall not at any time constitute an Event of Default to the extent such one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (f) shall have occurred and be continuing with respect to any Indebtedness the outstanding principal amount of which does not exceed in the aggregate $20,000,000 (or the equivalent in any other currency) or (b) an event of default under the DIP Facility;

(g)     any Borrower ceases or threatens to cease to carry on business in the ordinary course as it is carried on as of the date hereof, except where such cessation is consented to in writing by the Lenders;

(h)     revocation or cancellation by the counterparty of any contract to which any Borrower or is a party which has or would reasonably be expected to have a Material Adverse Effect;

(i)     any Borrower shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Security Agent or the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment.

(j)     one or more judgments or decrees shall be entered against the Borrower involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $20,000,000 (or the equivalent in any other currency) or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within sixty (60) days from the entry thereof.

(k)     written assertion by any Borrower or any affiliate thereof of the invalidity or impairment of (i) any Loan Document or (ii) any Liens over a material portion of the Collateral.

(l)     the Liens on any material portion of the Collateral intended to be created by the Collateral Documents or Loan Documents, as applicable, shall cease to be or shall not be a valid and perfected Lien having the priorities required under Section 9.

(m)     a Change of Control shall occur;

(n)     other than any *concurso mercantil* proceeding consented to by the Lenders (acting at the direction of the Requisite Purchasers in their reasonable discretion), the voluntary commencement, or consent to an involuntary filing for commencement, of a Mexican *concurso mercantil*, foreclosure, liquidation, *quiebra*, bankruptcy or similar proceeding, excluding appeals, according to the Mexican Insolvency Law (*Ley de Concursos Mercantiles*), without the express prior written consent of the Lenders (acting at the direction of the Requisite Purchasers in their reasonable discretion), or a Mexican

AMERICAS 108425130

*concurso mercantil*, foreclosure, liquidation, *quiebra*, bankruptcy or similar proceeding against the Borrowers if (i) any of said Borrower does not appeal, challenge or seek a stay against any such filing within nine (9) days after the notice of commencement is formally served to the applicable Borrower; or (ii) said Mexican *concurso mercantil*, foreclosure, liquidation, *quiebra*, bankruptcy or similar proceeding against the Borrowers, as applicable, has not been dismissed within ninety (90) days after the notice of commencement is formally served to the applicable Borrower.

(o)      the making of any material payments in respect of prepetition obligations prior to the Discharge of DIP Facility, other than (i) as permitted pursuant to this Agreement or (ii) as otherwise agreed to by the Lenders (acting at the direction of the Requisite Purchasers);

(p)      prior to the Discharge of DIP Facility the Borrowers (or any direct or indirect parent of any Borrower) shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Purchasers

(q)      any event shall have occurred with respect to the Borrowers (taken as a whole) since the Petition Date that has resulted in or could reasonably be expected to result in a Material Adverse Effect.

Upon the occurrence of any Event of Default, the Lenders may, by notice to the Borrowers declare the Commitment to be terminated forthwith, whereupon the Commitment shall immediately terminate, and/or, by notice to the Borrowers, declare its Loans hereunder, with accrued interest thereon, and all other Secured Obligations owed to it under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section 7, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

Further upon the occurrence and during the continuance of any Event of Default, the Lenders, may (and will be entitled to instruct the Security Agent to) exercise all of its rights and remedies set forth in any of the Loan Documents, in addition to all rights and remedies allowed under any applicable law, including the UCC.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

The Borrowers waive (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by the Security Agent or Lenders on which the Borrowers may in any way be liable and hereby ratify and confirm whatever the Security Agent or Lenders may lawfully do in this regard, (ii) all rights to notice and hearing prior to the Security Agent or the Lenders taking possession or control of the Collateral, or any bond or security which might be required by any court prior to allowing the Security Agent or Lenders to exercise any of their remedies, and (iii) the benefit of all valuation, appraisal and exemption laws.  The Borrowers acknowledge that they have been advised by counsel of their choice with respect to the effect of the foregoing waivers

and this Agreement, the other Loan Documents and the transactions evidenced by this Agreement and the other Loan Documents.

Section 8.    **Use of Proceeds.**

(a)    The Borrowers shall use the proceeds of the amounts disbursed under the Credit Facility for only the following purposes, in each case subject to the terms and conditions herein: (i) the Budget (subject to the Permitted Variance) and pursuant to controlled supervision from the Mexican Chief Restructuring Officer, (ii) providing liquidity for the Borrowers' working capital and other general corporate purposes and (iii) the fees, costs and expenses related to a *concurso mercantil* proceeding commenced for such Borrowers (the "**Permitted Uses**"), <u>provided</u> that payments prior to the tenth day from the date hereof required to be made by the Borrower pursuant to the Budget shall not require the approval of the Mexican Chief Restructuring Officer.

(b)    Notwithstanding anything to the contrary in this Agreement, none of the proceeds may be used, directly or indirectly, in any manner to: (i) object, challenge, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under, or the Liens or security interests granted under, this Agreement or the Loan Documents; (ii) investigate, initiate, assert or prosecute any claims, defenses, counterclaims, or offsets, or commence any cause of action against, under or relating to this Agreement or any other Loan Document, or the security interests and liens securing any of the Secured Obligations under the Credit Facility; (iii) prevent, hinder or delay, whether directly or indirectly, the Security Agents' assertion or enforcement of Liens on the Collateral, or efforts to realize upon any Collateral under the Loan Documents or exercise any other rights and remedies under the Loan Documents or applicable law; (iv) to fund prosecution or assertion of any claims, or to otherwise litigate against the DIP Agent or the Purchasers, (v) violate, in any material respect, of any Anti-Corruption Laws or AML Laws or (vi) (A) to fund or finance any activities or business of or with any person that is a Sanctioned Person or in any Sanctioned Country, or (B) in any other manner, in each case as would result in a violation of Sanctions by any person in connection with this Agreement (including any person participating or acting in connection with the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise).

Section 9.    **Application of Proceeds.**  Unless otherwise provided herein, (i) each prepayment of the Loans and (ii) all or any part of proceeds constituting Collateral in payment of the Secured Obligations shall be applied in the following order:

First, to pay the incurred and unpaid fees and expenses of the Security Agent and the Lenders required to be reimbursed under the Loan Documents.

Second, to the payment of any accrued interest at the Default Rate, if any;

Third, to the payment of any accrued interest (other than Default Rate interest);

Fourth, to prepay Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof); and

AMERICAS 108425130

Fifth, to payment of any remaining Secured Obligations then due and payable.

Section 10.    **Miscellaneous**.

(a)    Costs and Expenses.  Whether or not the transactions contemplated hereby shall be consummated, the Borrowers shall reimburse the Security Agent and the Lenders for (i) all reasonable and documented out-of-pocket costs and expenses in connection with the preparation of the Loan Documents, the Interim DIP Order, the Final DIP Order and any consents, amendments, waivers or other modifications thereto and in connection with the consummation and administration of the transactions contemplated hereby and thereby and in connection with the Chapter 11 Cases; (ii)  the reasonable and documented out-of-pocket fees, expenses and disbursements of counsel to the Security Agent and the Lenders in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by the Borrowers and in connection with the consummation and administration of the transactions contemplated hereby and thereby and in connection with the Chapter 11 Cases; (iii) all the reasonable and documented out-of-pocket costs and expenses in connection with the custody or preservation of any of the Collateral; and (v) all reasonable and documented out-of-pocket costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by the Security Agent and the Lenders in enforcing any Secured Obligations of or in collecting any payments due from the Borrowers hereunder or under the other Loan Documents (including in connection with the sale of, collection from, or other realization upon any of the Collateral) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to the Chapter 11 Cases, or any other insolvency proceedings or any attempt to enforce any rights or remedies of the Security Agent and the Lenders against the Borrowers or any other person that may be obligated thereto by virtue of being a party to any of the Loan Documents.

(b)    Indemnity. Whether or not the transactions contemplated hereby shall be consummated, the Borrowers agree, jointly and severally, to indemnify, pay and hold the Security Agent and the Lenders, and the shareholders, officers, directors, employees and agents thereof, harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (whether or not any of the foregoing persons is a party to any litigation), including, without limitation, reasonable attorneys' fees and costs (including, without limitation, the reasonable estimate of the allocated cost of in-house legal counsel and staff) and costs of investigation, document production, attendance at a deposition, or other discovery, with respect to or arising out of this Agreement or the or the other Loan Documents or any use of proceeds hereunder or the Chapter 11 Cases or any transactions contemplated hereby or thereby, or any claim, demand, action or cause of action being asserted against any Borrower (collectively, the "Indemnified Liabilities"); provided that the Borrowers shall have no obligation hereunder with respect to Indemnified Liabilities with respect to a particular indemnified person arising from the gross negligence or willful misconduct of any such indemnified person or its shareholders, officers, directors, employees and agents. This covenant shall survive termination of this Agreement and payment of the outstanding Loans.

(c)    Yield Protection, Taxes and Other Deductions.  Payments by a Borrower hereunder or under any other related Loan Documents shall be made free and clear of and

31

without reduction for or on account of any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings of any kind or nature whatsoever or any interest or penalties payable with respect thereto now or in the future imposed, levied, collected, withheld or assessed by any country or political subdivision of a country (collectively, "<u>Taxes</u>").

      (d)    <u>Assignments and Participations</u>.

      (i)    No Borrower may assign or transfer any of its rights, obligations or interest hereunder without the prior written consent of the Security Agent and the Lenders (and any attempted assignment or transfer without such consent shall be null and void). The Security Agent and the Lenders may sell, assign, transfer, negotiate or grant participations to the DIP Agent and the Purchasers to secure obligations under the DIP Note Purchase Agreement; <u>provided</u> that any such sale, assignment, transfer, negotiation or participation shall be in compliance with the applicable federal and state securities laws; <u>provided</u>, <u>further</u>, that any assignee or transferee agrees to be bound by the terms and conditions of this Agreement. The Security Agent and the Lenders may, in connection with any actual or proposed assignment or participation, disclose to the actual or proposed assignee or participant, any information relating to the Borrowers or any of their respective subsidiaries. The parties hereto agree that the Security Agent and the Lenders shall be permitted to make technical fixes to this Agreement to accommodate any such assignment or transfer.

      (ii)    The Lenders hereby acknowledge and agree to have pledged in first place their rights under this Credit Facility to the Purchasers under the DIP Facility and the Borrowers hereby expressly consent to such pledge (the "**DIP Lender Pledge**"), waiving any rights it may have. For the avoidance of doubt, the Borrower hereby consents to any such assignment and to the DIP Lender Pledge. In the event that the Purchasers foreclose or exercise any rights under the DIP Lender Pledge, the Borrowers agree to (i) treat the Purchasers as Lenders hereunder for any and all purposes, (ii) make payments exclusively to the Purchasers as if they were the Lenders party hereto and (iii) promptly appoint a collateral agent and an administrative agent in Mexico.

AMERICAS 108425130

(e)    <u>Amendments</u>.    Neither this Agreement nor any terms hereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Borrowers party hereto, the Security Agent and the Lenders (acting at the direction of the Requisite Purchasers).  The Borrowers, the Security Agent and the Lenders (acting at the direction of the Requisite Purchasers agree to use commercially reasonable efforts to amend this Agreement to (i) reflect material differences between this Agreement and the DIP Note Purchase Agreement to the extent such parties reasonably agree that a conforming change is required and (ii) supplement and/or correct any information set forth on the initial Schedules to this Agreement on or prior to the date which is two (2) Business Days after the date the DIP Note Purchase Agreement is entered into among the Lenders, the Purchasers and the other parties thereto.

(f)    <u>Entire Agreement; Conflict</u>.    This Agreement currently constitutes the entire agreement between the parties relating to the subject matter hereof and is binding on the parties in accordance with its terms.  To the extent that there is any inconsistency between this Agreement and any of the other related Loan Documents once executed, this Agreement shall govern unless such other document specifically states otherwise.

(g)    <u>Effectiveness; Binding Effect; Governing Law</u>.    This Agreement shall become effective when it shall have been executed by the Borrowers, the Security Agent and the Lenders and thereafter shall be binding upon and inure to the benefit of the Borrowers, the Security Agent, the Lenders and their respective successors and assigns.  THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(h)    <u>Waiver of Jury Trial</u>.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE AGENT/LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.

(i)    <u>Consent to Jurisdiction; Venue</u>.    All judicial proceedings brought against any party hereto with respect to this Agreement and the Loan Documents shall be brought in any state or federal court of competent jurisdiction in the State of New York. and by execution and delivery of this Agreement, each Borrower accepts for itself the irrevocable submission of the Borrowers to the exclusive jurisdiction of any federal court of the United States of America sitting in the borough of Manhattan or, of that court does not have subject matter jurisdiction, in any state court located in the city and county of New York, and the appointment by each Borrower of the Process Agent is legal, valid, binding and enforceable, and any judgment obtained in New York or arbitral award properly rendered will be recognized and enforceable against such Borrower and its assets in Mexico; <u>provided</u> that the relevant requirements of the Mexican Commerce Code (*Código de Comercio*) and the Mexican Federal Code of Civil Procedure (*Código Federal de Procedimientos Civiles*) are duly complied with.

AMERICAS 108425130

(j)    Execution in Counterparts.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be as effective as delivery of an original counterpart of this Agreement.  The words "execution," "signed," "signature," and words of like import in this Agreement or any other Loan Document shall in each case be deemed to include electronic signatures, signatures exchanged by electronic transmission, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided, that Security Agent and the Lenders may request, and upon any such request the Borrowers shall be obligated to provide, manually executed "wet ink" signatures to any Loan Document.

(k)    Headings.  Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

(l)    Interpretive Provisions. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.  Prior to the Discharge of DIP Facility, any reference to a consent or approval by any Lender or the Lenders hereunder shall be deemed to refer to the Lenders acting with the consent or approval of the Requisite Purchasers.

Section 11.    **Guarantee**.

(a)    The Guarantee.   Each of the Borrowers hereby jointly and severally guarantee, as a primary obligor and not as a surety to the Security Agent and the Lenders and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Bankruptcy Code) on the Loans made by the Lenders to each other Borrower, and all other Obligations and/or liabilities from time to time owing to the Security Agent and the Lenders by any other Borrower hereunder or under any other related Loan Documents (such obligations being herein collectively called the "Guaranteed Obligations" and each Borrower acting in such a role, a "Guarantor").   The Guarantors hereby jointly and severally agree that if the Borrowers or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

34

(b)    <u>Obligations Unconditional</u>.    The obligations of the Guarantors under Section 11(a) shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrowers under this Agreement or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).    Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect (included any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), or any right under this Agreement or any other agreement or instruments related hereto or referred to herein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any Lien or security interest granted to, or in favor of, the Security Agent on behalf of the Lenders as security for any of the Guaranteed Obligations shall fail to be perfected;

(v)    the release of any other Guarantor; or

(vi)    taking of any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Guarantor from its liabilities under this Guarantee.

Except as cannot be waived under applicable law, the Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Security Agent and the Lenders exhaust any right, power or remedy or proceed against any Borrower under this Agreement or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.    The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by the Lenders upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to

35

have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrowers and the Security Agent and the Lenders shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Security Agent and the Lenders, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Security Agent and the Lenders or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Security Agent and the Lenders, and its successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

(c)     Reinstatement.  The obligations of the Guarantors under this Section 11 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrowers in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise. The Guarantors jointly and severally agree that they will indemnify the Security Agent and the Lenders on demand for all reasonable costs and expenses (including reasonable fees of counsel) incurred by the Security Agent and the Lenders in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law, other than any costs or expenses resulting from the bad faith or willful misconduct of the Security Agent and the Lenders.

(d)     Subrogation; Subordination.  Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11(a), whether by subrogation or otherwise, against the Borrowers of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any indebtedness of any Borrower permitted pursuant to Section 5(d)(iv) shall be subordinated to such Borrower's Guaranteed Obligations in form and substance reasonably satisfactory to the Lenders.

(e)     Remedies.  The Guarantors jointly and severally agree that, as between the Guarantors and the Security Agent and the Lenders, the obligations of the Borrowers under this Agreement may be declared to be forthwith due and payable as provided in Section 7 for purposes of Section 11(a), notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against any Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable

36

by the Borrowers) shall forthwith become due and payable by the Guarantors for purposes of Section 11(a).

(f) <u>Instrument for the Payment of Money</u>.   Each Guarantor hereby acknowledges that the guarantee in this Section 11 constitutes an instrument for the payment of money, and consents and agrees that the Security Agent and the Lenders, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

(g) <u>Continuing Guarantee</u>.  The guarantee in this Section 11 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

(h) <u>General Limitation on Guarantee Obligations</u>.  In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11(a) would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11(a), then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any other Borrower or any other persons, be automatically limited and reduced to the highest amount after giving effect to the rights of contribution established in Section 11(i).

(i) <u>Right of Contribution</u>.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11(d). The provisions of this Section 11(i) shall in no respect limit the obligations and liabilities of any Guarantor to the Security Agent and the Lenders, and each Guarantor shall remain liable to the Security Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

(j) <u>Payments</u>.  All payments made by the Guarantors pursuant to this Section 11 shall be made in U.S.  Dollars and will be made without setoff, counterclaim or other defense and shall be subject to the provisions of Section 10(c).

(k) <u>Waivers</u>. Each Guarantor organized under the laws of Mexico expressly and irrevocably acknowledges and confirms that this Agreement is governed by the laws of the State of New York as set forth in Section 18(g), and expressly and irrevocably agrees that any rights and privileges that it may otherwise have under the laws of Mexico shall not be applicable to this Agreement. To the extent applicable under law and without limiting the generality of the foregoing, each Guarantor organized under the laws of Mexico hereby expressly, irrevocably and unconditionally waives all rights and benefits of *orden, excusión, división, quita, novación, espera and/or modificación* and any other rights specified in Articles 2813, 2814, 2815, 2816, 2817, 2818, 2819, 2820, 2821, 2822, 2823, 2824, 2826, 2827, 2829, 2836, 2837, 2838, 2839, 2840, 2842, 2844, 2845, 2846, 2847, 2848 and 2849, and any other related or applicable Articles of the Mexican Federal Civil Code (*Código Civil Federal*) and their correlatives in the Civil

Codes of the States of Mexico (or any successor provisions), which are not reproduced herein, given that each of the Guarantors organized under the laws of Mexico hereby expressly represents and acknowledges that it is familiar with the content of such Articles, and therefore, such Articles are not required to be transcribed herein.

Section 12.    **Third Party Beneficiaries**.  Prior to the Discharge of DIP Facility, Sections 2, 5 and 6 of this Agreement shall inure to the benefit of the Purchasers under the DIP Note Purchase Agreement as third-party beneficiaries of such provisions, to the extent permitted by applicable law.

Section 13.    **Taxes, Withholding, Etc..**

(a)    Payments to Be Free and Clear.  All sums payable by or on behalf of any Borrower hereunder and under the other Loan Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender).

(b)    Withholding of Taxes.  If any Borrower or any other Person (acting as a withholding agent) is (in such withholding agent's reasonable good faith discretion) required by law to make any deduction or withholding on account of any Tax from any sum paid or payable by any Borrower to any Lender under any of the Loan Documents: (i) such Borrower shall notify Lenders of any such requirement or any change in any such requirement as soon as such Borrower becomes aware of it; (ii) such Borrower or any other Person (acting as a withholding agent) shall pay or cause to be paid any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Borrower) for its own account or (if that liability is imposed on such Lender, as the case may be) on behalf of and in the name of such Lender; (iii) unless otherwise provided in this Section 213 (other than a Tax on the "overall net income" of any Lender) the sum payable by such Borrower in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment (including any such withholding Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 13), such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and (iv) within thirty days after the due date of payment of any such Tax that it is required by clause (ii) above to pay, Borrowers shall deliver to such Lender evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority; provided, with respect to any U.S. federal withholding tax (including any withholding tax imposed under FATCA), no such additional amount shall be required to be paid to any Lender under clause (iii) above except to the extent that any change after the date hereof (in the case of each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the documentation pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date hereof or at the date of such documentation, as the case may be, in respect of payments to such Lender; provided that additional amounts shall be payable to a Lender to the extent that such Lender's transferor was entitled to receive such additional amounts.

(c)      Evidence of Exemption From U.S. Withholding Tax.  Each Lender that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes (a "Non U.S. Lender") shall, to the extent such Lender is legally entitled to do so, deliver to the Borrowers, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the documentation pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of the Borrowers (in the reasonable exercise of its discretion), (i) two copies of Internal Revenue Service Form W 8BEN, W-8BEN-E, W 8ECI, W-8EXP and/or W-8IMY (or, in each case, any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Code and reasonably requested by the Borrowers to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of U.S. federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Loan Documents, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Code, a U.S. Tax Compliance Certificate together with two copies of Internal Revenue Service Form W 8BEN, W-8BEN-E or W-8IMY (or, in each case, any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Code and reasonably requested by the Borrowers to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of U.S. federal income tax with respect to any payments to such Lender of interest payable under any of the Loan Documents.  Each Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes (a "U.S. Lender") shall deliver to The Borrowers on or prior to the Closing Date (or, if later, on or prior to the date on which such Lender becomes a party to this Agreement) two copies of Internal Revenue Service Form W-9 (or any successor form), properly completed and duly executed by such Lender, certifying that such U.S. Lender is entitled to an exemption from U.S. backup withholding tax, or otherwise prove that it is entitled to such an exemption.  Each Lender required to deliver any forms, certificates or other evidence with respect to U.S. federal income tax withholding matters pursuant to this Section 13(c) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to the Borrowers two new copies of Internal Revenue Service Form W 8BEN, W-8BEN-E, W 8ECI, W-8EXP, W-8IMY, and/or W-9 (or, in any case, any successor form), or a U.S. Tax Compliance Certificate and two copies of Internal Revenue Service Form W 8BEN, W-8BEN-E, or W-8IMY (or, in each case, any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Code and reasonably requested by the Borrowers to confirm or establish that such Lender is not subject to deduction or withholding of U.S. federal income tax with respect to payments to such Lender under the Loan Documents, or notify the Borrowers of its inability to deliver any such forms, certificates or other evidence.  Notwithstanding anything to the contrary, the Borrowers shall not be required to pay any additional amount to any Lender under Section 13(b) if such Lender shall have failed to deliver the forms, certificates or other evidence required by this Section 13(c).

(d)      FATCA.  Notwithstanding anything to the contrary therein, the Borrowers shall not be required to pay any additional amount pursuant to Section 13(b) with respect to any U.S. federal withholding tax imposed under FATCA.  If a payment made to a Lender under any

Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers as may be necessary for the Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of the preceding sentence of this clause (d), "FATCA" shall include any amendments made to FATCA after the date hereof.

(e)     <u>Payment of Other Taxes by the Borrowers</u>.     Without limiting the provisions of Section 13(b), the Borrowers shall timely pay to the relevant Governmental Authorities in accordance with applicable law or, at the option of such Lender timely reimburse it for the payment of, all Other Taxes.

(f)     <u>Indemnification by Borrowers</u>.     Borrowers shall jointly and severally indemnify any Lender for the full amount of Taxes for which additional amounts are required to be paid pursuant to Section 13(b) arising in connection with payments made under this Agreement or any other Loan Document and Other Taxes (including any such Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 13) paid or payable by any Lender or any of their respective Affiliates and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Borrower shall be conclusive absent manifest error. Such payment shall be due within ten days of such Borrower's receipt of such certificate.

(g)     <u>Evidence of Payments</u>.     As soon as practicable after any payment of Taxes by any Borrower to a Governmental Authority pursuant to this Section 13, such Borrower shall deliver to Lenders the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Lender.

(h)     <u>Survival</u>.     Each party's obligations under this Section 13 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

AMERICAS 108425130

Section 14.   **Appointment of Agent.** Each Lender hereby irrevocably appoints AlphaDebit, S.A. de C.V. to act on its behalf as the Security Agent (in such capacity, the "Security Agent") hereunder and under the other Loan Documents and authorizes the Security Agent to take such actions on its behalf and to exercise such powers as are delegated to the Security Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. In addition, each Lender hereby further authorizes and appoints the Security Agent as an agent a (*comisión mercantil con representación*) pursuant to Articles 273 and 274, and other applicable articles of the Mexican Commercial Code (*Código de Comercio*) to execute, deliver and perform any Loan Document, and any other document or agreement derived, related or ancillary thereto to which the Security Agent is a party, respectively, as well as any other document, agreement or instrument necessary or convenient for the delivery, perfection, execution and foreclosure of the referred agreements and any other collateral that may be granted in connection with any Loan Document.  The provisions of this Section 10 are solely for the benefit of the Security Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to the Security Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The Security Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Loan Documents, as applicable.Powers and Duties.  The Security Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents.  The Security Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  The Security Agent shall have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Security Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

.

41

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the date and year first written above.

Alpha Holding, S.A. de C.V., as a Borrower

By: _____
Name: Augusto Álvarez de Iturbe
Title: Attorney-in-fact

Acercándonos, S.A.P.I. de C.V., as a Borrower

By: _____
Name: Augusto Álvarez de Iturbe
Title: Attorney-in-fact

Adelanto Express, S.A. de C.V., SOFOM, E.N.R., as a Borrower

By: _____
Name: Augusto Álvarez de Iturbe
Title: Attorney-in-fact

Aeternam, S.A.P.I. de C.V., as a Borrower

By: _____
Name: Augusto Álvarez de Iturbe
Title: Attorney-in-fact

Alf Recursos, S.A.P.I. de C.V., as a Borrower

By: _____
Name: Augusto Álvarez de Iturbe
Title: Attorney-in-fact

[Signature Pages for Intercompany Credit Agreement]

AlphaCredit Capital, S.A. de C.V., SOFOM, E.N.R., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact


AXS Servicios, S.A. de C.V. as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact


Beta Planeación, S.A. de C.V., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact


Betacredit, S.A. de C.V., SOFOM, E.N.R., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact


C Claro, S. de R.L de C.V., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact


Collect Broker, S.A.P.I. de C.V., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact


Iyu Digital, S.A. de C.V., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact

Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact


RXN Broker's, S.A.P.I. de C.V., as a Borrower

By: _____
Name: Augusto Alvarez de Iturbe
Title: Attorney-in-fact

Bontu Professional Services, S.A.P.I. de C.V., as a Borrower

By: _____

Name:

Title:    Augusto Alvarez - President


Dispersora C Claro S.A. de C.V., as a Borrower

By: _____

Name:

Title:    Augusto Alvarez - President

ALPHADEBIT S.A. DE C.V., as Lender


By: _____
Name: Augusto Álvarez de Iturbe
Title: Attorney-in-fact

ALPHA CAPITAL S.A.S., as Security Agent and as Lender


By: _____
Name: Augusto Álvarez de Iturbe
Title: Attorney-in-fact

SCHEDULE A

Existing Indebtedness

| US$ in millions | 6/22/21 Amount |
|---|---:|
| **Secured debt** | |
| ALPHACB18 securitization | $28.7 |
| Morgan Stanley | 20.1 |
| Credit Suisse | 9.4 |
| **Total secured debt** | **$58.2** |
| Notes due 2022[2] | $315.3 |
| Notes due 2025[2] | 413.2 |
| IDB | 23.3 |
| Harlan - Alpha Credit Subordinated Debt Fund | 20.0 |
| responsAbility | 16.9 |
| Alloy Merchant Finance | 5.0 |
| **Total unsecured debt** | **$793.6** |
| **Total debt** | **$851.8** |

Notes:

1) Converts USD at an MXN / USD FX rate of 20.03 and a COP / MXN rate of 182.48

2) Includes accrued interest

SCHEDULE B

Existing Affiliate Transactions

None.

SCHEDULE C

## Existing Liens

1.      All Liens with respect to Existing Indebtedness under the heading "Secured Debt" on Schedule A

SCHEDULE D

Existing Investments

None.

SCHEDULE E

Existing Restrictions on Subsidiaries

None.

**<u>EXHIBIT F</u>**

**Initial Approved DIP Budget**

# DIP Budget for Consolidated debtor entities



| (P$ in thousands) | Week 1 Forecast 8/6/2021 Aug-21 | Week 2 Forecast 8/13/2021 Aug-21 | Week 3 Forecast 8/20/2021 Aug-21 | Week 4 Forecast 8/27/2021 Aug-21 | Week 5 Forecast 9/3/2021 Sep-21 | Week 6 Forecast 9/10/2021 Sep-21 | Week 7 Forecast 9/17/2021 Sep-21 | Week 8 Forecast 9/24/2021 Sep-21 | Week 9 Forecast 10/1/2021 Sep-21 | Week 10 Forecast 10/8/2021 Oct-21 | Week 11 Forecast 10/15/2021 Oct-21 | Week 12 Forecast 10/22/2021 Oct-21 | Week 13 Forecast 10/29/2021 Oct-21 | Forecast Weeks 1-13 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Collections** | | | | | | | | | | | | | | |
| Colombia Collections | $ 37,854 | $ 24,660 | $ 26,719 | $ 76,745 | $ 41,942 | $ 21,026 | $ 12,069 | $ 25,871 | $ 62,133 | $ 34,875 | $ 16,810 | $ 27,534 | $ 81,429 | $ 489,666 |
| **Total Net Collections** | 37,854 | 24,660 | 26,719 | 76,745 | 41,942 | 21,026 | 12,069 | 25,871 | 62,133 | 34,875 | 16,810 | 27,534 | 81,429 | 489,666 |
| **Intercompany** | | | | | | | | | | | | | | |
| Inflows | - | - | - | 110,258 | 92,238 | 51,926 | 27,182 | 20,844 | 12,606 | - | 15,723 | 7,472 | 4,899 | 343,147 |
| Outflows | - | (35,242) | (28,781) | (158,589) | (184,475) | (103,852) | (54,364) | (41,687) | (25,211) | - | (31,446) | (14,944) | (9,799) | (688,390) |
| **Total Net Intercompany** | - | (35,242) | (28,781) | (48,331) | (92,238) | (51,926) | (27,182) | (20,844) | (12,606) | - | (15,723) | (7,472) | (4,899) | (345,243) |
| **Disbursements** | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll and Benefits | (1,269) | (3,631) | - | (1,516) | - | (506) | (1,800) | - | (651) | (744) | (1,482) | - | (1,594) | (13,191) |
| Sales Forces & Collections Fees | (41) | (328) | (41) | (41) | (37) | (37) | (300) | (37) | (37) | (41) | (328) | (41) | (41) | (1,350) |
| Broker Fees | (4,926) | - | - | - | (3,941) | - | - | - | (3,678) | - | - | - | - | (12,545) |
| Professional Fees | (696) | (362) | (370) | (271) | (1,465) | (1) | (325) | (343) | (970) | (450) | (27) | (353) | (1,202) | (6,835) |
| Other Operating Disbursements | (1,635) | (510) | (266) | (853) | (1,303) | (246) | (497) | (542) | (843) | (906) | (566) | (309) | (773) | (9,249) |
| Other Contingency | (500) | - | - | - | - | - | - | - | - | (500) | - | - | - | (1,000) |
| Taxes | - | (4,200) | (13,641) | (0) | (4) | - | (5,167) | (5,558) | - | - | (943) | (3,082) | - | (32,594) |
| **Total Operating Disbursements** | (9,067) | (9,030) | (14,318) | (2,680) | (6,750) | (790) | (8,089) | (6,480) | (6,179) | (2,640) | (3,345) | (3,786) | (3,610) | (76,763) |
| **Net Cash Flow from Operations** | $ 28,787 | $ (19,612) | $ (16,381) | $ 25,734 | $ (57,045) | $ (31,690) | $ (23,202) | $ (1,453) | $ 43,349 | $ 32,235 | $ (2,258) | $ 16,276 | $ 72,919 | $ 67,659 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Restructuring Professionals | (20,500) | - | - | - | - | (8,582) | - | - | - | (94,975) | - | - | (5,000) | (129,056) |
| Other Restructuring Costs | - | - | - | (6,213) | (1,429) | - | - | - | - | - | - | - | - | (7,642) |
| Non-Operating Inflows | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Total Non-Operating Disbursements** | (20,500) | - | - | (6,213) | (1,429) | (8,582) | - | - | - | (94,975) | - | - | (5,000) | (136,698) |
| **Total Net Cash Flow** | $ 8,287 | $ (19,612) | $ (16,381) | $ 19,521 | $ (58,475) | $ (40,272) | $ (23,202) | $ (1,453) | $ 43,349 | $ (62,740) | $ (2,258) | $ 16,276 | $ 67,919 | $ (69,039) |
| **LIQUIDITY** | | | | | | | | | | | | | | |
| **Beginning Cash Balance - Available** | $ 25,630 | $ 383,917 | $ 364,305 | $ 347,925 | $ 367,446 | $ 858,971 | $ 818,699 | $ 795,498 | $ 794,045 | $ 837,394 | $ 774,654 | $ 300,000 | $ 316,276 | $ 25,630 |
| Net Cash Flow | 8,287 | (19,612) | (16,381) | 19,521 | (58,475) | (40,272) | (23,202) | (1,453) | 43,349 | (62,740) | (2,258) | 16,276 | 67,919 | (69,039) |
| Draw / (Paydown) of Facilities | 350,000 | - | - | - | 550,000 | - | - | - | - | - | (472,396) | - | - | 427,604 |
| **Ending Cash Balance - Available** | $ 383,917 | $ 364,305 | $ 347,925 | $ 367,446 | $ 858,971 | $ 818,699 | $ 795,498 | $ 794,045 | $ 837,394 | $ 774,654 | $ 300,000 | $ 316,276 | $ 384,196 | $ 384,196 |
| **Restricted Cash** | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 | 15,425 |