## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Alpha Latam Management, LLC, *et al.*,[1] | ) | Case No. 21-11109 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

### THIRD AMENDED CHAPTER 11 PLAN OF
### ALPHA LATAM MANAGEMENT, LLC AND ITS DEBTOR AFFILIATES

---

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brendan J. Schlauch (No. 6115)
J. Zachary Noble (No. 6689)
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
collins@rlf.com
knight@rlf.com
schlauch@rlf.com
noble@rlf.com

*Co-Counsel to Debtors and
Debtors in Possession*

—and—

**WHITE & CASE LLP**

John K. Cunningham, Esq. (admitted *pro hac vice*)
Richard S. Kebrdle, Esq. (admitted *pro hac vice*)
Amanda A. Parra Criste, Esq. (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
jcunningham@whitecase.com
rkebrdle@whitecase.com
aparracriste@whitecase.com

Philip M. Abelson (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
Brett L. Bakemeyer (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
philip.abelson@whitecase.com
john.ramirez@whitecase.com
brett.bakemeyer@whitecase.com

*Co-Counsel to the Debtors and
Debtors in Possession*

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's tax identification number in their applicable jurisdiction of incorporation, are as follows: Alpha Latam Management, LLC (4610); Acsa Atento S.A.S. (766-6); Alpha Capital S.A.S. (717-5); AlphaCredit Latam S.A.S. (326-5); AlphaCredit Sudamérica, S. de R.L. (72 87); AlphaDebit, S.A. de C.V. (3FI4); and Vive Créditos Kusida S.A.S. (013-4).  Alpha Latam Management, LLC's registered address is 1209 N Orange Street, Wilmington, DE 19801.  The main address of the other Debtors is Carrera 14 No. 94 – 81, Bogotá, Colombia.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ............................................................. 1

   A.   *Defined Terms* ............................................................................................................. 1
   B.   *Interpretation* ............................................................................................................ 16
   C.   *Headings* .................................................................................................................. 16
   D.   *Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.* ....................... 16
   E.   *Other Terms* ............................................................................................................. 16
   F.   *Appendices and Plan Documents* ............................................................................ 16
   G.   *Controlling Document* ............................................................................................. 17

**ARTICLE II. PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN** ..... 17

   A.   *Treatment of Administrative Claims* ....................................................................... 17
      1.   Time for Filing Administrative Claims ............................................................. 17
      2.   Allowance of Administrative Claims ............................................................... 17
      3.   Payment of Allowed Administrative Claims .................................................... 18
   B.   *Professional Compensation* .................................................................................... 18
      1.   Professional Fee Escrow. ................................................................................. 18
      2.   Time for Filing Professional Fee Claims ......................................................... 18
      3.   Estimation of Fees and Expenses. .................................................................... 18
      4.   Ad Hoc Group Fees and Expenses. .................................................................. 19
      5.   Professionals' Fees and Expenses. ................................................................... 19
   C.   *Allowance and Payment of DIP Claims* ................................................................. 20
   D.   *Treatment of Tax Claims* ......................................................................................... 20

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS** .......... 20

   A.   *Summary of Classification* ...................................................................................... 20
   B.   *Treatment of Claims and Equity Interests* .............................................................. 21
      1.   Class 1 – Priority Claims ................................................................................. 21
      2.   Class 2 – Secured Claims ................................................................................ 21
      3.   Class 3 – Foreign Convenience Claims ........................................................... 21
      4.   Class 4a – Other Unsecured Claims ................................................................ 22
      5.   Class 4b – Notes Claims .................................................................................. 22
      6.   Class 4c – Funded Debt Claims ....................................................................... 22
      7.   Class 4d – Credit Suisse Claims ...................................................................... 22
      8.   Class 5 – Intercompany Claims ....................................................................... 23
      9.   Class 6 – Equity Interests ................................................................................ 23
      10.  Class 7 – ALM Equity. .................................................................................... 23
   C.   *Distributions on Account of Subordinated Claims* ................................................. 23
   D.   *Separate Classification of Claims Generally* ......................................................... 23
   E.   *Class Acceptance Requirement* ............................................................................... 24
   F.   *Cramdown* ............................................................................................................... 24

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ........................................... 24

   A.   *Sources of Consideration for Plan Distributions* ................................................... 24
      1.   Cash and Vesting of Assets (other than the Liquidating Trust Assets) ............ 24
      2.   Contribution of Liquidating Trust Assets. ....................................................... 24
   B.   *Preservation and Maintenance of Debtor Causes of Action* ................................... 25
      1.   Maintenance of Causes of Action. ................................................................... 25
      2.   Preservation of All Causes of Action Not Expressly Settled or Released. ....... 25
   C.   *Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust* ..................... 25
      1.   Creation of Liquidating Trust. ......................................................................... 25
      2.   Vesting of Liquidating Trust Assets. ............................................................... 26
      3.   Transfer of Liquidating Trust Assets. .............................................................. 26
   D.   *Corporate Action* .................................................................................................... 26

E.   *Alf Recursos Escrow*...................................................................................................................26
F.   *Refund Escrow*.........................................................................................................................27
G.   *Contingent Local Claims Trust*.................................................................................................27
H.   *Cancellation of Instruments*.....................................................................................................27
I.   *Wind-Down and Wind-Down Budget*.........................................................................................29
J.   *Employee Matters*....................................................................................................................29

**ARTICLE V. THE LIQUIDATING TRUST**......................................................................................**29**

A.   *Purpose of Liquidating Trust*....................................................................................................30
B.   *Governance of the Liquidating Trust*.........................................................................................30
C.   *Role of the Liquidating Trustee*.................................................................................................31
D.   *Cash*........................................................................................................................................32
E.   *Compensation of the Liquidating Trustee*..................................................................................32
F.   *Retention of Professionals by the Liquidating Trustee*................................................................32
G.   *Noncertificated Liquidating Trust Interests*...............................................................................33
H.   *Dissolution of the Liquidating Trust*..........................................................................................33
I.   *Securities Exempt*.....................................................................................................................33

**ARTICLE VI. ALPHA NOTEHOLDER CLAIMS TRUST**..............................................................**33**

A.   *Formation of Alpha Noteholder Claims Trust.*............................................................................33
B.   *Alpha Noteholder Claims Trust Assets.*......................................................................................34
C.   *Alpha Noteholder Claims Trust Trustee and Oversight Committee.*..............................................34
D.   *Beneficiaries: Distribution of Recoveries in Respect of Preserved Noteholder Claims and Preserved Indenture and Noteholder Claims.*............................................................................................35
E.   *Preserved Noteholder Claims Reserve.*.......................................................................................35
F.   *Federal Income Tax Treatment of Alpha Noteholder Claims Trust.*..............................................35
G.   *Cash.*........................................................................................................................................36
H.   *Compensation of the Alpha Noteholder Claims Trust Trustee and Oversight Committee*................36
I.   *Retention of Professionals by the Alpha Noteholder Claims Trust Trustee*....................................36
J.   *Noncertificated Trust Interests*.................................................................................................36
K.   *Securities Exempt*.....................................................................................................................36

**ARTICLE VII. PLAN DISTRIBUTION PROVISIONS**.....................................................................**36**

A.   *Plan Distributions*....................................................................................................................36
B.   *Timing of Plan Distributions*.....................................................................................................37
C.   *Address for Delivery of Plan Distributions/Unclaimed Plan Distributions*...................................37
D.   *Time Bar to Cash Payments*......................................................................................................38
E.   *Manner of Payment under the Plan*............................................................................................38
F.   *Fractional Plan Distributions*...................................................................................................38
G.   *De Minimis Distributions*.........................................................................................................38
H.   *Claims Paid or Payable by Third Parties*...................................................................................39
     1.   Claims Paid by Third Parties.................................................................................................39
     2.   Claims Payable by Third Parties.............................................................................................39
     3.   Applicability of Insurance Contracts.......................................................................................39

**ARTICLE VIII. PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS**.............**39**

A.   *Objection Deadline*..................................................................................................................39
B.   *Prosecution of Disputed Claims*................................................................................................40
C.   *Claims Settlement*....................................................................................................................40
D.   *Entitlement to Plan Distributions upon Allowance*.....................................................................40
E.   *Estimation of Claims*...............................................................................................................40

**ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.............**40**

A.   *Assumption and Rejection of Executory Contracts and Unexpired Leases*.....................................40
     1.   Rejection of Executory Contracts and Unexpired Leases...........................................................40
     2.   Effect of Rejection.................................................................................................................41

      3.    Assumption and Assignment of Executory Contracts and Unexpired Leases ........................................41
      4.    Warranties ...................................................................................................................41
B.    *Cure* ...........................................................................................................................42
C.    *Claims Arising from Rejection, Expiration, or Termination* ................................................42

**ARTICLE X. EFFECTS OF CONFIRMATION** ..............................................................................42

A.    *Releases by the Debtors* ..............................................................................................42
B.    *Releases by Creditors and Equity Security Holders* ........................................................43
C.    *Exculpation* ...............................................................................................................43
D.    *Injunctions* ................................................................................................................44
E.    *Satisfaction of Claims* .................................................................................................45
F.    *Discharge and Release of Claims against ALM* ..............................................................45
G.    *Compromise and Settlement of Claims and Controversies* ................................................45
H.    *Setoff Rights* .............................................................................................................45
I.    *Third Party Agreements; Subordination* ........................................................................46

**ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION  OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE** ...........................................................................46

A.    *Conditions Precedent to Confirmation* ..........................................................................46
B.    *Conditions Precedent to the Occurrence of the Effective Date* ..........................................46
C.    *Waiver of Conditions* ..................................................................................................47
D.    *Effect of Non-Occurrence of the Effective Date* ..............................................................47
E.    *Option to Delay Occurrence of the Effective Date.* ..........................................................47
F.    *Modification of the Plan* ..............................................................................................47
G.    *Revocation of Plan.* ....................................................................................................48

**ARTICLE XII. RETENTION OF JURISDICTION** ........................................................................48

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** .......................................................................49

A.    *Payment of Statutory Fees* ...........................................................................................49
B.    *Notices.* .....................................................................................................................50
C.    *Governing Law.* ..........................................................................................................51
D.    *Exemption from Transfer Taxes.* ...................................................................................51
E.    *Notice of Entry of Confirmation Order and Relevant Dates.* .............................................51
F.    *Compliance with Tax Requirements.* .............................................................................51
G.    *Rates.* .......................................................................................................................51
H.    *Binding Effect.* ...........................................................................................................51
I.    *Severability.* ..............................................................................................................52
J.    *No Admissions.* ..........................................................................................................52

**INTRODUCTION**

Alpha Latam Management, LLC and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases hereby collectively and jointly propose this chapter 11 plan. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Equity Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINITIONS AND INTERPRETATION**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*2018 and/or 2019 Financial Statements*" means the Company's financial statements for the years ended December 31, 2018 and/or December 31, 2019.

2.    "*2022 Notes*" means the 10.000% senior notes due 2022 issued by Alpha Holding and the guarantors thereto under the 2022 Notes Indenture.

3.    "*2022 Notes Claims*" means the Claims for principal and interest arising under the 2022 Notes, which shall be Allowed against the Debtors (except for ALM and AlphaDebit) in the amount of $318,857,240.40 as of the Effective Date (which amount includes all interest accrued on such Claims through the Petition Date).

4.    "*2022 Notes Indenture*" means that certain indenture, dated as of December 19, 2017 (as amended, amended and restated, waived, supplemented, and/or modified from time to time), for the 2022 Notes, among Alpha Holding, as issuer, the guarantors thereto, and the Notes Indenture Trustee.

5.    "*2025 Notes*" means the 9.000% senior notes due 2025 issued by Alpha Holding and the guarantors thereto under the 2025 Notes Indenture.

6.    "*2025 Notes Claims*" means the Claims for principal and interest arising under the 2025 Notes, which shall be Allowed against the Debtors (except for ALM and AlphaDebit) in the amount of $417,302,740.40 as of the Effective Date (which amount includes all interest accrued on such Claims through the Petition Date).

7.    "*2025 Notes Indenture*" means that certain indenture, dated as of February 10, 2020 (as amended, amended and restated, waived, supplemented, and/or modified from time to time), for the 2025 Notes, among Alpha Holding, as issuer, the guarantors thereto, and the Notes Indenture Trustee.

8.    "*Ad Hoc Group*" means the ad hoc group comprised of those holders of Notes listed in the *Verified Statement of Brown Rudnick LLP and Young Conway Stargatt & Taylor, LLP Pursuant to Bankruptcy Rule 2019* [D.I. 502] filed on January 25, 2022, and as amended from time to time, which is represented by Brown Rudnick LLP and Cuatrecasas, Gonçalves Pereira S.A.S., each as legal counsel, and Houlihan Lokey Capital, Inc., as financial advisor.

9.    "*Ad Hoc Group Fees and Expenses*" means the reasonable and documented professional fees, success fees, attorneys' fees, compensation, costs, expenses, disbursements, advancements, and any other amounts due to the Ad Hoc Group and/or its advisors, including, among other things, the fees, expenses and disbursements of Brown Rudnick LLP, Cuatrecasas, Goncalves Pereira S.A.S., Sainz Abogados S.C., Young, Conaway, Stargatt & Taylor, LLP, Houlihan Lokey Capital, Inc., and Blink Capital Solutions incurred prior to the Petition Date and through and including the Effective Date, which fees shall not include any fees and expenses for which the aforesaid firms

have received payment pursuant to the DIP Documents, pursuant to a settlement of certain litigation positions under Rule 9019 of the Bankruptcy Rules conditioned upon the Ad Hoc Group Majority voting in favor of the Plan and not opting out of all releases contained therein.

10. "*Ad Hoc Group Majority*" means members of the Ad Hoc Group who collectively beneficially hold more than 50% of the total Notes Claims held by members of the Ad Hoc Group as of the date of determination thereof. For the avoidance of doubt, the determination of an Ad Hoc Group Majority shall be based on the aggregate holdings of both the 2022 Notes and 2025 Notes of members of the Ad Hoc Group and not individually for each of such series of Notes.

11. "*Administrative Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

12. "*Administrative Claim*" means a Claim incurred by the Debtors (or their Estates) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

13. "*Administrative Claim Reserve*" means the Cash reserve to be held in escrow by the Debtors (or their designee) to make Plan Distributions to holders of Administrative Claims in an amount determined by the Debtors (subject to a Consultation Right for the Ad Hoc Group) sufficient to satisfy payment in full of (i) all Allowed Administrative Claims and (ii) the asserted amount of Disputed Administrative Claims.

14. "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced entity was a debtor in a case under the Bankruptcy Code.

15. "*AFPST Claim*" means an Allowed Administrative Claim, an Allowed Foreign Convenience Claim, an Allowed Priority Claim, an Allowed Secured Claim and an Allowed Tax Claim, as applicable.

16. "*Allowed*" when used: (a) with respect to any Claim, *except* for a Claim that is an Administrative Claim, means such Claim to the extent it is not a Disputed Claim or a Disallowed Claim; (b) with respect to an Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Article II.A of the Plan; and (c) with respect to Equity Interests in any Debtor, means the Equity Interests in such Debtor as reflected in the stock transfer ledger or similar register of such Debtor as of the Effective Date. For the avoidance of doubt, a Proof of Claim filed after the General Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allow" and "Allowing" shall have correlative meanings.

17. "*Alf Recursos*" means the Non-Debtor Affiliate, Alf Recursos, S.A.P.I. de C.V.

18. "*Alf Recursos Escrow*" means $567,736.39 being held in trust by AlphaDebit on behalf of Alf Recursos.

19. "*ALM*" means Debtor Alpha Latam Management, LLC.

20. "*Alpha Capital*" means Debtor Alpha Capital S.A.S.

21. "*Alpha Credit*" means Debtor AlphaCredit Latam S.A.S.

22. "*Alpha Holding*" means non-Debtor Alpha Holding, S.A. de C.V.

23. "*Alpha Noteholder Claims Trust*" means the trust established pursuant to Article VI of the Plan.

24. "*Alpha Noteholder Claims Trust Agreement*" means the agreement governing the Alpha Noteholder Claims Trust, dated as of the Effective Date, which shall be substantially in the form filed with the Bankruptcy Court as part of the Plan Supplement.

25.     "*Alpha Noteholder Claims Trust Assets*" means, (i) initially, the Preserved Noteholder Claims of the Consenting Noteholders deemed contributed to the Alpha Noteholder Claims Trust pursuant to Article VI.B of this Plan, and (ii) from time to time thereafter, such assets, rights, claims or entitlements of any nature whatsoever as at the time are held by the Alpha Noteholder Claims Trust.

26.     "*Alpha Noteholder Claims Trust Beneficiaries*" means the Consenting Noteholders.

27.     "*Alpha Noteholder Claims Trust Distribution Record Date*" means the record date for distribution of beneficial interests in the Alpha Noteholder Claims Trust.

28.     "*Alpha Noteholder Claims Trust Documents*" means the Alpha Noteholder Claims Trust Agreement, the identity and compensation of the Alpha Noteholder Claims Trust Trustee, and the affiliations, if any, that the Alpha Noteholder Claims Trust Trustee has with respect to the Debtors; the identity or method of appointment of the Alpha Noteholder Claims Trust Oversight Committee, and the affiliations, if any, that the member of such Alpha Noteholder Claims Trust Oversight Committee may have with respect to the Debtors, each of which shall be reasonably acceptable to (a) the Ad Hoc Group Majority and (b) the Debtors, solely with respect to matters, issues, or provisions that can reasonably be expected to impact the Debtors in any manner, whether before or after the Effective Date.

29.     "*Alpha Noteholder Claims Trust Oversight Committee*" means that committee of up to four (4) members that the Alpha Noteholder Claims Trust appoints by an Ad Hoc Group Majority the members of which Alpha Noteholder Claims Trust Oversight Committee shall be identified in the Plan Supplement.

30.     "*Alpha Noteholder Claims Trust Trustee*" means the Person serving as trustee of the Alpha Noteholder Claims Trust, the identity of whom shall be disclosed in the Plan Supplement.

31.     "*AlphaDebit*" means Debtor AlphaDebit S.A. de C.V.

32.     "*Applicable Reserves*" means the Administrative Claim Reserve, the Foreign Convenience Reserve, the Priority Claim Reserve, the Secured Claim Reserve, the Tax Claim Reserve, the Alf Recursos Escrow, the Refund Escrow, and the Contingent Local Claim Trust.

33.     "*Assets*" means all of the Debtors' right, title, and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code, *provided however*, for the avoidance of doubt, the Alf Recursos Escrow is not an asset of the Debtors.

34.     "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the list of assumed Executory Contracts and Unexpired Leases filed as an exhibit to the Plan Supplement, which may be supplemented or modified from time to time.

35.     "*Avoidance Actions*" means all Causes of Action of the Estates that arise under section 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code.

36.     "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

37.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

38.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Court.

39.     "*Bid Procedures Order*" means the *Order: (A) Authorizing and Approving Bidding Procedures Relating to the Sale of All or Substantially All of Certain of the Debtors' Assets; (B) Scheduling Auction for, and hearing to Approve, Sale of Certain of the Debtors' Assets; and (C) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing; and (D) Granting Related Relief,* [D.I. 198] entered by the Bankruptcy Court on September

15, 2021, as amended by the *Order (I) Authorizing and Approving Entry Into Stalking Horse Agreement and Related Bid Protections in Connection with the Sale of All or Substantially All of Certain of the Debtors' Assets, (II) Modifying Bidding Procedures, and (III) Granting Related Relief*, [D.I. 255] entered by the Bankruptcy Court on October, 1, 2021.

40.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

41.     "*Buyer*" means the purchaser in the Sale.

42.     "*Cash*" means the legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

43.     "*Causes of Action*" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

44.     "*Chapter 11 Cases*" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to the Debtors styled as *In re Alpha Latam Management, LLC*, Chapter 11 Case No. 21-11109 (JKS).

45.     "*Charging Lien*" means any lien or other priority in payment right to which the Notes Indenture Trustee is entitled pursuant to either or both of the Notes Indentures for the payment of the Notes Indenture Trustee Fees and Expenses.

46.     "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

47.     "*Class*" means a category of holders of Claims or Equity Interests under section 1122(a) of the Bankruptcy Code.

48.     "*Company*" means the Debtors, Axs Colombia, S.A.S. and their Mexican Affiliates.

49.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

50.     "*Confirmation Hearing*" the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan.

51.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan.

52.     "*Contingent Local Claims Trust*" means no more than $2,300,000 held in a trust under Colombian law for payment of contingent local claims, which claims shall be paid if they become due and payable; *provided, that,* any amounts remaining in the Contingent Local Claims Trust after all contingent local claims that are the subject of such trust are paid in full (if any) shall be provided to the Liquidating Trust Distribution Account (subject in all respects with Colombian law).

53.     "*Consenting Noteholders*" means those holders of the Notes or Notes Claims who do not opt out of transferring their Preserved Noteholder Claims to the Alpha Noteholder Claims Trust.

54.     "*Consultation Right*" means reasonable notice, if practicable, of the particular act by the Debtors for which a Consultation Right has been granted by this Plan with a corresponding right to challenge with the Bankruptcy Court, including on shortened notice (if necessary), the reasonableness of such act in light of the purpose the act is being performed.

55.    "*Credit Suisse Claims*" means those Claims, if any, arising under the Credit Suisse Loan against AlphaCredit Latam, S.A.S., in the amount of $9,631,697 as of the Effective Date (which amount includes all interest accrued on such Claims through the Petition Date).

56.    "*Credit Suisse Loan*" means that certain credit agreement dated as of August 15, 2019 between Alpha Holding, as borrower, the certain guarantors thereto, and OPCR, S.A. de C.V., SOFOM, E.N.R. acting as lender.

57.    "*Debtor in Possession*" means any Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

58.    "*Debtors*" means, collectively:  Alpha Latam Management, LLC; Acsa Atento S.A.S.; Alpha Capital S.A.S.; AlphaCredit Latam S.A.S.; AlphaCredit Sudamérica, S. de R.L.; AlphaDebit, S.A. de C.V.; and Vive Créditos Kusida S.A.S.

59.    "*Deloitte*" means Deloitte Touche Tohmatsu Limited together with any Affiliate, partner or employee thereof who performed services for any of the Debtors or any Non-Debtor Affiliate.

60.    "*DIP Agent*" means UMB Bank, N.A., as administrative agent and collateral agent under the Note Purchase Agreement.

61.    "*DIP Claims*" means any Claim against the Debtors arising from or related to the DIP Documents and any Claim by the DIP Agent or the DIP Note Purchasers under the Final DIP Order, including, but not limited to, principal, interest, fees, costs and expenses thereunder, to the extent such Claims were not previously satisfied from the Sale Consideration.

62.    "*DIP Documents*" means the Note Purchase Agreement, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

63.    "*DIP Facility*" means that certain debtor in possession financing facility governed by the Final DIP Order and the DIP Documents.

64.    "*DIP Note Purchasers*" means the lenders party to the Note Purchase Agreement.

65.    "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or this Plan, (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or this Plan, (d) has been waived or withdrawn by agreement of the applicable Debtor and the holder thereof, or (e) has been waived or withdrawn by the holder thereof.

66.    "*Disclosure Statement*" means the disclosure statement filed with respect to the Plan, as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules thereto.

67.    "*Disputed*" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest that is not yet Allowed, including (a) any Proof of Claim that, on its face, is contingent or unliquidated; (b) any Proof of Claim or request for payment of an Administrative Claim filed after the Effective Date or the deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, and (c) any Claim that is subject to an objection or a motion to estimate, in each case that has not been withdrawn, resolved, or ruled on by a Final Order of the Bankruptcy Court.

68.    "*DTC*" means The Depository Trust Company.

69.    "*Effective Date*" means, with respect to each Debtor, a date selected by such Debtor which shall be a Business Day that is no later than three (3) days after all of the conditions specified in Article XI.B have been satisfied or waived (to the extent waivable).

70.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

71.    "*Equity Interest*" means (i) any outstanding ownership interest in any of the Debtors, *including*, without limitation, interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation, and (ii) any Claim against the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

72.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

73.    "*Exculpated Parties*" means all Persons that are or were at any time on or after the Petition Date (solely in such capacity or position and whether or not any such Person currently retains such capacity or position): (i) the Debtors; (ii) the Special Committee and all current and former members of the Special Committee; (iii) to the extent they are or are acting as Estate fiduciaries, the directors, officers, agents, members of management and other employees of the Debtors, respectively; and (iv) to the extent they are Estate fiduciaries, the predecessors, successors and assigns, subsidiaries, affiliates, members, partners, officers, directors, agents, attorneys, advisors, accountants, investment bankers, consultants, and other professionals, to the extent such parties are or were acting in such capacity of any of the Persons identified in (i) through (iii) above on or after the Petition Date; *provided*, *however*, that for the avoidance of doubt, none of the Exculpated Parties shall be entitled to exculpation in respect to any Preserved Estate Claim or Preserved Noteholder Claim.

74.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

75.    "*Fee Application*" means an application for allowance and payment of a Professional Fee Claim (*including* Claims for "substantial contribution" pursuant to section 503(b) of the Bankruptcy Code).

76.    "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Debtor in Possession Financing and Granting Liens and Superpriority Administrative Claims and (II) Granting Related Relief* [D.I. 177] approving the DIP Documents on a final basis entered by the Bankruptcy Court on September 13, 2021, as the same may be amended or modified from time to time.

77.    "*Final Order*" (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided that* no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

78.    "*Finance Matters*" means any decisions, treatment, classification, booking, accounting, statement, calculation, movement, transfer, placement, determination of provisions, or other act or judgment relating to the Debtors' or their Non-Debtor Affiliates' (i) derivative positions, (ii) accounting treatment of loans, (iii) loans past due for 180 days or more or otherwise non-performing, delinquent, or defaulted loans, (iv) accounts receivable, (v) amortization of capitalized expenses, (vi) reserves, (vii) expenses, and (viii) to the extent it resulted in the Debtors'

or their Non-Debtor Affiliates' restating their financial statements for previous fiscal years, including, but not limited to, the fiscal years ending December 31, 2018 and December 31, 2019, any other accounting matter to the extent not included in the preceding clauses.

79.     "*Foreign Convenience Claims*" means any Claim held by a claimant which is not an entity organized under the laws of a jurisdiction located in the United States of America or doing business in the United States of America that would otherwise be classified as an Unsecured Claim but, with respect to such Claim, the aggregate amount of such Claim is $10,000 or less, or, at the claimant's option, any such Claim that is voluntarily reduced to $10,000.

80.     "*Foreign Convenience Reserve*" means the Cash reserve, if any, to be held in escrow by the Debtors (or their designee) to make Plan Distributions to holders of Allowed Foreign Convenience Claims in the amount of $150,000.

81.     "*Funded Debt Claims*" means the IDB Claims, the Morgan Stanley Claims, and the ResponsAbility Claims.

82.     "*General Bar Date*" means December 6, 2021 at 5:00 p.m. (prevailing Eastern Time), as established pursuant to the General Bar Date Order.

83.     "*General Bar Date Notice*" means the *Notice of Deadlines for Filing Proofs of Claim against Debtors*, attached to the General Bar Date Order as Exhibit 1.

84.     "*General Bar Date Order*" means the *Order (A) Establishing Bar Dates, (B) Establishing Procedures for Filing Proofs of Claim and Asserting Refund Claims, and (C) Approving the Form and Manner of Notice Thereof* [D.I. 279] entered by the Bankruptcy Court on October 8, 2021 establishing, among other things, the General Bar Date.

85.     "*IDB*" means Inter-American Investment Corporation as lender acting on behalf of the Inter-American Development Bank.

86.     "*IDB Claims*" means the Claims arising under the IDB Loan, which shall be Allowed against the Debtors (except for Debtors AlphaCredit Sudamérica, S. de R.L., AlphaDebit, and ALM) in the amount of $22,275,524.58 as of the Effective Date (which amount includes all interest accrued on such Claims through the Petition Date); *provided that* for purposes of receiving distributions under the Plan or from the Liquidating Trust, each holder of a IDB Claim shall be entitled to assert the full Allowed amount of such Claim unless and until such Claim has been paid in full and for the avoidance of doubt, once such Claims have been paid in full from all available sources, they shall be deemed satisfied in full and entitled to no further distributions under the Plan; *provided further* that for purposes of determining whether such Claim has been paid in full, upon request by the Debtors or the Liquidating Trustee (as applicable), such holder must disclose payments received on account of such Claim from any source, including the Mexican Affiliates.

87.     "*IDB Direct Claims*" means all direct known and unknown Claims and Causes of Action that may be asserted by IDB (i) against any Person who is not a Released Party or (ii) against a Released Party, arising from or relating to (x) such Released Party's willful misconduct, intentional fraud, or intentional material misstatements or omissions, or embezzlement or (y)(1) the preparation or restatement of the 2018 and/or 2019 Financial Statements or any prior year's financial statements, (2) the audit of the 2018 and/or 2019 Financial Statements or of any prior year's financial statements, (3) the Finance Matters, (4) the solicitation or acceptance of equity or debt financing (including, without limitation, the IDB Loan) in reliance upon following the issuance of the 2018 and/or 2019 Financial Statements or any prior year's financial statements or any other false or materially misleading statements, or (5) any other matter, event or occurrence which was the subject of investigation by the Special Committee; provided that any such Released Party who was not actively and substantially involved with the preparation of financial statements, the audit of financial statements (including, but not limited to, the accounting treatment of loans and reserves) or the solicitation of debt or equity shall be released from any Claim or Cause of Action referenced in this clause (y) to the extent that such Released Party did not know, or reasonably should not have known, of any material errors, omissions,

7

or misstatements relating to the applicable financial statements, audits, solicitation or other matters referenced in this clause (y); *provided, further,* that "IDB Direct Claims" do not include any Claims or Causes of Action that may be asserted against Alan M. Cohen or Pablo Escalante (other than any Claim or Cause of Action described in clause (ii)(x) of this definition).

88.    "*IDB Loan*" means the certain unsecured loan agreement dated as of December 22, 2020 between Alpha Capital, as borrower, the certain guarantors thereto, and IDB.

89.    "*Impaired*" means a Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

90.    "*Insurance Contract*" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time to provide coverage to any of the Debtors and all agreements, documents, or instruments relating thereto.

91.    "*Insurer*" means any company or other entity that issued an Insurance Contract, any third-party administrator, and any respective predecessors and/or Affiliates thereof.

92.    "*Intercompany Claim*" means a Claim held by any Debtor against any other Debtor or a Claim held by a Mexican Affiliate against any of the Debtors, other than any Administrative Claim; for the avoidance of doubt, the Intercompany Secured Claim and the Intercompany Funded Debt Claims are not Intercompany Claims.

93.    "*Intercompany Funded Debt Claims*" shall mean any contribution or subrogation claim of the Debtors against the Mexican Affiliates with respect to the obligations under the 2020 Notes Indenture, the 2025 Notes Indenture, the Credit Suisse Loan, the IDB Loan, the Morgan Stanley Loan, and/or the ResponsAbility Notes, respectively, as applicable, and each according to their terms.

94.    "*Intercompany Secured Claim*" means the Claim held by AlphaDebit and Alpha Capital against certain of the Mexican Affiliates arising under the Intercompany Secured Facility, including, but not limited to, any contribution or subrogation claims, and any proceeds of the foregoing.

95.    "*Intercompany Secured Facility*" means that certain pre-petition intercompany working capital credit agreement dated August 1, 2021, between Alpha Credit and AlphaDebit as lenders and certain of the Mexican Affiliates as borrowers.

96.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Professionals and Committee Members (If Any)* [D.I. 178] entered by the Bankruptcy Court on September 13, 2021.

97.    "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (*including* temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

98.    "*IRS*" means the United States Internal Revenue Service.

99.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

100.    "*Liquidating Trust*" means the trust established pursuant to Article V of the Plan.

101.    "*Liquidating Trust Agreement*" means the agreement, in a form reasonably acceptable to the Debtors and an Ad Hoc Group Majority, governing the Liquidating Trust, dated as of the Effective Date, which shall be substantially in the form filed with the Bankruptcy Court as part of the Plan Supplement.

102.    "*Liquidating Trust Assets*" means the Preserved Estate Claims, the Intercompany Secured Claim (and the proceeds thereof), the Intercompany Funded Debt Claims, and all Cash (but not the Cash or other amounts in

or necessary to fund the Applicable Reserves, the Professional Fee Escrow, or the Wind-Down Amount) and all other Assets remaining in the Estates on the Effective Date except for (i) Assets of ALM or AlphaDebit (other than Cash at AlphaDebit as provided below) and (ii) any operating or other Assets which are necessary for the Debtors to retain in connection with the liquidation and/or wind down of the Debtors as reasonably determined by the Debtors with a Consultation Right of the Ad Hoc Group in accordance with the Wind-Down Budget, the proceeds of the Liquidating Trust Assets shall be used to make distributions to the Liquidating Trust Beneficiaries.  For the avoidance of doubt, notwithstanding anything to the contrary, all Cash at AlphaDebit (including, but not limited to, the $2.5 million held by AlphaDebit) shall be included in the Liquidating Trust Assets transferred to the Liquidating Trust on the Effective Date.

103.    "*Liquidating Trust Beneficiaries*" means all individuals and entities that are holders of an Allowed Unsecured Claim that are entitled to a Plan Distribution from the Liquidating Trust.

104.    "*Liquidating Trust Distribution Account*" means an account held by the Liquidating Trust to be used as a transactional account for all of the Liquidating Trust expenses and/or for purposes of providing Plan Distributions to the Liquidating Trust Beneficiaries.

105.    "*Liquidating Trust Documents*" means the Liquidating Trust Agreement, the identity and compensation of the Liquidating Trustee, and the affiliations, if any, that the Liquidating Trustee has with respect to the Debtors; the identity or method of appointment of the Liquidating Trust Oversight Committee, and the affiliations, if any, that the member of such Liquidating Trust Oversight Committee may have with respect to the Debtors, each of which shall be reasonably acceptable to (a) the Ad Hoc Group Majority and (b) the Debtors, solely with respect to matters, issues, or provisions that can reasonably be expected to impact the Debtors in any manner, whether before or after the Effective Date.

106.    "*Liquidating Trust Oversight Committee*" means that committee of up to four (4) members that the Liquidating Trust appoints by an Ad Hoc Group Majority the members of which Liquidating Trust Oversight Committee shall be identified in the Plan Supplement.

107.    "*Liquidating Trustee*" means the Person serving as trustee of the Liquidating Trust, the identity of whom shall be disclosed in the Plan Supplement.

108.    "*Mexican Affiliates*" means Alpha Holding, S.A. de C.V.; AlphaCredit Capital, S.A. de C.V., SOFOM, E.N.R.; Aeternam, S.A.P.I. de C.V.; Collect Broker, S.A.P.I. de C.V.; C Claro, S. de R.L. de C.V.; Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R.; Adelanto Express, S.A. de C.V., SOFOM, E.N.R.; Iyu Digital, S.A. de C.V.; Betacredit, S.A. de C.V., SOFOM, E.N.R.; Beta Planeación, S.A. de C.V.; Bontu Professional Services, S.A.P.I. de C.V.; AXS Servicios, S.A. de C.V.; RXN Broker's, S.A.P.I. de C.V.; Dispersora C Claro S.A. de C.V.; Alf Recursos, S.A.P.I. de C.V.; and Acercándonos, S.A.P.I. de C.V.

109.    "*Morgan Stanley Claims*" means the Claims arising under the Morgan Stanley Loan, which shall be Allowed against the Debtors (except for Debtors AlphaCredit Sudamérica, S. de R.L., AlphaDebit, and ALM) in the amount of $19,222,530.83 as of the Effective Date (which amount includes all interest accrued on such Claims through the Petition Date); *provided that* for purposes of receiving distributions under the Plan or from the Liquidating Trust, each holder of a Morgan Stanley Claim shall be entitled to assert the full Allowed amount of such Claim unless and until such Claim has been paid in full and for the avoidance of doubt, once such Claims have been paid in full from all available sources, they shall be deemed satisfied in full and entitled to no further distributions under the Plan; *provided further* that for purposes of determining whether such Claim has been paid in full, upon request by the Debtors or the Liquidating Trustee (as applicable), such holder must disclose payments received on account of such Claim from any source, including the Mexican Affiliates.

110.    "*Morgan Stanley Loan*" means that certain credit agreement dated December 18, 2020 (as amended from time to time) between Alpha Capital, as borrower, the guarantors thereto, and Morgan Stanley Senior Funding, Inc. as arranger and Wilmington Savings Fund Society, FSB as administrative agent.

111. "*Morgan Stanley Loan Agent*" means Wilmington Savings Fund Society, FSB, and any successor thereto, solely in its capacity as administrative agent under the Morgan Stanley Loan.

112. "*Non-Consenting Noteholders*" means those holders of the Notes or Notes Claims who are not Consenting Noteholders.

113. "*Non-Debtor Affiliates*" means any and all Affiliates of the Debtors which are not Debtors in these Chapter 11 Cases including, but not limited to, each of the Mexican Affiliates, Alpha Latam, L.P., Alpha Tech Partners, LLC, AlphaCredit Tech Partners, L.P., Clarum Capital, L.P., Axs Colombia, S.A.S., and Beta Credit de C.V.

114. "*Note Purchase Agreement*" means that certain Senior Secured Super-Priority Debtor-in-Possession Note Purchase Agreement dated as of August 4, 2021, by and among Alpha Capital and AlphaDebit, as borrowers, the other Debtors, as guarantors, the DIP Note Purchasers and the DIP Agent, as amended from time to time.

115. "*Notes*" means the 2022 Notes and the 2025 Notes.

116. "*Notes Claims*" means the 2022 Notes Claims and the 2025 Notes Claims.

117. "*Notes Indenture Trustee*" means The Bank of New York Mellon Trust Company, N.A., and any successor thereto, solely in its capacity as trustee, registrar, paying agent, and transfer agent under the Notes Indentures.

118. "*Notes Indenture Trustee Fees and Expenses*" means the Claims for reasonable and documented fees and expenses of the Notes Indenture Trustee, which shall include the reasonable and documented fees and expenses of the Notes Indenture Trustee's professionals, indemnities, compensation, costs, expenses, disbursements, advancements, and any other amounts due to the Notes Indenture Trustee under either or both of the Notes Indentures, incurred by the Notes Indenture prior to the Petition Date and through and including the Effective Date and/or after the Effective Date with respect to fees and expenses relating to post-Effective Date services or duties under the Plan.

119. "*Notes Indenture Trustee Reserve*" means $550,000 to be held by the Notes Indenture Trustee to pay its fees and expenses (including the fees and expenses of the Notes Indenture Trustee's professionals) relating to (i) insolvency or bankruptcy proceedings of any of the Mexican Affiliates, (ii) the Alpha Noteholder Claims Trust, or (iii) the exercise of any duties or obligations under the Notes Indentures (including, without limitation, in response to any direction under either or both of the Notes Indentures) from and after the Effective Date, which reserve shall be deducted from the initial distributions made to the holders of the Note Claims from the Cash in the Liquidating Trust.

120. "*Notes Indentures*" means the 2022 Notes Indenture and the 2025 Notes Indenture.

121. "*Other Unsecured Claim*" means an Unsecured Claim except for the Credit Suisse Claims, the Foreign Convenience Claims, the IDB Claims, the Morgan Stanley Claims, the Notes Claims, and the ResponsAbility Claims.

122. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

123. "*Petition Date*" means August 1, 2021, the date on which the Chapter 11 Cases were commenced.

124. "*Plan*" means this chapter 11 plan, either in its present form or as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

125. "*Plan Distribution*" means the payment or distribution under the Plan of Cash, Assets, securities, or instruments evidencing an obligation under the Plan to the holder of an AFPST Claim or to a Liquidating Trust Beneficiary, excluding, for the avoidance of doubt, Professional Fee Claims and Wind-Down Amounts.

126.    "*Plan Distribution Date*" means with respect to any Claim (a) if such Claim is Allowed on the Effective Date, a date that is as soon as reasonably practicable after the Effective Date, or (b) if such Claim is not Allowed on the Effective Date, a date that is as soon as reasonably practicable after the date such Claim becomes Allowed.

127.    "*Plan Documents*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court, including, without limitation, the Plan Supplement, the Disclosure Statement and the Confirmation Order.

128.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules), each of which shall be in form and substance (except where otherwise provided) reasonably acceptable to the Debtors and the DIP Agent (to the extent, by that time, the DIP Facility has not been paid in full), and an Ad Hoc Group Majority, including, but not limited to: the Liquidating Trust Documents; the Alpha Noteholder Claims Trust Documents; the Assumed Executory Contracts and Unexpired Leases Schedule; and the Wind-Down Budget.

129.    "*Preserved Estate Claims*" means all known and unknown Claims and Causes of Action of the Debtors (other than ALM and AlphaDebit) and the Privileged Materials (i) of any kind nature or description against any Person who is not a Released Party; (ii) against a Released Party arising from or related to (x) such Released Party's willful misconduct, intentional fraud, or intentional material misstatements or omissions, or (y)(1) the preparation or restatement of the 2018 and/or 2019 Financial Statements or any prior year's financial statements, (2) the audit of the 2018 and/or 2019 Financial Statements or any prior year's financial statements, (3) the Finance Matters, (4) the solicitation or acceptance of equity or debt financing (including, without limitation, the 2022 Notes and 2025 Notes) following the issuance of the 2018 and/or 2019 Financial Statements or any prior year's financial statements or any other false or materially misleading statements, or (5) any other matter, event or occurrence which was the subject of investigation by the Special Committee; *provided, that* any such Released Party who was not actively and substantially involved with the preparation of financial statements, the audit of financial statements (including, but not limited to, the accounting treatment of loans and reserves) or the solicitation of debt or equity shall be released from any Claim or Cause of Action referenced in this clause (y) to the extent that such Released Party did not know, or reasonably should not have known, of any material errors, omissions, or misstatements relating to the applicable financial statements, audits, solicitation or other matters referenced in this clause (y); or (iii) which otherwise may be asserted by a Debtor (other than ALM and AlphaDebit) against a Person who is not a Released Party; *provided however,* for the avoidance of doubt, that "Preserved Estate Claims" does not include any Claim or Cause of Action that was transferred to the Buyer in connection with the Sale; *provided further,* that "Preserved Estate Claims" do not include (a) any defenses or setoff rights of the Debtors with respect to any AFPST Claims or the holders of such Claims (but solely in that capacity and with respect to such Claims) or (b) any Claims or Causes of Action that may be asserted against Alan M. Cohen or Pablo Escalante (other than any Claim or Cause of Action described in clause (ii)(x) of this definition).

130.    "*Preserved Estate Claims Reserve*" means a reserve to be established by the Liquidating Trustee from the Liquidating Trust Assets in an amount to be determined by the Liquidating Trustee in consultation with the Liquidating Trust Oversight Committee to fund the investigation and potential prosecution of the Preserved Estate Claims.

131.    "*Preserved Indenture and Noteholder Claims*" means all direct known and unknown Claims and Causes of Action that may be asserted (a) on behalf of all holders of Notes Claims under either or both of the Notes Indentures or (b) by any record or beneficial holder of the Notes or the Notes Indenture Trustee, in either case, (i) against any Person who is not a Released Party or (ii) against a Released Party, arising from or relating to (x) such Released Party's willful misconduct, intentional fraud, or intentional material misstatements or omissions, or embezzlement or (y)(1) the preparation or restatement of the 2018 and/or 2019 Financial Statements or any prior year's financial statements, (2) the audit of the 2018 and/or 2019 Financial Statements or of any prior year's financial statements, (3) the Finance Matters, (4) the solicitation or acceptance of equity or debt financing (including, without limitation, the 2022 Notes and 2025 Notes) in reliance upon following the issuance of the 2018 and/or 2019 Financial Statements or any prior year's financial statements or any other false or materially misleading statements, or (5) any

11

other matter, event or occurrence which was the subject of investigation by the Special Committee; *provided that* any such Released Party who was not actively and substantially involved with the preparation of financial statements, the audit of financial statements (including, but not limited to, the accounting treatment of loans and reserves) or the solicitation of debt or equity shall be released from any Claim or Cause of Action referenced in this clause (y) to the extent that such Released Party did not know, or reasonably should not have known, of any material errors, omissions, or misstatements relating to the applicable financial statements, audits, solicitation or other matters referenced in this clause (y); *provided*, *further*, that "Preserved Indenture and Noteholder Claims" do not include any Claims or Causes of Action that may be asserted against Alan M. Cohen or Pablo Escalante (other than any Claim or Cause of Action described in clause (ii)(x) of this definition).

132.    "*Preserved Noteholder Claims*" means all Preserved Indenture and Noteholder Claims existing as of the Alpha Noteholder Claims Trust Distribution Record Date that (a) may be asserted directly by any record or beneficial holder of the Notes  as of the Alpha Noteholder Claims Trust Distribution Record Date without compliance or further compliance with Section 6.06 of the applicable Notes Indenture or (b) may be asserted thereafter directly by any record or beneficial holder of the Notes after compliance with Section 6.06 of the applicable Notes Indentures; provided, however, that "Preserved Noteholder Claims" do not include claims for the payment of principal, premium, if any, or interest on  the Notes and, provided, further however, that nothing in this definition of "Preserved Noteholder Claims" shall modify (i) any of the rights and obligations of the Notes Indenture Trustee, (ii) the right of a holder of Notes to assert any Claims or Cause of Action as contemplated under the terms of Section 6.06 of the applicable Notes Indenture, or (iii) the right of a holder of Notes Claims or the Notes Indenture Trustee to assert any claims against a Non-Debtor Affiliate for payment of the principal of and a premium, if any, or interest on a Note.

133.    "*Preserved Noteholder Claims Reserve*" means a reserve to be established by the Alpha Noteholder Claims Trust Trustee in an amount to be determined by the Alpha Noteholder Claims Trust Trustee in consultation with the Alpha Noteholder Claims Trust Oversight Committee, to fund the investigation and potential prosecution of the Preserved Noteholder Claims which constitute Alpha Noteholder Claims Trust Assets; *provided however*, no Assets of the Estate (including, for the avoidance of doubt, any portion of the Sale Consideration), other than the Plan Distributions that are made to holders of the Notes Claims from the Liquidating Trust Assets at their direction, shall be contributed to the Preserved Noteholder Claims Reserve.

134.    "*Priority Claim*" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Administrative Claims, Secured Claims, and Tax Claims.

135.    "*Priority Claim Reserve*" means the Cash reserve to be held in escrow by the Debtors (or their designee) to make Plan Distributions to holders of Allowed Priority Claims in an amount determined by the Debtors (subject to a Consultation Right for the Ad Hoc Group) sufficient to satisfy in full (i) all Allowed Priority Claims and (ii) the asserted amount of Disputed Priority Claims.

136.    "*Privileged Materials*" means any written, oral or electronic/digital communications, documents, writings, or any other material pertaining or relevant to the Preserved Estate Claims that contain attorney-client privilege or work product protection (or both as the case may be) as those terms are defined in Federal Rule of Evidence 502(g) or any other privilege available under applicable law of the Debtors (other than ALM, AlphaDebit and, for the avoidance of doubt, the Special Committee), which shall not include any Withheld Materials.

137.    "*Pro Rata Share*" means the proportion that an Allowed Claim in Classes 4a, 4b, or 4c bears to the aggregate amount of all Claims in Classes 4a, 4b, and 4c, *including* Disputed Claims, but *excluding* Disallowed Claims.

138.    "*Professional*" means a Person employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; *provided, however,* that Professionals shall include ordinary course Professionals that were retained pursuant to the *Order (I) Authorizing the Employment and Payment of Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief*, which was entered by the Bankruptcy Court on September 1, 2021 [D.I. 149] solely to the extent such ordinary course Professionals are required to file Fee Applications pursuant to such order.

139.    "*Professional Fee Claim*" means a Claim of a Professional for fees and expenses (including hourly, transaction, and success fees) for services rendered by such Professional in the Chapter 11 Case.

140.    "*Professional Fee Escrow*" means an interest-bearing escrow account held in escrow by the Debtors (or their designee, but not the Liquidating Trust) to hold an amount of Cash equal to the Professional Fee Escrow Amount solely for the purpose of paying all remaining Allowed and unpaid Professional Fee Claims.

141.    "*Professional Fee Escrow Amount*" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.B, subject to a Consultation Right for the Ad Hoc Group.

142.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

143.    "*Refund Escrow*" means the amount that has been earmarked and will be held in trust to pay the Refund Claims, as authorized by and defined in the *Final Order Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, Foreign Vendors, and Customers* [No. 143], and will be no more than $1,858,000.

144.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Equity Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

145.    "*Related Parties*" has the meaning set forth in the definition of "Released Party".

146.    "*Released Party*" means each of the following, in their capacity as such: (i) the Debtors; (ii) the current and former directors, officers, agents, members of management and other employees of the Debtors; (iii) the Special Committee and all current and former members of the Special Committee; (iv) the DIP Agent; (v) each DIP Note Purchaser; (vi) the Notes Indenture Trustee; (vii) each member of the Ad Hoc Group; (viii) the agents, attorneys, advisors and other professionals employed by the Debtors from and after March, 2021 in respect to work performed from and after March 2021 in connection with the Debtors; (ix) the predecessors, successors and assigns, subsidiaries, affiliates, members, partners, officers, directors, agents, attorneys, advisors, accountants, investment bankers, consultants, and other professionals (collectively, the "Related Parties") of any of the Persons listed in clauses (i)-(viii) above; *provided, that*, notwithstanding anything to the contrary in this Plan, (a) none of the Mexican Affiliates, any other Non-Debtor Affiliate, Deloitte or the Underwriters, or any of their respective Related Parties (in such Related Parties' capacity as such) shall be a Released Party, and (b) no Released Party or any other Person, entity or other party shall be released from any Preserved Estate Claims (including any Claims or Causes of Action held by ALM or AlphaDebit whose substance would otherwise qualify as a Preserved Estate Claim, as defined in this Plan), Preserved Indenture and Noteholder Claims, IDB Direct Claims, or ResponsAbility Direct Claims.

147.    "*Releasing Party*" means each of the following, in their capacity as such: (a) the DIP Note Purchasers; (b) the DIP Agent; (c) the Notes Indenture Trustee; (d) all holders of Claims and Equity Interests that are deemed to accept the Plan; (e) all holders of Claims (including, but not limited to, Notes Claims) and Equity Interests who vote to accept the Plan; (f) all holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (g) all holders of Claims and Equity Interests who vote to reject the Plan and who do not opt out of the releases provided by the Plan; and (h) with respect to each of the foregoing Persons listed in clauses (a) through (g), such Persons' current and former Affiliates' and such Persons' and such Affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers consultants, representatives, management companies, fund advisors and other professionals, *provided that* notwithstanding anything provided in this Plan, none of the Mexican Affiliates, any other Non-Debtor Affiliate or and any of their respective Related Parties in such Related Parties' capacity as such shall be Releasing Parties.

148.    "*ResponsAbility Claims*" means the Claims arising under the ResponsAbility Notes, which shall be Allowed against the Debtors (except for AlphaCredit Sudamérica, S. de R.L., AlphaCredit Latam S.A.S., AlphaDebit, and ALM) in the amount of $17,684,078.13 as of the Effective Date (which amount includes all interest accrued on such Claims through the Petition Date); *provided that* for purposes of receiving distributions under the Plan or from the Liquidating Trust, each holder of a ResponsAbility Claim shall be entitled to assert the full Allowed amount of

such Claim unless and until such Claim has been paid in full and for the avoidance of doubt, once such Claims have been paid in full from all available sources, they shall be deemed satisfied in full and entitled to no further distributions under the Plan; *provided further* that for purposes of determining whether such Claim has been paid in full, upon request by the Debtors or the Liquidating Trustee (as applicable), such holder must disclose payments received on account of such Claim from any source, including the Mexican Affiliates.

149.    "*ResponsAbility Direct Claims*" means all direct known and unknown Claims and Causes of Action that may be asserted by the ResponsAbility Noteholders (i) against any Person who is not a Released Party or (ii) against a Released Party, arising from or relating to (x) such Released Party's willful misconduct, intentional fraud, or intentional material misstatements or omissions, or embezzlement or (y)(1) the preparation or restatement of the 2018 and/or 2019 Financial Statements or any prior year's financial statements, (2) the audit of the 2018 and/or 2019 Financial Statements or of any prior year's financial statements, (3) the Finance Matters, (4) the solicitation or acceptance of equity or debt financing (including, without limitation, the ResponsAbility Notes) in reliance upon following the issuance of the 2018 and/or 2019 Financial Statements or any prior year's financial statements or any other false or materially misleading statements, or (5) any other matter, event or occurrence which was the subject of investigation by the Special Committee; *provided that* any such Released Party who was not actively and substantially involved with the preparation of financial statements, the audit of financial statements (including, but not limited to, the accounting treatment of loans and reserves) or the solicitation of debt or equity shall be released from any Claim or Cause of Action referenced in this clause (y) to the extent that such Released Party did not know, or reasonably should not have known, of any material errors, omissions, or misstatements relating to the applicable financial statements, audits, solicitation or other matters referenced in this clause (y); *provided, further*, that "ResponsAbility Direct Claims" do not include any Claims or Causes of Action that may be asserted against Alan M. Cohen or Pablo Escalante (other than any Claim or Cause of Action described in clause (ii)(x) of this definition).

150.    "*ResponsAbility Noteholders*" means the various noteholders all acting for the benefit of their sub-funds including (a) responsAbility SICAV (Lux) Micro and SME Finance Leaders, (b) responsAbility SICAV (Lux) Financial Inclusion Fund, (c) responsAbility Global Micro and SME Finance Fund, (d) responsAbility SICAV (Lux) Micro and SME Finance Debt Fund.

151.    "*ResponsAbility Notes*" means the two (2) issuances of four (4) unsecured promissory notes (for a total of eight (8) notes) dated December 20, 2019 and August 28, 2020, respectively, with the ResponsAbility Noteholders, guaranteed by certain of the Debtors.

152.    "*Sale*" means the sale of certain of the Assets of the Debtors, Alpha Capital and Vive Créditos Kusida S.A.S., to the Buyer under section 363 and 1123 of the Bankruptcy Code on the terms and conditions set forth in the Sale Documents, as contemplated by the Sale Order.

153.    "*Sale Consideration*" means the consideration received by the Debtors from the Buyer in the Sale.

154.    "*Sale Documents*" means the documents associated with the Sale.

155.    "*Sale Order*" means the *Order (I) Authorizing and Approving the Sale of Substantially all of the Assets of Certain of the Debtors Free and Clear of all Liens, Claims, Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contract and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief*, [D.I. 365] entered by the Bankruptcy Court on November 16, 2021.

156.    "*Schedules*" means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

157.    "*Secured Claim*" means a Claim, other than a DIP Claim and the Intercompany Secured Claim, that is: (a) secured by a Lien on any assets, which Lien is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in

the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) asserted against any Debtor that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) deemed or treated under the Plan as a Secured Claim.

158.    "*Secured Claim Reserve*" means the Cash reserve, if any, to be held in escrow by the Debtors (or their designee) to make Plan Distributions to holders of Allowed Secured Claims in an amount determined by the Debtors (subject to a Consultation Right for the Ad Hoc Group) sufficient to satisfy in full (i) all Allowed Secured Claims and (ii) the asserted amount of Disputed Secured Claims.

159.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

160.    "*Special Committee*" means the Special Committee of the Board of Managers of ALM, comprised of the non-management members of the Board of Managers of ALM and whose current and former members are Alan Cohen, James Southern, Rafael Somoza, Christopher Cooper, Patricia Menendez-Cambo, Paolo Passoni, and Carlos Medeiros. The Special Committee is tasked with, among other things, conducting an investigation into the accounting practices of the Debtors and their Non-Debtor Affiliates and related matters, and is advised by law firms Skadden, Arps, Slate, Meagher & Flom LLP, Nader, Hayaux y Goebel, S.C., and Stikeman Elliot LLP as its independent legal counsel and PricewaterhouseCoopers Advisory Services LLC as its independent forensic accountant. For the avoidance of doubt, references to the individual members of the Special Committee or the Special Committee as a body in the definition of "Released Party", "Exculpated Party" or elsewhere in this Plan shall refer solely to such individuals in their capacity as a member of such Special Committee in regards to their service on such Committee and not to their relationship with the Debtors in any other capacity including, but not limited to, as a member of the board of directors of any of the Debtors.

161.    "*Tax Claim*" means a Claim against any of the Debtors that is (a) of a kind specified in section 507(a)(8) of the Bankruptcy Code or (b) owed to a foreign governmental authority.

162.    "*Tax Claim Reserve*" means the Cash reserve, if any, to be held in escrow by the Debtors (or their designee) to make Plan Distributions to holders of Allowed Tax Claims in an amount determined by the Debtors (subject to a Consultation Right for the Ad Hoc Group) sufficient to satisfy in full (i) all Allowed Tax Claims and (ii) the asserted amount of Disputed Tax Claims.

163.    "*Underwriters*" means the parties that acted as underwriters or book runners with respect to the issuance of the 2022 Notes and 2025 Notes.

164.    "*Unexpired Lease*" means a lease to which any of the Debtors are a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

165.    "*Unimpaired*" means a Claim that is not "impaired" pursuant to section 1124 of the Bankruptcy Code.

166.    "*Unsecured Claim*" means any Claim against any of the Debtors other than an Administrative Claim, a Priority Claim, a Tax Claim, a Professional Fee Claim, a Secured Claim, a DIP Claim, or an Intercompany Claim.

167.    "*Voting Deadline*" means February 25, 2022 at 5:00 p.m. EST, or such date and time as may be set by an order of the Bankruptcy Court.

168.    "*Wind-Down Amounts*" means the Cash, in an amount determined by the Debtors (subject to a Consultation Right for the Ad Hoc Group), which shall be disclosed in the Plan Supplement and which shall be used to pay the types of disbursements set forth in, and in accordance with, the Wind-Down Budget, and that shall be funded, first, from Cash on hand of the Debtors, if any, and, second, from Cash from the Sale Consideration.

169.    "*Wind-Down Budget*" means the budget attached to the Plan Supplement and as determined by the Debtors (subject to a Consultation Right for the Ad Hoc Group) to provide for the payment of all of the costs and expenses required to wind-down the applicable liquidating Debtors and to fund such Debtors' liquidation in their respective local jurisdictions.

170.    "*Wind-Down Reserve*" means the Wind-Down Amount to be held in escrow by the Debtors (or their designee), which reserve shall be subject to, and consistent with, the Wind-Down Budget, *provided* that, after (i) the applicable Debtors are fully and completely wound down under the local law that applies to each such Debtor and (ii) the Debtors or the liquidator appointed for the purpose of liquidating the Debtors have determined, in their reasonable judgment, that the liquidation of the applicable Debtor is complete and no obligations remain unsatisfied, any remaining Cash in such reserve shall be transferred to the Liquidating Trust Distribution Account.

171.    "*Withheld Materials*" means written, oral or electronic/digital communications, documents, writings, or any other materials subject to (i) common interest and/or joint privilege between the Debtors (including the Special Committee) and their Mexican Affiliates, (ii) privilege of the Mexican Affiliates, or (iii) any other privileges not solely held by the Debtors (other than ALM and AlphaDebit), which shall be determined by the Mexican Affiliates (or their designated counsel) at the expense of the Liquidating Trust at such time the Liquidating Trust requests the transfer of any written, oral or electronic/digital communications, documents, writings, or any other material under this agreement.

B.    *Interpretation*

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of or exhibit to the Plan, as the same may be amended, waived or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

C.    *Headings*

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

D.    *Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.*

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan, unless a different definition is given in Article I.A or elsewhere in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

E.    *Other Terms*

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

F.    *Appendices and Plan Documents*

All appendices to the Plan and the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Except as otherwise provided herein, the Plan Supplement shall be filed with the Bankruptcy Court not less than seven (7) days prior to the Voting Deadline. Holders of Claims and Equity Interests may obtain a copy of the Plan Documents, once filed, at www.deb.uscourts.gov and cases.primeclerk.com/alphalatam, or by a written request sent to:

White & Case LLP
Attn: John K. Cunningham
Attn: Richard S. Kebrdle
Attn: Amanda Parra Criste
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
jcunningham@whitecase.com
rkebrdle@whitecase.com
aparracriste@whitecase.com

White & Case LLP
Attn: Philip M. Abelson
Attn: John J. Ramirez
Attn: Brett L. Bakemeyer
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
philip.abelson@whitecase.com
john.ramirez@whitecase.com
brett.bakemeyer@whitecase.com

G.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

A.    *Treatment of Administrative Claims*

All Administrative Claims shall be treated as follows:

1.    Time for Filing Administrative Claims

The holder of an Administrative Claim, other than (i) a Professional Fee Claim, (ii) a DIP Claim, or (iii) an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors and the Office of the United States Trustee, notice of such Administrative Claim within thirty (30) days following the Effective Date. Such notice must include, at a minimum, (i) the name of the holder of the Claim, (ii) the amount of the Claim, and (iii) the basis of the Claim. Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred.

2.    Allowance of Administrative Claims

An Administrative Claim (i) with respect to which, in the case of Administrative Claims that must be filed and noticed pursuant to Article II.A.1, notice has been timely and properly filed and served pursuant to Article II.A.1 or (ii) with respect to which, in the case of Claims under section 503(b)(9) of the Bankruptcy Code, a valid Proof of Claim has been filed prior to the General Bar Date, shall become an Allowed Administrative Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice

17

of Administrative Claim or (iii) such later date as may be (A) agreed to by the holder of such Administrative Claim or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

3.    Payment of Allowed Administrative Claims

On the Plan Distribution Date, each holder of an Allowed Administrative Claim, shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; *provided*, that: (x) such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; (y) an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business at any time prior to the occurrence of the Effective Date; and (z) after all Allowed Administrative Claims have been paid in full and there are no Disputed Administrative Claims, any remaining Cash in the Administrative Claim Reserve shall be transferred to the Liquidating Trust Distribution Account unless the Debtors obtain approval from the Bankruptcy Court for such amounts to be transferred to the Wind-Down Reserve.

B.    *Professional Compensation*

1.    Professional Fee Escrow.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow. The Debtors shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow shall be funded no later than the Effective Date and maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Liquidating Trust; *provided* that after all Allowed Professional Fee Claims have been paid in full and there are no Disputed Professional Fee Claims, any remaining Cash in such reserve shall be transferred to the Liquidating Trust Distribution Account unless the Debtors obtain approval from the Bankruptcy Court for such amounts to be transferred to the Wind-Down Reserve.

As agreed, the Professional Fees to be paid to the Debtors' and Ad Hoc Groups' respective Professionals (i.e., (i) in the case of the Debtors, White & Case, Alix Partners, Rothschild, and Skadden Arps, and (ii) in the case of the Ad Hoc Group, Brown Rudnick and Houlihan Lokey/Blink) will be reduced by a total of $500,000 in the aggregate through a pro rata reduction for each such Professional (based on the total fees of each such Professional incurred during these Chapter 11 Cases as the numerator and the total fees of all such Professionals incurred during these Chapter 11 Cases in the aggregate as the denominator (with the numerator and denominator determined as of the Effective Date with any fees that have not been formally submitted or filed, as reasonably estimated by each such Professional)).

2.    Time for Filing Professional Fee Claims

Each Professional who holds or asserts a Professional Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date. The failure to timely file and serve such Fee Application shall result in the Professional Fee Claim being forever barred.

3.    Estimation of Fees and Expenses,

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Professionals shall estimate their Professional Fee Claims before and as of the Effective Date and shall deliver such estimate to the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the

Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

4.      Ad Hoc Group Fees and Expenses.

On the Effective Date, (i) the Debtors shall pay in Cash all unpaid reasonable and documented fees and expenses provided for under the Final DIP Order and (ii) without duplication, the Debtors (other than ALM and AlphaDebit) shall pay in Cash all Ad Hoc Group Fees and Expenses, in each of clauses (i) and (ii) without any requirement for (1) application to or approval of the Bankruptcy Court, or (2) the provision of itemized time details.

5.      Professionals' Fees and Expenses.

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court. Except as otherwise specifically provided in or otherwise limited by the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors up to the Effective Date, *however*, until the Plan's Effective Date, White & Case LLP shall provide notice of their monthly invoices (redacted for privilege and confidentiality) to Brown Rudnick LLP, as counsel to the Ad Hoc Group.

The Debtors and the Ad Hoc Group shall agree on a mutually acceptable procedure to review Colombian VAT payments made or to be made in respect to the Debtors' Professional Fee Claims.

On the Effective Date, the Debtors (other than ALM and AlphaDebit) shall pay in Cash the Notes Indenture Trustee Fees and Expenses up to $300,000, documented by summary invoice, all reasonable and documented unpaid fees and expenses of the DIP Agent that are required to be paid under the DIP Documents (if any), and all Ad Hoc Group Fees and Expenses (if any) through the Effective Date, in each case, without any requirement for (1) application to or approval of the Bankruptcy Court, or (2) the provision of itemized time details. The Debtors (other than ALM and AlphaDebit) shall provide counsel to the Notes Indenture Trustee and the Ad Hoc Group with five (5) Business Days advance notice of the Effective Date, and the Notes Indenture Trustee shall provide summary invoices to the Debtors two (2) Business Days prior to the Effective Date (subject to redaction to preserve attorney-client privilege). From and after the Effective Date, the Liquidating Trust shall pay in Cash all reasonable and documented fees and expenses of the Notes Indenture Trustee, incurred in connection with distributions made pursuant to the Plan or the cancellation and discharge of the Notes or the Notes Indentures, without any requirement for (1) application or approval of the Bankruptcy Court; or (2) the provision of itemized time details, and without reduction to recoveries on account of any of the Notes Claims. For the avoidance of doubt, nothing herein affects the Notes Indenture Trustee's rights to exercise its Charging Lien against distributions on account of the Notes Claims with respect to any unpaid Notes Indenture Trustee Fees and Expenses, and all such abilities are expressly preserved.

If the Debtors or the Liquidating Trustee dispute any requested fees and expenses of the Notes Indenture Trustee, the Ad Hoc Group, or the DIP Agent, the Debtors or the Liquidating Trustee, as applicable, shall (1) pay the undisputed portion of such fees and expenses and (2) notify the Notes Indenture Trustee, the Ad Hoc Group, or the DIP Agent, as applicable, of such dispute within five (5) Business Days after presentment of the summary invoices by the Notes Indenture Trustee or DIP Agent, as applicable. Upon such notification, the Notes Indenture Trustee, the Ad Hoc Group, or DIP Agent may submit such dispute for resolution by the Bankruptcy Court; *provided*, *however*, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the Notes Indenture or DIP Documents, as applicable. Nothing herein shall in any way affect or diminish the right of the Notes Indenture Trustee to exercise its Charging Lien against distributions on account of the Notes Claims with respect to any unpaid Notes Indenture Trustee Fees and Expenses, and all such abilities are hereby expressly preserved. For the avoidance of doubt, the Notes Indenture Trustee may assert its Charging Lien to pay any disputed portion of its Notes Indenture Trustee Fees and Expenses.

C.    *Allowance and Payment of DIP Claims*

The DIP Claims shall be Allowed in full on the Effective Date and the DIP Note Purchasers shall receive on the Plan Distribution Date (to be distributed among the DIP Note Purchasers in accordance with the DIP Documents), Cash in full satisfaction of their Allowed DIP Claims, to the extent not already satisfied.

D.    *Treatment of Tax Claims*

At the election of the Debtors, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim: (a) payment in Cash of the Allowed amount of such Claim over five (5) years, pursuant to section 1129(a)(9)(c)(ii) of the Bankruptcy Code; (b) a one time payment in Cash of the Allowed amount of such Claim; or (c) such other treatment as may be agreed upon in writing by such holder (subject to a Consultation Right for the Ad Hoc Group); *provided that* such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim; *provided further* that after all Allowed Tax Claims have been paid in full and there are no Disputed Tax Claims, any remaining Cash in the Tax Claims Reserve shall be transferred to the Liquidating Trust Distribution Account unless the Debtors obtain approval from the Bankruptcy Court for such amounts to be transferred to the Wind-Down Reserve.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

For the purposes of organization, voting and all confirmation matters, *except* as otherwise provided herein, all Claims against and all Equity Interests in the Debtors shall be classified as set forth in this Article III.[2]

A.    *Summary of Classification*

The Plan groups the Debtors together solely for the purposes of describing treatment under the Plan, confirmation of the Plan, and making distributions in accordance with the Plan in respect of Claims against, and Equity Interests in the Debtors under the Plan. Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised upon, and will not cause, the substantive consolidation of any of the Debtors. Notwithstanding the foregoing, in recognition of the fact that the majority of the Debtors are jointly and severally liable on all of the Funded Debt Claims and Note Claims, for purposes of distributing the beneficial interests in the Liquidating Trust pursuant to this Plan, the holders of Funded Debt Claims and Notes Claims shall each be deemed to hold a single Claim in the Allowed amounts listed herein, regardless of which Debtor such Claim is held against, so long as such Debtor is an obligor on such Claims. For brevity and convenience, the classification and treatment of Claims and Equity Interests have been arranged into one chart. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

The classes of Claims against and the Equity Interests in the Debtors shall be classified under the Plan as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Foreign Convenience Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

---

[2]    As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Claims shall not be classified under the Plan, and shall instead be treated separately as unclassified Claims on the terms set forth in Article II.

| 4a | Other Unsecured Claims | Impaired | Entitled to Vote |
|---|---|---|---|
| 4b | Notes Claims | Impaired | Entitled to Vote |
| 4c | Funded Debt Claims | Impaired | Entitled to Vote |
| 4d | Credit Suisse Claims | No Recovery | Not Entitled to Vote (Deemed to Reject) |
| 5 | Intercompany Claims | No Recovery | Not Entitled to Vote (Deemed to Reject) |
| 6 | Equity Interests | No Recovery | Not Entitled to Vote (Deemed to Reject) |
| 7 | ALM Equity | Reinstated | Not Entitled to Vote (Deemed to Accept) |

B.    *Treatment of Claims and Equity Interests*

The classes of Claims against the Debtors and Equity Interests in the Debtors shall be treated under the Plan as follows:

1.    Class 1 – Priority Claims

    a.    *Classification*:  Class 1 shall consist of all Priority Claims against the Debtors.

    b.    *Treatment*:  Each holder of an Allowed Priority Claim against the Debtors shall be Unimpaired under the Plan and, on the Plan Distribution Date, the holder of such Claim shall be paid in full and in Cash.

    c.    *Voting*:  Claims in Class 1 are Unimpaired under the Plan and are deemed to accept the Plan.

2.    Class 2 – Secured Claims

    a.    *Classification*:  Class 2 shall consist of all Secured Claims against the Debtors.

    b.    *Treatment*:  Each holder of an Allowed Secured Claim against the Debtors shall be Unimpaired under the Plan and, on the Plan Distribution Date, the holder of such Claim shall either be paid in full and in Cash or receive its collateral in full satisfaction of its Claim.

    c.    *Voting*:  Claims in Class 2 are Unimpaired under the Plan and are deemed to accept the Plan.

3.    Class 3 – Foreign Convenience Claims

    a.    *Classification*:   Class 3 shall consist of all Foreign Convenience Claims against the Debtors.

    b.    *Treatment*:  Except to the extent that a holder of a Foreign Convenience Claim agrees to a less favorable treatment, such holder shall receive, in full satisfaction of its Allowed Foreign Convenience Claim, Cash equal to 100% of the amount of such Allowed Foreign Convenience Claim on or as soon as practicable after the latest of (x) the Effective Date, (y) the date that such Foreign Convenience Claim becomes Allowed, and (z) a date agreed to by the Debtors and the holder of such Foreign Convenience Claim.

    c.      *Voting*:  Claims in Class 3 are Unimpaired under the Plan and are deemed to accept the Plan.

4.     <u>Class 4a – Other Unsecured Claims</u>

    a.      *Classification*:  Class 4a shall consist of all Other Unsecured Claims.

    b.      *Treatment*:  Each holder of an Allowed Other Unsecured Claim against the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed Other Unsecured Claim, its Pro Rata Share of the beneficial interest in the Liquidating Trust, entitling such holder to receive proceeds on account of such interests.

    c.      *Voting*:  Claims in Class 4a are Impaired and are entitled to vote on the Plan.

5.     <u>Class 4b – Notes Claims</u>

    a.      *Classification*:  Class 4b shall consist of all Notes Claims.

    b.      *Allowance*:  The Notes Claims shall be deemed Allowed in accordance with the definition of the 2022 Notes and 2025 Notes against the Debtors (except ALM and AlphaDebit).

    c.      *Treatment*:  Each holder of an Allowed Notes Claim against the applicable Debtors shall, subject to the Notes Indenture Trustee's Charging Lien and the funding of the Notes Indenture Trustee Mexican Proceeding Reserve, receive on the Plan Distribution Date, in full satisfaction of its Allowed Notes Claim, its Pro Rata Share of the beneficial interest in the Liquidating Trust, entitling such holder to receive proceeds on account of such interests.

    d.      *Voting*:  Claims in Class 4b are Impaired and are entitled to vote on the Plan.

6.     <u>Class 4c – Funded Debt Claims</u>

    a.      *Classification*:  Class 4c shall consist of all Funded Debt Claims.

    b.      *Allowance*.  The Funded Debt Claims shall be deemed Allowed against the Debtors in accordance with the definition of each applicable Funded Debt Claim (except for AlphaCredit Sudamérica, S. de R.L., AlphaDebit, and ALM).

    c.      *Treatment*:  Each holder of an Allowed Funded Debt Claim against the applicable Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed Funded Debt Claim, its Pro Rata Share of the beneficial interest in the Liquidating Trust, entitling such holder to receive proceeds on account of such interests.

    d.      *Voting*:  Claims in Class 4c are Impaired and are entitled to vote on the Plan.

7.     <u>Class 4d – Credit Suisse Claims</u>

    a.      *Classification*:  Class 4d shall consist of the Credit Suisse Claim.

    b.      *Allowance:*  The Credit Suisse Claims shall be deemed Allowed against Debtor, AlphaCapital Latam, S.A.S.

    c.      *Treatment*:  On the Effective Date, each holder of a Credit Suisse Claim shall receive, in full satisfaction of its Credit Suisse Claim, no distribution under the Plan on account of such Claim.

      d.      *Voting*:  Claims in Class 4d shall receive no recovery and are deemed to reject the Plan.

8.      <u>Class 5 – Intercompany Claims</u>

      a.      *Classification*:  Class 5 shall consist of all Intercompany Claims among Debtors.

      b.      *Treatment*:  On the Effective Date, all Intercompany Claims shall be cancelled and therefore not entitled to any Plan Distribution and shall not be entitled to vote on the Plan.

      c.      *Voting*:  Claims in Class 5 shall receive no recovery and are deemed to reject the Plan.

9.      <u>Class 6 – Equity Interests</u>

      a.      *Classification*:  Class 6 shall consist of all Equity Interests in the Debtors (other than ALM).

      b.      *Treatment*:  On the Effective Date, all Equity Interests in the Debtors (other than ALM) shall be Reinstated for administrative purposes only and, in any instance, shall receive no distribution under the Plan.

      c.      *Voting*:  Equity Interests in Class 6 shall receive no recovery and are deemed to reject the Plan.

10.      <u>Class 7 – ALM Equity</u>

      a.      *Classification*:  Class 7 shall consist of all the Equity Interests in ALM.

      b.      *Treatment*:  On the Effective Date, all Equity Interests in ALM will be Reinstated.

      c.      *Voting*:  Equity Interests in Class 7 are Unimpaired under the Plan and are deemed to accept the Plan.

C.      *Distributions on Account of Subordinated Claims*

      The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective distributions on account thereof take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim, other than the Notes Claims, in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding the foregoing, the Plan shall be without prejudice to the contractual, legal, or equitable subordination rights (if any) in favor of any holder of any Allowed Claim and any holder of any Allowed Claim (if any) subject to any such contractual, legal, or equitable subordination shall remit any distribution on account of such Claim to which such holder's Claim is subordinated in accordance with, and to the extent required under, any applicable contractual, legal, or equitable subordination obligation.

      To the extent any Allowed Claims that fall under Bankruptcy Code section 510(b) are asserted against the Debtors (which the Debtors do not believe any such Allowed Claims exist), such Claims: (i) shall be subordinated to all Allowed Claims; (ii) will not receive any recovery under the Plan; (iii) shall not be entitled to vote on the Plan; and (iv) shall receive a notice of non-voting status as an impaired party (if such Claim is Allowed before the Voting Deadline).

D.      *Separate Classification of Claims Generally*

      The Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Equity Interests set forth herein shall apply separately to each of the Debtors.  Any Class of Claims or Equity Interests that does not have

a holder of an Allowed Claim shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. For all purposes under the Plan, each Class will contain sub-Classes for each Debtor. Tabulation of votes accepting or rejecting the Plan shall be conducted on a Debtor-by-Debtor basis. Notwithstanding the foregoing, in recognition of the fact that the majority of the Debtors are jointly and severally liable on all of the Funded Debt Claims and Note Claims, for purposes of distributing the beneficial interests in the Liquidating Trust pursuant to this Plan, the holders of Funded Debt Claims and Note Claims shall each be deemed to hold a single Claim in the Allowed amounts listed herein, regardless of which Debtor such Claim is held against, so long as such Debtor is an obligor on such Claims.

E.      *Class Acceptance Requirement*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan. A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) of the Equity Interests in such Class that actually vote on the Plan.

F.      *Cramdown*

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a)(1) through (16) of the Bankruptcy Code, *except* subsection (8) thereof, then the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims and Equity Interests that is Impaired under, and has not accepted, the Plan.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *Sources of Consideration for Plan Distributions*

The Debtors or Liquidating Trustee, as applicable, shall provide Plan Distributions as follows:

1.      Cash and Vesting of Assets (other than the Liquidating Trust Assets)

On or before the Effective Date, the Debtors intend to effectuate and consummate the Sale. If not already fully satisfied by the Effective Date, the Debtors shall pay any DIP Claims from the Sale Consideration. The Debtors shall also use Cash on hand, if any, and then use the Cash from the Sale Consideration to fund the Applicable Reserves, the Professional Fee Escrow, and the Wind-Down Reserve. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all of the Debtors' Assets (including all interests, and rights related thereto) of each of the Debtors other than the Liquidating Trust Assets shall immediately vest in the Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests. All Claims, Liens, encumbrances, charges, and other interests against or in the Assets (other than the Liquidating Trust Assets) shall be deemed fully released as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.

2.      Contribution of Liquidating Trust Assets

On the Effective Date, the Debtors (other than AlphaDebit (except with respect to its interests in the Intercompany Secured Claim) or ALM) shall transfer one hundred percent (100%) of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, which Liquidating Trust Assets shall vest in the Liquidating Trust. On the Effective Date, subject to applicable local law, the Liquidating Trust shall be authorized to make distributions to the Liquidating Trust Beneficiaries in accordance with this Plan, the Confirmation Order, and the Liquidating Trust Agreement.

The Liquidating Trust shall be administered in accordance with the Liquidating Trust Agreement and shall have the standing and authority to enforce any obligations to it under the Plan; *provided* that the costs of administering the Liquidating Trust and all fees and expenses incurred by and on behalf of the Liquidating Trust shall be charged against the Liquidating Trust Assets subject to the terms of the Liquidating Trust Agreement. Notwithstanding anything in the Plan to the contrary, the Debtors shall have no obligation to provide any funds or financing to the Liquidating Trust, other than the obligation to contribute the Liquidating Trust Assets, and under no circumstances will the expenses of the Liquidating Trust be paid or reimbursed by the Debtors.

B.    *Preservation and Maintenance of Debtor Causes of Action*

1.    Maintenance of Causes of Action.

Except as otherwise provided in this Plan or the Confirmation Order, after the Effective Date, the Liquidating Trust shall automatically be deemed to have been vested with any and all rights to commence, pursue, litigate, or settle, as appropriate, any and all Preserved Estate Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Bankruptcy Court in connection with the Chapter 11 Cases. The Liquidating Trust as the successor in interest to the Debtors (other than ALM and AlphaDebit) and the Estates (other than ALM and AlphaDebit's Estates), may, in its sole and absolute discretion, and will have the exclusive right to, investigate, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any Preserved Estate Claims that have not been released pursuant to the terms of this Plan without notice to or approval from the Bankruptcy Court or the Debtors. The Liquidating Trust or its successor(s) may pursue such Preserved Estate Claims as appropriate in accordance with the best interests of the Liquidating Trust, or its successor(s) who hold such rights.

2.    Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Preserved Estate Claim against a holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order or by virtue of the allowance of such Claim hereunder), such Preserved Estate Claim is expressly preserved for later adjudication by the Liquidating Trust (including, without limitation, Causes of Action not specifically identified or of which the Debtors or their creditors who shall receive beneficial interests in the Liquidating Trust may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist, to the extent such Claims are not released by this Plan). Therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to such Preserved Estate Claims upon or after the entry of the Confirmation Order or the Effective Date of the Plan based on the Plan or the Confirmation Order, except where such Preserved Estate Claims have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order). Any Preserved Estate Claims shall be automatically deemed to have vested in and been transferred to the Liquidating Trust on the Effective Date for investigation and potential prosecution and adjudication by the Liquidating Trust. In addition, solely with respect to the Preserved Estate Claims, the Liquidating Trust shall have the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Person, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

C.    *Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust*

1.    Creation of Liquidating Trust

On the Effective Date, the Liquidating Trust shall be established for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Plan. The form of the Liquidating Trust Agreement shall be included in the Plan Supplement and approved pursuant to the Plan. The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement.

2.      Vesting of Liquidating Trust Assets

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code and subject to applicable law, all Liquidating Trust Assets (including all interests and rights related thereto), shall immediately vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests. All Claims, Liens, encumbrances, charges, and other interests against or in the Liquidating Trust Assets shall be deemed fully released as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.

3.      Transfer of Liquidating Trust Assets

On the Effective Date, other than as set forth in this Plan or the Confirmation Order and subject to applicable law, the Debtors (other than ALM and AlphaDebit) are authorized and directed to and shall be deemed to have irrevocably transferred, granted, assigned, conveyed, and delivered to the Liquidating Trust, for the benefit of the Liquidating Trust Beneficiaries, in the form thereof existing on such date, all of the Debtors' (other than ALM and AlphaDebit) and Estates' (other than ALM and AlphaDebit) right, title, and interest in and to all of the Liquidating Trust Assets free and clear of any and all Liens, Claims, encumbrances, and interests (legal, beneficial, or otherwise) of all other Persons and entities. Without limitation of the generality of the foregoing, the Liquidating Trust Assets to be transferred to such trust shall include the Preserved Estate Claims. The Debtors (other than ALM and AlphaDebit), the Liquidating Trustee, the Liquidating Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors (other than ALM and AlphaDebit) shall have no interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors (other than ALM and AlphaDebit) and their predecessors, successors, and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust in accordance with this Article IV.C of the Plan. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. For purposes of this paragraph only, the term "Debtors" shall also include only AlphaDebit's rights, title, and interests in the Intercompany Secured Claim and all Cash received by AlphaDebit and Alpha Capital as payment on the Intercompany Secured Claim prior to or on the Effective Date.

D.      *Corporate Action*

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Liquidating Trustee, as applicable, to take or cause to be taken, all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, (i) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (ii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan, and (iii) the execution, delivery, filing and/or recording of any contracts, agreements, instruments or other documents contemplated by the Plan Documents (or necessary or desirable to effectuate the transactions contemplated by the Plan Documents). On the Effective Date, the officers of the Debtors are authorized to do all things and to execute and deliver all agreements, documents, instruments, notices, and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtor.

E.      *Alf Recursos Escrow*

On the Effective Date, if applicable, AlphaDebit shall transfer or cause to be transferred the Alf Recursos Escrow to Alf Recursos or its designee.

26

F.      *Refund Escrow*

On and after the Effective Date, the Debtors shall maintain the Refund Escrow to be administered pursuant to Colombian law.

G.      *Contingent Local Claims Trust*

As soon as practicable after the Effective Date, the Debtors shall establish the Contingent Local Claims Trust under Colombian law and fund the amount specified in the definition of Contingent Local Claims Trust in this Plan.

H.      *Cancellation of Instruments*

Except as otherwise provided herein (including, but not limited to, in Article III.B), all Equity Interests in the Debtors (other than ALM) and any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed cancelled on the Effective Date; *provided that,* notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or Confirmation Order, or the occurrence of the Confirmation Date or the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the DIP Agent, or any other agent or trustee in respect of any of the Funded Debt Claims shall continue in effect solely for purposes of: (1) allowing the beneficial holders of such Claims to receive distributions as specified under the Plan; (2) allowing and preserving the rights of the DIP Agent, or any other of the aforementioned agents or trustees, as applicable, to make distributions as specified under the Plan on account of Allowed Claims, as applicable, including allowing the DIP Agent or any of the other aforementioned agents and trustees to submit invoices to the Debtors for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the DIP Documents or any other document or instrument evidencing or concerning the Funded Debt Claims; (3)  preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the DIP Agent against any person (including, without limitation, with respect to any indemnification or contribution from the respective holders of Allowed Claims under the DIP Documents, as applicable), or any exculpations of the DIP Agent, pursuant to and subject to the terms of the DIP Documents; (4) permitting the DIP Agent to appear in the Chapter 11 Cases or in any proceeding by the Bankruptcy Court or any other court, including to enforce the respective obligations owed to them under the Plan and to enforce any obligations owed to their respective beneficial holders of Claims under the Plan in accordance with the DIP Documents; and (5) permitting the DIP Agent to perform any functions that are necessary to effectuate the foregoing.

Except as otherwise set forth herein, the Notes Indentures shall terminate as of the Effective Date as to the Debtors and the Notes Indenture Trustee with regard to obligations thereunder related to the Debtors, except as necessary to (i) enforce the rights and Claims of the Notes Indenture Trustee on behalf of itself or holders of Notes Claims; (ii) allow the Notes Indenture Trustee to receive distributions under the Plan and to distribute them on account of the Preserved Estate Claims, Preserved Indenture and Noteholder Claims, and the Notes Claims (subject, in each case, to the Notes Indenture Trustee's Charging Lien) in accordance with the terms of the Notes Indentures and the Plan and allow the Notes Indenture Trustee, as a distribution agent under the Plan, to make Effective Date and post-Effective Date distributions (subject to the Notes Indenture Trustee's Charging Lien) or take such other action pursuant to the Plan on account of the Preserved Indenture and Noteholder Claims and the Notes Claims and to otherwise exercise its rights related to the interest of the holders of the Preserved Estate Claims,  Preserved Indenture and Noteholder Claims and the Notes Claims in accordance with the Plan; (iii) enforce and/or preserve any rights of the Notes Indenture Trustee as against any money or property distributable on account of the Preserved Estate Claims (solely to the extent it relates to any distributions of recoveries thereunder), Preserved Indenture and Noteholder Claims, and the Notes Claims; (iv) preserve the right of the Notes Indenture Trustee to exculpation from the Debtors pursuant and subject to the terms of the Notes Indentures; (v) preserve the right of the Notes Indenture Trustee to indemnification from the Plan Distributions and recoveries in respect of Preserved Estate Claims (solely to the extent it relates to any distributions of recoveries thereunder, if applicable), the Preserved Indenture and Noteholder Claims, and the Notes Claims, each pursuant to and subject to the terms of the Notes Indentures; (vi) preserve the Notes Indenture Trustee's rights to appear and be heard in the Chapter 11 Cases or in any other proceeding in the Bankruptcy Court, including but not limited to for the purpose of enforcing any obligations owed to the Notes Indenture Trustee under the Plan or Confirmation Order; and (vii) permit the Notes Indenture Trustee to perform any function necessary to effectuate or in furtherance of any of the foregoing.  Except for the foregoing, on and after the Effective Date, all duties and responsibilities of the Debtors and the Notes Indenture Trustee under the Notes Indentures, as related to the

27

Debtors, shall terminate and shall be fully discharged and released. Notwithstanding any other provision of this Plan or the Confirmation Order, (a) nothing herein shall terminate or otherwise affect the existence of, or the rights and obligations under, the Notes Indentures with respect to the Non-Debtor Affiliates or any other non-Debtor obligor under the Notes Indentures, and (b) the Notes Indentures shall continue for all purposes with respect to any of the Non-Debtor Affiliates or any other non-Debtor obligor under the Notes Indentures, including, but subject to, insolvency, bankruptcy, or similar proceedings regarding the Non-Debtor Affiliates.

Solely as applied to the Alpha Noteholder Claims Trust and notwithstanding any other provision of this Plan or the Confirmation Order: (i) the Notes Indenture Trustee shall not be required to (a) expend or risk its own funds or otherwise incur financial liability in the performance or nonperformance of any act requested of it or in the exercise or non-exercise of its rights or powers or (b) perform or not perform any act if (1) the Notes Indenture Trustee reasonably believes that repayment of any funds is not assured to it, (2) the Notes Indenture Trustee is not provided with reasonably satisfactory indemnity and security against any risk of loss, expense (including reasonable attorneys' fees and expenses), or liability, or (3) the Notes Indenture Trustee shall have reasonably determined, or shall have been advised by counsel, that such action is likely to result in personal liability on the part of the Notes Indenture Trustee or is contrary to the terms of any agreement to which the Notes Indenture Trustee is a party or is otherwise contrary to applicable law; (ii) the Notes Indenture Trustee may require a certificate of the Alpha Noteholder Claims Trust Trustee and an opinion of counsel from counsel for the Alpha Noteholder Claims Trust before the Notes Indenture Trustee acts or refrains from acting; (iii) the Notes Indenture Trustee shall not be liable for any action it takes or omits to take in good faith reliance on any such certificate of the Alpha Noteholder Claims Trust Trustee or opinion of counsel; (iv) the Notes Indenture Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care; (v) the Notes Indenture Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or requested by the Alpha Noteholder Claims Trust Trustee; (vi) the Notes Indenture Trustee may consult with counsel of its selection, and the advice or opinion of counsel with respect to legal matters relating to Alpha Noteholder Claims Trust shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel; (vii) in no event shall the Notes Indenture Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Notes Indenture Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action; (viii) the permissive rights of the Notes Indenture Trustee under the Alpha Noteholder Claims Trust Agreement shall not be construed as duties; (ix) the Notes Indenture Trustee may rely on any document reasonably believed by it to be genuine and to have been signed or presented by the proper person, and the Notes Indenture Trustee need not investigate any fact or matter stated in such document; (x) the Notes Indenture Trustee shall not be liable for any action it takes or omits in at the request of the Alpha Noteholder Claims Trust Trustee; (xi) if at any time the Notes Indenture Trustee is served with any arbitral, judicial or administrative order, judgment, award, decree, writ or other form of arbitral, judicial or administrative process which in any way affects the Alpha Noteholder Claims Trust or the Notes Indenture Trustee (including, but not limited to, orders of attachment or garnishment or other forms of levies or injunctions), it shall be authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate; and if the Notes Indenture Trustee complies with any such arbitral, judicial or administrative order, judgment, award, decree, writ or other form of arbitral, judicial or administrative process, the Notes Indenture Trustee shall not be liable to any of the parties hereto or to any other person or entity even though such order, judgment, award, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect (other than the Notes Indenture Trustee's gross negligence, willful misconduct or bad faith in execution of such compliance). The Notes Indenture Trustee may act or refrain acting unless the Consenting Noteholders hold more than fifty percent (50%) of the outstanding principal amount of each of the 2022 Notes Claims and the 2025 Notes Claims (separately considered), and the Alpha Notes Claim Trust Trustee shall furnish reasonable proof of such holdings to the Notes Indenture Trustee.

Except as otherwise set forth herein, the Morgan Stanley Loan shall terminate as of the Effective Date as to the Debtors and the Morgan Stanley Loan Agent with regard to obligations thereunder related to the Debtors, except as necessary to (i) enforce the rights and Claims of the Morgan Stanley Loan Agent under the Plan; (ii) allow the Morgan Stanley Loan Agent to receive distributions under the Plan and to distribute them on account of the Morgan Stanley Claims in accordance with the terms of the Morgan Stanley Loan and the Plan and allow the Morgan Stanley Loan Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of the Morgan Stanley Claims and to otherwise exercise its rights in accordance with the Plan; (iii) enforce and/or preserve

any rights of the Morgan Stanley Loan Agent as against any money or property distributable under the Plan on account of the Morgan Stanley Claims; (iv) preserve the right of the Morgan Stanley Loan Agent to indemnification from the Plan Distributions, pursuant to and subject to the terms of the Morgan Stanley Loan; (v) preserve the Morgan Stanley Loan Agent's rights to appear and be heard in the Chapter 11 Cases or in any other proceeding in the Bankruptcy Court, including but not limited to for the purpose of enforcing any obligations owed to the Morgan Stanley Loan Agent under the Plan or Confirmation Order; and (vi) permit the Morgan Stanley Loan Agent to perform any function necessary to effectuate or in furtherance of any of the foregoing.  Except for the foregoing, on and after the Effective Date, all duties and responsibilities of the Debtors and the Morgan Stanley Loan Agent under the Morgan Stanley Loan, as related to the Debtors, shall terminate and shall be fully discharged and released.  Notwithstanding any other provision of this Plan or the Confirmation Order, (a) nothing herein shall terminate or otherwise affect the existence of, or the rights and obligations under, the Morgan Stanley Loan with respect to the Non-Debtor Affiliates or any other non-Debtor obligor under the Morgan Stanley Loan or any related instruments or documents, and (b) the Morgan Stanley Loan and all related instruments and documents shall continue for all purposes with respect to any insolvency, bankruptcy, or similar proceedings regarding the Mexican Affiliates and/or the Non-Debtor Affiliates.

I.      *Wind-Down and Wind-Down Budget*

On and after the Effective Date, in accordance with the Wind-Down Budget, the Debtors (except for ALM) shall (1) continue in existence solely for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible pursuant to applicable local law, (b) paying the Professional Fee Claims, (c) filing appropriate tax returns, (d) complying with their continuing obligations under the Sale Documents (if applicable), (e) administering the Refund Escrow; (f) administering the Allowed AFPST Claims; (g) disputing the Disputed AFPST Claims; and (h) administering the Plan in an efficacious manner; and (2) liquidate or dissolve, as applicable, pursuant to applicable local law.  The Debtors shall have the power and authority to take any actions necessary to wind-down the affairs of the Debtors; *provided, however,* that, without Bankruptcy Court approval, the Debtors shall not incur or make any expenditure or disbursement which is not contemplated by or which would be in excess of the amounts included in the Wind-Down Budget or which would cause the aggregate of such expenditures and disbursements to exceed the Wind-Down Amount.

On the Effective Date, the Debtors shall retain the Sale Consideration or, if applicable, Cash in an amount equal to the Wind-Down Amount (inclusive of the Professional Fee Escrow) in accordance with the terms of the Wind-Down Budget to facilitate the liquidation and/or dissolution of the respective Debtors under local law.  Any remaining amounts of Cash in the Wind-Down Reserve following all required distributions therefrom in accordance with the terms of the Wind-Down Budget shall promptly be transferred to the Liquidating Trust Distribution Account in accordance with the terms of the Plan and the Wind-Down Budget.

The Debtors shall make all distributions on account of the Allowed Professional Fee Claims, Allowed AFPST Claims, and Wind-Down Amounts in accordance with the Plan and the Wind-Down Budget.  In the event an Allowed Professional Fee Claim, AFPST Claim, or Wind-Down Amount shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due.

J.      *Employee Matters*

Notwithstanding any other provision hereof, the Debtors will continue their obligations under applicable law to continue paying their employees or former employees pursuant to such applicable law.  For the avoidance of doubt, the Liquidating Trust is not assuming any obligation to pay any of the Debtors' employees for services performed after the Effective Date.

**ARTICLE V.**
**THE LIQUIDATING TRUST**

This Article V sets forth certain of the rights, duties and obligations of the Liquidating Trustee.  In the event of any conflict between the terms of this Article V and the terms of the Liquidating Trust Agreement, the terms of the Plan shall govern.

A.    *Purpose of Liquidating Trust*

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business.  The Liquidating Trust shall be governed by the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  For United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries, followed by (2) the contribution of such assets to the Liquidating Trust in exchange for interests therein.  The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the primary purpose of receiving Liquidating Trust Assets and distributing any such assets pursuant to the Plan, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust, and without effect to its status as a "liquidating trust" for United States federal income tax purposes.  In the event of any inconsistency between the Plan and the Liquidating Trust Agreement, the Plan shall control.

B.    *Governance of the Liquidating Trust*

On the Effective Date, the Liquidating Trust Oversight Committee shall be formed, and the Liquidating Trustee shall be appointed.  The Liquidating Trust Oversight Committee shall oversee the implementation and administration of the Liquidating Trust and the Plan.  Except as otherwise provided herein or in the Liquidating Trust Agreement, decisions of the Liquidating Trust Oversight Committee shall be made with the approval of its members.  As set forth in the Liquidating Trust Agreement, if the members of the Liquidating Trust Oversight Committee cannot agree on a course of action, the Liquidating Trustee shall be the deciding vote.  The Liquidating Trust Oversight Committee shall have the following rights, obligations and duties (subject to and, in each instance, in conformance with the terms of the Plan and the Confirmation Order and subject to the final terms and conditions of the Liquidating Trust Agreement):

1)    approve the Liquidating Trustee's selection of, as well as the terms governing the engagement of, professionals to be engaged by the Liquidating Trustee on behalf of the Liquidating Trust, who may have been previously engaged by the Debtors, and establish retainer terms, conditions and budgets;

2)    decide whether, when, and in what amounts Plan Distributions to holders of Funded Debt Claims, Notes Claims, and Other Unsecured Claims should be made, and direct the Liquidating Trustee (subject to the provisions of the Liquidating Trust Agreement) to make Plan Distributions to such holders;

3)    determine the appropriate amount of the Preserved Estate Claims Reserve;

4)    oversee, review, and guide the Liquidating Trustee on performance of its duties and its activities proposed and underway, as often as is necessary and appropriate to implement the provisions of the Plan that apply to the Liquidating Trust;

5)    articulate the Liquidating Trust Oversight Committee's position in the event the Liquidating Trustee brings a dispute with the Liquidating Trust Oversight Committee to the Bankruptcy Court for resolution, or the Liquidating Trust Oversight Committee concludes it should bring a dispute with the Liquidating Trustee to the Bankruptcy Court for resolution;

6)    direct the pursuit and litigation to conclusion or settlement of any Preserved Estate Claims transferred to the Liquidating Trust; and

7)        determine the manner in which any such litigation should be funded by the Liquidating Trust, including, but not limited to, whether to obtain litigation financing from a third party or certain holders of beneficial interests in the Liquidating Trust and the terms of any such financing.

Each member of the Liquidating Trust Oversight Committee shall be entitled to reasonable compensation in an amount to be set forth in the Plan Supplement and to the reimbursement of reasonable expenses incurred in the exercise of such member's duties as set forth herein.  Any disputes between and among the Liquidating Trust Oversight Committee, its members, or the Liquidating Trustee shall be resolved by the Bankruptcy Court, and the Liquidating Trustee shall bring any such dispute to the Bankruptcy Court for resolution if so, requested in writing by any of such parties in accordance with the Liquidating Trust Agreement.

Subject to any applicable law, the members of the Liquidating Trust Oversight Committee shall not be liable for any act done or omitted by any member in such capacity, while acting in good faith and in the exercise of business judgment.

Except as otherwise set forth in the Plan and to the extent permitted by applicable law, the members of the Liquidating Trust Oversight Committee, in the performance of their duties hereunder, shall be defended, held harmless and indemnified from time to time by the Liquidating Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which such members of the Liquidating Trust Oversight Committee may be subject by reason of such members' execution of duties pursuant to the discretion, power and authority conferred on such members of the Liquidating Trust Oversight Committee by the Plan or the Confirmation Order; *provided*, *however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the members of the Liquidating Trust Oversight Committee for any actions taken by such members which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Plan or the Confirmation Order. Satisfaction of any obligation of the Liquidating Trust arising pursuant to the terms of this Section shall be payable only from the assets of the Liquidating Trust, including, if available, any insurance maintained by the Liquidating Trust.  The indemnification provisions contained in this Section shall remain available to and be binding upon any future members of the Liquidating Trust Oversight Committee or the estate of any decedent.

No Causes of Action against any of the Released Parties which are being released pursuant to this Plan shall be investigated or pursued by the Liquidating Trustee, Debtors, or any other Releasing Party.

The Liquidating Trust shall be governed and administered by the Liquidating Trustee, subject to the supervision of the Liquidating Trust Oversight Committee, as provided under the Plan and the Liquidating Trust Agreement.  Notwithstanding anything to the contrary herein, the Liquidating Trust Oversight Committee shall act in furtherance of, and consistent with, the purpose of the Liquidating Trust and shall act in the best interests of the Liquidating Trust Beneficiaries.

C.        *Role of the Liquidating Trustee*

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, subject to the oversight of the Liquidating Trust Oversight Committee as provided herein, the Liquidating Trustee shall: (i) hold the assets of the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries; (ii) have the power and authority to hold, manage, sell, and distribute Cash or non-Cash assets of the Liquidating Trust obtained through the exercise of its power and authority in accordance with the Plan; (iii) have the power and authority to investigate, prosecute and resolve, in the name of the Debtors (other than ALM and AlphaDebit) and/or the name of the Liquidating Trustee, any Preserved Estate Claims and to enter into arrangements to fund such litigation with third parties and/or certain holders of beneficial interests in such Liquidating Trust on such terms as are determined to be reasonable and in the interest of the Liquidating Trust; (iv) have the power and authority to perform such other functions as are provided to the Liquidating Trust in the Plan; and (v) have the power and authority to administer the closure of the Chapter 11 Cases with the consent of the Debtors that have not been wound down and/or dissolved under local law.   The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and its assets. In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) and in accordance with the Plan. The Liquidating Trust's taxable income shall be allocated by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their book value) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.

As soon as possible after the Effective Date, the Liquidating Trustee shall make (or cause to be made) a good faith valuation of the assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for United States federal income tax purposes.  The Notes Indenture Trustee shall have no tax reporting obligations relating to the Liquidating Trust.

The Liquidating Trustee may be removed by the Liquidating Trust Oversight Committee with the unanimous consent of all of its members and with the approval of the Bankruptcy Court upon application for good cause shown. In the event of the resignation, removal, death or incapacity of the Liquidating Trustee, the Liquidating Trust Oversight Committee shall designate another Person to become the Liquidating Trustee and, thereupon, the successor Liquidating Trustee, without any further action, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Liquidating Trustee.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Liquidating Trustee, in the performance of his or her duties hereunder, shall be defended, held harmless and indemnified from time to time by the Liquidating Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which the Liquidating Trustee may be subject by reason of his or her execution of duties pursuant to the discretion, power and authority conferred on the Liquidating Trustee by the Plan or the Confirmation Order; *provided, however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the Liquidating Trustee for any actions taken by such members which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Plan or the Confirmation Order.  Satisfaction of any obligation of the Liquidating Trust arising pursuant to the terms of this Section shall be payable only from the assets of the Liquidating Trust, including, if available, any insurance maintained by the Liquidating Trust.  The indemnification provisions contained in this Section shall remain available to and be binding upon any future Liquidating Trustee or the estate of any decedent.

The identity of the Liquidating Trustee and members of the Liquidating Trust Oversight Committee shall be disclosed in the Plan Supplement prior to entry of the Confirmation Order on the docket of the Chapter 11 Cases.

D.      *Cash*

The Liquidating Trustee may (but shall not be required to) invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

E.      *Compensation of the Liquidating Trustee*

The Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings and as disclosed in the Plan Supplement.

F.      *Retention of Professionals by the Liquidating Trustee*

The Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval, but with the consent of the Liquidating Trust Oversight Committee.  The Liquidating Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

G.     *Noncertificated Liquidating Trust Interests*

The beneficial interests in the Liquidating Trust shall not be certificated, except as otherwise provided in the Liquidating Trust Agreement.  To the extent practicable under and not in violation of applicable securities and tax laws, the beneficial interests in the Liquidating Trust may be transferable on terms to be detailed in the Liquidating Trust Agreement.

H.     *Dissolution of the Liquidating Trust*

The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all assets of the Liquidating Trust have been liquidated and (ii) all distributions required to be made by the Liquidating Trustee under the Plan have been made, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidating Trust.

I.     *Securities Exempt*

The beneficial interests to be issued to the Liquidating Trust Beneficiaries under the Plan are not intended to be "securities" under applicable laws, but the Debtors do not represent or warrant that such interests shall not be securities or shall be entitled to exemption from registration under applicable securities laws.  If such interests constitute securities, the Debtors intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

**ARTICLE VI.**
**ALPHA NOTEHOLDER CLAIMS TRUST**

A.     *Formation of Alpha Noteholder Claims Trust*.

On the Effective Date, the Alpha Noteholder Claims Trust shall be created and the Alpha Noteholder Claims Trust Trustee (who may be the same Person as the Liquidating Trustee) shall be appointed.  The Alpha Noteholder Claims Trust shall be governed by the Alpha Noteholder Claims Trust Agreement under the oversight of the Alpha Noteholder Claims Trust Oversight Committee, which shall select and appoint the Alpha Noteholder Claims Trust Trustee, and if necessary, a replacement Alpha Noteholder Claims Trust Trustee, as shall be provided for in the Alpha Noteholder Claims Trust Agreement.  The form of Alpha Noteholder Claims Trust Agreement and the identities of the members of the Alpha Noteholder Claims Trust Oversight Committee and the anticipated Alpha Noteholder Claims Trust Trustee shall be included in the Plan Supplement.  The Alpha Noteholder Claims Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Alpha Noteholder Claim Trust as a grantor trust and the Alpha Noteholder Claims Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  The Alpha Noteholder Claims Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the purposes of (i) receiving, investigating, prosecuting, settling and ensuring the liquidation of the Preserved Noteholder Claims which constitute Alpha Noteholder Claims Trust Assets, in the sole discretion of the Alpha Noteholder Claims Trust Trustee and the Alpha Noteholder Claims Trust Oversight Committee and (ii) distributing any net Cash proceeds of such assets pursuant to the Plan, with no objective to continue or engage in the conduct of a trade or business.  In the event of any inconsistency between the Plan and the Alpha Noteholder Claims Trust Agreement (as such conflict relates to anything other than the establishment of the Alpha Noteholder Claims Trust), the Plan shall control.  For the avoidance of doubt, if the same Person(s) serve as trustee or on both oversight committees, their fees and expenses shall be appropriately allocated between them.

B.      *Alpha Noteholder Claims Trust Assets*.

At the time of formation of the Alpha Noteholder Claims Trust and subject to the terms of and solely in conformance with the Notes Indentures (as and to the extent applicable), Consenting Noteholders shall be deemed to have automatically contributed to the Alpha Noteholder Claims Trust all of their Preserved Noteholder Claims in exchange for beneficial interests therein simultaneously issued to each Consenting Noteholder, *pro rata*, in proportion to the amount of the Notes Claims held at such time by such Consenting Noteholder.  Thereafter, the Alpha Noteholder Claims Trust, acting through the Alpha Noteholder Claims Trust Trustee under the oversight of the Alpha Noteholder Claims Trust Oversight Committee, shall have the exclusive right to investigate, prosecute, settle and resolve any of the Preserved Noteholder Claims which constitute Alpha Noteholder Claims Trust Assets.  Without limitation of the generality of the foregoing, the Preserved Noteholder Claims contributed to the Alpha Noteholder Claims Trust as set forth above shall include such Preserved Noteholder Claims and any and all privileges (including, but not limited to, attorney client privileges) belonging to the Consenting Noteholders in respect of the Preserved Noteholder Claims being contributed.  On the Effective Date, the Consenting Noteholders shall be deemed to have assigned any of their applicable privileges relating to the Preserved Indenture and Noteholder Claims to the Alpha Noteholder Claims Trust.  For the avoidance of doubt, Claims and Causes of Action held and assertable (i) solely by Non-Consenting Noteholders or (ii) by the Notes Indenture Trustee on behalf of all holders of Notes Claims, shall not be contributed to the Alpha Noteholder Claims Trust and shall remain the sole property of such Non-Consenting Noteholders or the Notes Indenture Trustee for the benefit of all holders of Notes Claims, as applicable.

For the avoidance of doubt, no Assets of the Estate (including Sale Consideration) shall be transferred to the Alpha Noteholder Claims Trust or become Alpha Noteholder Claims Trust Assets, other than the Plan Distributions from the Liquidating Trust Assets that are made to holders of the Notes, which may be transferred at such holder's direction.

C.      *Alpha Noteholder Claims Trust Trustee and Oversight Committee*.

In furtherance of and consistent with the purpose of the Alpha Noteholder Claims Trust and the Plan, subject to the oversight of the Alpha Noteholder Claims Trust Oversight Committee as provided herein, the Alpha Noteholder Claims Trust Trustee shall: (i) hold the assets of the Alpha Noteholder Claims Trust for the benefit of the Alpha Noteholder Claims Trust Beneficiaries; (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash assets of the Alpha Noteholder Claims Trust obtained through the exercise of its power and authority in accordance with the Plan and the Alpha Noteholder Claims Trust Agreement; (iii) have the power and authority to investigate, prosecute, settle and provide for the liquidation or abandonment of, in the name of the Alpha Noteholder Claims Trust and/or the name of the Alpha Noteholder Claims Trust Trustee, any Preserved Noteholder Claims which constitute Alpha Noteholder Claims Trust Assets and to enter into arrangements to fund such litigation with third parties and/or any of the Alpha Noteholder Claims Trust Beneficiaries on such terms as are determined to be reasonable and in the interest of the Alpha Noteholder Claims Trust; and (iv) have the power and authority to perform such other functions as are provided in the Plan or the Alpha Noteholder Claims Trust Agreement.  Alpha Noteholder Claims Trust shall be governed by the Alpha Noteholder Claims Trust Trustee and the Alpha Noteholder Claims Trust Oversight Committee.  The division of responsibilities and authority between such Alpha Noteholder Claims Trust Trustee and Alpha Noteholder Claims Trust Oversight Committee shall be set forth in the Alpha Noteholder Claims Trust Agreement but shall be substantially similar to that as between the Liquidating Trustee and the Liquidating Trust Oversight Committee.

Subject to any applicable law, the members of the Alpha Noteholder Claims Trust Oversight Committee shall not be liable for any act done or omitted by any member in such capacity, while acting in good faith and in the exercise of business judgment.

Except as otherwise set forth in the Plan and to the extent permitted by applicable law, the members of the Alpha Noteholder Claims Trust Oversight Committee and the Alpha Noteholder Claims Trust Trustee, in the performance of their duties hereunder, shall be defended, held harmless and indemnified from time to time by the Alpha Noteholder Claims Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which such members of the Alpha Noteholder Claims Trust Oversight Committee and/or the Alpha Noteholder Claims Trust Trustee may be subject by reason of such members' execution of duties pursuant to the discretion, power and authority conferred on such members of the Alpha Noteholder Claims Trust Oversight

Committee by the Plan or the Confirmation Order; *provided, however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the members of the Alpha Noteholder Claims Trust Oversight Committee or the Alpha Noteholder Claims Trust Trustee for any actions taken by such members which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Plan or the Confirmation Order. Satisfaction of any obligation of the Alpha Noteholder Claims Trust, including, if available, any insurance maintained by the Alpha Noteholder Claims Trust. The indemnification provisions contained in this Section shall remain available to and be binding upon any future members of the Alpha Noteholder Claims Trust Oversight Committee and the Alpha Noteholder Claims Trust Trustee or the estate of any decedent.

The Alpha Noteholder Claims Trust Trustee may be removed by the Alpha Noteholder Claims Trust Oversight Committee with the unanimous consent of all of its members and with the approval of the Bankruptcy Court upon application for good cause shown. In the event of the resignation, removal, death or incapacity of the Alpha Noteholder Claims Trust Trustee, the Alpha Noteholder Claims Trust Oversight Committee shall designate another Person to become the trustee of such Alpha Noteholder Claims Trust and, thereupon, the successor Alpha Noteholder Claims Trust Trustee, without any further action, shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Alpha Noteholder Claims Trust Trustee.

D.      *Beneficiaries: Distribution of Recoveries in Respect of Preserved Noteholder Claims and Preserved Indenture and Noteholder Claims*.

The initial Alpha Noteholder Claims Trust Beneficiaries shall be the Consenting Noteholders.

The Alpha Noteholder Claims Trust Beneficiaries shall receive their pro rata share of any recoveries arising out of Preserved Noteholder Claims which constitute Alpha Noteholder Claims Trust Assets as provided in the Alpha Noteholder Claims Trust Agreement.

Subject to the Notes Indenture Trustee's Charging Lien, all holders of Notes Claims shall receive their pro rata share of any recoveries arising out of Preserved Indenture and Noteholder Claims assertable, on behalf of all holders of Notes Claims, by the Notes Indenture Trustee under the Notes Indenture based on the aggregate principal amount of all Notes Claims. The Notes Indenture Trustee shall make the distribution to all holders of Notes Claims through the facilities of DTC. Prior to the Notes Indenture Trustee making such distribution, the Notes Indenture Trustee shall pay the Notes Indenture Trustee's Fees and Expenses then outstanding, including those relating to such distributions. The Notes Indenture Trustee shall have no liability for actions taken in accordance with the Plan or in reliance upon the information provided to it by or on behalf of the Alpha Noteholder Claims Trust.

E.      *Preserved Noteholder Claims Reserve*.

Funds in the Preserved Noteholder Claims Reserve shall be available to the Alpha Noteholder Claims Trust to pay fees and expenses (including, but not limited to, reasonable compensation to the Alpha Noteholder Claims Trust Trustee and members of the Alpha Noteholder Claims Trust Oversight Committee and the reasonable and documented fees and expenses of attorneys and other professionals retained by the Alpha Noteholder Claims Trust) in such amounts as may be determined by the Alpha Noteholder Claims Trust Trustee and Alpha Noteholder Claims Trust Oversight Committee.

F.      *Federal Income Tax Treatment of Alpha Noteholder Claims Trust*.

The Alpha Noteholder Claims Trust shall be established as a "grantor trust" for federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business. The Alpha Noteholder Claims Trust shall be governed by the Plan and the Alpha Noteholder Claims Trust Agreement. The Alpha Noteholder Claims Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Alpha Noteholder Claims Trust as a grantor trust and the Alpha Noteholder Claims Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes. The Alpha Noteholder Claims Trust Trustee shall file returns for the Alpha Noteholder Claims Trust as a grantor trust

pursuant to Treasury Regulations section 1.671-4(a) and in accordance with this Plan. The Notes Indenture Trustee shall have no tax reporting obligations relating to the Alpha Noteholder Claims Trust.

G.    *Cash*

The Alpha Noteholder Claims Trust Trustee may (but shall not be required to) invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; *provided, however*, that the Alpha Noteholder Claims Trust Trustee may not "vary the investments" of the Alpha Noteholder Claims Trust Beneficiaries within the meaning of Treasury Regulation Section 301.7701-4(c) or under applicable IRS guidelines, rulings, or other controlling authorities.

H.    *Compensation of the Alpha Noteholder Claims Trust Trustee and Oversight Committee*

The Alpha Noteholder Claims Trust Trustee and the members of the Alpha Noteholder Claims Trust Oversight Committee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings the terms of which shall be disclosed in the Plan Supplement.

I.    *Retention of Professionals by the Alpha Noteholder Claims Trust Trustee*

The Alpha Noteholder Claims Trust Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Alpha Noteholder Claims Trust Trustee on such terms as the Alpha Noteholder Claims Trust Trustee deems appropriate without Bankruptcy Court approval, but with the consent of the Alpha Noteholder Claims Trust Oversight Committee. The Alpha Noteholder Claims Trust Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases, and for the avoidance of doubt, if the same Person(s) serve as trustee or on both oversight committees, their fees and expenses shall be appropriately allocated between them. The Alpha Noteholder Claims Trust Trustee may enter into arrangements to fund litigation with third parties and/or certain holders of beneficial interests in the Liquidating Trust or the Alpha Noteholder Claims Trust on such terms as are determined to be reasonable and in the interest of the Alpha Noteholder Claims Trust.

J.    *Noncertificated Trust Interests*

The beneficial interests in the Alpha Noteholder Claims Trust shall not be certificated, except as otherwise provided in the Alpha Noteholder Claims Trust Agreement. To the extent practicable under and not in violation of applicable securities and tax laws, the beneficial interests in the Alpha Noteholder Claims Trust may be transferable on terms to be detailed in the Alpha Noteholder Claims Trust Agreement.

K.    *Securities Exempt*

The beneficial interests to be issued to the Alpha Noteholder Claims Trust Beneficiaries under the Plan are not intended to be "securities" under applicable laws, but the Debtors do not represent or warrant that such interests shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such interests constitute securities, the Debtors intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

**ARTICLE VII.**
**PLAN DISTRIBUTION PROVISIONS**

A.    *Plan Distributions*

The Liquidating Trustee shall make all Plan Distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement and the Debtors shall make all Plan Distributions to holders of the AFPST Claims from the Applicable Reserves or available Cash in accordance with the Plan and the Wind-Down Budget. All distributions on account of Preserved Noteholder Claims which constitute Alpha Noteholder Claims Trust Assets shall be made as provided in Article VI. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business

36

Day, but shall be deemed to have been made on the date otherwise due.  For federal income tax purposes, *except* to the extent a Plan Distribution is made in connection with Reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest and other fees, premiums and charges, as applicable.  Except as otherwise provided herein, Plan Distributions shall be made to the holders of Allowed Claims as reflected in the registry of Claims maintained by Prime Clerk, the Debtors' claims agent, on the Effective Date.[3]  Notwithstanding and without limitation of the generality of the foregoing, prior to the Effective Date, the Debtors shall determine the amount of the Applicable Reserves and before or after the Effective Date, the Debtors shall set aside Cash to fund such Applicable Reserves, *provided that* after all such obligations payable from the Applicable Reserves have been paid in full, any remaining Cash in such reserve shall be transferred to the Liquidating Trust Distribution Account unless the Debtors obtain approval from the Bankruptcy Court for such amounts to be transferred to the Wind-Down Reserve.  On the Effective Date, the Liquidating Trustee shall also distribute beneficial interests in the Liquidating Trust to the holders of Funded Debt Claims, Notes Claims, and any Other Unsecured Claims that constitute Allowed Claims as of such date and shall make further distributions of such beneficial interests to holders of any Other Unsecured Claims that have not become Allowed Claims as of the Effective Date, promptly after any of such Other Unsecured Claims have been Allowed.

B.      *Timing of Plan Distributions*

Each Plan Distribution shall be made on the relevant Plan Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

C.      *Address for Delivery of Plan Distributions/Unclaimed Plan Distributions*

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (i) in the Schedules, (ii) on the Proof of Claim filed by such holder, (iii) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (iv) in any notice served by such holder giving details of a change of address; *provided, however*, that with respect to syndicated bank debt or other similarly situated creditor groups, if requested by the agent bank, Plan Distributions may be made to the agent bank to forward to the participating banks in accordance with the applicable credit documents.

Plan Distributions to be made from the Liquidating Trust in respect of the Notes Claims shall be made to the Notes Indenture Trustee who shall thereafter, as a distribution agent under the Plan and subject to the Notes Indenture Trustee's Charging Lien, make distributions of the Cash received to the holders of the Notes in accordance with the applicable provisions of the Notes Indentures, respectively, and through the facilities of DTC.  In making distributions under the Plan, the Notes Indenture Trustee shall be deemed to be acting as a distribution agent under the Plan and shall only be required to act and make distributions in accordance with the terms of the Plan.  The Notes Indenture Trustee shall have no liability for actions taken in accordance with the Plan or in reliance upon the information provided to it by or for the Liquidating Trust.  To the extent the Notes Indenture Trustee provides services or incurs costs or expenses on or after the Effective Date, including attorneys' fees and expenses, related to or in connection with the Plan, the Confirmation Order, or the Notes Indentures, including without limitation, in connection with making distributions under the Plan to holders of Notes Claims, the Notes Indenture Trustee shall be entitled to receive from the Liquidating Trustee, without application to or approval of the Bankruptcy Court, payment, in Cash, as reasonable compensation for such services and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with such services.  Upon presentation of a summary invoice, payment of such compensation and expenses will be made as soon as reasonably practicable but in any case within five (5) days following the Notes Indenture Trustee's notification to the Liquidating Trustee of the amount of such fees and expenses.  Upon final administration of the distributions made to the Notes Indenture Trustee in accordance with the Plan and the Notes Indentures, the Notes Indenture Trustee shall be discharged from any further responsibility under the Plan.

Plan Distributions to be made from the Liquidating Trust in respect of the Morgan Stanley Claims shall be made to the Morgan Stanley Loan Agent who shall thereafter, as a distribution agent under the Plan, make distributions

---

[3] For the avoidance of doubt, no distribution record date shall apply to distributions to holders of Class 4B Notes Claims, which shall receive distributions in accordance with the applicable procedures of DTC.

of the Cash received to lenders under the Morgan Stanley Loan in accordance with the applicable provisions of the Morgan Stanley Loan.  In making distributions under the Plan, the Morgan Stanley Loan Agent shall be deemed to be acting as a distribution agent under the Plan and shall only be required to act and make distributions in accordance with the terms of the Plan. The Morgan Stanley Loan Agent shall have no liability for actions taken in accordance with the Plan or in reliance upon the information provided to it by or for the Liquidating Trust.  To the extent the Morgan Stanley Loan Agent provides services or incurs costs or expenses on or after the Effective Date, including attorneys' fees and expenses, related to or in connection with the Plan, the Confirmation Order, or the Morgan Stanley Loan, including without limitation, in connection with making distributions under the Plan to lenders under the Morgan Stanley Loan, the Morgan Stanley Loan Agent shall be entitled to receive from the Liquidating Trustee, without application to or approval of the Bankruptcy Court, payment, in Cash, as reasonable compensation for such services and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with such services.  Upon presentation of a summary invoice, payment of such compensation and expenses will be made as soon as reasonably practicable but in any case within five (5) days following the Morgan Stanley Loan Agent's notification to the Liquidating Trustee of the amount of such fees and expenses.  Upon final administration of the distributions made to the Morgan Stanley Loan Agent in accordance with the Plan and the Morgan Stanley Loan, the Morgan Stanley Loan Agent shall be discharged from any further responsibility under the Plan.

If any Plan Distribution is returned to the Liquidating Trustee as undeliverable, no Plan Distributions shall be made to such holder unless the Liquidating Trustee is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned.  After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the other holders of Allowed Claims in such holder's class shall receive a pro rata share of such undeliverable Plan Distribution, free of any restrictions thereon, pending final Plan Distribution pursuant to the terms of the Plan.

D.      *Time Bar to Cash Payments*

Checks issued in respect of Allowed Claims shall be null and void if not presented within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom such check was originally issued.  Any claim in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check.  If no request is made as provided in the preceding sentence, any claim in respect of such voided check shall be forever barred and the holders of Allowed Claims in such barred Claim's class shall receive a pro rata share of such the amount represented by such voided check.

E.      *Manner of Payment under the Plan*

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

F.      *Fractional Plan Distributions*

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars will be made.  Fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half dollar to be rounded down).

G.      *De Minimis Distributions*

Notwithstanding anything contrary contained herein, no Plan Distribution of less than ten dollars ($10.00) shall be made to the holder of any Claim unless a request therefor is made in writing to the Liquidating Trustee or the Debtors, as applicable.  If no request is made as provided in the preceding sentence within ninety (90) days of the Effective Date, all such Plan Distributions shall be added to and constitute a portion of the Wind-Down Reserve or the Liquidating Trust Assets, as applicable.

H.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors (or solely with respect to Funded Debt Claims, Notes Claims and Other Unsecured Claims, the Liquidating Trustee), as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Liquidating Trustee; *provided* that the Debtors or the Liquidating Trustee, as applicable, shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidating Trust on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors or Liquidating Trust to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Debtors or the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contract until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one (1) or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled by the Insurer), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide twenty-one (21) days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3.      Applicability of Insurance Contracts

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action under any Insurance Contract that the Debtors or any entity may hold against any other entity, including Insurers, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

**ARTICLE VIII.**
**PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS**

A.      *Objection Deadline*

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Debtors or the Liquidating Trustee (in consultation with each other), as applicable), (i) the Debtors or the Liquidating Trustee (in each case, in consultation with each other) may file objections, if any, to AFPST Claims and (ii) objections to Notes Claims, Funded Debt Claims, and Other Unsecured Claims may be filed by the Liquidating Trustee with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

B.      *Prosecution of Disputed Claims*

After the Effective Date, the Debtors (with respect to AFPST Claims) and the Liquidating Trustee (with respect to Notes Claims, Funded Debt Claims, and Other Unsecured Claims) may (i) prosecute objections to Claims filed prior to the Effective Date and (ii) object to the allowance of Claims, as applicable, filed with the Bankruptcy Court before, on or after the Effective Date with respect to which liability is Disputed (and when the Debtors are the objecting party, subject to a Consultation Right for the Liquidating Trustee).  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with this Plan.

C.      *Claims Settlement*

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, (i) with respect to any Notes Claims, Funded Debt Claims, or Other Unsecured Claims, the Liquidating Trustee, with the prior approval of the Liquidating Trust Oversight Committee in accordance with the Liquidating Trust Agreement, and (ii) subject to a Consultation Right for the Liquidating Trustee, the Debtors with respect to AFPST Claims shall have authority to settle or compromise such Claims and Causes of Action without further review or approval of the Bankruptcy Court.

D.      *Entitlement to Plan Distributions upon Allowance*

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim, subject to the setoff rights as provided in Article X.H.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

E.      *Estimation of Claims*

The Debtors (with respect to the AFPST Claims), subject to a Consultation Right for the Liquidating Trustee, or the Liquidating Trustee (with respect to a Notes Claims, Funded Debt Claims, and Other Unsecured Claims) may, at any time, request that the Bankruptcy Court estimate any respective Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, underlying during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**ARTICLE IX.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

1.      <u>Rejection of Executory Contracts and Unexpired Leases</u>

On the Effective Date, subject to a Consultation Right for the Ad Hoc Group, all Executory Contracts and Unexpired Leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code, *except*: (i) any Executory Contracts and Unexpired Leases that are the subject of separate motions to reject, assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order; (ii) contracts and leases listed in the Assumed Executory Contracts and Unexpired Leases Schedule, filed as an exhibit to the Plan Supplement, and any supplements thereto; (iii) all Executory Contracts and

Unexpired Leases assumed or assumed and assigned by order of the Bankruptcy Court entered before the Effective Date and not subsequently rejected pursuant to an order of the Bankruptcy Court; (iv) any Executory Contract or Unexpired Lease that is the subject of a dispute over the amount or manner of cure pursuant to Article IX.B below and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to the Debtors or to indemnify the Debtors; and (vi) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors. Any order entered post-confirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an Executory Contract or Unexpired Lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered pre-confirmation. The Debtors reserve the right  (subject to a Consultation Right for the Ad Hoc Group) to amend the Assumed Executory Contracts and Unexpired Leases Schedule.

2.    Effect of Rejection

Exclusion of a contract, lease or other agreement from the exceptions from Article IX.A.1 shall constitute adequate and sufficient notice (i) of any Claims arising thereunder or related thereto shall be treated as Other Unsecured Claims under the Plan, and (ii) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder. The Plan shall constitute a motion to reject such Executory Contracts and Unexpired Leases rejected pursuant to this section, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, Executory Contract or Unexpired Lease is burdensome, and that the rejection thereof is in the best interests of the Debtors and their Estates.

3.    Assumption and Assignment of Executory Contracts and Unexpired Leases

The Plan shall constitute a motion to assume or assume and assign such Executory Contracts and Unexpired Leases as set forth in the Assumed Executory Contracts and Unexpired Leases Schedule filed as an exhibit to the Plan Supplement or as otherwise designated as being assumed or assumed and assigned in Article IX.A.1 and the Debtors shall have no liability thereunder for any breach of such assumed and assigned Executory Contract or lease occurring after such assignment pursuant to section 365(k) of the Bankruptcy Code, *except* as is specifically provided in the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied. Any non-Debtor counterparty to an agreement listed on the Assumed Executory Contracts and Unexpired Leases Schedule or otherwise designated as being assumed or assumed and assigned in Article IX.A.1 who disputes the assumption or assignment of an Executory Contract or Unexpired Lease must file with the Bankruptcy Court, and serve upon the Debtors and the Liquidating Trustee (if appointed), a written objection to the assumption or assumption and assignment, which objection shall set forth the basis for the dispute by the later of (1) February 25, 2022, at 4:00 p.m. (Prevailing Eastern Time) or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contracts and Unexpired Leases Schedule after February 11, 2022, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contracts and Unexpired Leases Schedule. The failure to timely object shall be deemed a waiver of any and all objections to the assumption or assumption and assignment of Executory Contracts and Unexpired Leases as set forth in the Assumed Executory Contracts and Unexpired Leases Schedule filed as an exhibit to the as set forth in the Plan Supplement or as otherwise designated as being assumed or assumed and assigned in Article IX.A.1.

4.    Warranties

Notwithstanding the rejection of any of the Debtors' Executory Contracts under this Plan or by separate motion, the Debtors or the Liquidating Trustee, subject to a Consultation Right for the Ad Hoc Group, as applicable, shall retain and be entitled to enforce any warranties provided to, or for the benefit of, the Debtors under applicable federal or state law; *provided*, *however*, for the avoidance of doubt, that the foregoing does not include any warranties provided to, or for the benefit of, the Debtors pursuant to any contract that has been assumed and assigned by order entered by the Bankruptcy Court on or before the Effective Date.

B.      *Cure*

At the election of the Debtors, subject to a Consultation Right for the Ad Hoc Group, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (i) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (ii) on such other terms as agreed to by the parties to such Executory Contract or Unexpired Lease.  In the event of a dispute regarding: (x) the amount of any cure payments; (y) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assumed and assigned; or (z) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable.  The Assumed Executory Contracts and Unexpired Leases Schedule filed as an exhibit to the Plan Supplement sets forth the Debtors' cure obligations for each agreement for which a cure obligation must be satisfied as a condition to the assumption or assumption and assignment of such agreement.  Any non-Debtor counterparty to an agreement listed in the Assumed Executory Contracts and Unexpired Leases Schedule who disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by the later of (1) February 25, 2022, at 4:00 p.m. (Prevailing Eastern Time) or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contracts and Unexpired Leases Schedule after February 11, 2022, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contracts and Unexpired Leases Schedule.  If a non-Debtor counterparty fails to file and serve an objection that complies with the foregoing, the cure obligation set forth in the Plan Supplement shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption or assumption and assignment of the relevant agreement as proposed by the Debtors.

C.      *Claims Arising from Rejection, Expiration, or Termination*

Claims created by the rejection of Executory Contracts and Unexpired Leases or the expiration or termination of any Executory Contract or Unexpired Lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors, the Ad Hoc Group, and the Liquidating Trustee (i) in the case of an Executory Contract or Unexpired Lease rejected by the Debtors, subject to a Consultation Right for the Ad Hoc Group, prior to the Confirmation Date, in accordance with the General Bar Date Notice, or (ii) in the case of an Executory Contract or Unexpired Lease that (1) was terminated or expired by its terms prior to the Confirmation Date, or (2) is rejected pursuant to this Article IX no later than thirty (30) days after the Confirmation Date.  Any such Claims for which a Proof of Claim is not filed and served by the deadlines set forth in the General Bar Date Notice or this Article IX.C, as applicable, will be forever barred from assertion and shall not be enforceable against the Debtors, their Estates or their Assets.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as either a Foreign Convenience Claim or an Other Unsecured Claims under the Plan subject to objection by the Liquidating Trustee.

**ARTICLE X.**
**EFFECTS OF CONFIRMATION**

A.      *Releases by the Debtors*

**Except as otherwise provided herein, as of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions of the Released Parties to facilitate and implement this Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors and their Estates from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan Documents, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, or any other transaction relating to any security of the Debtors, the subject matter of, or the transactions or events**

**giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of this Plan, the DIP Documents, the Liquidating Trust Agreement, the solicitation of votes with respect to this Plan, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *however*, that nothing in this Section or any other provision of the Plan shall be construed to release any Person from willful misconduct, intentional material misstatements or omissions or intentional fraud (including, but not limited to, intentional falsehoods or embezzlement); and *provided further*, *however*, that the foregoing provisions of this release shall not operate to waive or release any Released Party from any of the Preserved Estate Claims, Preserved Indenture and Noteholder Claims, IDB Direct Claims, or ResponsAbility Direct Claims.  For the avoidance of doubt, the releases set forth above shall not operate to waive or release any post-Effective Date obligations of any party or Entity under the Plan, the Sale, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

B.    *Releases by Creditors and Equity Security Holders*

**Except as otherwise provided in the Plan, as of the Effective Date and to the fullest extent authorized by applicable law, each Releasing Party expressly, unconditionally, generally and individually and collectively releases, acquits and discharges the Debtors and Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any holder of any Claim against or Equity Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Releasing Party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, or any other transaction relating to any security of the Debtors, or any other transaction or other arrangement with the Debtors whether before or during the transactions or events giving rise to, any Claim or Equity Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors, on the one hand, and Released Parties, on the other hand, the restructuring of Claims and Equity Interests before or during the effectuation of the Plan, the negotiation, formulation or preparation of the Sale, Plan, the Plan Supplement, the Disclosure Statement or any related agreements, any asset purchase agreement, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Sale, Plan, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of the Confirmation Order, the pursuit of consummation of the Sale, the administration and implementation of the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Effective Date related or relating to any of the foregoing; *provided*, *however*, that nothing in this section or any other provision of the Plan shall be construed to release any Person from willful misconduct, intentional material misstatements or omissions or intentional fraud (including, but not limited to, intentional falsehoods or embezzlement); and; *provided further*, *however*, that the foregoing provisions of this release shall not operate to waive or release any Released Party from any of the Preserved Estate Claims, Preserved Indenture and Noteholder Claims, IDB Direct Claims, or ResponsAbility Direct Claims.  For the avoidance of doubt, the releases set forth above shall not operate to waive or release any post-Effective Date obligations of any party or Entity under the Plan, the Sale, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

C.    *Exculpation*

**Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any person for any Claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, related to, or arising out of, the administration of**

the Chapter 11 Cases, the entry into the DIP Documents and the DIP Facility (or the recovery by the DIP Agent and the DIP Note Purchasers in connection therewith), entry into the Liquidating Trust Agreement, the Debtors' entry into any asset purchase agreement during the Chapter 11 Cases, the consummation of any transactions and sales contemplated therein, the negotiation and pursuit of this Plan, or the solicitation of votes for, or confirmation of, this Plan, the funding of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, and the issuance of securities or beneficial interests under or in connection with this Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or intentional fraud as finally determined by a Final Order, but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to this Plan.  The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of securities thereunder. Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the foregoing provisions of this exculpation provision shall not operate to waive or release the rights of the Debtors or other parties in interest to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan and Plan Supplement or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.

D.     *Injunctions*

Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors or the Estates are, with respect to any such Claims or Equity Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates or any of their Assets, the Liquidating Trustee, the Buyer, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Estates or any of their Assets, the Liquidating Trustee, the Buyer, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Estates or any of their Assets, the Liquidating Trustee, the Buyer, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) commencing or continuing in any manner or in any place, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest, or remedy released or to be released pursuant to the Plan or the Confirmation Order, including, but not limited to, the releases and exculpations provided under Article X.A, Article X.B, and Article X.C, of the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the fullest extent permitted by applicable law; and (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; *provided, however*, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan. Each holder of an Allowed Claim or Allowed Equity Interest shall be deemed to have specifically consented to the injunctions set forth herein.  For the avoidance of doubt, the foregoing provisions of this Section shall not operate to waive or release the rights of the Debtors or other parties in interest to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan and Plan Supplement or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.

E.    *Satisfaction of Claims*

(a)    Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, the distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction of all Claims against the Debtors, and in satisfaction of all Equity Interests and the termination of Equity Interests in the Debtors.  Except as otherwise specifically provided in the Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled.  Accordingly, except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, satisfy, terminate and cancel all Claims against the Debtors and Equity Interests and other rights of equity security holders in the Debtors.

(b)    Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors, the Liquidating Trustee or their respective successors or property, any other or further Claims, debts, rights, Causes of Action, liabilities or Equity Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date.

(c)    No Person holding a Claim may receive any payment from, or seek recourse or recovery against, any Assets that are to be distributed under the Plan, other than Assets required to be distributed to that Person under the Plan.

F.    *Discharge and Release of Claims against ALM*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Plan shall discharge and release, effective as of the Effective Date, Claims and Causes of Action of any nature whatsoever, whether known or unknown, against, liabilities of, liens on, obligations of and rights against ALM or any of its assets or properties, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the occurrence of the Effective Date.

G.    *Compromise and Settlement of Claims and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Equity Interests and is fair, equitable, and is within the range of reasonableness. Subject to Article VII of the Plan, all distributions made to holders of Allowed Claims and Allowed Equity Interests in any Class are intended to be and shall be final.

H.    *Setoff Rights*

In the event that any Debtor, as applicable, has a Claim of any nature whatsoever against the holder of a AFPST Claim, then such Debtor, as applicable, may, but is not required to, setoff against the AFPST Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code.  In the event that the Liquidating Trustee has or is transferred a Claim of any nature whatsoever against the holder of an Other Unsecured Claim, a Notes Claim or a Funded Debt Claim, then the Liquidating Trustee may, but is not required to, setoff against the Other Unsecured Claim, Notes Claim or Funded Debt Claim, as applicable, (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Liquidating Trustee's Claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code.  Neither the failure to setoff nor the

allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor or the Liquidating Trustee, as applicable, may have against the holder of any Claim.

I.      *Third Party Agreements; Subordination*

The Plan Distributions to the various classes of Claims hereunder shall not affect the right of any Person to levy, garnish, attach or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise. All such rights and any agreements relating thereto shall remain in full force and effect, *except* as otherwise compromised and settled pursuant to the Plan.

Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Debtors or the Liquidating Trustee to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a subordinated Claim or subordinated Equity Interest.

**ARTICLE XI.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE**

A.      *Conditions Precedent to Confirmation*

The following are conditions precedent to confirmation of the Plan:

(1)      the Bankruptcy Court shall have entered an order or orders: (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) authorizing the solicitation of votes with respect to the Plan; (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (iv) confirming and giving effect to the terms and provisions of the Plan; (v) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan; (vi) approving the Plan Documents; and (vii) authorizing the Debtors to execute, enter into and deliver the Plan Documents, and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer of assets contemplated by the Plan and the Plan Documents; and

(2)      the Confirmation Order, the Plan Documents and the Plan shall each be in form and substance reasonably satisfactory to the Debtors, the DIP Agent (to the extent, by that time, the DIP Facility has not been paid in full) and the Ad Hoc Group advisors.

B.      *Conditions Precedent to the Occurrence of the Effective Date*

The following are conditions precedent to the occurrence of the Effective Date with respect to each of the Debtors' Estates:

(1)      the Confirmation Order shall be a Final Order and the Debtors, in consultation with the Ad Hoc Group and the DIP Agent (to the extent, by that time, the DIP Facility has not been paid in full), shall not have elected to delay the occurrence of the Effective Date with respect to such Estate in accordance with Article XI.E of the Plan;

(2)      the Sale shall have been consummated and the Debtors shall be in receipt of the Sale Consideration, and the appropriate portion of such Sale Consideration shall have been applied to repay the DIP Claims;

(3)      all reasonable and unpaid Notes Indenture Trustee Fees and Expenses up to $300,000 USD, as documented by summary invoice, all Ad Hoc Group Fees and Expenses, and all unpaid fees and expenses of the DIP Agent (if applicable), including their respective counsel's fees and expenses shall have been paid in full, in Cash, in accordance with Article II.B(4) of the Plan;

46

(4)     the Liquidating Trust shall have been formed and the Liquidating Trustee and the Liquidating Trust Oversight Committee shall each have been appointed;

(5)     no orders, decisions, or injunctions have been issued by a governmental unit prohibiting, modifying, or conditioning any transaction contemplated herein;

(6)     the Applicable Reserves, the Professional Fee Escrow, and the Wind-Down Reserve shall have been fully funded;

(7)     all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan and the Plan Documents, *including*, without limitation, satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents in accordance with Article X.C of the Plan; and

(8)     the Effective Date shall occur on or before April 8, 2022, which may be extended (i) if any necessary regulatory approvals in Colombia remain outstanding or (ii) with the reasonable consent of the Ad Hoc Group Majority.

C.     *Waiver of Conditions*

The Debtors, with the prior written consent of the DIP Agent (to the extent, by that time, the DIP Facility has not been paid in full) and with the reasonable consent of an Ad Hoc Group Majority, may waive any one or more of the conditions set forth in Article XI.A or Article XI.B without notice or order of the Bankruptcy Court and without notice to any other parties in interest; *provided that*, (i) the conditions set forth in Article XI.B(3) shall not be waivable without the prior written consent from the Ad Hoc Group or order of the Bankruptcy Court; (ii) the condition set forth in Article XI.B(8) shall not be waiveable except with the consent of the Ad Hoc Group Majority; and (iii) the condition set forth in Article XI.B(5) shall not be waiveable to the extent relating to an order, decision, or injunction imposed by Colombian authorities in the framework of the administrative control, measure and/or judicial liquidation process with respect to any Debtor organized in Colombia that is not waiveable.

D.     *Effect of Non-Occurrence of the Effective Date*

If the Effective Date shall not occur (except as provided in Article XI.E hereof), the Plan shall be null and void and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, *including*, without limitation, any right to seek an extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (iii) constitute an admission, acknowledgement, offer or undertaking by the Debtors.

E.     *Option to Delay Occurrence of the Effective Date*.

Notwithstanding anything in the Plan to the contrary, the Debtors reserve (with a Consultation Right to the Ad Hoc Group) the right to delay the occurrence of the Effective Date with respect to one or more of the Debtors' Estates to a later date; *provided*, *however*, that any such election by the Debtors to delay the occurrence of the Effective Date with respect to one Estate shall not prevent the occurrence of the Effective Date with respect to any of the other Estates.

F.     *Modification of the Plan*.

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, *provided that* the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. The Debtors may (with a Consultation Right to the Ad Hoc Group) modify the Plan at any time after the Confirmation Date and before substantial consummation, *provided that* the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  A holder

of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

G.    *Revocation of Plan*.

    The Debtors (with a Consultation Right to the Ad Hoc Group) reserve the right to revoke and withdraw the Plan and/or to adjourn the Confirmation Hearing prior to the occurrence of the Effective Date.  If the Debtors revoke or withdraw the Plan, or if the Effective Date does not occur, then the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in the Debtors or to prejudice in any manner the rights of the Debtors or any other Person in any other further proceedings involving the Debtors.

**ARTICLE XII.**
**RETENTION OF JURISDICTION**

    Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and subject to the last sentence in this Article XII, the Bankruptcy Court shall retain and shall have exclusive jurisdiction, except that the jurisdiction of the Bankruptcy Court in respect of matters concerning the Liquidating Trust and/or the Alpha Noteholders Claims Trust set forth in subparagraphs (2), (7), (9) or (13) shall be non-exclusive, over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

    1.    to hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article IX hereof for the assumption, assumption and assignment or rejection of Executory Contracts or Unexpired Leases to which any Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine any and all Claims and any related disputes (*including*, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination, or liquidation of any Executory Contract or Unexpired Lease);

    2.    to determine any and all adversary proceedings, applications, motions and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trustee or the Alpha Noteholder Claims Trust Trustee after the Effective Date, including, but not limited to, any adversary proceedings which the Liquidating Trustee may choose to bring in the Bankruptcy Court in respect to any of the Preserved Estate Claims and any adversary proceedings the Alpha Noteholder Claims Trust Trustee may choose to bring in the Bankruptcy Court in respect of any of the Preserved Noteholder Claims, *provided however*, that the jurisdiction of the Bankruptcy Court to hear and determine any such suits shall be non-exclusive, and for the avoidance of doubt, litigation in regards to such matters may be commenced by the Liquidating Trustee or the Alpha Noteholder Claims Trust Trustee in any court of competent jurisdiction;

    3.    to hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, *including*, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Disputed Claim in whole or in part;

    4.    to issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

    5.    to consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, *including*, without limitation, the Confirmation Order;

    6.    to hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

7.　　　　to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with the Plan Documents or their interpretation, implementation, enforcement or consummation (including as provided in Article V.B of this Plan, including, but not limited to, any disputes concerning the Liquidating Trust or between the trustee of either of such trusts and the oversight committee of either such trusts);

8.　　　　to hear and determine all controversies, suits and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

9.　　　　to the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of or against the Estates or any of the Preserved Estate Claims;

10.　　　　to determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan or the Confirmation Order;

11.　　　　to hear and determine matters concerning state, local and federal taxes, fines, penalties or additions to taxes for which the Debtors may be liable in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

12.　　　　to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

13.　　　　to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with Causes of Action of the Debtors (*including* Avoidance Actions and the Preserved Estate Claims) commenced by the Liquidating Trustee, the Debtors or any third parties, as applicable, before or after the Effective Date;

14.　　　　to enter an order or final decree closing the Chapter 11 Cases;

15.　　　　to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

16.　　　　to extend the initial stated terms of the Liquidating Trust in accordance with the provisions concerning such a potential extension in the applicable Trust Agreement; and

17.　　　　to hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

This Article XII shall not create, limit, or be deemed consent to either subject matter jurisdiction or personal jurisdiction beyond what would otherwise exist in absence of this Article.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.　　　*Payment of Statutory Fees.*

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.  All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors after the Effective Date until the Debtors provide notice to the Liquidating Trustee that the Chapter 11 Cases can be closed, and thereafter, if the Liquidating Trustee decides to keep any such cases open, by the Liquidating Trust.

B.       *Notices*.

Any notices, requests and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (*including*, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors:

>               Alpha Capital S.A.S.
>               Attention: Edgardo Mendoza
>               Carrera 14 No. 94-81
>               Bogota, Colombia
>               Facsimile:  +52 (55) 6378 2075

with a copy (which shall not constitute notice) to:

>               White & Case LLP
>               Attn: John K. Cunningham
>               Attn: Richard S. Kebrdle
>               Attn: Amanda A. Parra Criste
>               200 South Biscayne Boulevard, Suite 4900
>               Miami, FL 33131
>               Telephone: (305) 371-2700
>               jcunningham@whitecase.com
>               rkebrdle@whitecase.com
>               aparracriste@whitecase.com
>
>               White & Case LLP
>               Attn: Philip M. Abelson
>               Attn: John J. Ramirez
>               Attn: Brett L. Bakemeyer
>               1221 Avenue of the Americas
>               New York, NY 10020
>               Telephone: (212) 819-8200
>               philip.abelson@whitecase.com
>               john.ramirez@whitecase.com
>               brett.bakemeyer@whitecase.com
>
>               Brown Rudnick LLP
>               Attn: Jeffrey L. Jonas
>               Attn: Uriel Pinelo
>               Seven Times Square
>               New York, NY 10036
>               Telephone: (212) 209-4800
>               jjonas@brownrudnick.com
>               upinelo@brownrudnick.com
>
>               Brown Rudnick LLP
>               Attn: Steven B. Levine
>               Attn: Andrew P. Strehle
>               One Financial Center
>               Boston, MA 02111
>               Telephone: (617) 856-8200
>               slevine@brownrudnick.com
>               astrehle@brownrudnick.com

C.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (*including* the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents and instruments executed in connection with the Plan, *except* as otherwise expressly provided in such instruments, agreements or documents.

D.      *Exemption from Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, including the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.  Transfers made under the Plan include, without limitation, any transfer, sale, or exchange of the assets that is the subject of a motion or notice pursuant to section 363 of the Bankruptcy Code filed by the Debtors before the Effective Date regardless of the date the transaction is approved by the Court or the date such transfer, sale, or exchange closes.  To effectuate the terms of this Section, the Bankruptcy Court may enter any order necessary or appropriate to implement this provision of the Plan.

E.      *Notice of Entry of Confirmation Order and Relevant Dates.*

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, *including*, but not limited to, the deadline for filing notice of Administrative Claims, and the deadline for filing rejection damage Claims.

F.      *Compliance with Tax Requirements.*

In connection with the Plan, the Debtors and the Liquidating Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, *including* income, withholding, and other tax obligations, on account of such Plan Distribution.  The Debtors, or Liquidating Trustee, as applicable, have the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Debtors or the Liquidating Trustee, as applicable, for payment of any such tax obligations.

G.      *Rates.*

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.  Where a Claim has been denominated in foreign currency on a Proof of Claim, the Allowed amount of such Claim shall be calculated in legal tender of the United States based upon the conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

H.      *Binding Effect.*

The Plan shall be binding upon the Debtors, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the Alpha Noteholder Claims Trust Trustee, the Alpha Noteholder Claims Trust Oversight Committee, Notes Indenture Trustee, the holders of all Claims and Equity Interests, parties in interest, Persons, and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

I.      *Severability*.

In the event the Bankruptcy Court determines that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the Debtors may modify the Plan in accordance with Article XI.F so that such provision shall be not be applicable to the holder of any such Claim or Equity Interest or transaction.  Any such determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provision of the Plan or (ii) require the re-solicitation of any acceptance or rejection of the Plan.

J.      *No Admissions*.

As to contested matters, adversary proceedings and other Causes of Action or threatened Causes of Action, this Plan shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

March 15, 2022                          Alpha Latam Management, LLC (for itself and all Debtors)

                                        By:    */s/ Augusto Alvarez*
                                        Name:    Augusto Alvarez
                                        Title:    President